NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 14-5316

# In the United States Court of Appeals for the District of Columbia

**TRUE THE VOTE, INC.**,

*Plaintiff-Appellant*,

v.

**INTERNAL REVENUE SERVICE**, *et al.*

*Defendants-Appellees*,

On Appeal from the United States District Court for the District of Columbia

The Honorable Reggie B. Walton
United States District Court Judge
Case No. 1:13-cv-00734-RBW

**JOINT APPENDIX**

Cleta Mitchell
Michael J. Lockerby
FOLEY & LARDNER, LLP
Washington Harbour
3000 K Street, N.W., Suite 600
Washington, DC 20007
(202) 672-5300 (telephone)
(202) 672-5399 (fax)
mlockerby@foley.com
cmitchell@foley.com

Kaylan L. Phillips
Noel H. Johnson
PUBLIC INTEREST LEGAL FOUNDATION
209 West Main Street
Plainfield, IN 46168
(317) 203-5599 (telephone)
(888) 815-5641 (fax)
kphillips@publicinterestlegal.org
njohnson@publicinterestlegal.org

*Counsel for Plaintiff-Appellant (additional counsel listed inside front cover)*

*Additional Counsel for Plaintiff-Appellant:*

William E. Davis
Mathew D. Gutierrez
FOLEY & LARDNER, LLP
One Biscayne Tower
2 South Biscayne Boulevard
Suite 1900
Miami, FL 33131
(305) 482-8404 (telephone)
(305) 482-8600 (fax)
wdavis@foley.com
mgutierrez@foley.com

John C. Eastman
CENTER FOR CONST'L JURISPRUDENCE
c/o Chapman University Fowler
School of Law
One University Drive
Orange, CA 92866
(877) 855-3330 x2 (telephone)
(714) 844-4817 (fax)
jeastman@chapman.edu

JUDITH A. HAGLEY, ESQ.
U.S. DEPARTMENT OF
JUSTICE
Tax Division, Appellate Section
PO Box 502
Washington, DC 20044
appellate.Taxcivil@usdoj.gov
Direct: (202)514-8126
Fax: (202)514-8456

MARTIN VINCENT TOTARO,
ESQ.
SECURITIES AND
EXCHANGE COMMISSION
100 F Street, NE
Washington, DC 20549
totarom@sec.gov
Direct: (202)551-7962
Fax: (202)772-9260

JEFFREY ALAN LAMKEN
ERIC RICHARD NITZ
MOLO LAMKEN LLP
The Watergate
600 New Hampshire Ave., NW
Washington, DC 20037
jlamken@mololamken.com
enitz@mololamken.com
Direct: (202)556-2000
Fax: (202)556-2001

R. CRAIG LAWRENCE
U.S. ATTORNEY'S OFFICE
(USA) Civil Division
555 4th Street, NW
Washington, DC 20530
craig.lawrence@usdoj.gov
Direct: (202)252-2500

*Counsel for Defendants-Appellees*

# TABLE OF CONTENTS

District Court Docket ..................................................................JA-1

First Amended Complaint (Dkt. 14) ......................................JA-17

    Exhibit A to First Amended Complaint (Dkt. 14-1) ...................JA-66

    Exhibit B to First Amended Complaint (Dkt. 14-2) ....................JA-68

    Exhibit C to First Amended Complaint (Dkt. 14-3) ................. JA-108

    Exhibit D to First Amended Complaint (Dkt. 14-4) ................ JA-114

    Exhibit E to First Amended Complaint (Dkt. 14-5) ................. JA-125

    Exhibit F to First Amended Complaint (Dkt. 14-6) ................. JA-130

    Exhibit G to First Amended Complaint (Dkt. 14-7) ................ JA-185

    Exhibit H to First Amended Complaint (Dkt. 14-8) ................ JA-187

Order on Defendants' Motions to Dismiss and
Plaintiff's Motion to Stay Agency Action (Dkt. 102) ......................... JA-197

Memorandum Opinion re: Dkt. 102 (Dkt. 103) ................................... JA-199

Notice of Appeal (Dkt. 104) ............................................................ JA-222

APPEAL,CLOSED,TYPE−L

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:13−cv−00734−RBW

TRUE THE VOTE, INC. v. INTERNAL REVENUE SERVICE et al
Assigned to: Judge Reggie B. Walton
Demand: $85,000
 Case: 1:13−cv−00777−RBW
 Case in other court:  USCA, 14−05316
Cause: 26:7428 IRS: Declaratory Judgment

Date Filed: 05/21/2013
Date Terminated: 10/23/2014
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**TRUE THE VOTE, INC.**

represented by **Cleta Deatherage Mitchell**
FOLEY & LARDNER
3000 K Street, NW
6th Floor
Washington, DC 20007−5143
(202) 295−4081
Fax: (202) 672−5399
Email: cmitchell@foley.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John C. Eastman**
CENTER FOR CONSTITUTIONAL
JURISPRUDENCE
C/O Chapman University School of Law
One University Drive
Orange, CA 92866
(877) 855−3330 x2
Fax: (714) 844−4817
Email: jeastman@chapman.edu
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kaylan L. Phillips**
ACTRIGHT LEGAL FOUNDATION
209 West Main Street
Plainfield, IN 46168
(317) 203−5599
Fax: (888) 815−5641
Email: kphillips@publicinterestlegal.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Noel H. Johnson**
ACTRIGHT LEGAL FOUNDATION
209 West Main Street
Plainfield, IN 46168
(317) 203−5599
Fax: (888) 815−5641
Email: njohnson@actrightlegal.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mathew D. Gutierrez**
FOLEY & LARDNER LLP
One Biscayne Tower

2 South Biscayne Boulevard
Ste. 1900
Miami, FL 33131
(305) 482−8417
Fax: (305) 482−8600
Email: mgutierrez@foley.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael J. Lockerby**
FOLEY & LARDNER LLP
3000 K Street, NW
Suite 600
Washington, DC 20007
(202) 945−6079
Email: mlockerby@foley.com
*ATTORNEY TO BE NOTICED*

**William E. Davis**
FOLEY & LARDNER LLP
One Biscayne Tower
2 South Biscayne Boulevard
Ste. 1900
Miami, FL 33131
(305) 482−8404
Fax: (305) 482−8600
Email: wdavis@foley.com
*PRO HAC VICE*

**Zachary S. Kester**
ACTRIGHT LEGAL FOUNDATION
209 West Main Street
Plainfield, IN 46168
(317) 203−5599
Fax: (888) 815−5641
Email: zkester@actrightlegal.org
*TERMINATED: 12/17/2013*
*PRO HAC VICE*

V.

**Defendant**

**INTERNAL REVENUE SERVICE**       represented by   **Grover Hartt , III**
U.S. DEPARTMENT OF JUSTICE
Tax Division
717 North Harwood Street
Suite 400
Dallas, TX 75201
(214) 880−9733
Email: grover.hartt@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph A. Sergi**
U.S. DEPARTMENT OF JUSTICE
Tax Division
555 4th Street, NW
Washington, DC 20001
(202) 305−0868
Fax: 202−331−2032
Email: joseph.a.sergi@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher David Belen**
U.S. DEPARTMENT OF JUSTICE
Tax Division
555 4th Street, NW
Washington, DC 20001
(202) 307−2089
Email: christopher.d.belen@usdoj.gov
*TERMINATED: 10/17/2014*

**Christopher Randy Egan**
U.S. DEPARTMENT OF JUSTICE
Tax Division
717 North Harwood Street
Suite 400
Dalls, TX 75201
(214) 880−9721
Email: christopher.r.egan@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES OF AMERICA**          represented by  **Grover Hartt , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph A. Sergi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher David Belen**
(See above for address)
*TERMINATED: 10/17/2014*

**Christopher Randy Egan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**STEVEN T. MILLER**          represented by  **Brigida Benitez**
*In his official and Indiviual capacity as*          STEPTOE & JOHNSON, LLP
*former Deputy Commissioner, Services &*          1330 Connecticut Avenue, NW
*Enforcement, and Acting Commissioner,*          Washington, DC 20036
*Internal Revenue Service*          (202) 429−6261
Email: bbenitez@steptoe.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erica Lynne Gerson**
STEPTOE & JOHNSON, LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429−6748
Email: egerson@steptoe.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph A. Sergi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DOUGLAS H. SHULMAN**
*In his individual capacity*

represented by **Brigida Benitez**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erica Lynne Gerson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**LOIS LERNER**
*In her official and individual capacity as
Director, Exempt Organizations Division,
IRS*

represented by **Brigida Benitez**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erica Lynne Gerson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**SUSAN MALONEY**
*In her official and individual capacity as
an Exempt Organizations Specialist, IRS*

represented by **Jeffrey A. Lamken**
MOLOLAMKEN, LLP
600 New Hampshire Avenue, NW
Suite 660
Washington, DC 20037
(202) 556−2010
Fax: (202) 556−2001
Email: jlamken@mololamken.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin V Shur**
MOLOLAMKEN LLP
600 New Hampshire, Avenue, NW
Washington, DC 20037
(202) 556−2005
Email: jshur@mololamken.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**RONALD BELL**
*In his official and individual capacity as
an Exempt Organizations Specialist, IRS*

represented by **Jeffrey A. Lamken**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin V Shur**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**JANINE L. ESTES**
*In her official and individual capacity as
an Exempt Organizations Specialist, IRS*

represented by **Jeffrey A. Lamken**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin V Shur**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **FAYE NG**<br>*In her official and individual capacity as*<br>*an Exempt Organizations Sepcialist, IRS* | represented by | **Jeffrey A. Lamken**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Justin V Shur**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

**UNKNOWN NAMED EMLPLOYEES**
**OF INTERNAL REVENUE SERVICE**
*In their official and individual capacities*

**Defendant**

**DANIEL WERFEL**
*In his official capacity as Acting*
*Commissioner of the Internal Revenue*
*Service*

**Defendant**

| | | |
|---|---|---|
| **WILLIAM WILKINS**<br>*In his official and indivdual capacity as*<br>*Chief Counsel, Internal Revenue Service* | represented by | **Brigida Benitez**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Erica Lynne Gerson**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **HOLLY PAZ**<br>*In her official and individual capacity as*<br>*Acting Manager, Exempt Organizations*<br>*Technical Unit, Acting Director, Office of*<br>*Rulings & Agreements, And Director,*<br>*Office of Rulings & Agreements, IRS* | represented by | **Brigida Benitez**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Erica Lynne Gerson**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **CINDY M. THOMAS**<br>*In her official and individual capacity as*<br>*Program Manager, Exempt*<br>*Organizations Determinations Unit of the*<br>*IRS* | represented by | **Brigida Benitez**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Erica Lynne Gerson**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **STEVEN GRODNITZKY**<br>*In his official and individual capacity as*<br>*Manager, Exempt Organizations*<br>*Technical Unit, IRS* | represented by | **Brigida Benitez**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Erica Lynne Gerson**<br>(See above for address) |

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DAVID FISH**
*In his official and individual capacity as*
*Acting Director, Office of Rulings &*
*Agreements, IRS*

represented by   **Brigida Benitez**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erica Lynne Gerson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**MICHAEL SETO**
*In his official and individual capacity as*
*Acting Manager, Technical Unit, IRS*

represented by   **Brigida Benitez**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erica Lynne Gerson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/21/2013 | 1 | COMPLAINT against All Defendants ( Filing fee $ 400 receipt number 0090−3332389) filed by TRUE THE VOTE, INC.. (Attachments: # 1 Exhibit A: Timeline, # 2 Exhibit B: Form 1023 & Attach, # 3 Exhibit C: Request for Information 1, # 4 Exhibit D: Request for Information 2, # 5 Exhibit E: Request for Information 3, # 6 Exhibit F: TIGTA Report, # 7 Civil Cover Sheet, # 8 Summons Douglas H. Shulman, # 9 Summons Internal Revenue Service, # 10 Summons Janine L Estes, # 11 Summons Lois Lerner, # 12 Summons Steven T. Miller, # 13 Summons Susan Maloney, # 14 Summons USA, # 15 Summons Unknown Named Employees of the IRS, # 16 Summons US Attorney)(Mitchell, Cleta) (Entered: 05/21/2013) |
| 05/21/2013 | 2 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− John C. Eastman, :Firm− Claremont Institute's Center for Constitutional Jurisprudence, :Address− c/o Chapman University School of Law, One University Drive, Orange, CA 92866. Phone No. − 877−855−3330 X2. by TRUE THE VOTE, INC. (Mitchell, Cleta) (Entered: 05/21/2013) |
| 05/21/2013 | 3 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Kaylan L. Phillips, :Firm− ActRight Legal Foundation, :Address− 209 W. Main Street, Plainfield, IN 46168. Phone No. − 317−203−5599. by TRUE THE VOTE, INC. (Mitchell, Cleta) (Entered: 05/21/2013) |
| 05/21/2013 | 4 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Noel H. Johnson, :Firm− ActRight Legal Foundation, :Address− 209 W. Main Street, Plainfield, IN 46168. Phone No. − 317−203−5599. by TRUE THE VOTE, INC. (Mitchell, Cleta) (Entered: 05/21/2013) |
| 05/21/2013 | 5 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Zachary S. Kester, :Firm− ActRight Legal Foundation, :Address− 209 W. Main Street, Plainfield, IN 46168. Phone No. − 317−203−5599. by TRUE THE VOTE, INC. (Mitchell, Cleta) (Entered: 05/21/2013) |
| 05/21/2013 | | Case Assigned to Judge Reggie B. Walton. (sth) (Entered: 05/21/2013) |
| 05/21/2013 | | SUMMONS Not Issued as to RONALD BELL, FAYE NG, UNKNOWN NAMED EMLPLOYEES OF INTERNAL REVENUE SERVICE (sth) (Entered: 05/21/2013) |
| 05/21/2013 | 6 | ELECTRONIC SUMMONS (8) Issued as to JANINE L. ESTES, INTERNAL REVENUE SERVICE, LOIS LERNER, SUSAN MALONEY, STEVEN T. MILLER, DOUGLAS H. SHULMAN, UNITED STATES OF AMERICA, U.S. Attorney and |

U.S. Attorney General (Attachments: # 1 Summons, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons, # 8 Summons)(sth) Modified on 5/23/2013 o add seal to 6−4 (rdj). (Entered: 05/21/2013)

| | | |
|---|---|---|
| 05/21/2013 | 7 | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by TRUE THE VOTE, INC. (Mitchell, Cleta) (Entered: 05/21/2013) |
| 05/22/2013 | | MINUTE ORDER granting 2 Motion for Leave to Appear Pro Hac Vice; granting 3 Motion for Leave to Appear Pro Hac Vice; granting 4 Motion for Leave to Appear Pro Hac Vice; granting 5 Motion for Leave to Appear Pro Hac Vice. Upon consideration of the motions for leave to appear pro hac vice by John C. Eastman, Kaylan L. Phillips, Noel H. Johnson, and Zachary S. Kester, and finding good cause to grant the motions, the motions are hereby GRANTED. John C. Eastman, Kaylan L. Phillips, Noel H. Johnson, and Zachary S. Kester may appear and be heard in the above−captioned matter. Signed by Judge Reggie B. Walton on 5/22/2013. (lcrbw2) (Entered: 05/22/2013) |
| 05/22/2013 | 8 | NOTICE *Summons In A Civil Action for Faye Ng* by TRUE THE VOTE, INC. re 1 Complaint,, (Mitchell, Cleta) (Entered: 05/22/2013) |
| 05/23/2013 | 9 | REQUEST FOR SUMMONS TO ISSUE *Ronald Bell* by TRUE THE VOTE, INC. re 1 Complaint,, filed by TRUE THE VOTE, INC.. Related document: 1 Complaint,, filed by TRUE THE VOTE, INC..(Mitchell, Cleta) (Entered: 05/23/2013) |
| 05/23/2013 | 10 | Electronic Summons (1) Issued as to FAYE NG., ELECTRONIC SUMMONS (1) REISSUED as to RONALD BELL (Attachments: # 1 summons)(td, ) (Entered: 05/23/2013) |
| 06/20/2013 | 11 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 05/28/2013., RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 5/22/2013. ( Answer due for ALL FEDERAL DEFENDANTS by 7/21/2013.), RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. RONALD BELL served on 6/5/2013, answer due 6/26/2013; JANINE L. ESTES served on 5/29/2013, answer due 6/19/2013; INTERNAL REVENUE SERVICE served on 5/28/2013, answer due 6/18/2013; LOIS LERNER served on 5/24/2013, answer due 6/14/2013; SUSAN MALONEY served on 5/23/2013, answer due 6/13/2013; STEVEN T. MILLER served on 5/22/2013, answer due 6/12/2013; FAYE NG served on 5/29/2013, answer due 6/19/2013; DOUGLAS H. SHULMAN served on 5/23/2013, answer due 6/13/2013; UNITED STATES OF AMERICA served on 5/28/2013, answer due 6/18/2013, RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. RONALD BELL served on 6/5/2013, answer due 6/26/2013; JANINE L. ESTES served on 5/29/2013, answer due 6/19/2013; INTERNAL REVENUE SERVICE served on 5/28/2013, answer due 6/18/2013; LOIS LERNER served on 5/24/2013, answer due 6/14/2013; SUSAN MALONEY served on 5/23/2013, answer due 6/13/2013; STEVEN T. MILLER served on 5/22/2013, answer due 6/12/2013; FAYE NG served on 5/29/2013, answer due 6/19/2013; DOUGLAS H. SHULMAN served on 5/23/2013, answer due 6/13/2013; UNITED STATES OF AMERICA served on 5/28/2013, answer due 6/18/2013 (Phillips, Kaylan) (Entered: 06/20/2013) |
| 07/16/2013 | 12 | MOTION for Extension of Time to File Answer re 1 Complaint,, *Motion and Memorandum of Law for Extension of Time to Respond to Complaint* by UNITED STATES OF AMERICA (Attachments: # 1 Exhibit A − Belen Declaration, # 2 Exhibit B − Kane Declaration, # 3 Text of Proposed Order)(Hartt, Grover) (Entered: 07/16/2013) |
| 07/17/2013 | 13 | NOTICE of Appearance by Joseph A. Sergi on behalf of INTERNAL REVENUE SERVICE, STEVEN T. MILLER, UNITED STATES OF AMERICA (Sergi, Joseph) (Entered: 07/17/2013) |
| 07/22/2013 | 14 | First AMENDED COMPLAINT against RONALD BELL, JANINE L. ESTES, INTERNAL REVENUE SERVICE, LOIS LERNER, SUSAN MALONEY, STEVEN T. MILLER, FAYE NG, DOUGLAS H. SHULMAN, UNITED STATES OF AMERICA, UNKNOWN NAMED EMLPLOYEES OF INTERNAL REVENUE SERVICE, DANIEL WERFEL, WILLIAM WILKINS, HOLLY PAZ, CINDY M. |

THOMAS, STEVEN GRODNITZKY, DAVID FISH, MICHAEL SETO filed by TRUE THE VOTE, INC.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Certificate of Service, # 10 Summons FISH, # 11 Summons GRODNITZKY, # 12 Summons PAZ, # 13 Summons SETO, # 14 Summons THOMAS, # 15 Summons WILKINS)(Mitchell, Cleta) Modified text to add first on 7/23/2013 (td, ). (Entered: 07/22/2013)

| 07/23/2013 | 15 | REQUEST FOR SUMMONS TO ISSUE *Ronald Bell, In His Official Capacity* by TRUE THE VOTE, INC. re 14 Amended Complaint,,, filed by TRUE THE VOTE, INC.. Related document: 14 Amended Complaint,,, filed by TRUE THE VOTE, INC..(Mitchell, Cleta) (Entered: 07/23/2013) |

| 07/23/2013 | 16 | REQUEST FOR SUMMONS TO ISSUE *JANINE L. ESTES, In Her Official Capacity* by TRUE THE VOTE, INC. re 14 Amended Complaint,,, filed by TRUE THE VOTE, INC.. Related document: 14 Amended Complaint,,, filed by TRUE THE VOTE, INC..(Mitchell, Cleta) (Entered: 07/23/2013) |

| 07/23/2013 | 17 | REQUEST FOR SUMMONS TO ISSUE *LOIS LERNER, In Her Official Capacity* by TRUE THE VOTE, INC. re 14 Amended Complaint,,, filed by TRUE THE VOTE, INC.. Related document: 14 Amended Complaint,,, filed by TRUE THE VOTE, INC..(Mitchell, Cleta) (Entered: 07/23/2013) |

| 07/23/2013 | 18 | REQUEST FOR SUMMONS TO ISSUE *SUSAN MALONEY, In Her Official Capacity* by TRUE THE VOTE, INC. re 14 Amended Complaint,,, filed by TRUE THE VOTE, INC.. Related document: 14 Amended Complaint,,, filed by TRUE THE VOTE, INC..(Mitchell, Cleta) (Entered: 07/23/2013) |

| 07/23/2013 | 19 | REQUEST FOR SUMMONS TO ISSUE *STEVEN T. MILLER, In His Official Capacity* by TRUE THE VOTE, INC. re 14 Amended Complaint,,, filed by TRUE THE VOTE, INC.. Related document: 14 Amended Complaint,,, filed by TRUE THE VOTE, INC..(Mitchell, Cleta) (Entered: 07/23/2013) |

| 07/23/2013 | 20 | REQUEST FOR SUMMONS TO ISSUE *FAYE NG, In Her Official Capacity* by TRUE THE VOTE, INC. re 14 Amended Complaint,,, filed by TRUE THE VOTE, INC.. Related document: 14 Amended Complaint,,, filed by TRUE THE VOTE, INC..(Mitchell, Cleta) (Entered: 07/23/2013) |

| 07/23/2013 | 21 | REQUEST FOR SUMMONS TO ISSUE *DOUGLAS H. SHULMAN, In His Official Capacity* by TRUE THE VOTE, INC. re 14 Amended Complaint,,, filed by TRUE THE VOTE, INC.. Related document: 14 Amended Complaint,,, filed by TRUE THE VOTE, INC..(Mitchell, Cleta) (Entered: 07/23/2013) |

| 07/23/2013 | 22 | REQUEST FOR SUMMONS TO ISSUE *UNKNOWN NAMED EMPLOYEES OF THE INTERNAL REVENUE SERVICE, In Their Official Capacities* by TRUE THE VOTE, INC. re 14 Amended Complaint,,, filed by TRUE THE VOTE, INC.. Related document: 14 Amended Complaint,,, filed by TRUE THE VOTE, INC..(Mitchell, Cleta) (Entered: 07/23/2013) |

| 07/23/2013 | | MINUTE ORDER terminating 12 Motion for Extension of Time to Answer. In light of the fact that the plaintiff has filed an amended complaint, it is ORDERED that the motion for extension of time to answer or otherwise respond to the plaintiff's original complaint is TERMINATED AS MOOT. Signed by Judge Reggie B. Walton on 7/23/2013. (lcrbw2) (Entered: 07/23/2013) |

| 07/24/2013 | | NOTICE OF ERROR re 22 Request for Summons to Issue; emailed to cmitchell@foley.com, cc'd 12 associated attorneys — The PDF file you docketed contained errors: 1. Can not issue summonses to unknown parties. (td, ) (Entered: 07/24/2013) |

| 07/24/2013 | 23 | Electronic Summons (7) Issued, in official capacities, as to RONALD BELL, JANINE L. ESTES, LOIS LERNER, SUSAN MALONEY, STEVEN T. MILLER, FAYE NG, DOUGLAS H. SHULMAN. (Attachments: # 1 Summons, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons)(td, ) Modified text on 7/24/2013 (td, ). (Entered: 07/24/2013) |

| 07/24/2013 | 24 | Electronic Summons (6) Issued as to DAVID FISH, STEVEN GRODNITZKY, HOLLY PAZ, MICHAEL SETO, CINDY M. THOMAS, WILLIAM WILKINS. |

|  |  | (Attachments: # 1 Summons, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons)(td, ) (Entered: 07/24/2013) |
|--|--|--|
| 08/02/2013 | 25 | MOTION for Extension of Time to File Answer re 14 Amended Complaint,,, *Renewed Motion and Memorandum of Law for Extension of Time to Respond to First Amended Complaint* by UNITED STATES OF AMERICA (Attachments: # 1 Exhibit A − Second Declaration of Christopher D. Belen, # 2 Exhibit B − Declaration of Thomas J. Kane, # 3 Text of Proposed Order)(Hartt, Grover) (Entered: 08/02/2013) |
| 08/05/2013 | 26 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Michael J. Lockerby, :Firm− Foley & Lardner LLP, :Address− 3000 K Street, N.W., Suite 600, Washington, D.C. 20007. Phone No. − 202−045−6079. Fax No. − 202−672−5399 by TRUE THE VOTE, INC. (Attachments: # 1 Affidavit (Affidavit of Michael J. Lockerby), # 2 Certificate of Service)(Mitchell, Cleta) (Entered: 08/05/2013) |
| 08/13/2013 | 27 | REQUEST FOR SUMMONS TO ISSUE *for Defendant David Fish in His Official Capacity* by TRUE THE VOTE, INC. filed by TRUE THE VOTE, INC..(Phillips, Kaylan) (Entered: 08/13/2013) |
| 08/13/2013 | 28 | REQUEST FOR SUMMONS TO ISSUE *for Defendant Steven Grodnitzky in His Official Capacity* by TRUE THE VOTE, INC. filed by TRUE THE VOTE, INC..(Phillips, Kaylan) (Entered: 08/13/2013) |
| 08/13/2013 | 29 | REQUEST FOR SUMMONS TO ISSUE *for Defendant Holly Paz in Her Official Capacity* by TRUE THE VOTE, INC. filed by TRUE THE VOTE, INC..(Phillips, Kaylan) (Entered: 08/13/2013) |
| 08/13/2013 | 30 | REQUEST FOR SUMMONS TO ISSUE *for Defendant Michael C. Seto in His Official Capacity* by TRUE THE VOTE, INC. filed by TRUE THE VOTE, INC..(Phillips, Kaylan) (Entered: 08/13/2013) |
| 08/13/2013 | 31 | REQUEST FOR SUMMONS TO ISSUE *for Defendant Cindy M. Thomas in Her Official Capacity* by TRUE THE VOTE, INC. filed by TRUE THE VOTE, INC..(Phillips, Kaylan) (Entered: 08/13/2013) |
| 08/13/2013 | 32 | REQUEST FOR SUMMONS TO ISSUE *for Defendant William Wilkins in His Official Capacity* by TRUE THE VOTE, INC. filed by TRUE THE VOTE, INC..(Phillips, Kaylan) (Entered: 08/13/2013) |
| 08/13/2013 | 33 | REQUEST FOR SUMMONS TO ISSUE *for Defendant Daniel Werfel in His Official Capacity* by TRUE THE VOTE, INC. filed by TRUE THE VOTE, INC..(Phillips, Kaylan) (Entered: 08/13/2013) |
| 08/14/2013 | 34 | Electronic Summons Issued as to CINDY M. THOMAS, in her official capacity. (td, ) (Entered: 08/14/2013) |
| 08/14/2013 | 35 | Electronic Summons Issued as to DAVID FISH, in his official capacity. (td, ) (Entered: 08/14/2013) |
| 08/14/2013 | 36 | Electronic Summons Issued as to STEVEN GRODNITZKY, in his official capacity. (td, ) (Entered: 08/14/2013) |
| 08/14/2013 | 37 | Electronic Summons Issued as to HOLLY PAZ, in her official capacity. (td, ) (Entered: 08/14/2013) |
| 08/14/2013 | 38 | Electronic Summons Issued as to MICHAEL SETO, in his official capacity. (td, ) (Entered: 08/14/2013) |
| 08/14/2013 | 39 | Electronic Summons Issued as to WILLIAM WILKINS, in his official capacity. (td, ) (Entered: 08/14/2013) |
| 08/14/2013 | 40 | Electronic Summons Issued as to DANIEL WERFEL, in his official capacity. (td, ) (Entered: 08/14/2013) |
| 08/15/2013 | 41 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. DAVID FISH served on 7/25/2013; STEVEN GRODNITZKY served on 7/29/2013; HOLLY PAZ served on 7/29/2013; MICHAEL SETO served on 7/25/2013; DANIEL WERFEL served on 8/14/2013, RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. DAVID FISH served on 7/25/2013; STEVEN |

GRODNITZKY served on 7/29/2013; HOLLY PAZ served on 7/29/2013; MICHAEL SETO served on 7/25/2013; DANIEL WERFEL served on 8/14/2013 (Phillips, Kaylan) (Entered: 08/15/2013)

| 08/16/2013 | 42 | RESPONSE re 25 MOTION for Extension of Time to File Answer re 14 Amended Complaint,,, *Renewed Motion and Memorandum of Law for Extension of Time to Respond to First Amended Complaint* filed by TRUE THE VOTE, INC.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Mitchell, Cleta) (Entered: 08/16/2013) |
| --- | --- | --- |
| 08/27/2013 | 43 | NOTICE *Suggestion of Incapacity of David Fish* by UNITED STATES OF AMERICA (Hartt, Grover) (Entered: 08/27/2013) |
| 08/28/2013 | 44 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Matthew D. Gutierrez, :Firm− Foley & Lardner LLP, :Address− One Biscayne Tower, 2 South Biscayne Boulevard, Ste. 1900, Miami, FL 33131. Phone No. − 305−482−8417. Fax No. − 305−482−8600 by TRUE THE VOTE, INC. (Attachments: # 1 Declaration, # 2 Certificate of Service)(Mitchell, Cleta) (Entered: 08/28/2013) |
| 08/28/2013 | 45 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− William E. Davis, :Firm− Foley & Lardner LLP, :Address− One Biscayne Tower, 2 South Biscayne Boulevard, Suite 1900, Miami, FL 33131. Phone No. − 305−482−8404. Fax No. − 305−482−8600 by TRUE THE VOTE, INC. (Attachments: # 1 Declaration, # 2 Certificate of Service)(Mitchell, Cleta) (Entered: 08/28/2013) |
| 08/29/2013 | | MINUTE ORDER granting 25 Motion for Extension of Time to Answer. For good cause shown, it is ORDERED that the motion for an extension of time is GRANTED nunc pro tunc to August 5, 2013. The defendants shall answer or otherwise respond to the plaintiff's amended complaint on or before September 20, 2013. Signed by Judge Reggie B. Walton on 8/29/2013. (lcrbw2) (Entered: 08/29/2013) |
| 08/29/2013 | | MINUTE ORDER denying 26 Motion for Leave to Appear Pro Hac Vice. It appearing to the Court from the motion that attorney Michael J. Lockerby is "[a]n attorney who engages in the practice of law from an office located in the District of Columbia" and is thus ineligible for admission pro hac vice under this Court's Local Rules, see Local Civ. R. 83.2(c)(2), it is ORDERED that the motion is DENIED. Signed by Judge Reggie B. Walton on 8/29/2013. (lcrbw2) (Entered: 08/29/2013) |
| 08/29/2013 | | MINUTE ORDER granting 44 Motion for Leave to Appear Pro Hac Vice; granting 45 Motion for Leave to Appear Pro Hac Vice. For good cause shown, it is ORDERED that the motions are GRANTED. Attorneys Mathew D. Gutierrez and William E. Davis may appear and be heard in the above captioned action. Signed by Judge Reggie B. Walton on 8/29/2013. (lcrbw2) (Entered: 08/29/2013) |
| 08/30/2013 | | Set/Reset Deadline: The defendants shall answer or otherwise respond to the plaintiff's amended complaint on or before 9/20/2013. (ad) (Entered: 08/30/2013) |
| 09/05/2013 | | MINUTE ORDER. In light of the representations made to the Court in the United States' Suggestion of Incapacity of David Fish (see ECF no. 43 ), it is ORDERED that the parties shall appear before the Court for a status hearing concerning the matters addressed in the Suggestion of Incapacity at a date and time to be determined by the Clerk. Signed by Judge Reggie B. Walton on 9/5/2013. (lcrbw2) (Entered: 09/05/2013) |
| 09/10/2013 | | Set/Reset Hearings: Status Conference set for 9/26/2013 10:15 AM in Courtroom 16 before Judge Reggie B. Walton. (mpt, ) (Entered: 09/10/2013) |
| 09/10/2013 | 46 | NOTICE of Appearance by Jeffrey A. Lamken on behalf of RONALD BELL, JANINE L. ESTES, SUSAN MALONEY, FAYE NG (Lamken, Jeffrey) (Entered: 09/10/2013) |
| 09/10/2013 | 47 | NOTICE of Appearance by Justin V Shur on behalf of RONALD BELL, JANINE L. ESTES, SUSAN MALONEY, FAYE NG (Shur, Justin) (Entered: 09/10/2013) |
| 09/10/2013 | 48 | MOTION for Extension of Time to *Respond to Plaintiff's First Amended Complaint* by RONALD BELL, JANINE L. ESTES, STEVEN GRODNITZKY, LOIS LERNER, SUSAN MALONEY, STEVEN T. MILLER, FAYE NG, HOLLY PAZ, MICHAEL SETO, DOUGLAS H. SHULMAN, CINDY M. THOMAS, WILLIAM WILKINS (Shur, Justin) (Entered: 09/10/2013) |

| 09/11/2013 | 49 | NOTICE of Appearance by Brigida Benitez on behalf of STEVEN GRODNITZKY, LOIS LERNER, STEVEN T. MILLER, HOLLY PAZ, MICHAEL SETO, DOUGLAS H. SHULMAN, CINDY M. THOMAS, WILLIAM WILKINS (Benitez, Brigida) (Entered: 09/11/2013) |
|---|---|---|
| 09/18/2013 | 50 | ENTERED IN ERROR. . . . .RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. CINDY M. THOMAS served on 8/19/2013, answer due 9/9/2013; WILLIAM WILKINS served on 8/10/2013, answer due 8/31/2013 (Phillips, Kaylan) Modified on 9/19/2013 (td, ). (Entered: 09/18/2013) |
| 09/18/2013 | 51 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 08/27/2013. (Phillips, Kaylan) (Entered: 09/18/2013) |
| 09/18/2013 | 52 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 9/12/2013. Answer due for ALL FEDERAL DEFENDANTS by 11/11/2013. (Phillips, Kaylan) (Entered: 09/18/2013) |
| 09/18/2013 | 53 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to CINDY M. THOMAS served on 8/19/2013; WILLIAM WILKINS served on 8/10/2013. (td, ) (Entered: 09/19/2013) |
| 09/19/2013 | | NOTICE OF CORRECTED DOCKET ENTRY: 50 was entered in error and refiled as docket entry no. 53 .(td, ) (Entered: 09/19/2013) |
| 09/20/2013 | 54 | MOTION to Dismiss *Motion to Dismiss Counts I, II, IV and V and Statement of Points and Authorities* by UNITED STATES OF AMERICA (Attachments: # 1 Text of Proposed Order)(Hartt, Grover) (Entered: 09/20/2013) |
| 09/23/2013 | 55 | ENTERED IN ERROR. . . . .RESPONSE re 48 MOTION for Extension of Time to *Respond to Plaintiff's First Amended Complaint* filed by TRUE THE VOTE, INC.. (Johnson, Noel) Modified on 9/24/2013 (td, ). (Entered: 09/23/2013) |
| 09/24/2013 | | NOTICE OF ERROR re 55 Response to motion; emailed to njohnson@actrightlegal.org, cc'd 29 associated attorneys — The PDF file you docketed contained errors: 1. Invalid attorney signature, 2. Please refile document, 3. The filing attorney and the signing attorney should be the same. (td, ) (Entered: 09/24/2013) |
| 09/24/2013 | 56 | RESPONSE re 48 MOTION for Extension of Time to *Respond to Plaintiff's First Amended Complaint* filed by TRUE THE VOTE, INC.. (Mitchell, Cleta) (Entered: 09/24/2013) |
| 09/25/2013 | | MINUTE ORDER granting 48 Motion for Extension of Time. Upon consideration of the Motion and Memorandum of Law for an Extension of Time for the Individual Defendants to Respond to Plaintiff's First Amended Complaint, and for good cause shown, it is ORDERED that the motion is GRANTED. The individual defendants shall answer or otherwise respond to the first amended complaint on or before October 18, 2013. Signed by Judge Reggie B. Walton on 9/25/2013. (lcrbw2) (Entered: 09/25/2013) |
| 09/25/2013 | 57 | NOTICE of Appearance by Christopher David Belen on behalf of INTERNAL REVENUE SERVICE, UNITED STATES OF AMERICA (Attachments: # 1 LCvR 83.2(j) Attorney Certification)(Belen, Christopher) (Entered: 09/25/2013) |
| 09/26/2013 | 58 | ORDER. For the reasons stated in the attached Order, it is herebyORDERED that the matters of Mr. Fish's legal representation and the appointment of a guardian ad litem for Mr. Fish are HELD IN ABEYANCE until further order of the Court. Signed by Judge Reggie B. Walton on 9/26/2013. (lcrbw2) (Entered: 09/26/2013) |
| 09/26/2013 | 59 | SUPPLEMENT to 54 MOTION to Dismiss *Motion to Dismiss Counts I, II, IV and V and Statement of Points and Authorities* by INTERNAL REVENUE SERVICE (Hartt, Grover) Modified title on 9/30/2014 (tg, ). (Entered: 09/26/2013) |
| 09/26/2013 | | Minute Entry for proceedings held before Judge Reggie B. Walton: Status Conference held on 9/26/2013. (Court Reporter Cathryn Jones.) (mpt, ) (Entered: 09/27/2013) |

| 09/27/2013 | 60 | Notice to Clarify *TRUE THE VOTE'S CLARIFICATION OF ITS RESPONSE TO THE INDIVIDUAL IRS DEFENDANTS' MOTION FOR AN EXTENSION OF TIME TO OCTOBER 18, 2013* by TRUE THE VOTE, INC. (Mitchell, Cleta) Modified to read "Notice" per chambers on 9/30/2013 (td, ). (Entered: 09/27/2013) |
|---|---|---|
| 09/30/2013 | 61 | Joint MOTION for Briefing Schedule *on Motions to Dismiss* by TRUE THE VOTE, INC. (Mitchell, Cleta) (Entered: 09/30/2013) |
| 10/02/2013 | 62 | Consent MOTION for Extension of Time to File Response/Reply as to 54 MOTION to Dismiss *Motion to Dismiss Counts I, II, IV and V and Statement of Points and Authorities* by TRUE THE VOTE, INC. (Mitchell, Cleta) (Entered: 10/02/2013) |
| 10/03/2013 | | MINUTE ORDER granting 61 Motion for Briefing Schedule; granting 62 Motion for Extension of Time to File Response/Reply. For good cause shown, and in light of the parties' consent, the motions are GRANTED. The plaintiff's response(s) to motion(s) to dismiss filed by any/all defendant(s) shall be filed on or before November 15, 2013, and the defendants' reply briefs to the plaintiff's response(s) to motion(s) to dismiss shall be filed on or before December 17, 2013. Signed by Judge Reggie B. Walton on 10/3/2013. (lcrbw2) (Entered: 10/03/2013) |
| 10/04/2013 | | Set/Reset Deadlines: Response due by 11/15/2013; Reply due by 12/17/2013. (mpt) (Entered: 10/04/2013) |
| 10/18/2013 | 63 | MOTION to Dismiss *of Individual Management Defendants* by STEVEN GRODNITZKY, LOIS LERNER, STEVEN T. MILLER, HOLLY PAZ, MICHAEL SETO, DOUGLAS H. SHULMAN, CINDY M. THOMAS, WILLIAM WILKINS (Attachments: # 1 Text of Proposed Order)(Benitez, Brigida) (Entered: 10/18/2013) |
| 10/18/2013 | 64 | MOTION to Dismiss *of Cincinnati Defendants* by RONALD BELL, JANINE L. ESTES, SUSAN MALONEY, FAYE NG (Attachments: # 1 Text of Proposed Order Proposed Order)(Lamken, Jeffrey) (Entered: 10/18/2013) |
| 11/15/2013 | 65 | Memorandum in opposition to re 59 Supplemental MOTION to Amend/Correct 54 MOTION to Dismiss *Motion to Dismiss Counts I, II, IV and V and Statement of Points and Authorities* , 54 MOTION to Dismiss *Motion to Dismiss Counts I, II, IV and V and Statement of Points and Authorities* filed by TRUE THE VOTE, INC.. (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order Denying Motion to Dismiss)(Mitchell, Cleta) (Entered: 11/15/2013) |
| 11/15/2013 | 66 | MOTION for Leave to File *Consolidated Oversized Memorandum in Opposition to Individual Defendants' Motions to Dismiss* by TRUE THE VOTE, INC. (Attachments: # 1 Text of Proposed Order Granting Motion to File Consolidated Oversized Memo)(Mitchell, Cleta) (Additional attachment(s) added on 11/18/2013: # 2 Exhibit Opposition) (td, ). (Entered: 11/15/2013) |
| 11/15/2013 | 67 | ENTERED IN ERROR. . . . .Memorandum in opposition to re 64 MOTION to Dismiss *of Cincinnati Defendants*, 63 MOTION to Dismiss *of Individual Management Defendants* filed by TRUE THE VOTE, INC.. (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order)(Mitchell, Cleta) Modified on 11/18/2013 (td, ). (Entered: 11/15/2013) |
| 11/16/2013 | 68 | MOTION to Stay *Agency Action* by TRUE THE VOTE, INC. (Attachments: # 1 Text of Proposed Order)(Mitchell, Cleta) (Entered: 11/16/2013) |
| 11/18/2013 | | NOTICE OF ERROR re 65 Memorandum in Opposition; emailed to cmitchell@foley.com, cc'd 31 associated attorneys — The PDF file you docketed contained errors: 1. Leave to file not yet requested and/or granted, 2. This document will be Entered In Error and added as an exhibit to the Motion for Leave. (ztd, ) (Entered: 11/18/2013) |
| 11/20/2013 | 69 | Memorandum in opposition to re 66 MOTION for Leave to File *Consolidated Oversized Memorandum in Opposition to Individual Defendants' Motions to Dismiss by Individual Management Defendants* filed by STEVEN GRODNITZKY, LOIS LERNER, STEVEN T. MILLER, HOLLY PAZ, MICHAEL SETO, DOUGLAS H. SHULMAN, CINDY M. THOMAS, WILLIAM WILKINS. (Attachments: # 1 Text of Proposed Order)(Benitez, Brigida) (Entered: 11/20/2013) |

11/22/2013   70   REPLY to opposition to motion re 66 MOTION for Leave to File *Consolidated Oversized Memorandum in Opposition to Individual Defendants' Motions to Dismiss* filed by TRUE THE VOTE, INC.. (Mitchell, Cleta) (Entered: 11/22/2013)

11/26/2013   71   RESPONSE re 66 MOTION for Leave to File *Consolidated Oversized Memorandum in Opposition to Individual Defendants' Motions to Dismiss* filed by RONALD BELL, JANINE L. ESTES, SUSAN MALONEY, FAYE NG. (Lamken, Jeffrey) (Entered: 11/26/2013)

11/26/2013     MINUTE ORDER granting 66 Motion for Leave to File. Upon consideration of the plaintiff's Motion to File Oversized Memorandum in Consolidated Response to Individual Defendants' Motions to Dismiss, and the opposition thereto, and for good cause shown, it is ORDERED that the motion is GRANTED nunc pro tunc to November 15, 2013. The plaintiff's opposition to the individual defendants' motions to dismiss is deemed timely filed. The plaintiff is admonished that future requests to file oversized memoranda of law should be submitted to the Court prior to the date on which any such memoranda are due in accordance with this Court's local rules. See Local Civ. R. 7(e) ("A memorandum of points and authorities in support of or in opposition to a motion shall not exceed 45 pages and a reply memorandum shall not exceed 25 pages, without prior approval of the court."). Signed by Judge Reggie B. Walton on 11/26/2013. (lcrbw2) (Entered: 11/26/2013)

11/26/2013   72   Memorandum in opposition to re 64 MOTION to Dismiss *of Cincinnati Defendants*, 63 MOTION to Dismiss *of Individual Management Defendants*, 54 MOTION to Dismiss *Motion to Dismiss Counts I, II, IV and V and Statement of Points and Authorities* filed by TRUE THE VOTE, INC.. (Filed Nunc Pro Tunc to 11/15/2013, pursuant to Minute Order filed on 11/26/2013 (jf, ) (Entered: 11/27/2013)

12/03/2013   73   RESPONSE re 68 MOTION to Stay *Agency Action Opposition to Plaintiff's Motion to Stay Agency Action* filed by UNITED STATES OF AMERICA. (Attachments: # 1 Exhibit 1)(Hartt, Grover) (Entered: 12/03/2013)

12/09/2013   74   REPLY to opposition to motion re 68 MOTION to Stay *Agency Action* filed by TRUE THE VOTE, INC.. (Mitchell, Cleta) (Entered: 12/09/2013)

12/17/2013   75   NOTICE OF WITHDRAWAL OF APPEARANCE as to TRUE THE VOTE, INC.. Attorney Zachary S. Kester terminated. (Kester, Zachary) (Entered: 12/17/2013)

12/17/2013   76   REPLY to opposition to motion re 63 MOTION to Dismiss *of Individual Management Defendants* filed by STEVEN GRODNITZKY, LOIS LERNER, STEVEN T. MILLER, HOLLY PAZ, MICHAEL SETO, DOUGLAS H. SHULMAN, CINDY M. THOMAS, WILLIAM WILKINS. (Benitez, Brigida) (Entered: 12/17/2013)

12/17/2013   77   REPLY to opposition to motion re 64 MOTION to Dismiss *of Cincinnati Defendants* filed by RONALD BELL, JANINE L. ESTES, SUSAN MALONEY, FAYE NG. (Lamken, Jeffrey) (Entered: 12/17/2013)

12/17/2013   78   REPLY to opposition to motion re 54 MOTION to Dismiss *Motion to Dismiss Counts I, II, IV and V and Statement of Points and Authorities Reply in Support of Motion to Dismiss Counts I, II, IV and V* filed by UNITED STATES OF AMERICA. (Hartt, Grover) (Entered: 12/17/2013)

01/23/2014   79   NOTICE of Appearance by Erica Lynne Gerson on behalf of STEVEN GRODNITZKY, LOIS LERNER, STEVEN T. MILLER, HOLLY PAZ, MICHAEL SETO, DOUGLAS H. SHULMAN, CINDY M. THOMAS, WILLIAM WILKINS (Gerson, Erica) (Entered: 01/23/2014)

06/02/2014   80   NOTICE OF SUPPLEMENTAL AUTHORITY by TRUE THE VOTE, INC. (Attachments: # 1 Exhibit 1)(Johnson, Noel) (Entered: 06/02/2014)

06/05/2014   81   REPLY re 80 NOTICE OF SUPPLEMENTAL AUTHORITY *Federal Defendants' Response to Plaintiff's Notice of Supplemental Authority* filed by UNITED STATES OF AMERICA. (Hartt, Grover) (Entered: 06/05/2014)

06/18/2014   82   NOTICE of Appearance by Michael J. Lockerby on behalf of All Plaintiffs (Attachments: # 1 Certificate of Service)(Lockerby, Michael) (Entered: 06/18/2014)

| | | |
|---|---|---|
| 06/30/2014 | 83 | MOTION for Discovery *(Plaintiff's Motion for Preliminary Injunction and Expedited Discovery to Prevent Further Spoliation of, and to Preserve and Restore, Evidence and Discoverable Information)* by TRUE THE VOTE, INC. (Attachments: # 1 Text of Proposed Order Granting Plaintiff's Motion for Preliminary Injunction and Expedited Discovery to Prevent Further Spoliation of, and to Preserve and Restore, Evidence and Discoverable Information, # 2 Memorandum in Support Plaintiff's Motion for Preliminary Injunction and Expedited Discovery to Prevent Further Spoliation of, and to Preserve and Restore, Evidence and Discoverable Information, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Exhibit D, # 7 Exhibit E, # 8 Exhibit F, # 9 Exhibit G, # 10 Exhibit H, # 11 Exhibit I, # 12 Exhibit J, # 13 Exhibit L, # 14 Exhibit M, # 15 Exhibit N, # 16 Exhibit O)(Lockerby, Michael). Added MOTION for Preliminary Injunction on 7/1/2014 (td, ). (Entered: 06/30/2014) |
| 07/01/2014 | | NOTICE OF ERROR re 83 Motion for Discovery; emailed to mlockerby@foley.com, cc'd 36 associated attorneys — The PDF file you docketed contained errors: 1. Do not refile. Remember to select all reliefs that pertain to your document when filing. (td, ) (Entered: 07/01/2014) |
| 07/01/2014 | | MINUTE ORDER. The Court having received the Plaintiff's Motion for Preliminary Injunction and Expedited Discovery (ECF No. 83 ), and to ensure the prompt resolution thereof, it is hereby ORDERED that the defendants shall file their opposition to the plaintiff's motion on or before Monday, July 7, 2014, and it is further ORDERED that the parties shall appear before the Court for a hearing on the merits of the plaintiff's motion at 11:00 a.m. on Friday, July 11, 2014. Signed by Judge Reggie B. Walton on 7/1/2014. (lcrbw2) (Entered: 07/01/2014) |
| 07/01/2014 | | Set/Reset Hearings: Motion Hearing set for 7/11/2014 11:00 AM in Courtroom 16 before Judge Reggie B. Walton. (mpt, ) (Entered: 07/01/2014) |
| 07/01/2014 | 84 | NOTICE *of Filing Exhibit K to Plaintiff's Motion for Preliminary Injunction and Expedited Discovery to Prevent Further Spoliation of, and to Preserveand Restore, Evidence and Discoverable Information* by TRUE THE VOTE, INC. re 83 MOTION for Discovery *(Plaintiff's Motion for Preliminary Injunction and Expedited Discovery to Prevent Further Spoliation of, and to Preserve and Restore, Evidence and Discoverable Information)* MOTION for Preliminary Injunction (Attachments: # 1 Exhibit K to Plaintiff's Motion for Preliminary Injunction and Expedited Discovery to Prevent Further Spoliation of, and to Preserve and Restore, Evidence and Discoverable Information)(Lockerby, Michael) (Entered: 07/01/2014) |
| 07/03/2014 | 85 | NOTICE of Appearance by Erica Lynne Gerson on behalf of DAVID FISH (Gerson, Erica) (Entered: 07/03/2014) |
| 07/03/2014 | 86 | NOTICE of Appearance by Brigida Benitez on behalf of DAVID FISH (Benitez, Brigida) (Entered: 07/03/2014) |
| 07/07/2014 | 87 | Memorandum in opposition to re 83 MOTION for Discovery *(Plaintiff's Motion for Preliminary Injunction and Expedited Discovery to Prevent Further Spoliation of, and to Preserve and Restore, Evidence and Discoverable Information)* MOTION for Preliminary Injunction filed by DAVID FISH, STEVEN GRODNITZKY, LOIS LERNER, STEVEN T. MILLER, HOLLY PAZ, MICHAEL SETO, DOUGLAS H. SHULMAN, CINDY M. THOMAS, WILLIAM WILKINS. (Attachments: # 1 Exhibit 1)(Benitez, Brigida) (Entered: 07/07/2014) |
| 07/07/2014 | 88 | RESPONSE re 83 MOTION for Discovery *(Plaintiff's Motion for Preliminary Injunction and Expedited Discovery to Prevent Further Spoliation of, and to Preserve and Restore, Evidence and Discoverable Information)* MOTION for Preliminary Injunction *United States' Response Opposing True the Vote's Motion for Premiliary Injunction and Expedited Discovery* filed by UNITED STATES OF AMERICA. (Attachments: # 1 Exhibit Gov Ex A, # 2 Exhibit Gov Ex B, # 3 Exhibit Gov Ex C, # 4 Exhibit Gov Ex D)(Sergi, Joseph) (Entered: 07/07/2014) |
| 07/07/2014 | 89 | Memorandum in opposition to re 83 MOTION for Discovery *(Plaintiff's Motion for Preliminary Injunction and Expedited Discovery to Prevent Further Spoliation of, and to Preserve and Restore, Evidence and Discoverable Information)* MOTION for Preliminary Injunction filed by RONALD BELL, JANINE L. ESTES, SUSAN MALONEY, FAYE NG. (Attachments: # 1 Text of Proposed Order)(Lamken, Jeffrey) (Entered: 07/07/2014) |

| 07/08/2014 | 90 | NOTICE of Appearance by Christopher Randy Egan on behalf of INTERNAL REVENUE SERVICE, UNITED STATES OF AMERICA (Attachments: # 1 Cert of Familiarity)(Egan, Christopher) (Entered: 07/08/2014) |
|---|---|---|
| 07/11/2014 | | Minute Entry for proceedings held before Judge Reggie B. Walton: Motion Hearing held on 7/11/2014 re 83 MOTION for Discovery/Preliminary Injunction filed by TRUE THE VOTE, INC., HEARD and TAKEN UNDER ADVISEMENT. (Order forthcoming). (Court Reporter Cathryn Jones) (ad) (Entered: 07/11/2014) |
| 07/11/2014 | 91 | ORDER. In accordance with the rulings orally issued by the Court during the July 11, 2014 hearing, and to inform the Court's consideration of current and/or future discovery matters pertaining to the emails and computer hard drive at issue, it is hereby ORDERED that, on or before July 18, 2014, defendant the Internal Revenue Service shall submit to the Court an affidavit or declaration signed under oath by an appropriate individual with firsthand knowledge that: 1. outlines the expertise and qualifications of the individual or individuals currently conducting the forensic examination as part of the Inspector General's investigation; 2. outlines the expertise and qualifications of the individual or individuals who previously conducted forensic examinations or otherwise attempted to recover information from the computer hard drive at issue; 3. provides a projected date of completion of the Inspector General's investigation; 4. states whether the serial number, if any, assigned to the computer hard drive at issue is known; and 5. if the serial number is known, why the computer hard drive cannot be identified and preserved. See the attachced order for additional details. Signed by Judge Reggie B. Walton on 7/11/2014. (lcrbw2) (Entered: 07/11/2014) |
| 07/11/2014 | | Set/Reset Deadline: On or before 7/18/2014, defendant the Internal Revenue Service shall submit to the Court an affidavit or declaration. (ad) (Entered: 07/11/2014) |
| 07/18/2014 | 92 | NOTICE *of Filing the Declaration of Timothy P. Camus, Stephen L. Manning, and Todd Egaas* by RONALD BELL, JANINE L. ESTES, DAVID FISH, STEVEN GRODNITZKY, INTERNAL REVENUE SERVICE, LOIS LERNER, SUSAN MALONEY, STEVEN T. MILLER, FAYE NG, HOLLY PAZ, MICHAEL SETO, DOUGLAS H. SHULMAN, CINDY M. THOMAS, UNITED STATES OF AMERICA, UNKNOWN NAMED EMLPLOYEES OF INTERNAL REVENUE SERVICE, DANIEL WERFEL, WILLIAM WILKINS re 91 Order,,,,, (Attachments: # 1 Exhibit Ex. A Declaration of Timothy Camus, # 2 Exhibit Ex. B Declaration of Stephen L. Manning, # 3 Exhibit Ex. C Declaration of Todd O. Egaas)(Sergi, Joseph) (Entered: 07/18/2014) |
| 07/21/2014 | 93 | NOTICE OF SUPPLEMENTAL AUTHORITY by RONALD BELL, JANINE L. ESTES, DAVID FISH, STEVEN GRODNITZKY, LOIS LERNER, SUSAN MALONEY, STEVEN T. MILLER, FAYE NG, HOLLY PAZ, MICHAEL SETO, DOUGLAS H. SHULMAN, CINDY M. THOMAS, WILLIAM WILKINS (Lamken, Jeffrey) (Entered: 07/21/2014) |
| 07/22/2014 | 94 | NOTICE OF SUPPLEMENTAL AUTHORITY by TRUE THE VOTE, INC. (Johnson, Noel) (Entered: 07/22/2014) |
| 07/23/2014 | 95 | RESPONSE re 94 NOTICE OF SUPPLEMENTAL AUTHORITY *Federal Defendants' Response to Plaintiffs' Notice of Supplemental Authority* filed by UNITED STATES OF AMERICA. (Hartt, Grover) (Entered: 07/23/2014) |
| 08/07/2014 | 96 | ORDER denying 83 Motion for Discovery; denying 83 Motion for Preliminary Injunction. Per the attached Order and for the reasons stated in the Memorandum Opinion entered this same date, it is hereby ORDERED that the Plaintiff's Motion for Preliminary Injunction and Expedited Discovery to Prevent Further Spoliation of, and to Preserve and Restore, Evidence and Discoverable Information is DENIED. Signed by Judge Reggie B. Walton on 8/7/2014. (lcrbw2) (Entered: 08/07/2014) |
| 08/07/2014 | 97 | MEMORANDUM OPINION. Signed by Judge Reggie B. Walton on 8/7/2014. (lcrbw2) (Entered: 08/07/2014) |
| 09/02/2014 | 98 | TRANSCRIPT OF PROCEEDINGS before Judge Reggie B. Walton held on July 11, 2014; Page Numbers: 1 − 88. Court Reporter/Transcriber Cathryn Jones, Telephone number 202 354−3246, Court Reporter Email Address : jcathryn55@yahoo.com.<P></P>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via |

PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<P>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at ww.dcd.uscourts.gov.<P></P> Redaction Request due 9/23/2014. Redacted Transcript Deadline set for 10/3/2014. Release of Transcript Restriction set for 12/1/2014.(Jones, Cathryn) (Entered: 09/02/2014)

| | | |
|---|---|---|
| 10/08/2014 | 99 | NOTICE OF SUPPLEMENTAL AUTHORITY by TRUE THE VOTE, INC. (Johnson, Noel) (Entered: 10/08/2014) |
| 10/13/2014 | 100 | RESPONSE re 99 NOTICE OF SUPPLEMENTAL AUTHORITY filed by RONALD BELL, JANINE L. ESTES, DAVID FISH, STEVEN GRODNITZKY, LOIS LERNER, SUSAN MALONEY, STEVEN T. MILLER, FAYE NG, HOLLY PAZ, MICHAEL SETO, DOUGLAS H. SHULMAN, CINDY M. THOMAS, WILLIAM WILKINS. (Gerson, Erica) (Entered: 10/13/2014) |
| 10/17/2014 | 101 | NOTICE OF WITHDRAWAL OF APPEARANCE as to INTERNAL REVENUE SERVICE, UNITED STATES OF AMERICA. Attorney Christopher David Belen terminated. (Belen, Christopher) (Entered: 10/17/2014) |
| 10/23/2014 | 102 | ORDER granting 54 Motion to Dismiss; granting 63 Motion to Dismiss; granting 64 Motion to Dismiss; denying 68 Motion to Stay. Per the attached Order, and for the reasons stated in the Court's Memorandum Opinion issued this same date, it is hereby ORDERED that the Defendants' Motion to Dismiss Counts I, II, IV[,] and V is GRANTED. It is further ORDERED that the Individual Management Defendants' Motion to Dismiss is GRANTED. It is further ORDERED that the Motion to Dismiss of Cincinnati Defendants Susan Maloney, Ronald Bell, Janine L. Estes, and Faye Ng is GRANTED. It is further ORDERED that the Plaintiff's Motion to Stay Agency Action is DENIED AS MOOT. It is further ORDERED that the plaintiff's request for an oral hearing is DENIED AS MOOT. It is further ORDERED that this case is CLOSED. Signed by Judge Reggie B. Walton on October 23, 2014. (lcrbw2) (Entered: 10/23/2014) |
| 10/23/2014 | 103 | MEMORANDUM OPINION. Signed by Judge Reggie B. Walton on October 23, 2014. (lcrbw2) (Entered: 10/23/2014) |
| 12/18/2014 | 104 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 103 Memorandum & Opinion, 102 Order on Motion to Dismiss,,, Order on Motion to Stay,,,,,,,,,,, by TRUE THE VOTE, INC.. Filing fee $ 505, receipt number 0090−3940769. Fee Status: Fee Paid. Parties have been notified. (Johnson, Noel) (Entered: 12/18/2014) |
| 12/18/2014 | 105 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid this date 12/18/14 re 104 Notice of Appeal to DC Circuit Court,. (td, ) (Entered: 12/18/2014) |
| 12/19/2014 | | USCA Case Number 14−5316 for 104 Notice of Appeal to DC Circuit Court, filed by TRUE THE VOTE, INC.. (rd) (Entered: 12/19/2014) |

JA-16

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**TRUE THE VOTE, INC.,**
7232 Wynnwood Lane
Houston, TX 77008-6041                          Civ. No. 13-cv-00734-RBW

                                                *Plaintiff,*

    *v.*


**INTERNAL REVENUE SERVICE**,
1111 Constitution Avenue, N.W.
Washington, DC 20224

**UNITED STATES OF AMERICA**,
Serve: Eric H. Holder
Attorney General for the United States
Department of Justice
Room B-103
950 Pennsylvania Ave. NW
Washington DC 20530-0001

Serve: Ronald C. Machen, Jr.
United States Attorney for the District of Columbia,
United States Attorney's Office
ATTN: Civil Process Clerk
555 4th Street, NW
Washington, DC 20530

**DANIEL WERFEL**, in his official capacity as
Acting Commissioner of the INTERNAL REVENUE
SERVICE,
1111 Constitution Avenue, N.W.
Washington, DC 20224

**STEVEN T. MILLER**, in his official and individual
capacity as former Deputy Commissioner, Services &
Enforcement, and Acting Commissioner, INTERNAL
REVENUE SERVICE,
1111 Constitution Avenue, N.W.
Washington, DC 20224

5006 Elsmere Place
Bethesda, MD 20814

**DOUGLAS H. SHULMAN**, in his official and
individual capacity as former Commissioner,
INTERNAL REVENUE SERVICE,
1111 Constitution Avenue, N.W.
Washington, DC 20224

2706 36th Street, N.W.
Washington, DC 20007

**WILLIAM WILKINS**, in his official and individual
capacity as Chief Counsel, INTERNAL REVENUE
SERVICE,
1111 Constitution Avenue, N.W.
Washington, DC 20224

[Residential address forthcoming]

**LOIS LERNER**, in her official and individual
capacity as Director, Exempt Organizations Division,
INTERNAL REVENUE SERVICE,
1111 Constitution Avenue, N.W.
Washington, DC 20224

6610 Fernwood Court
Bethesda, MD 20817

**HOLLY PAZ**, in her official and individual capacity
as Acting Manager, Exempt Organizations Technical
Unit, Acting Director, Office of Rulings &
Agreements, and Director, Office of Rulings &
Agreements, INTERNAL REVENUE SERVICE,
1111 Constitution Avenue, N.W.
Washington, DC 20224

5703 Northfield Road
Bethesda, MD 20817

**CINDY M. THOMAS,** in her official and individual
capacity as Program Manager, Exempt Organizations
Determinations Unit of the INTERNAL REVENUE
SERVICE,
1111 Constitution Avenue, N.W.
Washington, DC 20224

11 Wesley Drive
Wilder, KY 41076-1472

**STEVEN GRODNITZKY**, in his official and
individual capacity as Manager, Exempt
Organizations Technical Unit,
INTERNAL REVENUE SERVICE,
1111 Constitution Avenue, N.W.
Washington, DC 20224

916 6th Street, NE
Washington, DC 20002

**DAVID FISH**, in his official and individual capacity
as Acting Director, Office of Rulings & Agreements,
INTERNAL REVENUE SERVICE,
1111 Constitution Avenue, N.W.
Washington, DC 20224

3623 37th St. N.
Arlington, VA  22207

**MICHAEL C. SETO**, in his official capacity and
individual capacity as Acting Manager, Technical
Unit, INTERNAL REVENUE SERVICE,
1111 Constitution Avenue, N.W.
Washington, DC 20224

1711 Massachusetts Avenue, N.W., #512
Washington, D.C. 20036

**SUSAN MALONEY**, in her official and individual
capacity as an Exempt Organizations Specialist,
INTERNAL REVENUE SERVICE,
1111 Constitution Avenue, N.W.
Washington, DC 20224

4753 Summerside Road
Cincinnati, OH 45244

**RONALD BELL**, in his official and individual
capacity as an Exempt Organizations Specialist,
INTERNAL REVENUE SERVICE,
1111 Constitution Avenue, N.W.
Washington, DC 20224,

929 Main Street
Covington, KY 41011

**JANINE L. ESTES**, in her official and individual
capacity as an Exempt Organizations Specialist,
INTERNAL REVENUE SERVICE,
1111 Constitution Avenue, N.W.
Washington, DC 20224

8956 Richmond Road
Union, KY 41091

**FAYE NG**, in her official and individual capacity as
an Exempt Organizations Specialist, INTERNAL
REVENUE SERVICE,
1111 Constitution Avenue, N.W.
Washington, DC 20224

6568 Pepperell Lane
Cincinnati, OH 45236, and

**UNKNOWN NAMED EMPLOYEES OF THE
INTERNAL REVENUE SERVICE**, in their official
and individual capacities,

*Defendants.*

## First Amended Verified Complaint for Declaratory Judgment, Injunctive Relief, and Compensatory, Statutory, and Punitive Damages

Plaintiff, True the Vote, Inc. ("True the Vote"), by counsel, respectfully states as follows

for its complaint against Defendants the Internal Revenue Service ("IRS"), the United States of

America (the "U.S. Government"), IRS Commissioner Daniel Werfel ("Commissioner Werfel"),

and Steven T. Miller ("Mr. Miller"), Douglas H. Shulman ("Mr. Shulman"), William Wilkins

("Mr. Wilkins"), Lois Lerner ("Ms. Lerner"), Holly Paz ("Ms. Paz"), Steven Grodnitzky  ("Mr.

Grodnitzky"), David Fish ("Mr. Fish"), Michael C. Seto  ("Mr. Seto"), Cindy M. Thomas ("Ms.

Thomas"), Susan Maloney ("Ms. Maloney"), Ronald Bell ("Mr. Bell"), Janine L. Estes ("Ms.

Estes"), Faye Ng ("Ms. Ng"), and Unknown Named Employees of the Internal Revenue Service

(collectively, the "IRS Employees") (collectively, the "IRS Defendants").

## Introduction

1.      This action arises out of the IRS Defendants' wrongful acts and omissions

concerning the application of True the Vote to the IRS for recognition as a tax-exempt

educational and charitable organization pursuant to the following Sections of Title 26 of the U.S.

Code, the Internal Revenue Code: 26 U.S.C. § 501(c)(3) ("Section 501(c)(3)"), 26 U.S.C. §

509(a)(1) ("Section 509(a)(1)"), and 26 U.S.C. § 170(b)(1)(A)(vi) ("Section 170(b)(1)(A)(vi)").

2.      True the Vote is a not-for-profit Texas corporation organized and operated

exclusively or primarily for a charitable purpose.

3.      True the Vote is entitled to tax-exempt status by virtue of its status as a not-for-

profit, non-partisan, charitable and educational organization. As stated in True the Vote's

application for tax-exempt status (the "Application") and other information furnished to the IRS,

True the Vote's mission is to promote and improve the integrity of the voting process in the

United States. Its primary activity is to observe and promote better compliance with election

laws and procedures through citizen participation. True the Vote seeks to educate the public

about election law compliance and procedures. True the Vote works with any person or

organization who shares its mission of supporting and promoting free and fair elections. True the

Vote's charitable and educational purposes fall squarely within applicable legal precedent for

tax-exempt status under Sections 501(c)(3), 509(a)(1) and 170(b)(1)(A)(vi).

4.      It has now been more than three years since True the Vote filed its Application

with the IRS on July 15, 2010. Yet the Application remains pending at the IRS. As a practical

matter, True the Vote's application has essentially been denied, albeit without benefit of the

normal and customary appeals process to which applicants are entitled.

5.      Because of True the Vote's mission of promoting election integrity and its

perceived association with "Tea Party" organizations, the IRS Defendants systematically

targeted True the Vote's application for unwarranted delay and heightened review and scrutiny.

As a result, True the Vote was deliberately subjected to numerous unnecessary, burdensome, and

unlawful requests for information about its operations, activities, leadership, volunteers,

associations, and affiliations.  The effect if not the intent of this wrongful conduct was to infringe

the First Amendment rights of free speech and association of True the Vote and its members,

supporters, and donors—both current and prospective.

6.      Under the IRS Defendants' unlawful scheme, True the Vote was forced to

repeatedly furnish the IRS with information, materials, and documents that were not necessary to

determine whether True the Vote was entitled to tax-exempt status. The IRS Defendants'

repeated requests for additional information and documents were intended to harass True the

Vote and to have a chilling effect on the First Amendment rights of current and prospective

members and donors. Rather than use True the Vote's information and documents for any

legitimate purpose, the IRS Defendants repeatedly accessed and inspected the information in

violation of federal law that prohibits IRS agents from inspecting taxpayer information without

authorization.

7.      By creating, developing, implementing, and applying this unlawful scheme, the

IRS Defendants acted in violation of their oaths and duties to uphold the Constitution of the

United States and the laws of the United States. Instead, the IRS Defendants exceeded their

authority under federal law to recognize the status of tax-exempt charitable and educational

organizations. True the Vote has been irreparably harmed, and its recognition as a tax-exempt

charitable and educational organization has been improperly withheld as a result of the IRS Defendants' actions.

8.      True the Vote has taken, in a timely manner, all reasonable steps to secure a determination from the IRS of its charitable and educational status.

9.      The IRS has failed to make a determination with respect to True the Vote's Application despite multiple efforts over three years by True the Vote to furnish to the IRS all information requested, including substantial information and materials unnecessary to the processing of True the Vote's Application.

10.      Due to the unwarranted and unlawful delay of the processing of its Application, True the Vote requested hardship status three times to seek an expedited processing of its Application.  However, no expedited process occurred.

11.      Attached as Exhibit A is a timeline describing True the Vote's correspondence with the IRS regarding its Application.

12.      It has been more than 270 days since the IRS received a substantially completed application for tax-exempt status from True the Vote, thereby confirming that True the Vote has exhausted its administrative remedies as required under 26 U.S.C. § 7428(b)(2).

13.      Accordingly, True the Vote seeks the following relief against the following IRS Defendants:

    a.  against the U.S. Government, a declaratory judgment pursuant to 26 U.S.C.

        § 7428 finding that True the Vote is a tax-exempt charitable and educational

        organization under Sections 501(c)(3), 509(a)(1), and 170(b)(1)(A)(vi);

b.   against the IRS and Commissioner Werfel, a declaratory judgment and injunctive

relief pursuant to 28 U.S.C. §§ 2201 and 2202 to prevent further infringement of

True the Vote's First Amendment rights of free speech and association;

c.   against the Defendant IRS Employees in their individual capacities, pursuant to

*Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403

U.S. 388 (1971), actual and/or punitive damages resulting from the Defendant

IRS Employees' violations of True the Vote's First Amendment rights of free

speech and association;

d.   against the U.S. Government, pursuant to 26 U.S.C. § 7431, statutory and/or

actual and punitive damages caused by the U.S. Government's willful,

unauthorized inspection of True the Vote's confidential tax return information in

violation of 26 U.S.C. § 6103; and

e.   against each of the IRS Defendants, in their official capacities, declaratory and

injunctive relief from violations of the Administrative Procedure Act, 5 U.S.C. §

706 (the "APA").

## Jurisdiction and Venue

### (Subject Matter Jurisdiction)

14.   This Court has subject matter jurisdiction under 26 U.S.C. § 7431(a), 28 U.S.C. §

1331 (federal question), 28 U.S.C. § 2201 (Declaratory Judgment Act), and 5 U.S.C. § 702

(Administrative Procedure Act).

15.   This Court also has subject matter jurisdiction under 28 U.S.C. § 1346(e) because

this is an action brought pursuant to 26 U.S.C. § 7428.

16.     True the Vote satisfies the prerequisites for an action under 28 U.S.C. § 7428 for the following reasons:

   a.   True the Vote seeks relief as to its qualification or classification under Section 501(c)(3), thereby satisfying the requirements of 28 U.S.C. § 7428(b)(1).

   b.   The IRS has failed to make a determination with respect to True the Vote's initial qualification as an organization described in Section 501(c)(3), thereby satisfying the requirements of 28 U.S.C. § 7428(a)(2).

   c.   True the Vote has exhausted its administrative remedies, thereby satisfying the requirements of 28 U.S.C. § 7428(b)(2).

   d.   There are actual legal interests of sufficient immediacy to reflect an actual controversy between True the Vote and the U.S. Government, thereby satisfying the requirements of 28 U.S.C. § 7428(a).

17.     This Court is duly authorized and empowered pursuant to 26 U.S.C. § 7428 to issue a declaratory judgment granting the initial qualification for exempt status of an organization such as True the Vote as described in Section 501(c)(3) of the Code.

18.     Pursuant to 28 U.S.C. § 2201, Defendant U.S. Government has waived its sovereign immunity with regard to True the Vote's claims seeking declaratory relief from violations of its constitutional rights. Section 2201 does not bar review of these claims because they are not "with respect to Federal taxes."

19.     The Anti-Injunction Act, 26 U.S.C. § 7421(a), does not bar review of these claims because they are not brought "for the purpose of restraining the assessment or collection of any tax." Alternatively, these claims are not barred because they satisfy one or more of the judicially-created exceptions to the Anti-Injunction Act. *See, e.g.*, *Enochs v. Williams Packing and*

*Navigation Co.*, 370 U.S. 1 (1962); *South Carolina v. Regan*, 465 U.S. 367 (1984); *Cohen v. United States*, 650 F.3d 717 (D.C. Cir. 2011) (*en banc*).

20.     This Court is authorized pursuant to 28 U.S.C. § 2202 to grant "[f]urther necessary or proper relief based on a declaratory judgment or decree," including injunctive relief.

21.     Pursuant to 5 U.S.C. § 702, the U.S. Government has waived its sovereign immunity in actions "seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority…."

22.     The U.S. Government has waived its sovereign immunity pursuant to 26 U.S.C. § 7431, which provides taxpayers a cause of action for damages against the United States for knowing or negligent unauthorized inspection of tax return information in violation of 26 U.S.C. § 6103.

23.     Defendant U.S. Government is a proper defendant pursuant to 26 U.S.C. § 7431(a)(1) and 28 U.S.C. § 1346(e).

24.     This action is brought within two years after the date of discovery by True the Vote of the unauthorized inspections of its confidential taxpayer return information as described herein. 26 U.S.C. § 7431(d).

**(Personal Jurisdiction)**

25.     Personal jurisdiction over the IRS and U.S. Government is proper in this Court because they "maintain [their]…principal place of business in" the District of Columbia. D.C. Code § 13-422.

26.     Personal jurisdiction over Defendants Mr. Miller, Mr. Wilkins, Ms. Lerner, Ms. Paz, and Mr. Fish, and Unknown Named Employees of the IRS is proper in this Court because at

times relevant to this Complaint they "maintain[ed] [their]…principal place of business in" the District of Columbia, D.C. Code § 13-422, and have "transact[ed]…business in the District of Columbia," D.C. Code § 13-423(a)(1).

27.     Personal jurisdiction over Defendants Mr. Shulman, Mr. Grodnitzky, and Mr. Seto are proper in this Court because they are "domiciled in" the District of Columbia and at times relevant to this Complaint "maintain[ed] [their]…principal place of business in" the District of Columbia. D.C. Code § 13-422.

28.      Personal jurisdiction over defendants Mr. Thomas, Ms. Maloney, Mr. Bell, Ms. Estes, Ms. Ng, and Unknown Named Employees of the IRS is proper in this Court for the following reasons:

a.   Each of the foregoing IRS Employees has established minimum contacts with this forum by virtue of deliberate actions or omissions, described more thoroughly herein, regarding the processing of True the Vote's application for tax-exempt status within this forum. Such involvement also satisfies the conditions for jurisdiction within this forum under D.C. Code § 13-423(a)(1) ("transacting…business in the District of Columbia") and D.C. Code § 13-423(a)(4) ("causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia" while "engag[ing] in [a] persistent course of conduct" within the District of Columbia);

b.   Each of the foregoing IRS Employees worked in concert with one or more of the IRS Defendants residing in the District of Columbia—including the IRS, Mr. Miller, Mr. Shulman, Mr. Wilkins, Ms. Lerner, Ms. Paz, Mr. Grodnitzky, Mr. Fish, Mr. Seto, and Unknown Named Employees of the IRS—in furtherance of a

civil conspiracy aimed at creating, revising, implementing and applying the
unlawful and discriminatory IRS Targeting Scheme, described more thoroughly
herein, in violation of the statutory and constitutional rights of True the Vote and
others.

**(Venue)**

29.     Venue is proper in this district under 26 U.S.C. § 7428(a), which requires such
actions to be brought in either the United States Tax Court, the United States Court of Federal
Claims, or the United States District Court for the District of Columbia.

30.     Venue is also appropriate under 28 U.S.C. § 1391(e)(1)(B) because a substantial
part of the events or omissions giving rise to the claims occurred in this district.

# The Parties

**(Plaintiff)**

31.     Plaintiff True the Vote, Inc. is a not-for-profit corporation duly created on June 7,
2010 and validly existing under the laws of the State of Texas. True the Vote's current mailing
address is in care of its registered agent:

> Catherine Engelbrecht
> 7232 Wynnwood Lane
> Houston, TX 77008-6041

**(The IRS Defendants)**

32.     Defendant IRS is an agency of the U.S. Government that is responsible for
administration and enforcement of provisions of the Internal Revenue Code, as well as all other
IRS rules, regulations, policies, procedures, and practices.

33.     Defendant the U.S. Government is a proper defendant pursuant to 5 U.S.C. § 702,
26 U.S.C. §§ 7428, 7431(a), and 28 U.S.C. § 1346(e).

34.     Defendant Commissioner Werfel is the Acting Commissioner of the IRS. As

such, Commissioner Werfel is responsible for managing, directing, and supervising the activities

and executing and implementing the laws and policies of the IRS. Commissioner Werfel is sued

in his official capacity only.

35.     At times relevant to this Complaint, Defendant Mr. Miller was either the Deputy

Commissioner for Services and Enforcement, or the Acting Commissioner, of the IRS. His

current position with the U.S. Government is unknown to True the Vote. During the time that he

was Deputy Commissioner for Services and Enforcement or the Acting Commissioner of the

IRS, Mr. Miller was responsible for managing, directing, and supervising the activities of the

IRS and executing and implementing the laws, regulations, and policies governing the activities

of the IRS. Mr. Miller is sued in his official capacity, and pursuant to Fed. R. Civ. P. 4(i)(3), in

his individual capacity for acts and omissions occurring in connection with duties performed on

behalf of the U.S. Government.

36.     At times relevant to this Complaint, Defendant Mr. Shulman was the

Commissioner of the IRS. At such times, he was responsible for managing, directing, and

supervising the activities of the IRS and executing and implementing the laws, regulations, and

policies governing the activities of the IRS. Mr. Shulman is sued in his official capacity and,

pursuant to Fed. R. Civ. P. 4(i)(3), in his individual capacity for acts and omissions occurring in

connection with duties performed on behalf of the U.S. Government.

37.     Defendant Mr. Wilkins is the Chief Counsel for the IRS, appointed to that

position by the President of the United States. At times relevant to this Complaint, Mr. Wilkins

was responsible for interpreting, administering and enforcing the Internal Revenue laws,

representing the IRS in litigation, and providing all other legal support needed by the IRS. He

and IRS Employees subject to his supervision and control were directly involved in the actions and activities described in this Complaint. Mr. Wilkins is sued in his official capacity and, pursuant to Fed. R. Civ. P. 4(i)(3), in his individual capacity for acts and omissions occurring in connection with duties performed on behalf of the U.S. Government.

38.    At times relevant to this Complaint, Defendant Ms. Lerner was the Director of the Exempt Organizations Division of the IRS. At such times, she was responsible for planning, managing, directing, administering, enforcing, and executing the rules, policies and practices of the Exempt Organizations Division of the IRS. Ms. Lerner is sued in her official capacity and, pursuant to Fed. R. Civ. P. 4(i)(3), in her individual capacity for acts and omissions occurring in connection with duties performed on behalf of the U.S. Government.

39.    At times relevant to this Complaint, Defendant Ms. Paz was either the Acting Manager, Exempt Organizations Technical Unit; the Acting Director, Office of Rulings and Agreements; or the Director, Office of Rulings and Agreements, of the IRS. Her current position with the government is unknown to True the Vote.  Ms. Paz was responsible for processing determination letter requests from exempt organizations seeking recognition of tax-exempt status, and providing assistance and guidance to other IRS officers and employees involved in such processing. Ms. Paz is sued in her official capacity and, pursuant to Fed. R. Civ. P. 4(i)(3), in her individual capacity for acts and omissions occurring in connection with duties performed on behalf of the U.S. Government.

40.    Defendant Ms. Thomas is the Program Manager, Exempt Organizations Determinations Unit, of the IRS. She is the highest ranking IRS employee in the Exempt Organizations Determination Unit of the IRS, located in Cincinnati, Ohio. She is responsible for processing determination letter requests from exempt organizations seeking recognition of tax-

exempt status, and providing assistance and guidance to other IRS officers and employees

involved in such processing. She is sued in her official and, pursuant to Fed. R. Civ. P. 4(i)(3), in

her individual capacity for acts and omissions occurring in connection with duties performed on

behalf of the U.S. Government.

41.     Defendant Mr. Grodnitzky is a Manager, Exempt Organizations Technical Unit,

of the IRS. He is responsible for processing determination letter requests from exempt

organizations seeking recognition of tax-exempt status, and providing assistance and guidance to

other IRS officers and employees involved in such processing. He is sued in his official capacity

and, pursuant to Fed. R. Civ. P. 4(i)(3), in his individual capacity for acts and omissions

occurring in connection with duties performed on behalf of the U.S. Government

42.      At times relevant to this Complaint, Defendant Mr. Fish was either the Acting

Director, Exempt Organizations Office of Rulings and Agreements, or the Manager, Exempt

Organizations, Guidance Unit, of the IRS. At such times, he was responsible for processing

determination letter requests from exempt organizations seeking recognition of tax-exempt

status, and providing assistance and guidance to other IRS officers and employees involved in

such processing. His current position with the government is unknown to True the Vote. He is

sued in his official capacity and, pursuant to Fed. R. Civ. P. 4(i)(3), in his individual capacity for

acts and omissions occurring in connection with duties performed on behalf of the U.S.

Government.

43.     Defendant Mr. Seto is the Acting Manager, Exempt Organizations Technical

Unit, of the IRS. He is responsible for processing determination letter requests from exempt

organizations seeking recognition of tax-exempt status, and providing assistance and guidance to

other IRS officers and employees involved in such processing. He is sued in his official capacity

and, pursuant to Fed. R. Civ. P. 4(i)(3), in his individual capacity for acts and omissions

occurring in connection with duties performed on behalf of the U.S. Government.

44.     Defendant Ms. Maloney is an IRS Exempt Organizations Specialist in the IRS

Determinations Unit who oversaw the processing of True the Vote's application for tax-exempt

status. She is sued in her official capacity and, pursuant to Fed. R. Civ. P. 4(i)(3), in her

individual capacity for acts and omissions occurring in connection with duties performed on

behalf of the U.S. Government.

45.     Defendant Mr. Bell is an IRS Exempt Organizations Specialist in the IRS

Determinations Unit who oversaw the processing of True the Vote's application for tax-exempt

status. He is sued in his official capacity and, pursuant to Fed. R. Civ. P. 4(i)(3), in his individual

capacity for acts and omissions occurring in connection with duties performed on behalf of the

U.S. Government.

46.     Defendant Ms. Estes is an IRS Exempt Organizations Specialist in the IRS

Determinations Unit who oversaw the processing of True the Vote's application for tax-exempt

status. She is sued in her official capacity and, pursuant to Fed. R. Civ. P. 4(i)(3), in her

individual capacity for acts and omissions occurring in connection with duties performed on

behalf of the U.S. Government.

47.     Defendant Ms. Ng is an IRS Exempt Organizations Specialist in the IRS

Determinations Unit who oversaw the processing of True the Vote's application for tax-exempt

status. She is sued in her official capacity and, pursuant to Fed. R. Civ. P. 4(i)(3), in her

individual capacity for acts and omissions occurring in connection with duties performed on

behalf of the U.S. Government.

48.     Defendant Unknown Named Employees of the Internal Revenue Service are current and/or former directors, officers, agents, and employees of the IRS who developed, implemented, applied, approved, or oversaw the unconstitutional IRS identification, review, and processing criteria and policies described herein. Each Unknown Named Defendant is sued in his or her official capacity and/or, pursuant to Fed. R. Civ. P. 4(i)(3), in his or her individual capacity for acts and omissions occurring in connection with duties performed on behalf of the U.S. Government. The identity of all individual named defendants liable to True the Vote cannot be completely and accurately ascertained at this time, but will be more fully known after the completion of discovery.

49.     At all times relevant to this Complaint, the IRS Employee Defendants were acting under color of federal law within the scope of their employment at the IRS.

## Factual Allegations

**True the Vote's Application for Tax-exempt Status**

50.     On June 7, 2010, an entity then known as KSP/True the Vote was duly created as a non-profit corporation under the laws of the State of Texas. (Exhibit B at 20.)

51.     KSP stands for "King Street Patriots," which was True the Vote's 26 U.S.C. § 501(c)(4) affiliated organization. King Street Patriots and True the Vote are separate and distinct corporate entities.

52.     On August, 26, 2011, KSP/True the Vote changed its name to True the Vote, Inc.

53.     On July 15, 2010, True the Vote properly filed with the IRS its Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code (Form 1023) (Exhibit B.)

54.     True the Vote received no further contact from the IRS Defendants during calendar year 2010.

55.     On January 5, 2011, at the request of True the Vote, Sen. John Cornyn (R-TX) inquired of the IRS as to the status of True the Vote's application for tax-exempt status on behalf of his constituent, True the Vote, a Texas-based organization.

56.     In a February 15, 2011 letter sent from the Cincinnati, Ohio IRS office, Defendant Ms. Maloney requested additional information from True the Vote in order to complete the IRS' consideration of True the Vote's Application. (Exhibit C.)

57.     In letters dated March 7, 2011 and March 8, 2011, True the Vote furnished to the IRS the information requested in the IRS' February 15 letter.

58.     Following True the Vote's submission of the requested information, the IRS Defendants failed to proceed in a lawful manner to consider and grant True the Vote's application for tax-exempt status.

59.     On or around October 27, 2011, the IRS Taxpayer Advocate advised Sen. Cornyn in response to his January 5, 2011 inquiry that it had contacted Defendant Mr. Bell regarding the status of True the Vote's application and that Mr. Bell had informed the Taxpayer Advocate that he was waiting for a determination on True the Vote's Application from the IRS Washington D.C. office. (Exhibit G.)

60.     On October 12, 2011, True the Vote's legal counsel contacted the IRS and its agent, Defendant Mr. Bell, to inquire as to the status of True the Vote's Application. During this phone conversation, Mr. Bell stated that True the Vote's Application was being overseen by and had been forwarded to the IRS office in Washington, D.C. for additional review. According to Mr. Bell, the Washington, D.C. office had assumed primary approval responsibility.

61.     On November 8, 2011, True the Vote memorialized its October 12, 2011 phone conversation with the IRS in correspondence. Along with this November 8, 2011 correspondence, True the Vote submitted to the IRS additional information regarding its mission, purpose and activities, together with documentation of legal precedent in and before the IRS that provided the IRS Defendants the legal basis for granting to True the Vote recognition as a charitable and educational tax-exempt organization.

62.     Following True the Vote's submission of the legal precedent for recognition of True the Vote as a charitable and educational tax-exempt organization, the IRS Defendants still failed to proceed in a lawful manner to consider and grant True the Vote's application for tax-exempt status.

63.     In a February 8, 2012 letter, sent from the Cincinnati, Ohio IRS office, Defendant Ms. Estes stated that the IRS needed even more information from True the Vote to complete the IRS' consideration of True the Vote's Application. (Exhibit D.)

64.     In a letter dated March 20, 2012, True the Vote furnished to the IRS the information requested in the IRS' February 8, 2012 letter.

65.     Following True the Vote's submission of the requested information, the IRS Defendants again failed to proceed in a lawful manner to consider and grant True the Vote's application for exempt status.

66.     In an October 9, 2012 letter, sent from the Cincinnati, Ohio IRS office, Defendant Ms. Ng requested still more information from True the Vote in order to complete its consideration of its Application. (Exhibit E.)

67.     In a letter dated November 30, 2012, True the Vote furnished to the IRS the information requested in the IRS' October 9, 2012 letter.

68.     Following True the Vote's submission of the requested information, the IRS Defendants yet again failed to proceed in a lawful manner to consider and grant True the Vote's application for exempt status.

69.     True the Vote has acted in good faith in its dealings with the IRS Defendants— responding to all requests of the IRS for materials, documents, and information— notwithstanding that the information requested is and was well beyond the scope of the government's legitimate inquiries for purposes of ascertaining and acting on True the Vote's application for tax-exempt status.

70.     Despite responding to each and every request propounded to True the Vote by Defendants, True the Vote has yet to receive recognition of its tax-exempt status from the IRS.

71.     True the Vote has incurred substantial costs and expenses in responding to the IRS' burdensome, unnecessary, and unlawful requests for information.

72.     Because the IRS Defendants deliberately and unnecessarily delayed the processing of its Application, True the Vote's ability to build its organization has been hindered and it has been forced to forfeit grants from grant-making foundations and other contributions and fundraising opportunities.

**IRS Scheme of Targeting Tea Party Applicants for Tax-exempt Status**

73.     Beginning in 2010, and possibly earlier, the IRS Defendants developed and implemented a written and unwritten policy for identifying and subjecting certain applicants for tax-exempt status to additional and heightened review and scrutiny, based solely on a notion by the IRS Defendants that groups should be targeted for such review based on their purpose, mission, and/or name(s). (This policy, as described more fully throughout this Complaint, is collectively referred to as the "IRS Targeting Scheme.")

74.     Under the IRS Targeting Scheme, applications for tax-exempt status filed by organizations whose names, purpose(s), or mission(s)- in the view of the IRS Defendants— indicated a conservative philosophical viewpoint or a viewpoint supported by "Tea Party" organizations (the "Targeted Organizations") were subjected to additional review and scrutiny, and deliberate delays in processing.

75.     Under the IRS Targeting Scheme, the IRS Defendants engaged in other discriminatory conduct toward the Targeted Organizations.

76.     The IRS Defendants swept True the Vote into its IRS Targeting Scheme based solely on True the Vote's name, affiliation with King Street Patriots, and/or its mission and purpose of promoting election integrity.

77.     On May 10, 2013, at a meeting of the Exempt Organizations Committee of the Tax Section of the American Bar Association, Defendant Ms. Lerner—who was at the time the Director of the Exempt Organizations Division of the IRS—admitted in a response to a question she had planted in the audience that the IRS had selected applications for tax-exempt status for further review and scrutiny "simply because the applications" "used names like Tea Party or Patriots." Streckfus, EO Tax Journal 2013-82, May 11, 2013, *available in part at* http://electionlawblog.org/?p=50160.

78.     At that May 10, 2013 meeting, Defendant Ms. Lerner made the following additional admissions regarding the IRS Targeting Scheme:

    a.  "That was wrong, that was absolutely incorrect, insensitive, and inappropriate — that's not how we go about selecting cases for further review. We don't select for review because they have a particular name." *Id*.

    b.  "The other thing that happened was they also, in some cases, cases sat around for a while. "[The IRS] sent some letters out that were far too broad, asking questions of these organizations that weren't really necessary for the type of application." *Id*.

c. "[The IRS] went back and looked at questions that had been sent out to folks because some of them were extensive and where the questions weren't necessary we gave the organizations flexibility as to which questions they needed to answer and gave them more time to answer them. In some cases we told them to just ignore the letter we already sent and sent a new list of questions. In some cases we said we don't need those questions answered. We can deal with your application without responses to those questions." *Id.*

79.     At the time, Defendant Ms. Lerner apologized on behalf of the IRS for the way the IRS had handled the applications of the Targeted Organizations. *Id.*

80.     On or around May 14, 2013, the Treasury Inspector General for Tax Administration issued a report entitled "Inappropriate Criteria Were Used to Identify Tax-Exempt Applications for Review" (the "TIGTA Report"). The TIGTA Report describes the results of the Inspector General's audit of the IRS Targeting Scheme. (Exhibit F.)

81.     The TIGTA Report concludes as follows:

The IRS used inappropriate criteria that identified for review Tea Party and other organizations applying for tax-exempt status based upon their names or policy positions instead of indications of potential political campaign intervention.  Ineffective management: 1) allowed inappropriate criteria to be developed and stay in place for more than 18 months, 2) resulted in substantial delays in processing certain applications, and 3) allowed unnecessary information requests to be issued.

(Exhibit F at 2.)

82.     Appendix VII to the TIGTA Report is a Comprehensive Timeline of Events. The timeline summarizes the involvement of various IRS agents and officers—including Defendant IRS Employees—in the creation, revision and implementation of the IRS Targeting Scheme. (Exhibit F at 37-38.)

83.     As described by the TIGTA Report, in March and April of 2010, the IRS Exempt Organizations ("EO") Determinations Unit in Cincinnati, Ohio, under the control and direction of Defendant Ms. Thomas, "began searching for…requests for tax-

exemption involving the Tea Party, Patriots, 9/12 and 26 U.S.C. § 501(c)(4) applications

involving political sounding names, *e.g.*, 'We the People' or 'Take Back the Country.'"

(Exhibit F at 36-37.)

84.     By July 2010, the EO "Determinations Unit management requested its specialists

to be on the lookout for Tea Party applications." (Exhibit F at 12, 36.)

85.     "In August 2010, the Determinations Unit distributed the first formal BOLO

listing. The criteria in the BOLO listing were Tea Party organizations applying for 26 U.S.C.

§ 501(c)(3) or 26 U.S.C. § 501(c)(4) status."[1] (Exhibit F at 12.)

86.     As detailed by the TIGTA Report, between 2010 and 2012, the EO

Determinations Unit and EO Specialists in the Cincinnati, Ohio IRS office, under the direction

and control of Defendant Ms. Thomas, worked in concert with the IRS EO Technical Unit and

other IRS offices in Washington, D.C. to develop and revise the unconstitutional IRS Targeting

Scheme and to process applications in accordance with the IRS Targeting Scheme. (Exhibit F at

19, 37-48.)

87.     In March 2010, and possibly earlier, Defendant Paz, who was then Acting

Manager of the EO Technical Unit, was aware of the existence and application of the IRS

Targeting Scheme. (Exhibit F at 37.)

88.     In March 2010, Defendant Ms. Paz requested that certain applications being

processed in accordance with the IRS Targeting Scheme in the IRS EO Determinations Unit,

under the direction and control of Defendant Ms. Thomas, be transferred to IRS offices in

Washington, D.C. (Exhibit F at 37.)

---

[1] "BOLO" stands for "Be On The Look Out." (Exhibit F at 6.)

89.     In April 2010, and possibly earlier, Defendant Mr. Grodnitzky, who was then Acting Manager of the EO Technical Unit, was aware of the existence and application of the IRS Targeting Scheme. (Exhibit F at 37.)

90.     In April 2010, Defendant Mr. Grodnitzky suggested the need for a "Sensitive Case Report" regarding applications being processed in accordance with IRS Targeting Scheme. (Exhibit F at 37.) Defendant Ms. Thomas agreed that a "Sensitive Case Report" was needed. (*Id*.)

91.     In April 2010, Defendant Mr. Grodnitzky directed the preparation of a "Sensitive Case Report" regarding processing applications for tax-exempt status submitted by the Targeted Organizations. (Exhibit F at 38.)

92.     According to the TIGTA Report, the Sensitive Case Report was shared with the Director, Office of Rulings and Agreements, and a chart summarizing the Sensitive Case Report was provided to Defendant Ms. Lerner, the Director of the Exempt Organizations division. (Exhibit F at 38.)

93.     In April 2010, the IRS EO Determinations Unit requested that the EO Technical Unit provide assistance with identifying and processing the applications subject to the IRS Targeting Scheme. (Exhibit F at 19.)

94.     Defendant Ms. Thomas requested status updates from the EO Technical Unit on these requests for assistances several times. (Exhibit F at 20.)

95.     In May 2010, the Technical Unit began reviewing additional information request letters prepared by the Determinations Unit. (Exhibit F at 32.)

96.     Between 2010 and 2012, the IRS EO Technical Unit—under the direction and control of either Defendant Ms. Paz, Defendant Mr. Grodnitzky, or Defendant Mr. Seto—the

IRS Office of Rulings and Agreements—under the direction and control of either Defendant Ms. Paz or Defendant Mr. Fish—Defendant Ms. Lerner, and Unknown Named Employees of the IRS developed and revised written and oral guidance on how IRS Employees, including Defendant Ms. Thomas, Ms. Maloney, Ms. Estes, Mr. Bell, Ms. Ng, and Unknown Named IRS Employees were to identify and process applications in accordance with the IRS Targeting Scheme. (*See* Exhibit F at 19, 20, 37-48.)

97.     Between 2010 and 2012, the EO Determinations Unit—under the direction and control of Defendant Ms. Thomas—and EO Specialists implemented and applied this written and oral guidance on how to identify and process applications in accordance with the IRS Targeting Scheme. (*See* Exhibit F at 37-48.)

98.     Based on this written and oral guidance, IRS Employees prepared, reviewed, and issued letters requesting substantial additional information from True the Vote and hundreds of other applicants for tax-exempt status that were among the Targeted Organizations. (Exhibit F at 24 and 44.)

99.     In March 2012, a draft list of template questions prepared by a team of specialists was forwarded to the Guidance Unit—under the direction and control of Defendant Mr. Fish— for review. (Exhibit F at 45.)

100.     Pursuant to the IRS Targeting Scheme, "the Determinations Unit requested irrelevant (unnecessary) information" from the Targeted Organizations. (Exhibit F at 24.)

101.     As the TIGTA Report states: "This created a burden on the organizations that were required to gather and forward information that was not needed by the Determinations Unit and led to delays in processing the applications." (Exhibit F at 24.)

102.    The Targeted Organizations were not subjected to the IRS Targeting Scheme because their applications indicated "political activity" as that term is defined by the Internal Revenue Code and regulations, guidance and rulings of the IRS. Rather, the Targeted Organizations were subjected to this unconstitutional and otherwise illegal scheme because they were perceived to be associated with conservative policy positions and Tea Party organizations.

103.    On June 29, 2011, and likely earlier, Defendant Ms. Lerner was made aware of the existence and application of the IRS Targeting Scheme. (Exhibit F at 13 and 41.)

104.    On June 29, 2011, Defendant Ms. Lerner was presented with a briefing paper concerning the existence and application of the IRS Targeting Scheme. (Exhibit F at 41.)

105.    The primary author of the briefing paper was a specialist in the IRS EO Guidance Unit, which was under the direction and control of Defendant Mr. Fish. (Exhibit F at 41.)

106.    Defendant Mr. Seto reviewed the briefing paper before presenting it to Defendant Ms. Lerner. (Exhibit F at 41.)

107.    As early as June 29, 2011, and likely earlier, Defendants Ms. Lerner, Ms. Paz, Mr. Grodnitzky, Mr. Fish, Mr. Seto, Ms. Thomas, and Unknown Named Employees of the IRS were aware that applications for tax-exempt status were being subjected to additional and heightened review and scrutiny and delays in processing based solely on one or more of the following discriminatory criteria:

    a.   "Tea Party," "Patriots," or "9/12 Project" is referenced in the case file;

    b.   Issues include U.S. Government spending, U.S. Government debt, or taxes;

    c.   Education of the public via advocacy/lobbying to "make America a better place to live."; and/or

    d.   Statements in the case file criticize how the country is being run.

(Exhibit F at 41).

108.   Defendant Ms. Lerner did not engage in actions necessary to halt the application of the IRS Targeting Scheme despite knowing that it violated federal law and the First Amendment to the United States Constitution. Rather, starting in "January 2012 criteria again focused on the policy positions of organizations instead of tax-exempt laws and Treasury Regulations." (Exhibit F at 13.)

109.   Attached as Exhibit H is a July 17, 2013 letter from Members of Congress to Defendant Commissioner Werfel. This letter includes testimony describing the involvement of Defendant Mr. Wilkins, Defendant Ms. Lerner, and other IRS Employees in creating, overseeing, revising, and implementing the IRS Targeting Scheme.

110.   According to testimony of Carter Hull ("Mr. Hull"), an IRS tax law specialist in Washington, D.C. who was assigned to review some of the first applications of the Targeted Organizations, sometime in the winter of 2010-2011, the senior advisor to Defendant Ms. Lerner told Mr. Hull that Defendant Mr. Wilkins' office would need to review the applications of the Targeted Organizations. (Exhibit H at 2.)

111.   In an email to Defendant Mr. Seto, Defendant Ms. Lerner stated that the applications of the Targeted Organizations would need to go through a  "multi-tier review" and "they will eventually have to go [through her staff] and the chief counsel's office." (Exhibit H at 2.)

112.   Mr. Hull testified that this was the first time in his tenure as an IRS employee that Defendant Ms. Lerner's office had requested that he send applications for tax-exempt status to her office for review. (Exhibit H at 2.)

113.   On August 4, 2011, personnel from the Office of Rulings and Agreements—under the direction of Defendant Ms. Paz—and other IRS Employees held a meeting with Defendant Mr. Wilkins and his office "so that everyone would have the latest information on the [IRS Targeting Scheme]." (Exhibit F at 42.)

114.   Months later, Defendant Mr. Wilkins' office instructed Mr. Hull that "more information" was needed from the Targeted Organizations to process their applications for tax-exempt status. (Exhibit H at 3.)

115.   An IRS tax law specialist and an employee from Defendant Mr. Wilkins' office then prepared a "template" of questions that would be sent to the Targeted Organizations. (Exhibit H at 4.)

116.   The template questions included requests for information from the Targeted Organizations about the Targeted Organizations' political activities leading up to the 2010 election. (Exhibit H at 5.)

117.   Defendant Mr. Wilkins did not engage in actions necessary to halt the application of the IRS Targeting Scheme despite knowing that it violated federal law and the First Amendment to the United States Constitution. Rather, Defendant Mr. Wilkins and the Office of the Chief Counsel, under his direction and control, coordinated the development and implementation of the IRS Targeting Scheme.

118.   In January 2012, the IRS' written criteria used to identify and subject applications to the IRS Targeting Scheme included the following: "Political action type organizations involved in limiting/expanding government, educating on the constitution and bill of rights, [and] social economic reform/movement.'" (Exhibit F at 36.)

119.     In March 2012, and possibly earlier, Defendant Mr. Miller was made aware of the existence and application of the IRS Targeting Scheme.

120.     Defendant Miller did not engage in actions necessary to halt the application of the IRS Targeting Scheme despite knowing that it violated federal law and the First Amendment to the United States Constitution.

121.     In the spring of 2012, and possibly earlier, Defendant Mr. Shulman was made aware of the existence and application of the IRS Targeting Scheme.

122.     Defendant Shulman did not engage in actions necessary to halt the application of the IRS Targeting Scheme despite knowing that it violated federal law and the First Amendment to the United States Constitution.

123.     Defendants the IRS, Commissioner Werfel, Mr. Shulman, Mr. Miller, Mr. Wilkins, Ms. Lerner, Ms. Paz, Mr. Grodnitzky, Mr. Fish, Mr. Seto, Ms. Thomas, Ms. Maloney, Mr. Bell, Ms. Estes, Ms. Ng, and Unknown Named IRS Employees have not taken necessary actions to halt the IRS Targeting Scheme and to ensure that applicants subjected to the IRS Targeting Scheme instead received a determination for tax-exempt status despite actual knowledge that the IRS had received sufficient information from the applicants to make determinations of exempt status.

124.     The IRS Defendants knowingly developed, implemented, and applied the IRS Targeting Scheme in violation of the United States Constitution, the Internal Revenue Code governing tax-exempt organizations, procedures historically followed by the IRS, and Treasury Regulations.

125.    The IRS illegally and incorrectly categorized and characterized True the Vote based on its name, its affiliation with King Street Patriots, and other Tea Party groups, and the mission of True the Vote to protect the integrity of elections.

126.    True the Vote's Application was intentionally targeted for additional review and scrutiny by the IRS Defendants pursuant to the IRS Targeting Scheme because of True the Vote's affiliation with King Street Patriots and other Tea Party groups and the conservative policy positions these organizations are perceived to hold.

127.    King Street Patriots submitted its application for tax-exempt status as a social welfare organization in the spring of 2010. It has not yet received from the IRS a determination letter recognizing its tax-exempt status under 26 U.S.C. § 501(c)(4).

128.    The IRS Defendants made multiple, unnecessary, burdensome, and voluminous requests for information and documentation wholly unnecessary to the determination of True the Vote's tax-exempt status. These requests were propounded solely based on True the Vote's name, its affiliation with King Street Patriots, and its mission and purpose of protecting the integrity of elections.

129.    The IRS and IRS Employees made certain requests for information of True the Vote specifically identified in the TIGTA Report as being unnecessary for the determination of True the Vote's tax-exempt status. (Exhibit F at 26.) For example, True the Vote was asked to provide the following information:

    a.  List each past or present board member, officer, key employee and members of their families who:

        a)  Has served on the board of another organization.

        b)  Was, is or plans to be a candidate for public office. Indicate the nature of each candidacy.

    c) Has previously conducted similar activities for another entity.

    d) Has previously submitted an application for tax-exempt status.

(Exhibit D at 3.)

  b. Do you or will you endorse candidates? If yes, explain and answer the following:

    a) Provide your endorsement criteria.

    b) Once a candidate is endorsed, how does your organization handle the endorsement?

    c) Provide a list of all candidates you have endorsed.

    d) Does your organization notify the candidate of the endorsement? If yes, explain.

    e) Do you provide any materials to candidates, which they may use to promote their candidacy? If so, please describe and provide copies of those materials.

(Exhibit D at 8.)

  c. You have indicated you have a close connection with King Street Patriots.

    a) Provide the address of the organization.

    b) Describe in detail the nature of the relationship.

    c) Do you work with the organization(s) regularly?

    d) Provide copies of all related contracts with such organizations.

    e) Describe the nature of all contacts with the organizations.

    f) Do you share employees, volunteers, resources, office space, etc. with the organization(s)? If yes, explain.

(Exhibit D at 8.)

  d. Are you associated with any other IRC 501(c)(3), 501(c)(4) or 527 organizations? If yes:

    a) Provide the name, federal employer identification number and address of each organization.

      b)  Describe in detail the nature of the relationship(s).

      c)  Do you work with the organization(s) regularly?

      d)  Provide copies of all related contracts with such organizations.

      e)  Describe the nature of all contacts with the organizations.

      f)  Do you share employees, volunteers, resources, office space, etc. with the organization(s)? If yes, explain.

(Exhibit D at 8.)

    e.  Do you engage in business dealings with any candidate(s) for public office or an organization associated with the candidate, such as renting office space or providing access to a membership list? If so, describe the relationship in detail and provide contracts or other agreements documenting the business relationship.

    (Exhibit D at 9.)

    f.  Has any person or organization provided educational services to you? If yes, provide the following:

      a)  The name of the person or organization.

      b)  A full description of the services provided.

      c)  The political affiliation of the person or organization.

(Exhibit D at 9.)

    g.  Have you conducted candidate forums at which candidates for public office were invited to speak? If yes, provide the following:

      a)  Details, including the nature of the forums.

      b)  The candidates invited to participate.

      c)  The candidates that did participate.

      d)  The issues discussed.

      e)  The time and location of the event.

      f)  Copies of all materials distributed regarding the forum and provided at the forum, including any internet material discussing or advertising the forum.

(Exhibit D at 9.)

    h.  You have submitted handouts on teambuilding and presentations used to mobilize and train your volunteers (including Tab 19 and Tab 20 of your response). However, we need additional information on the following:

      d)  Please describe how you partner with Local Parties, local Election Officials and other authorities to place your volunteers as poll workers or poll watchers.

(Exhibit E at 3.)

    i. Please provide a breakdown of the total number of volunteers you have trained as poll watchers that:

      i.  were appointed by Democratic candidates or the Democratic Party,

      ii.  were appointed by Republican candidates or the Republican Party,

      iii.  were appointed by other candidates and other political parties (please specify the names the other parties).

(Exhibit E at 4.)

    j. Please provide a breakdown of the total number of volunteers you have trained as poll workers that:

      i.  were appointed by the Democratic Party,

      ii.  were appointed by the Republican Party,

      iii.  were appointed by other political parties (please specify the names of the other parties)?

    (Exhibit E at 4.)

130.    The questions contained in Paragraph 129 are but a sampling of the intrusive and burdensome questions propounded to True the Vote by the IRS Defendants and is representative of the unnecessary and discriminatory questioning of True the Vote by the IRS.

131.    Certain of the burdensome questions propounded by the IRS to True the Vote further demonstrate the utter disregard by the IRS Defendants of information provided by True the Vote in its initial application filed in July 2010. In its Application, True the Vote stated under penalty of perjury that it did not "support or oppose candidates in political campaigns in any way[.]" (Exhibit B at 9.) As a Section 501(c)(3) organization, True the Vote engages in no partisan campaign intervention, endorses no political candidates and makes no political expenditures.

132.    The IRS Defendants deliberately delayed the processing of True the Vote's Application on the basis of True the Vote's mission and philosophy, its name, and its affiliation with King Street Patriots.

133.    The deliberate targeting of True the Vote for additional review and scrutiny caused and is continuing to cause the IRS to withhold a determination of True the Vote's tax-exempt status.

134.    The mistreatment and mishandling of True the Vote's application for tax-exempt status and the refusal of the IRS Defendants to issue a determination letter recognizing True the Vote's tax-exempt status violate True the Vote's constitutional rights and has caused the organization substantial damages and financial hardship.

135.    The IRS Targeting Scheme was developed, revised, and implemented under the authority of Defendants the IRS, Mr. Miller, Mr. Shulman, Mr. Wilkins, Ms. Lerner, Ms. Paz, Mr. Fish, Mr. Grodnitzky, Mr. Seto, Mr. Thomas, and Unknown Named IRS Employees in violation of the Constitution of the United States and federal law. (Exhibit F at 35.)

136.    According to an internal IRS memorandum released by the IRS as part of a status report on the IRS Targeting Scheme, applications for tax-exempt status continued to be subjected

to the onerous IRS Targeting Scheme until June 20, 2013, when it was allegedly suspended.

Werfel, Charting a Path Forward at the IRS: Initial Assessment and Plan of Action, Appendix C,

June 24, 2013, *available at*

http://www.irs.gov/pub/newsroom/Initial%20Assessment%20and%20Plan%20of%20Action.pdf.

137.    The application of the IRS Targeting Scheme to True the Vote has substantially

and materially interfered with its ability to engage in free speech, free association, and activities

in furtherance of its charitable purpose.

138.    The violations by Defendants of True the Vote's constitutional rights have caused

irreparable harm to True the Vote. Such harm will continue unless this Court provides the

requested relief.

## COUNT I
## Declaratory Judgment Pursuant to 26 U.S.C. § 7428
## (Against Defendant U.S. Government)

139.    Plaintiff True the Vote realleges and incorporates by reference the preceding

paragraphs of this Complaint as though fully set forth herein.

140.    Under 28 U.S.C. § 2201 of the Declaratory Judgment Act and 26 U.S.C. § 7428

of the  Internal Revenue Code (the "Code"), this Court is empowered to issue a declaratory

judgment regarding the initial qualification of an organization as an organization described in

Section 501(c)(3) of the Code.

141.    True the Vote hereby seeks an Order declaring that it is exempt from federal

income tax under Section 501(a) of the Code as a charity described in Sections 501(c)(3),

509(a)(1) and 170(b)(1)(A)(vi) of the Code.

142.    No part of True the Vote's earnings inures to the benefit of any private

shareholder or individual.

143.    True the Vote does not participate or intervene in partisan political campaigns on behalf of or in opposition to any candidate for public office.

144.    To date, True the Vote has timely filed its IRS Form 990 for the relevant years.

145.    The unexplained and inexcusable delay in ruling on the substantially complete Form 1023 has caused True the Vote hardship and irreparable injury by thwarting significant donations from ready and willing donors.

146.    True the Vote is entitled to the relief requested because more than 270 days have passed since the filing of the substantially complete Form 1023 on July 15, 2010, and through no fault of True the Vote, the IRS still has not issued a Notice of Determination with respect to the Application. Due to the passage of the statutorily prescribed review period, all administrative remedies are deemed exhausted as a matter of law pursuant to 26 U.S.C. § 7428(b)(2).

147.    Pursuant to § 7430(a) of the Code, True the Vote is entitled to reasonable attorneys' fees, costs, and expenses in the prosecution of this action.

## COUNT II
### Violation of the First Amendment to the United States Constitution
### Declaratory and Injunctive Relief
### (Against Defendants the IRS and Commissioner Werfel)

148.    Plaintiff realleges and incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

149.    The First Amendment to the United States Constitution protects True the Vote's rights of free speech and association.

150.    The IRS Targeting Scheme under which True the Vote was deliberately subjected to additional review and scrutiny on the basis of True the Vote's affiliations, mission, and substantive philosophical views—actual or as perceived by the IRS Defendants—restricts the

freedom of speech and association of True the Vote and the persons associated with it, in
violation of the First Amendment.

151.     The IRS Targeting Scheme under which the determination of True the Vote's tax-
exempt status was deliberately delayed on the basis of True the Vote's affiliations, mission, and
substantive philosophical views—actual or as perceived by the IRS Defendants—infringes upon
the freedom of speech and association rights of True the Vote and the persons who operate,
support, and associate with it, in violation of the First Amendment.

152.     The IRS Targeting Scheme was applied to True the Vote for the purpose of
chilling True the Vote's expression of its views and right of free association in violation of the
First Amendment.

153.     The application of the IRS Targeting Scheme to True the Vote has impaired the
expressive associational effectiveness of True the Vote and its members.

154.     The conduct of Defendants the IRS and Commissioner Werfel has had a chilling
effect on the willingness and ability of potential donors, grant-making foundations, and others to
provide financial support to True the Vote.

155.     The deliberate delay of True the Vote's determination of exempt status for more
than three years amounts to a functional denial of tax-exempt status, without True the Vote's
having the benefit of its due process rights and an appeal of an actual denial.

156.     The existence and application of the IRS Targeting Scheme by the IRS and
Commissioner Werfel constitutes blatant viewpoint discrimination in violation of the First
Amendment.

157.    The existence and application of the IRS Targeting Scheme by the IRS and

Commissioner Werfel constitutes First Amendment retaliation in violation of the First

Amendment.

158.    Defendants the IRS and Commissioner Werfel knowingly and willfully applied

the IRS Targeting Scheme to True the Vote and other applicants for tax-exempt status in

violation of the First Amendment.

159.    Defendants the IRS and Commissioner Werfel have caused irreparable harm to

True the Vote by violating True the Vote's First Amendment rights of freedom of speech and

association.

160.    True the Vote has no other adequate remedy at law for Defendant IRS' violations

of True the Vote's constitutional rights.

161.    This Court is empowered to grant declaratory and injunctive relief pursuant to 28

U.S.C. §§ 2201 and 2202.

**COUNT III**
**Violation of the First Amendment to the United States Constitution**
***Bivens* Action**
**(Against Defendants Mr. Miller, Mr. Shulman, Mr. Wilkins, Ms. Lerner, Ms. Paz, Mr.**
**Grodnitzky, Mr. Fish, Mr. Seto, Ms. Thomas, Ms. Maloney, Mr. Bell, Ms. Estes, Ms. Ng,**
**and Unknown Named Employees of the Internal Revenue Service In Their Individual**
**Capacities)**

162.    Plaintiff realleges and incorporates by reference the preceding paragraphs of this

Complaint as though fully set forth herein.

163.    The First Amendment to the United States Constitution protects True the Vote's

right to free speech and association.

164.    In *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403

U.S. 388 (1971), the Supreme Court recognized a civil action for money damages against federal

officials for constitutional violations while acting under the color of federal authority.

165.    Defendants Mr. Miller, Mr. Shulman, Mr. Wilkins, Ms. Lerner, Ms. Paz, Mr.

Grodnitzky, Mr. Fish, Mr. Seto, Ms. Thomas, Ms. Maloney, Mr. Bell, Ms. Estes, Ms. Ng, and

Unknown Named Employees of the IRS (the "IRS Employees"), while acting under the color of

federal authority, violated True the Vote's constitutional rights to free speech and association.

They did so by creating, developing, implementing, and applying the IRS Targeting Scheme to

True the Vote and by failing to prevent such development, implementation, and application by

others under their direct supervision and control despite knowledge of such unconstitutional

conduct.

166.    Defendant the IRS Employees knew, or reasonably should have known, that their

actions and omissions would violate True the Vote's constitutional rights.

167.    Congress has not provided any alternative, existing process, or remedy for

protecting the constitutionally recognized interests violated by the IRS Employees. This Court

may, therefore, recognize a remedy for damages under *Bivens v. Six Unknown Named Agents of*

*the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

**COUNT IV**
**Violation of 26 U.S.C. § 6103**
**(Against Defendant the U.S. Government)**

168.    Plaintiff realleges and incorporates by reference the preceding paragraphs of this

Complaint as though fully set forth herein.

169.    Title 26, U.S.C. § 6103 provides that tax "[r]eturns and return information shall be confidential" and prohibits disclosure and inspection by United States employees except as provided for by this provision.

170.    Title 26, U.S.C. § 7431 provides taxpayers a cause of action for damages against the U.S. Government for knowing or negligent unauthorized inspection of tax return information in violation of 26 U.S.C. § 6103.

171.    "Return information" is defined very broadly to include the following:

(A) a taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense,

(B) any part of any written determination or any background file document relating to such written determination (as such terms are defined in section 6110(b) [*IRC Sec. 6110(b)*]) which is not open to public inspection under section 6110 [*IRC Sec. 6110*][.]

26 U.S.C. § 6103(b)(2)(A)-(B).

172.    Because the IRS has not issued a written determination regarding True the Vote's Application, no information furnished by True the Vote to the IRS is open to public inspection under 26 U.S.C. §§ 6104 or 6110.

173.    All information furnished by True the Vote to the IRS is the "return information" of True the Vote pursuant to 26 U.S.C. § 6103(b)(2).

174.    Pursuant to the IRS Targeting Scheme, the IRS Defendants knowingly requested information from True the Vote that was and is unnecessary to its determination of True the Vote's tax-exempt status.

175.    Pursuant to the IRS Targeting Scheme, the IRS Defendants knowingly requested information from True the Vote in furtherance of the IRS' discriminatory and unconstitutional written identification and review policy.

176.    Title 26, U.S.C. § 6103(h) authorizes "inspection by…officers and employees of the Department of the Treasury whose official duties require such inspection or disclosure for tax administration purposes."[2]

177.    Inspection of return information furnished by True the Vote to the IRS Defendants in response to questions the IRS Defendants knew or should have known to be unnecessary to the determination of True the Vote's tax-exempt status is not authorized under 26 U.S.C. § 6103 because it is *per se* not "for tax administration purposes."

178.    Inspection of return information furnished by True the Vote to the IRS Defendants in response to questions asked in furtherance of the IRS Defendants' discriminatory and unconstitutional Targeting Scheme is not authorized under 26 U.S.C. § 6103 because it is *per se* not "for tax administration purposes."

---

[2] The term "tax administration"--
    (A) means—

    (i)     the administration, management, conduct, direction, and supervision of the execution and application of the internal revenue laws or related statutes (or equivalent laws and statutes of a State) and tax conventions to which the United States is a party, and

    (ii)    the development and formulation of Federal tax policy relating to existing or proposed internal revenue laws, related statutes, and tax conventions, and

    (B) includes assessment, collection, enforcement, litigation, publication, and statistical gathering functions under such laws, statutes, or conventions.

26 U.S.C. § 6103(b)(4)(A)-(B).

179.    For example, the IRS Defendants knowingly inspected return information provided to the IRS in response to the non-exhaustive list of questions identified by the TIGTA report as "unnecessary," (Exhibit F at 26) *See supra* ¶¶ 117(a)-(j).

180.    True the Vote provided tax return information to the IRS Defendants in response to requests for additional information on March 7, March 8, and November 8, 2011 and on March 20 and November 30, 2012. (*See* Exhibit A.)

181.    This tax return information was inspected on and after these dates by IRS Employees—including Defendants Ms. Maloney, Mr. Bell, Ms. Estes, and Ms. Ng—who were the IRS agents to whom the information was addressed.

182.    The number of unauthorized inspections of True the Vote's return information and the identity of those who made the inspections cannot be completely and accurately ascertained at this time, but will be more fully known after the completion of discovery.

183.    Each such inspection was made willfully or as a result of gross negligence.

184.    At a minimum, each such inspection was made as a result of negligence.

185.    Such inspections did not result from a "good faith, but erroneous interpretation of section 6103," 26 U.S.C. § 7431(b)(1), because knowingly unnecessary and unconstitutional actions cannot be made in good faith, nor can any law be interpreted in good faith to permit unconstitutional conduct or conduct knowingly outside of its permissible scope.

186.    Such inspections were not requested by True the Vote, thus making it wrongful under 26 U.S.C. § 7431(b)(2).

187.    Each such inspection therefore violates 26 U.S.C. § 6103.

**Count V**
**Violations of the Administrative Procedure Act**
**(Against the IRS and the IRS Employees in Their Official Capacities)**

188.     Plaintiff realleges and incorporates by reference the preceding paragraphs of this

Complaint as though fully set forth herein.

189.     The Administrative Procedure Act (the "APA") provides a cause of action for any

person suffering legal wrong because of agency action, or adversely affected or aggrieved by

agency action against the United States, a United States agency, or an officer thereof. 5 U.S.C.

§ 702.

190.     Pursuant to 5 U.S.C. § 702, the U.S. Government has waived its sovereign

immunity in actions seeking relief other than money damages and stating a claim that an agency

or an officer or employee thereof acted or failed to act in an official capacity or under color of

legal authority.

191.     Pursuant to 5 U.S.C. § 706, this Court shall hold unlawful and set aside agency

action, findings, and conclusions found to be

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance
>       with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of
>       statutory right;
>
> (D) without observance of procedure required by law;

192.     Defendant the IRS is an agency of the U.S. Government for purposes of the APA.

193.     Defendants Commissioner Werfel, Mr. Shulman, Mr. Miller, Mr. Wilkins, Ms.

Lerner, Ms. Paz, Mr. Fish, Mr. Seto, Ms. Thomas, Ms. Maloney, Mr. Bell, Ms. Estes, Ms. Ng,

and Unknown Named Employees of the IRS, at times relevant to this Complaint, were officers of an agency of the U.S. Government for purposes of the APA.

194.    The IRS Defendants' discriminatory and unlawful application of the IRS Targeting Scheme to True the Vote based on True the Vote's mission, its perceived philosophical policy positions, and its affiliation with King Street Patriots and other groups constitutes final agency action that is contrary to True the Vote's constitutional rights to due process under the Fifth Amendment, and freedom of speech and association under the First Amendment.

195.    Title 26, U.S.C. § 501(a) exempts from federal income tax groups described in 26 U.S.C. § 501(c)(3).

196.    Title 26 U.S.C. § 508(a)(1) requires organizations seeking tax-exempt status under 26 U.S.C. § 501(c)(3) to "give[] notice to the Secretary in such manner as the Secretary may by regulations prescribe, that it is applying for recognition of such status."

197.    Pursuant to 26 U.S.C. § 7803(2), the IRS Commissioner is empowered to administer, manage, conduct, direct, and supervise the execution and application of the internal revenue laws.

198.    Title 26, C.F.R. § 1.501(a)-1 permits the IRS Commissioner to "require any additional information deemed necessary for a proper determination of whether a particular organization is exempt under section 501(a)."

199.    The IRS Defendants' application of the IRS Targeting Scheme to True the Vote, under which the IRS Defendants required True the Vote to provide information wholly unnecessary for a determination of True the Vote's tax-exempt status, violated the IRS

Defendants' statutory and agency authority under the Internal Revenue Code and the rules and regulations promulgated thereunder.

200.    The IRS Defendants' application of the IRS Targeting Scheme to True the Vote is contrary to the intention of Congress as expressed in 26 U.S.C. §§ 501(a), 501(c)(3), and 508(a).

201.    The IRS Defendants' application of the IRS Targeting Scheme to True the Vote, under which IRS Defendants required True the Vote to provide information wholly unnecessary for a determination of True the Vote's tax-exempt status, violated the IRS Defendants' authority under Internal Revenue Manual § 7.20.2.4.1, which requires "requests for additional information" to be "relevant to the paragraph of section 501(c) appropriate to the applicant."

202.    The IRS Defendants departed from customary and established procedures in the processing the applications of the Targeted Organizations, applying arbitrary and subjective criteria for consideration of True the Vote's Application and which criteria are still unknown to True the Vote and other Targeted Organizations. (*See* Exhibit H.) Such criteria were created and implemented without observance of procedures required by law, exceed the statutory and agency authority of the IRS Defendants, are arbitrary and capricious, and are contrary to law. True the Vote has no knowledge or notice of the legal standard(s) by which its Application has been judged and processed by the IRS Defendants.

203.    The IRS Defendants have subjected True the Vote to discriminatory treatment in the processing of its Application and have applied subjective criteria to True the Vote that have not been applied to other applicants for exempt status.

204.    The deliberate delay of True the Vote's determination for nearly three years amounts to a functional denial of tax-exempt status, while depriving True the Vote of its due process right to appeal an adverse decision on the Application.

205.    The IRS Defendants' functional denial of True the Vote's Application was

arbitrary and capricious and contrary to law.

206.    True the Vote has no other adequate remedy at law for the IRS Defendants'

violations of True the Vote's constitutional and statutory rights.

## Damages

207.    Title 26, U.S.C. § 7431 authorizes damages "in an amount equal to the sum of—

(1) the greater of—
    (A) $ 1,000 for each act of unauthorized inspection or disclosure of a return or
    return information with respect to which such defendant is found liable, or
    (B) the sum of--
        (i) the actual damages sustained by the plaintiff as a result of such
        unauthorized inspection or disclosure, plus
        (ii) in the case of a willful inspection or disclosure or an inspection or
        disclosure which is the result of gross negligence, punitive damages, plus
(2) the costs of the action, plus
(3) in the case of a plaintiff which is described in section 7430(c)(4)(A)(ii), reasonable
attorneys fees, except that if the defendant is the United States, reasonable attorneys fees
may be awarded only if the plaintiff is the prevailing party (as determined under section
7430(c)(4)).

208.    The number of unauthorized inspections of True the Vote return information

cannot be completely and accurately ascertained at this time, but will be more fully known after

the completion of discovery. At minimum, Defendant the U.S. Government is liable for $1,000

for each unauthorized inspection by employees of the U.S. Government.

209.    The IRS Defendants' conduct has caused True the Vote to incur substantial costs

preparing responses to the IRS Defendants' unnecessary, burdensome and unconstitutional

requests for information.

210.    Because the IRS Defendants delayed the processing of True the Vote's

Application, True the Vote was forced to forfeit a foundation grant in the amount of $25,000 that

was contingent on True the Vote receiving its tax-exempt status.

211.    Because the IRS Defendants deliberately delayed the processing of True the Vote's Application, True the Vote was forced to return a foundation grant in the amount of $35,000 that was contingent on True the Vote receiving its tax-exempt status.

212.    Because the IRS and IRS Employees deliberately delayed the processing of True the Vote's Application, True the Vote was forced to forgo applying for grants from other grant-making foundations that had committed to support True the Vote.

213.    Because the IRS and IRS Employees deliberately delayed the processing of True the Vote's Application, True the Vote was forced to forgo other fundraising opportunities.

214.    WHEREFORE, True the Vote prays for the relief set forth below.

## Prayer for Relief

Plaintiff True the Vote respectfully requests the following relief:

1.  A declaration that the True the Vote is exempt from federal income taxation under Section 501(a) of the Internal Revenue Code as a charity described in Sections 501(c)(3), 509(a)(1) and 170(b)(1)(A)(vi) of the Internal Revenue Code;

2.  A declaration that the IRS Targeting Scheme and any other similar policies are unconstitutional under the First Amendment to the United States Constitution;

3.  Injunctive relief to prevent the IRS from further implementing and applying the IRS Targeting Scheme and any other similar practices and policies;

4.  Injunctive relief to prevent the IRS from illegally inspecting True the Vote's the return information;

5.  An award to True the Vote of $1,000 in damages for each unauthorized inspection of its return information;

6.   An award to True the Vote in excess of $85,000 in actual damages for its costs and losses incurred as a result of the IRS Targeting Scheme and the IRS Employees' violations of True the Vote's constitutional rights;

7.   An award to True the Vote of actual damages incurred as a result of the unauthorized inspections of its return information;

8.   An award to True the Vote punitive damages pursuant to 26 U.S.C. § 7431 and *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971);

9.   Costs and reasonable attorneys' fees under 26 U.S.C. § 7431 and 28 U.S.C. § 2412 or other statute; and

10.  Such other relief as the Court deems just.


Respectfully submitted this 22nd day of July, 2013

Kaylan L. Phillips (D.C. 1110583)
Noel H. Johnson (Wisc. 1068004)*
Zachary S. Kester (Ind. 28630-49)*
ACTRIGHT LEGAL FOUNDATION
209 West Main Street
Plainfield, IN 46168
(317) 203-5599 (telephone)
(888) 815-5641 (fax)
kphillips@actrightlegal.org
njohnson@actrightlegal.org
zkester@actrightlegal.org
*Counsel for Plaintiff*

John C. Eastman (Cal. 193726)*
Center for Constitutional Jurisprudence
c/o Chapman University School of Law
One University Drive
Orange, CA 92866
(877) 855-3330 (telephone and fax)
jeastman@chapman.edu
*Counsel for Plaintiff*

s/Cleta Mitchell
Michael J. Lockerby (D.C. 502987)**
Cleta Mitchell (D.C. 433386)
FOLEY & LARDNER, LLP
Washington Harbour
3000 K Street NW Suite #600
Washington, DC 20007
(202) 672-5300 (telephone)
(202) 672-5399 (fax)
mlockerby@foley.com
cmitchell@foley.com
*Lead Counsel for Plaintiff*

*Pro Hac Vice Motions granted*
** *Pro Hac Vice Motion pending*

**VERIFICATION OF COMPLAINT**
**PURSUANT TO 28 U.S.C. § 1746**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on July 20 , 2013

Engelbrecht
President, True the Vote, Inc.

# Exhibit A:

# Timeline of Events

| Date | Event(s) |
| --- | --- |
| July 15, 2010 | KSP/True the Vote filed Form 1023 (39 total pages). |
| January 2011 | KSP/True the Vote sought hardship status to expedite 501(c)3 determination. |
| February 15, 2011 | IRS sent Information Request #1, including 11 inquiries, signed by Defendant Susan Maloney. |
| March 7, 2011 | KSP/True the Vote sent Response #1 to IRS Inquiry Letter #1 (13 total pages). |
| March 8, 2011 | KSP/True the Vote sent Response #2 to IRS Inquiry Letter #1 (11 total pages). |
| May 16, 2011 | KSP/True the Vote sent the IRS an earnest and personal plea to expedite 501(c)3 application, signed by Catherine Engelbrecht, and directed to the attention of Defendant Ronald Bell. |
| October 12, 2011 | True the Vote's counsel, Cleta Mitchell, telephoned Defendant Bell to inquire about the status of True the Vote's application. |
| Nov. 8, 2011 | True the Vote sent a letter memorializing the phone call with Defendant Bell along with additional information and legal precedent (26 total pages). |
| February 8, 2012 | IRS sent Information Request #2, including at least 119 distinct inquiries, signed by Defendant Janine Estes. |
| March 20, 2012 | True the Vote sent a Response to Information Request #2 (583 total pages). |
| October 9, 2012 | IRS sent Information Request #3, with 15 inquiries, signed by Defendant Faye Ng. |
| Nov. 30, 2012 | True the Vote sent a Response to Information Request #3 (105 total pages). |

USCA Case #14-5316      Document #1587305        Filed: 12/07/2015      Page 71 of 228

# Exhibit B:

# Form 1023

# Form 1023 Checklist

## (Revised June 2006)

### Application for Recognition of Exemption under Section 501(c)(3) of the Internal Revenue Code

**Note.** *Retain a copy of the completed Form 1023 in your permanent records. Refer to the General Instructions regarding Public Inspection of approved applications.*

**Check each box to finish your application (Form 1023). Send this completed Checklist with your filled-in application. If you have not answered all the items below, your application may be returned to you as incomplete.**

☑ Assemble the application and materials in this order:
- Form 1023 Checklist
- Form 2848, *Power of Attorney and Declaration of Representative* (if filing)
- Form 8821, *Tax Information Authorization* (if filing)
- Expedite request (if requesting)
- Application (Form 1023 and Schedules A through H, as required)
- Articles of organization
- Amendments to articles of organization in chronological order
- Bylaws or other rules of operation and amendments
- Documentation of nondiscriminatory policy for schools, as required by Schedule B
- Form 5768, Election/Revocation of Election by an Eligible Section 501(c)(3) Organization To Make Expenditures To Influence Legislation (if filing)
- All other attachments, including explanations, financial data, and printed materials or publications. Label each page with name and EIN.

☑ User fee payment placed in envelope on top of checklist. DO NOT STAPLE or otherwise attach your check or money order to your application. Instead, just place it in the envelope. **$850**

☑ Employer Identification Number (EIN) **27-2860095**

☑ Completed Parts I through XI of the application, including any requested information and any required Schedules A through H.
- You must provide specific details about your past, present, and planned activities.
- Generalizations or failure to answer questions in the Form 1023 application will prevent us from recognizing you as tax exempt.
- Describe your purposes and proposed activities in specific easily understood terms.
- Financial information should correspond with proposed activities.

☑ Schedules. Submit only those schedules that apply to you and check either "Yes" or "No" below.

| | | | |
|---|---|---|---|
| Schedule A | Yes ___ No X | Schedule E | Yes ___ No X |
| Schedule B | Yes ___ No X | Schedule F | Yes ___ No X |
| Schedule C | Yes ___ No X | Schedule G | Yes ___ No X |
| Schedule D | Yes ___ No X | Schedule H | Yes ___ No X |

☑ An exact copy of your complete articles of organization (creating document). Absence of the proper purpose and dissolution clauses is the number one reason for delays in the issuance of determination letters.

• Location of Purpose Clause from Part III, line 1 (Page, Article and Paragraph Number) _Article 5- Purpose_
• Location of Dissolution Clause from Part III, line 2b or 2c (Page, Article and Paragraph Number) or by operation of state law _Distribution of Assets Upon Winding Up (p2)_

☑ Signature of an officer, director, trustee, or other official who is authorized to sign the application.
• Signature at Part XI of Form 1023.

☑ Your name on the application must be the same as your legal name as it appears in your articles of organization.

Send completed Form 1023, user fee payment, and all other required information, to:

Internal Revenue Service
P.O. Box 192
Covington, KY 41012-0192

If you are using express mail or a delivery service, send Form 1023, user fee payment, and attachments to:

Internal Revenue Service
201 West Rivercenter Blvd.
Attn: Extracting Stop 312
Covington, KY 41011

♻ *Printed on recycled paper*

| Form **2848** | **Power of Attorney** | OMB No. 1545-0150 |
|---|---|---|
| (Rev. March 2004)<br>Department of the Treasury<br>Internal Revenue Service | **and Declaration of Representative**<br>▶ Type or print. ▶ See the separate instructions. | For IRS Use Only<br>Received by:<br>Name _____<br>Telephone _____<br>Function _____<br>Date    /    / |

**Part I**  **Power of Attorney**
Caution: *Form 2848 will not be honored for any purpose other than representation before the IRS.*

**1   Taxpayer information.** Taxpayer(s) must sign and date this form on page 2, line 9.

| Taxpayer name(s) and address<br><br>KSP/True the Vote<br>708 Damascus<br>Rosenberg, Texas 77471 | Social security number(s)<br>: :<br>: :<br>Daytime telephone number<br>(    ) | Employer identification number<br>27 : 2860095<br>Plan number (if applicable) |
|---|---|---|

hereby appoint(s) the following representative(s) as attorney(s)-in-fact:

**2   Representative(s)** must sign and date this form on page 2, Part II.

| Name and address<br>Deron R. Harrington, JD,CPA<br>2225 County Road 90, Suite 115<br>Pearland, TX 77584 | CAF No. ............... 0302-15514R<br>Telephone No. ....... 281-997-6699<br>Fax No. ............. 281-997-6633<br>Check if new: Address ☐  Telephone No. ☐  Fax No. ☐ |
|---|---|
| Name and address<br>Tony Carbone, CPA<br>2225 County Road 90, Suite 115<br>Pearland, TX 77584 | CAF No. ............... 0303-75115R<br>Telephone No. ....... 281-997-6699<br>Fax No. ............. 281-997-6633<br>Check if new: Address ☐  Telephone No. ☐  Fax No. ☐ |
| Name and address<br>Marilyn Allison, CPA<br>2225 County Road 90, Suite 115<br>Pearland, TX 77584 | CAF No. ............... 0304-74055R<br>Telephone No. ....... 281-997-6699<br>Fax No. ............. 281-997-6633<br>Check if new: Address ☐  Telephone No. ☐  Fax No. ☐ |

to represent the taxpayer(s) before the Internal Revenue Service for the following tax matters:

**3   Tax matters**

| Type of Tax (Income, Employment, Excise, etc.)<br>or Civil Penalty (see the instructions for line 3) | Tax Form Number<br>(1040, 941, 720, etc.) | Year(s) or Period(s)<br>(see the instructions for line 3) |
|---|---|---|
| **Non-profit** | 990, 1023 | 2010 |
|  |  |  |
|  |  |  |

**4   Specific use not recorded on Centralized Authorization File (CAF).** If the power of attorney is for a specific use not recorded on CAF, check this box. See the instructions for Line 4. Specific uses not recorded on CAF. . . . . . . . . . . ▶ ☐

**5   Acts authorized.** The representatives are authorized to receive and inspect confidential tax information and to perform any and all acts that I (we) can perform with respect to the tax matters described on line 3, for example, the authority to sign any agreements, consents, or other documents. The authority does not include the power to receive refund checks (see line 6 below), the power to substitute another representative, the power to sign certain returns, or the power to execute a request for disclosure of tax returns or return information to a third party. See the line 5 instructions for more information.

Exceptions. An unenrolled return preparer cannot sign any document for a taxpayer and may only represent taxpayers in limited situations. See Unenrolled Return Preparer on page 2 of the instructions. An enrolled actuary may only represent taxpayers to the extent provided in section 10.3(d) of Circular 230. See the line 5 instructions for restrictions on tax matters partners.

List any specific additions or deletions to the acts otherwise authorized in this power of attorney: ............................
Representative may execute Form 8821
................................................................................................................................
................................................................................................................................

**6   Receipt of refund checks.** If you want to authorize a representative named on line 2 to receive, **BUT NOT TO ENDORSE OR CASH**, refund checks, initial here _____ and list the name of that representative below.

Name of representative to receive refund check(s) ▶

For Privacy Act and Paperwork Reduction Notice, see page 4 of the instructions.      Cat. No. 11980J      Form **2848** (Rev. 3-2004)

Form 2848 (Rev. 3-2004)                                                                 Page **2**

**7   Notices and communications.** Original notices and other written communications will be sent to you and a copy to the first representative listed on line 2.
a   If you also want the second representative listed to receive a copy of notices and communications, check this box . . . ▶ ☐
b   If you do not want any notices or communications sent to your representative(s), check this box . . . . . . . . . . ▶ ☐

**8   Retention/revocation of prior power(s) of attorney.** The filing of this power of attorney automatically revokes all earlier power(s) of attorney on file with the Internal Revenue Service for the same tax matters and years or periods covered by this document. If you do not want to revoke a prior power of attorney, check here . . . . . . . . . . . . . ▶ ☐
**YOU MUST ATTACH A COPY OF ANY POWER OF ATTORNEY YOU WANT TO REMAIN IN EFFECT.**

**9   Signature of taxpayer(s).** If a tax matter concerns a joint return, both husband and wife must sign if joint representation is requested, otherwise, see the instructions. If signed by a corporate officer, partner, guardian, tax matters partner, executor, receiver, administrator, or trustee on behalf of the taxpayer, I certify that I have the authority to execute this form on behalf of the taxpayer.

▶ **IF NOT SIGNED AND DATED, THIS POWER OF ATTORNEY WILL BE RETURNED.**

| | | |
|---|---|---|
| X ___*(signature)*___ | 7.15.10 | President |
| Signature | Date | Title (if applicable) |

| | ☐☐☐☐☐ | |
|---|---|---|
| Print Name | PIN Number | Print name of taxpayer from line 1 if other than individual |

| | | |
|---|---|---|
| Signature | Date | Title (if applicable) |

| | ☐☐☐☐☐ | |
|---|---|---|
| Print Name | PIN Number | |

**Part II    Declaration of Representative**

*Caution: Students with a special order to represent taxpayers in Qualified Low Income Taxpayer Clinics or the Student Tax Clinic Program, see the instructions for Part II.*

Under penalties of perjury, I declare that:
- I am not currently under suspension or disbarment from practice before the Internal Revenue Service;
- I am aware of regulations contained in Treasury Department Circular No. 230 (31 CFR, Part 10), as amended, concerning the practice of attorneys, certified public accountants, enrolled agents, enrolled actuaries, and others;
- I am authorized to represent the taxpayer(s) identified in Part I for the tax matter(s) specified there; and
- I am one of the following:
  a  Attorney—a member in good standing of the bar of the highest court of the jurisdiction shown below.
  b  Certified Public Accountant—duly qualified to practice as a certified public accountant in the jurisdiction shown below.
  c  Enrolled Agent—enrolled as an agent under the requirements of Treasury Department Circular No. 230.
  d  Officer—a bona fide officer of the taxpayer's organization.
  e  Full-Time Employee—a full-time employee of the taxpayer.
  f  Family Member—a member of the taxpayer's immediate family (i.e., spouse, parent, child, brother, or sister).
  g  Enrolled Actuary—enrolled as an actuary by the Joint Board for the Enrollment of Actuaries under 29 U.S.C. 1242 (the authority to practice before the Service is limited by section 10.3(d) of Treasury Department Circular No. 230).
  h  Unenrolled Return Preparer—the authority to practice before the Internal Revenue Service is limited by Treasury Department Circular No. 230, section 10.7(c)(1)(viii). You must have prepared the return in question and the return must be under examination by the IRS. See Unenrolled Return Preparer on page 2 of the instructions.

▶ **IF THIS DECLARATION OF REPRESENTATIVE IS NOT SIGNED AND DATED, THE POWER OF ATTORNEY WILL BE RETURNED. See the Part II instructions.**

| Designation—Insert above letter (a–h) | Jurisdiction (state) or identification | Signature | Date |
|---|---|---|---|
| b | TX/OK | *(signature)* | 7-21-10 |
| b | TX | *(signature)* | 7-21-10 |
| b | TX | *(signature)* | 7-21-10 |

Form **2848** (Rev. 3-2004)

**Form 1023**
(Rev. June 2006)
Department of the Treasury
Internal Revenue Service

## Application for Recognition of Exemption
### Under Section 501(c)(3) of the Internal Revenue Code

OMB No. 1545-0056

**Note:** *If exempt status is approved, this application will be open for public inspection.*

Use the instructions to complete this application and for a definition of all **bold** items. For additional help, call IRS Exempt Organizations Customer Account Services toll-free at 1-877-829-5500. Visit our website at www.irs.gov for forms and publications. If the required information and documents are not submitted with payment of the appropriate user fee, the application may be returned to you.

Attach additional sheets to this application if you need more space to answer fully. Put your name and EIN on each sheet and identify each answer by Part and line number. Complete Parts I - XI of Form 1023 and submit only those Schedules (A through H) that apply to you.

| Part I | Identification of Applicant |
| --- | --- |

| | |
| --- | --- |
| **1** Full name of organization (exactly as it appears in your **organizing document**) <br><br> **KSP/True the Vote** | **2** c/o Name (if applicable) |

| | | | |
| --- | --- | --- | --- |
| **3** Mailing address (Number and street) (see instructions) <br><br> **708 Damascus** | Room/Suite | **4** Employer Identification Number (EIN) <br><br> **27-2860095** | |
| City or town, state or country, and ZIP + 4 <br><br> **Rosenberg, TX 77471** | | **5** Month the annual accounting period ends (01 – 12) <br><br> **12** | |

| | |
| --- | --- |
| **6** Primary contact (officer, director, trustee, or **authorized representative**) <br><br> **a** Name: **Catherine Engelbrecht** | |
| | **b** Phone: **832-444-7701** |
| | **c** Fax: (optional) |

| | |
| --- | --- |
| **7** Are you represented by an authorized representative, such as an attorney or accountant? If "Yes," provide the authorized representative's name, and the name and address of the authorized representative's firm. Include a completed Form 2848, *Power of Attorney and Declaration of Representative*, with your application if you would like us to communicate with your representative. | ☑ Yes  ☐ No |

| | |
| --- | --- |
| **8** Was a person who is not one of your officers, directors, trustees, employees, or an authorized representative listed in line 7, paid, or promised payment, to help plan, manage, or advise you about the **structure** or **activities** of your organization, or about your financial or tax matters? If "Yes," provide the person's name, the name and address of the person's firm, the amounts paid or promised to be paid, and describe that person's role. | ☐ Yes  ☑ No |

**9a** Organization's website: www.truethvote.org

**b** Organization's email: (optional)

| | |
| --- | --- |
| **10** Certain organizations are not required to file an information return (Form 990 or Form 990-EZ). If you are granted tax-exemption, are you claiming to be excused from filing Form 990 or Form 990-EZ? If "Yes," explain. See the instructions for a description of organizations not required to file Form 990 or Form 990-EZ. | ☐ Yes  ☑ No |

| | |
| --- | --- |
| **11** Date incorporated if a corporation, or formed, if other than a corporation. (MM/DD/YYYY) | 06 / 07 / 2010 |

| | |
| --- | --- |
| **12** Were you formed under the laws of a **foreign country**? <br> If "Yes," state the country. | ☐ Yes  ☑ No |

For Paperwork Reduction Act Notice, see page 24 of the instructions.     Cat. No. 17133K     Form **1023** (Rev. 6-2006)

| Form 1023 (Rev. 6-2006) | Name: | EIN: | – | Page **2** |
|---|---|---|---|---|

## Part II — Organizational Structure

You must be a corporation (including a limited liability company), an unincorporated association, or a trust to be tax exempt. (See instructions.) DO NOT file this form unless you can check "Yes" on lines 1, 2, 3, or 4.

1 Are you a **corporation?** If "Yes," attach a copy of your articles of incorporation showing **certification of filing** with the appropriate state agency. Include copies of any amendments to your articles and be sure they also show state filing certification. ☑ Yes ☐ No

2 Are you a **limited liability company (LLC)?** If "Yes," attach a copy of your articles of organization showing certification of filing with the appropriate state agency. Also, if you adopted an operating agreement, attach a copy. Include copies of any amendments to your articles and be sure they show state filing certification. Refer to the instructions for circumstances when an LLC should not file its own exemption application. ☐ Yes ☐ No

3 Are you an **unincorporated association?** If "Yes," attach a copy of your articles of association, constitution, or other similar organizing document that is dated and includes at least two signatures. Include signed and dated copies of any amendments. ☐ Yes ☐ No

4a Are you a **trust?** If "Yes," attach a signed and dated copy of your trust agreement. Include signed and dated copies of any amendments. ☐ Yes ☐ No

b Have you been funded? If "No," explain how you are formed without anything of value placed in trust. ☐ Yes ☐ No

5 Have you adopted **bylaws?** If "Yes," attach a current copy showing date of adoption. If "No," explain how your officers, directors, or trustees are selected. ☑ Yes ☐ No

## Part III — Required Provisions in Your Organizing Document

The following questions are designed to ensure that when you file this application, your organizing document contains the required provisions to meet the organizational test under section 501(c)(3). Unless you can check the boxes in both lines 1 and 2, your organizing document does not meet the organizational test. DO NOT file this application until you have amended your organizing document. Submit your original and amended organizing documents (showing state filing certification if you are a corporation or an LLC) with your application.

1 Section 501(c)(3) requires that your organizing document state your exempt purpose(s), such as charitable, religious, educational, and/or scientific purposes. Check the box to confirm that your organizing document meets this requirement. Describe specifically where your organizing document meets this requirement, such as a reference to a particular article or section in your organizing document. Refer to the instructions for exempt purpose language. Location of Purpose Clause (Page, Article, and Paragraph): **Article 5--Purpose** ☑

2a Section 501(c)(3) requires that upon dissolution of your organization, your remaining assets must be used exclusively for exempt purposes, such as charitable, religious, educational, and/or scientific purposes. Check the box on line 2a to confirm that your organizing document meets this requirement by express provision for the distribution of assets upon dissolution. If you rely on state law for your dissolution provision, do not check the box on line 2a and go to line 2c. ☑

2b If you checked the box on line 2a, specify the location of your dissolution clause (Page, Article, and Paragraph). Do not complete line 2c if you checked box 2a. Distribution of Assets upon winding up p.2 of Article of Incorp.

2c See the instructions for information about the operation of state law in your particular state. Check this box if you rely on operation of state law for your dissolution provision and indicate the state: ☐

## Part IV — Narrative Description of Your Activities   See attached

Using an attachment, describe your *past, present,* and *planned* activities in a narrative. If you believe that you have already provided some of this information in response to other parts of this application, you may summarize that information here and refer to the specific parts of the application for supporting details. You may also attach representative copies of newsletters, brochures, or similar documents for supporting details to this narrative. Remember that if this application is approved, it will be open for public inspection. Therefore, your narrative description of activities should be thorough and accurate. Refer to the instructions for information that must be included in your description.

## Part V — Compensation and Other Financial Arrangements With Your Officers, Directors, Trustees, Employees, and Independent Contractors

1a List the names, titles, and mailing addresses of all of your officers, directors, and trustees. For each person listed, state their total annual compensation, or proposed compensation, for all services to the organization, whether as an officer, employee, or other position. Use actual figures, if available. Enter "none" if no compensation is or will be paid. If additional space is needed, attach a separate sheet. Refer to the instructions for information on what to include as compensation.

| Name | Title | Mailing address | Compensation amount (annual actual or estimated) |
|---|---|---|---|
| Catherine Engelbrecht | Director | 708 Damascus, Rosenberg, TX 77471 | None |
| Dianne Josephs | Director | 3225 Locke Lane, Houston, TX 77019 | None |
| Brian Engelbrecht | Director | 708 Damascus, Rosenberg, TX 77471 | None |
| | | | |
| | | | |
| | | | |

Form **1023** (Rev. 6-2006)

Form 1023 (Rev. 6-2006)   Name:                                    EIN:        –          Page **3**

| **Part V** | **Compensation and Other Financial Arrangements With Your Officers, Directors, Trustees, Employees, and Independent Contractors** *(Continued)* |

**b** List the names, titles, and mailing addresses of each of your five highest compensated employees who receive or will receive compensation of more than $50,000 per year. Use the actual figure, if available. Refer to the instructions for information on what to include as compensation. Do not include officers, directors, or trustees listed in line 1a.

| Name | Title | Mailing address | Compensation amount (annual actual or estimated) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**c** List the names, names of businesses, and mailing addresses of your five highest compensated **independent contractors** that receive or will receive compensation of more than $50,000 per year. Use the actual figure, if available. Refer to the instructions for information on what to include as compensation.

| Name | Title | Mailing address | Compensation amount (annual actual or estimated) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

The following "Yes" or "No" questions relate to *past, present, or planned* relationships, transactions, or agreements with your officers, directors, trustees, highest compensated employees, and highest compensated independent contractors listed in lines 1a, 1b, and 1c.

| | | Yes | No |
|---|---|---|---|
| **2a** | Are any of your officers, directors, or trustees **related** to each other through **family** or **business relationships**? If "Yes," identify the individuals and explain the relationship. | ☐ Yes | ☑ No |
| **b** | Do you have a business relationship with any of your officers, directors, or trustees other than through their position as an officer, director, or trustee? If "Yes," identify the individuals and describe the business relationship with each of your officers, directors, or trustees. | ☐ Yes | ☑ No |
| **c** | Are any of your officers, directors, or trustees related to your highest compensated employees or highest compensated independent contractors listed on lines 1b or 1c through family or business relationships? If "Yes," identify the individuals and explain the relationship. | ☐ Yes | ☑ No |
| **3a** | For each of your officers, directors, trustees, highest compensated employees, and highest compensated independent contractors listed on lines 1a, 1b, or 1c, attach a list showing their name, qualifications, average hours worked, and duties. | | |
| **b** | Do any of your officers, directors, trustees, highest compensated employees, and highest compensated independent contractors listed on lines 1a, 1b, or 1c receive compensation from any other organizations, whether tax exempt or taxable, that are related to you through **common control**? If "Yes," identify the individuals, explain the relationship between you and the other organization, and describe the compensation arrangement. | ☐ Yes | ☑ No |
| **4** | In establishing the compensation for your officers, directors, trustees, highest compensated employees, and highest compensated independent contractors listed on lines 1a, 1b, and 1c, the following practices are recommended, although they are not required to obtain exemption. Answer "Yes" to all the practices you use. | *N/A* | |
| **a** | Do you or will the individuals that approve compensation arrangements follow a conflict of interest policy? | ☐ Yes | ☐ No |
| **b** | Do you or will you approve compensation arrangements in advance of paying compensation? | ☐ Yes | ☐ No |
| **c** | Do you or will you document in writing the date and terms of approved compensation arrangements? | ☐ Yes | ☐ No |

Form **1023** (Rev. 6-2006)

| Form 1023 (Rev. 6-2006) | Name: | EIN: – | Page **4** |
|---|---|---|---|

**Part V**  **Compensation and Other Financial Arrangements With Your Officers, Directors, Trustees, Employees, and Independent Contractors** *(Continued)*

**d** Do you or will you record in writing the decision made by each individual who decided or voted on compensation arrangements? ☐ Yes ☐ No  N/A

**e** Do you or will you approve compensation arrangements based on information about compensation paid by similarly situated taxable or tax-exempt organizations for similar services, current compensation surveys compiled by independent firms, or actual written offers from similarly situated organizations? Refer to the instructions for Part V, lines 1a, 1b, and 1c, for information on what to include as compensation. ☐ **Yes** ☐ No

**f** Do you or will you record in writing both the information on which you relied to base your decision and its source? ☐ Yes ☐ No

**g** If you answered "No" to any item on lines 4a through 4f, describe how you set compensation that is **reasonable** for your officers, directors, trustees, highest compensated employees, and highest compensated independent contractors listed in Part V, lines 1a, 1b, and 1c.

**5a** Have you adopted a **conflict of interest policy** consistent with the sample conflict of interest policy in Appendix A to the instructions? If "Yes," provide a copy of the policy and explain how the policy has been adopted, such as by resolution of your governing board. If "No," answer lines 5b and 5c. ☐ Yes ☐ No

**b** What procedures will you follow to assure that persons who have a conflict of interest will not have influence over you for setting their own compensation?

**c** What procedures will you follow to assure that persons who have a conflict of interest will not have influence over you regarding business deals with themselves?

**Note:** A conflict of interest policy is recommended though it is not required to obtain exemption. Hospitals, see Schedule C, Section I, line 14.

**6a** Do you or will you compensate any of your officers, directors, trustees, highest compensated employees, and highest compensated independent contractors listed in lines 1a, 1b, or 1c through **non-fixed payments**, such as discretionary bonuses or revenue-based payments? If "Yes," describe all non-fixed compensation arrangements, including how the amounts are determined, who is eligible for such arrangements, whether you place a limitation on total compensation, and how you determine or will determine that you pay no more than reasonable compensation for services. Refer to the instructions for Part V, lines 1a, 1b, and 1c, for information on what to include as compensation. ☐ Yes ☐ No

**b** Do you or will you compensate any of your employees, other than your officers, directors, trustees, or your five highest compensated employees who receive or will receive compensation of more than $50,000 per year, through non-fixed payments, such as discretionary bonuses or revenue-based payments? If "Yes," describe all non-fixed compensation arrangements, including how the amounts are or will be determined, who is or will be eligible for such arrangements, whether you place or will place a limitation on total compensation, and how you determine or will determine that you pay no more than reasonable compensation for services. Refer to the instructions for Part V, lines 1a, 1b, and 1c, for information on what to include as compensation. ☐ Yes ☐ No

**7a** Do you or will you purchase any goods, services, or assets from any of your officers, directors, trustees, highest compensated employees, or highest compensated independent contractors listed in lines 1a, 1b, or 1c? If "Yes," describe any such purchase that you made or intend to make, from whom you make or will make such purchases, how the terms are or will be negotiated at **arm's length**, and explain how you determine or will determine that you pay no more than **fair market value**. Attach copies of any written contracts or other agreements relating to such purchases. ☐ Yes ☐ No

**b** Do you or will you sell any goods, services, or assets to any of your officers, directors, trustees, highest compensated employees, or highest compensated independent contractors listed in lines 1a, 1b, or 1c? If "Yes," describe any such sales that you made or intend to make, to whom you make or will make such sales, how the terms are or will be negotiated at arm's length, and explain how you determine or will determine you are or will be paid at least fair market value. Attach copies of any written contracts or other agreements relating to such sales. ☐ Yes ☐ No

**8a** Do you or will you have any leases, contracts, loans, or other agreements with your officers, directors, trustees, highest compensated employees, or highest compensated independent contractors listed in lines 1a, 1b, or 1c? If "Yes," provide the information requested in lines 8b through 8f. ☐ Yes ☐ No

**b** Describe any written or oral arrangements that you made or intend to make.

**c** Identify with whom you have or will have such arrangements.

**d** Explain how the terms are or will be negotiated at arm's length.

**e** Explain how you determine you pay no more than fair market value or you are paid at least fair market value.

**f** Attach copies of any signed leases, contracts, loans, or other agreements relating to such arrangements.

**9a** Do you or will you have any leases, contracts, loans, or other agreements with any organization in which any of your officers, directors, or trustees are also officers, directors, or trustees, or in which any individual officer, director, or trustee owns more than a 35% interest? If "Yes," provide the information requested in lines 9b through 9f. ☐ Yes ☐ No

Form **1023** (Rev. 6-2006)

Form 1023 (Rev. 6-2006)    Name:                                    EIN:    –                Page **5**

| **Part V** | **Compensation and Other Financial Arrangements With Your Officers, Directors, Trustees, Employees, and Independent Contractors** *(Continued)* |
|---|---|

**b** Describe any written or oral arrangements you made or intend to make.

**c** Identify with whom you have or will have such arrangements.

**d** Explain how the terms are or will be negotiated at arm's length.

**e** Explain how you determine or will determine you pay no more than fair market value or that you are paid at least fair market value.

*N/A*

**f** Attach a copy of any signed leases, contracts, loans, or other agreements relating to such arrangements.

| **Part VI** | **Your Members and Other Individuals and Organizations That Receive Benefits From You** |
|---|---|

The following "Yes" or "No" questions relate to goods, services, and funds you provide to individuals and organizations as part of your activities. Your answers should pertain to *past, present,* and *planned* activities. (See instructions.)

**1a** In carrying out your exempt purposes, do you provide goods, services, or funds to individuals? If "Yes," describe each program that provides goods, services, or funds to individuals. ☐ Yes ☑ No

**b** In carrying out your exempt purposes, do you provide goods, services, or funds to organizations? If "Yes," describe each program that provides goods, services, or funds to organizations. ☐ Yes ☐ No

**2** Do any of your programs limit the provision of goods, services, or funds to a specific individual or group of specific individuals? For example, answer "Yes," if goods, services, or funds are provided only for a particular individual, your members, individuals who work for a particular employer, or graduates of a particular school. If "Yes," explain the limitation and how recipients are selected for each program. ☐ Yes ☑ No

**3** Do any individuals who receive goods, services, or funds through your programs have a family or business relationship with any officer, director, trustee, or with any of your highest compensated employees or highest compensated independent contractors listed in Part V, lines 1a, 1b, and 1c? If "Yes," explain how these related individuals are eligible for goods, services, or funds. ☐ Yes ☑ No

| **Part VII** | **Your History** |
|---|---|

The following "Yes" or "No" questions relate to your history. (See instructions.)

**1** Are you a successor to another organization? Answer "Yes," if you have taken or will take over the activities of another organization; you took over 25% or more of the fair market value of the net assets of another organization; or you were established upon the conversion of an organization from for-profit to non-profit status. If "Yes," complete Schedule G. ☐ Yes ☑ No

**2** Are you submitting this application more than 27 months after the end of the month in which you were legally formed? If "Yes," complete Schedule E. ☐ Yes ☑ No

| **Part VIII** | **Your Specific Activities** |
|---|---|

The following "Yes" or "No" questions relate to specific activities that you may conduct. Check the appropriate box. Your answers should pertain to *past, present,* and *planned* activities. (See instructions.)

**1** Do you support or oppose candidates in political campaigns in any way? If "Yes," explain. ☐ Yes ☑ No

**2a** Do you attempt to influence legislation? If "Yes," explain how you attempt to influence legislation and complete line 2b. If "No," go to line 3a. ☑ Yes ☐ No

**b** Have you made or are you making an election to have your legislative activities measured by expenditures by filing Form 5768? If "Yes," attach a copy of the Form 5768 that was already filed or attach a completed Form 5768 that you are filing with this application. If "No," describe whether your attempts to influence legislation are a substantial part of your activities. Include the time and money spent on your attempts to influence legislation as compared to your total activities. ☐ Yes ☑ No

**3a** Do you or will you operate bingo or gaming activities? If "Yes," describe who conducts them, and list all revenue received or expected to be received and expenses paid or expected to be paid in operating these activities. Revenue and expenses should be provided for the time periods specified in Part IX, Financial Data. ☐ Yes ☑ No

**b** Do you or will you enter into contracts or other agreements with individuals or organizations to conduct bingo or gaming for you? If "Yes," describe any written or oral arrangements that you made or intend to make, identify with whom you have or will have such arrangements, explain how the terms are or will be negotiated at arm's length, and explain how you determine or will determine you pay no more than fair market value or you will be paid at least fair market value. Attach copies or any written contracts or other agreements relating to such arrangements. ☐ Yes ☑ No

**c** List the states and local jurisdictions, including Indian Reservations, in which you conduct or will conduct gaming or bingo.

Form **1023** (Rev. 6-2006)

| Form 1023 (Rev. 6-2006) | Name: | EIN: | – | Page **6** |

## Part VIII  Your Specific Activities *(Continued)*

**4a** Do you or will you undertake **fundraising**? If "Yes," check all the fundraising programs you do or will conduct. (See instructions.)  ☐ **Yes**  ☑ **No**

    ☐ mail solicitations         ☐ phone solicitations
    ☐ email solicitations        ☐ accept donations on your website
    ☑ personal solicitations     ☐ receive donations from another organization's website
    ☐ vehicle, boat, plane, or similar donations     ☑ government grant solicitations
    ☑ foundation grant solicitations     ☐ Other

    Attach a description of each fundraising program.

**b** Do you or will you have written or oral contracts with any individuals or organizations to raise funds for you? If "*Yes*," describe these activities. Include all revenue and expenses from these activities and state who conducts them. Revenue and expenses should be provided for the time periods specified in Part IX, Financial Data. Also, attach a copy of any contracts or agreements.  ☐ Yes  ☑ No

**c** Do you or will you engage in fundraising activities for other organizations? If "Yes," describe these arrangements. Include a description of the organizations for which you raise funds and attach copies of all contracts or agreements.  ☐ Yes  ☑ No

**d** List all states and local jurisdictions in which you conduct fundraising. For each state or local jurisdiction listed, specify whether you fundraise for your own organization, you fundraise for another organization, or another organization fundraises for you.

**e** Do you or will you maintain separate accounts for any contributor under which the contributor has the right to advise on the use or distribution of funds? Answer "Yes" if the donor may provide advice on the types of investments, distributions from the types of investments, or the distribution from the donor's contribution account. If "Yes," describe this program, including the type of advice that may be provided and submit copies of any written materials provided to donors.  ☐ Yes  ☑ No

**5** Are you **affiliated with a** governmental unit? If "**Yes**," explain.  ☐ Yes  ☑ **No**

**6a** Do you or will you engage in **economic development**? If "Yes," describe your program.  ☐ Yes  ☑ No
**b** Describe in full who benefits from your economic development activities and how the activities promote exempt purposes.

**7a** Do or will persons other than your employees or volunteers **develop** your facilities? If "Yes," describe each facility, the role of the developer, and any business or family relationship(s) between the developer and your officers, directors, or trustees.  ☐ Yes  ☑ No

**b** Do or will persons other than your employees or volunteers **manage** your activities or facilities? If "Yes," describe each activity and facility, the role of the manager, and any business or family relationship(s) between the manager and your officers, directors, or trustees.  ☐ Yes  ☑ No

**c** If there is a business or family relationship between any manager or developer and your officers, directors, or trustees, identify the individuals, explain the relationship, describe how contracts are negotiated at arm's length so that you pay no more than fair market value, and submit a copy of any contracts or other agreements.

**8** Do you or will you enter into **joint ventures**, including partnerships or **limited liability companies** treated as partnerships, in which you share profits and losses with partners other than section 501(c)(3) organizations? If "Yes," describe the activities of these joint ventures in which you participate.  ☐ Yes  ☑ No

**9a** Are you applying for exemption as a childcare organization under section 501(k)? If "Yes," answer lines 9b through 9d. If "No," go to line 10.  ☐ Yes  ☑ No

**b** Do you provide child care so that parents or caretakers of children you care for can be **gainfully employed** (see instructions)? If "No," explain how you qualify as a childcare organization described in section 501(k).  ☐ Yes  ☐ No

**c** Of the children for whom you provide child care, are 85% or more of them cared for by you to enable their parents or caretakers to be gainfully employed (see instructions)? If "No," explain how you qualify as a childcare organization described in section 501(k).  ☐ Yes  ☐ No

**d** Are your services available to the general public? If "No," describe the specific group of people for whom your activities are available. Also, see the instructions and explain how you qualify as a childcare organization described in section 501(k).  ☐ Yes  ☐ No

**10** Do you or will you publish, own, or have rights in music, literature, tapes, artworks, choreography, scientific discoveries, or other **intellectual property**? If "Yes," explain. Describe who owns or will own any copyrights, patents, or trademarks, whether fees are or will be charged, how the fees are determined, and how any items are or will be produced, distributed, and marketed.  ☐ Yes  ☑ No

Form **1023** (Rev. 6-2006)

| Form 1023 (Rev. 6-2006) | Name: | EIN: | – | Page **7** |

## Part VIII   Your Specific Activities (Continued)

**11**   Do you or will you accept contributions of: real property; conservation easements; closely held securities; intellectual property such as patents, trademarks, and copyrights; works of music or art; licenses; royalties; automobiles, boats, planes, or other vehicles; or collectibles of any type? If "Yes," describe each type of contribution, any conditions imposed by the donor on the contribution, and any agreements with the donor regarding the contribution.   ☐ Yes   ☑ No

**12a**   Do you or will you operate in a **foreign country** or **countries?** If "Yes," answer lines 12b through 12d. If "No," go to line 13a.   ☐ Yes   ☑ No
**b**   Name the foreign countries and regions within the countries in which you operate.
**c**   Describe your operations in each country and region in which you operate.
**d**   Describe how your operations in each country and region further your exempt purposes.

**13a**   Do you or will you make grants, loans, or other distributions to organization(s)? If "Yes," answer lines 13b through 13g. If "No," go to line 14a.   ☐ Yes   ☑ No
**b**   Describe how your grants, loans, or other distributions to organizations further your exempt purposes.
**c**   Do you have written contracts with each of these organizations? If "Yes," attach a copy of each contract.   ☐ Yes   ☐ No
**d**   Identify each recipient organization and any **relationship** between you and the recipient organization.
**e**   Describe the records you keep with respect to the grants, loans, or other distributions you make.
**f**   Describe your selection process, including whether you do any of the following:
   **(i)**   Do you require an application form? If "Yes," attach a copy of the form.   ☐ Yes   ☐ No
   **(ii)**   Do you require a grant proposal? If "Yes," describe whether the grant proposal specifies your responsibilities and those of the grantee, obligates the grantee to use the grant funds only for the purposes for which the grant was made, provides for periodic written reports concerning the use of grant funds, requires a final written report and an accounting of how grant funds were used, and acknowledges your authority to withhold and/or recover grant funds in case such funds are, or appear to be, misused.   ☐ Yes   ☐ No
**g**   Describe your procedures for oversight of distributions that assure you the resources are used to further your exempt purposes, including whether you require periodic and final reports on the use of resources.

**14a**   Do you or will you make grants, loans, or other distributions to foreign organizations? If "Yes," answer lines 14b through 14f. If "No," go to line 15.   ☐ Yes   ☑ No
**b**   Provide the name of each foreign organization, the country and regions within a country in which each foreign organization operates, and describe any relationship you have with each foreign organization.
**c**   Does any foreign organization listed in line 14b accept contributions earmarked for a specific country or specific organization? If "Yes," list all earmarked organizations or countries.   ☐ Yes   ☐ No
**d**   Do your contributors know that you have ultimate authority to use contributions made to you at your discretion for purposes consistent with your exempt purposes? If "Yes," describe how you relay this information to contributors.   ☐ Yes   ☐ No
**e**   Do you or will you make pre-grant inquiries about the recipient organization? If "Yes," describe these inquiries, including whether you inquire about the recipient's financial status, its tax-exempt status under the Internal Revenue Code, its ability to accomplish the purpose for which the resources are provided, and other relevant information.   ☐ Yes   ☐ No
**f**   Do you or will you use any additional procedures to ensure that your distributions to foreign organizations are used in furtherance of your exempt purposes? If "Yes," describe these procedures, including site visits by your employees or compliance checks by impartial experts, to verify that grant funds are being used appropriately.   ☐ Yes   ☐ No

Form **1023** (Rev. 6-2006)

| Form 1023 (Rev. 6-2006) | Name: | EIN: | − | | Page 8 |

## Part VIII   Your Specific Activities *(Continued)*

| | | Yes | No |
|---|---|---|---|
| 15 | Do you have a **close connection** with any organizations? If "Yes," explain. | ☑ Yes | ☐ No |
| 16 | Are you applying for exemption as a **cooperative hospital service organization** under section 501(e)? If "Yes," explain. | ☐ Yes | ☑ No |
| 17 | Are you applying for exemption as a **cooperative service organization of operating educational organizations** under section 501(f)? If "Yes," explain. | ☐ Yes | ☑ No |
| 18 | Are you applying for exemption as a **charitable risk pool** under section 501(n)? If "Yes," explain. | ☐ Yes | ☑ No |
| 19 | Do you or will you operate a **school?** If "Yes," complete Schedule B. Answer "Yes," whether you operate a school as your main function or as a secondary activity. | ☐ Yes | ☑ No |
| 20 | Is your main function to provide **hospital or medical care?** If "Yes," complete Schedule C. | ☐ Yes | ☑ No |
| 21 | Do you or will you provide **low-income housing** or housing for the **elderly or handicapped?** If "Yes," complete Schedule F. | ☐ Yes | ☑ No |
| 22 | Do you or will you provide scholarships, fellowships, educational loans, or other educational grants to individuals, including grants for travel, study, or other similar purposes? If "Yes," complete Schedule H.<br><br>**Note:** Private foundations may use Schedule H to request advance approval of individual grant procedures. | ☐ Yes | ☑ No |

Form **1023** (Rev. 6-2006)

Form 1023 (Rev. 6-2006)      Name:                                      EIN:       −               Page **9**

## Part IX   Financial Data

For purposes of this schedule, years in existence refer to completed tax years. If in existence 4 or more years, complete the schedule for the most recent 4 tax years. If in existence more than 1 year but less than 4 years, complete the statements for each year in existence and provide projections of your likely revenues and expenses based on a reasonable and good faith estimate of your future finances for a total of 3 years of financial information. If in existence less than 1 year, provide projections of your likely revenues and expenses for the current year and the 2 following years, based on a reasonable and good faith estimate of your future finances for a total of 3 years of financial information. (See instructions.)

### A. Statement of Revenues and Expenses

| | Type of revenue or expense | Current tax year | 3 prior tax years or 2 succeeding tax years | | | (e) Provide Total for (a) through (d) |
|---|---|---|---|---|---|---|
| | | (a) From ............ To _2010_ | (b) From ............ To _2011_ | (c) From ............ To _2012_ | (d) From ............ To ............ | |
| **Revenues** 1 | Gifts, grants, and contributions received (do not include unusual grants) | 190,000 | 432,000 | 765,000 | | |
| 2 | Membership fees received | | | | | |
| 3 | Gross investment income | | | | | |
| 4 | Net unrelated business income | | | | | |
| 5 | Taxes levied for your benefit | | | | | |
| 6 | Value of services or facilities furnished by a governmental unit without charge (not including the value of services generally furnished to the public without charge) | | | | | |
| 7 | Any revenue not otherwise listed above or in lines 9–12 below (attach an itemized list) | | | | | |
| 8 | Total of lines 1 through 7 | | | | | |
| 9 | Gross receipts from admissions, merchandise sold or services performed, or furnishing of facilities in any activity that is related to your exempt purposes (attach itemized list) | | | | | |
| 10 | Total of lines 8 and 9 | | | | | |
| 11 | Net gain or loss on sale of capital assets (attach schedule and see instructions) | | | | | |
| 12 | **Unusual grants** | | | | | |
| 13 | Total Revenue Add lines 10 through 12 | | | | | |
| **Expenses** 14 | Fundraising expenses | | | | | |
| 15 | Contributions, gifts, grants, and similar amounts paid out (attach an itemized list) | | | | | |
| 16 | Disbursements to or for the benefit of members (attach an itemized list) | | | | | |
| 17 | Compensation of officers, directors, and trustees | | | | | |
| 18 | Other salaries and wages | | | | | |
| 19 | Interest expense | | | | | |
| 20 | Occupancy (rent, utilities, etc.) | 27,000 | 32,400 | 54,000 | | |
| 21 | Depreciation and depletion | | | | | |
| 22 | Professional fees | 3,000 | 3,500 | 4,000 | | |
| 23 | Any expense not otherwise classified, such as program services (attach itemized list) | 160,000 | 395,400 | 706,500 | | |
| 24 | Total Expenses Add lines 14 through 23 | 190,000 | 431,300 | 764,500 | | |

Form **1023** (Rev. 6-2006)

Form 1023 (Rev. 6-2006)        Name:                                    EIN:        –                    **Page 10**

| **Part IX** | **Financial Data** *(Continued)* |
|---|---|

| **B. Balance Sheet** (for your most recently completed tax year) | | Year End: |
|---|---|---|

**Assets** — (Whole dollars)

| | | | |
|---|---|---|---|
| 1 | Cash . . . . . . . . . . . . . . . . . . . . . . . . . | 1 | |
| 2 | Accounts receivable, net . . . . . . . . . . . . . . . . | 2 | |
| 3 | Inventories . . . . . . . . . . . . . . . . . . . . . | 3 | |
| 4 | Bonds and notes receivable (attach an itemized list) . . . . . | 4 | |
| 5 | Corporate stocks (attach an itemized list) . . . . . . . . . | 5 | |
| 6 | Loans receivable (attach an itemized list) . . . . . . . . . | 6 | |
| 7 | Other Investments (attach an itemized list) . . . . . . . . . | 7 | |
| 8 | Depreciable and depletable assets (attach an itemized list) . . . | 8 | |
| 9 | Land . . . . . . . . . . . . . . . . . . . . . . . | 9 | |
| 10 | Other assets (attach an itemized list) . . . . . . . . . . . | 10 | |
| 11 | Total Assets (add lines 1 through 10) . . . | 11 | |

**Liabilities**

| | | | |
|---|---|---|---|
| 12 | Accounts payable . . . . . . . . . . . . . . . . . . | 12 | |
| 13 | Contributions, gifts, grants, etc. payable . . . . . . . . . | 13 | |
| 14 | Mortgages and notes payable (attach an itemized list) . . . . . | 14 | |
| 15 | Other liabilities (attach an itemized list) . . . . . . . . . | 15 | |
| 16 | Total Liabilities (add lines 12 through 15) . . . | 16 | |

**Fund Balances or Net Assets**

| | | | |
|---|---|---|---|
| 17 | Total fund balances or net assets . . . . . . . . . . . . | 17 | |
| 18 | Total Liabilities and Fund Balances or Net Assets (add lines 16 and 17) . | 18 | |

| 19 | Have there been any substantial changes in your assets or liabilities since the end of the period shown above? If "Yes," explain. | ☐ Yes  ☐ No |
|---|---|---|

| **Part X** | **Public Charity Status** |
|---|---|

Part X is designed to classify you as an organization that is either a **private foundation** or a **public charity**. Public charity status is a more favorable tax status than private foundation status. If you are a private foundation, Part X is designed to further determine whether you are a **private operating foundation**. (See instructions.)

**1a** Are you a private foundation? If "Yes," go to line 1b. If "No," go to line 5 and proceed as instructed.          ☐ Yes   ☑ No
If you are unsure, see the instructions.

**b** As a private foundation, section 508(e) requires special provisions in your organizing document in          ☐
addition to those that apply to all organizations described in section 501(c)(3). Check the box to
confirm that your organizing document meets this requirement, whether by express provision or by
reliance on operation of state law. Attach a statement that describes specifically where your
organizing document meets this requirement, such as a reference to a particular article or section in
your organizing document or by operation of state law. See the instructions, including Appendix B,
for information about the special provisions that need not be contained in your organizing document.
Go to line 2.

**2** Are you a private operating foundation? To be a private operating foundation you must engage          ☐ Yes   ☐ No
directly in the active conduct of charitable, religious, educational, and similar activities, as opposed
to indirectly carrying out these activities by providing grants to individuals or other organizations. If
"Yes," go to line 3. If "No," go to the signature section of Part XI.

**3** Have you existed for one or more years? If "Yes," attach financial information showing that you are a private          ☐ Yes   ☐ No
operating foundation; go to the signature section of Part XI. If "No," continue to line 4.

**4** Have you attached either (1) an affidavit or opinion of counsel, (including a written affidavit or opinion          ☐ Yes   ☐ No
from a certified public accountant or accounting firm with expertise regarding this tax matter),
that sets forth facts concerning your operations and support to demonstrate that you are likely to
satisfy the requirements to be classified as a private operating foundation; or (2) a statement
describing your proposed operations as a private operating foundation?

**5** If you answered "No" to line 1a, indicate the type of public charity status you are requesting by checking one of the choices below.
You may check only one box.

The organization is not a private foundation because it is:

**a** 509(a)(1) and 170(b)(1)(A)(i)—a church or a convention or association of churches. Complete and attach Schedule A.          ☐

**b** 509(a)(1) and 170(b)(1)(A)(ii)—a school. Complete and attach Schedule B.          ☐

**c** 509(a)(1) and 170(b)(1)(A)(iii)—a hospital, a cooperative hospital service organization, or a medical research          ☐
organization operated in conjunction with a hospital. Complete and attach Schedule C.

**d** 509(a)(3)—an organization supporting either one or more organizations described in line 5a through c, f, g, or h          ☐
or a publicly supported section 501(c)(4), (5), or (6) organization. Complete and attach Schedule D.

Form **1023** (Rev. 6-2006)

Form 1023 (Rev. 6-2006)    Name:                                    EIN:        –              Page **11**

| **Part X** | **Public Charity Status** *(Continued)* |
|---|---|

e  509(a)(4)—an organization organized and operated exclusively for testing for public safety.  ☐

f  509(a)(1) and 170(b)(1)(A)(iv)—an organization operated for the benefit of a college or university that is owned or operated by a governmental unit.  ☐

g  509(a)(1) and 170(b)(1)(A)(vi)—an organization that receives a substantial part of its financial support in the form of contributions from publicly supported organizations, from a governmental unit, or from the general public.  ☐

h  509(a)(2)—an organization that normally receives not more than one-third of its financial support from gross **investment income** and receives more than one-third of its financial support from contributions, membership fees, and gross receipts related to its exempt functions (subject to certain exceptions).  ☐

i  A publicly supported organization, but unsure if it is described in 5g or 5h. The organization would like the IRS to decide the correct status.  ☑

6  If you checked box g, h, or i in question 5 above, you must request either an **advance** or a **definitive ruling** by selecting one of the boxes below. Refer to the instructions to determine which type of ruling you are eligible to receive.

a  **Request for Advance Ruling:** By checking this box and signing the consent, pursuant to section 6501(c)(4) of the Code you request an advance ruling and agree to extend the statute of limitations on the assessment of excise tax under section 4940 of the Code. The tax will apply only if you do not establish public support status at the end of the 5-year advance ruling period. The assessment period will be extended for the 5 advance ruling years to 8 years, 4 months, and 15 days beyond the end of the first year. You have the right to refuse or limit the extension to a mutually agreed-upon period of time or issue(s). Publication 1035, *Extending the Tax Assessment Period*, provides a more detailed explanation of your rights and the consequences of the choices you make. You may obtain Publication 1035 free of charge from the IRS web site at www.irs.gov or by calling toll-free 1-800-829-3676. Signing this consent will not deprive you of any appeal rights to which you would otherwise be entitled. If you decide not to extend the statute of limitations, you are not eligible for an advance ruling.  ☑

**Consent Fixing Period of Limitations Upon Assessment of Tax Under Section 4940 of the Internal Revenue Code**

For Organization

_____    _____    _____
(Signature of Officer, Director, Trustee, or other    (Type or print name of signer)                        (Date)
authorized official)

_____
(Type or print title or authority of signer)

For IRS Use Only

_____                                              _____
IRS Director, Exempt Organizations                                                    (Date)

b  **Request for Definitive Ruling:** Check this box if you have completed one tax year of at least 8 full months and you are requesting a definitive ruling. To confirm your public support status, answer line 6b(i) if you checked box g in line 5 above. Answer line 6b(ii) if you checked box h in line 5 above. If you checked box i in line 5 above, answer both lines 6b(i) and (ii).  ☐

(i) **(a)** Enter 2% of line 8, column (e) on Part IX-A. Statement of Revenues and Expenses. _____

**(b)** Attach a list showing the name and amount contributed by each person, company, or organization whose gifts totaled more than the 2% amount. If the answer is "None," check this box.  ☐

(ii) **(a)** For each year amounts are included on lines 1, 2, and 9 of Part IX-A. Statement of Revenues and Expenses, attach a list showing the name of and amount received from each **disqualified person.** If the answer is "None," check this box.  ☐

**(b)** For each year amounts are included on line 9 of Part IX-A. Statement of Revenues and Expenses, attach a list showing the name of and amount received from each payer, other than a disqualified person, whose payments were more than the larger of (1) 1% of line 10, Part IX-A. Statement of Revenues and Expenses, or (2) $5,000. If the answer is "None," check this box.  ☐

7  Did you receive any unusual grants during any of the years shown on Part IX-A. Statement of Revenues and Expenses? If "Yes," attach a list including the name of the contributor, the date and amount of the grant, a brief description of the grant, and explain why it is unusual.    ☐ Yes    ☐ No

Form **1023** (Rev. 6-2006)

Form 1023 (Rev. 6-2006)    Name:    EIN:    –    Page **12**

| Part XI | User Fee Information |
|---------|---------------------|

*You must include a user fee payment with this application. It will not be processed without your paid user fee. If your average annual gross receipts have exceeded or will exceed $10,000 annually over a 4-year period, you must submit payment of $750. If your gross receipts have not exceeded or will not exceed $10,000 annually over a 4-year period, the required user fee payment is $300. See instructions for Part XI, for a definition of **gross receipts** over a 4-year period. Your check or money order must be made payable to the United States Treasury. User fees are subject to change. Check our website at www.irs.gov and type "User Fee" in the keyword box, or call Customer Account Services at 1-877-829-5500 for current information.*

| 1 | Have your annual gross receipts averaged or are they expected to average not more than $10,000? ☐ **Yes**  ☑ **No** |
|---|---|
| | If "Yes," check the box on line 2 and enclose a user fee payment of $300 (Subject to change—see above). |
| | If "No," check the box on line 3 and enclose a user fee payment of ~~$750~~ (Subject to change—see above). $850 |
| 2 | Check the box if you have enclosed the reduced user fee payment of $300 (Subject to change). ☐ |
| 3 | Check the box if you have enclosed the user fee payment of ~~$750~~ (Subject to change). $850 ☑ |

I declare under the penalties of perjury that I am authorized to sign this application on behalf of the above organization and that I have examined this application, including the accompanying schedules and attachments, and to the best of my knowledge it is true, correct, and complete.

**Please Sign Here** ▶

| (Signature of Officer, Director, Trustee, or other authorized official) | (Type or print name of signer) | (Date) |
|---|---|---|
| | (Type or print title or authority of signer) | |

**Reminder:** Send the completed Form 1023 Checklist with your filled-in-application.    Form **1023** (Rev. 6-2006)

**KSP/True the Vote**                                                    EIN 27-2860095

Part IV Description of Activities:


KSP/True the Vote is a non-partisian initiative to recruit and train volunteers to work inside polling places for elections. True the Vote initiatives are the following:

- Mobilizing and training volunteers who are willing to work as election monitors
- Aggressively pursuing fraud reports to ensure prosecution when appropriate
- Providing a support system for volunteers that includes live and online training, quick reference guides, a call bank to phone in problem reports, information on videotaping at polling places, and security as necessary
- Creating documentaries and instructional videos for use in recruiting and training
- Raising awareness of the problem through strategic outreach efforts including advertising, social networking, media relations, and relational marketing
- Voter registration programs and efforts to validate existing registration lists, including the use of pattern recognition software to detect problem areas


Part V

2a Relationships of directors: Catherine Engelbrecht and Bryan Engelbrecht are both on the Board of Directors and are married.


Part V

| 3a. | Name | Qualifications | Avg. Hrs Worked | Duties |
|-----|------|----------------|-----------------|--------|
| | Bryan Engelbrecht | co-owner of Engelbrecht Mfg. Inc. | 10/wk | advisor |
| | Dianne Josephs | owner Dianne L. Josephs Design, Inc. | 40/wk | event coordinator |
| | Catherine Engelbrecht | co-owner of Engelbrecht Mfg. Inc. | 65/wk | Pres. And spokesperson |


Part VII

2b. In 2011, KSP/True the Vote would like to see Texas enact legislation to support use of a Voter ID Card.  20% of budget would be used to support printing to educate on the cause.

**KSP/True the Vote**                                          **EIN 27-2860095**

Part VII

15. KSP/ True the Vote has a close connection with King Street Patriots (EIN 27-1620172). Both were formed approximately 6 months apart and have the same Board of Directors. KSP/True the Vote began as an initiative of King Street Patriots. King Street Patriots' leadership oversees the True the Vote program. However, you do not have to be associated with King Street Patriots to volunteer for KSP/ True the Vote.

**KSP/True the Vote**                                    EIN 27-2860095

Part IX Financial Data

| | 2010 | 2011 | 2112 |
|---|---|---|---|
| **Other Expenses** | | | |
| Advertising | 50,000 | 30,000 | 100,000 |
| Design - cards & materials | 20,000 | 45,000 | 75,000 |
| Printing | 25,000 | 175,000 | 250,000 |
| Signage | 25,000 | 100,000 | 200,000 |
| True The Vote website | 10,000 | - | |
| True The Vote website - maintenance | 12,000 | 14,400 | 24,000 |
| Various Collateral Material | 10,000 | 25,000 | 50,000 |
| Video completion | 3,000 | - | - |
| Misallaneous | 5,000 | 6,000 | 7,500 |
| **Total Other Expenses:** | 160,000 | 395,400 | 706,500 |

USCA Case #14-5316      Document #1568110      Filed: 07/08/2015      Page 91 of 228
Fax Server      9/16/2010 2:58:11PM   PAGE   2/003   Fax Server

Corporations Section
P.O.Box 13697
Austin, Texas 78711-3697



Hope Andrade
Secretary of State

# Office of the Secretary of State

The undersigned, as Secretary of State of Texas, does hereby certify that the attached is a true and correct copy of each document on file in this office as described below:

KSP/True the Vote
Filing Number: 801278527

Certificate of Formation                                June 07, 2010

In testimony whereof, I have hereunto signed my name officially and caused to be impressed hereon the Seal of State at my office in Austin, Texas on September 16, 2010.



Hope Andrade
Secretary of State

Come visit us on the internet at http://www.sos.state.tx.us/

Phone: (512) 463-5555        Fax: (512) 463-5709        Dial: 7-1-1 for Relay Services
Prepared by: VCASTILLO        TID: 10266                 Document: 328076970002

USCA Case #14-5316      Document #158710 PM   PAGE Filed: 05/07/2015   Page 92 of 228
FAX SERVER   06/16/2010   2:58:41 PM   PAGE 005/005 Fax Server

| Form 202 | | |
|---|---|---|
| Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>FAX: 512/463-5709<br><br>Filing Fee: $25 | *(seal: STATE OF TEXAS)*<br><br>**Certificate of Formation**<br>**Nonprofit Corporation** | **Filed in the Office of the<br>Secretary of State of Texas**<br>Filing #: 801278527 06/07/2010<br>Document #: 310811380002<br>**Image Generated Electronically<br>for Web Filing** |

**Article 1 - Corporate Name**

The filing entity formed is a nonprofit corporation. The name of the entity is :

**KSP/True the Vote**

**Article 2 – Registered Agent and Registered Office**

☐ A. The initial registered agent is an organization (cannot be corporation named above) by the name of:

**OR**

☑ B. The initial registered agent is an individual resident of the state whose name is set forth below:

Name:

**Catherine    Engelbrecht**

C. The business address of the registered agent and the registered office address is:

Street Address:

**708 Damascus    Rosenberg TX 77471**

**Consent of Registered Agent**

☐ A. A copy of the consent of registered agent is attached.

**OR**

☑ B. The consent of the registered agent is maintained by the entity.

**Article 3 - Management**

☐ A. Management of the affairs of the corporation is to be vested solely in the members of the corporation.

**OR**

☑ B. Management of the affairs of the corporation is to be vested in its board of directors. The number of directors, which must be a minimum of three, that constitutes the initial board of directors and the names and addresses of the persons who are to serve as directors until the first annual meeting or until their successors are elected and qualified are set forth below.

| Director 1: **Catherine    Engelbrecht** | Title: **Director** |
|---|---|
| Address: **708 Damascus    Rosenberg TX, USA 77471** | |
| Director 2: **Lynn    Lasher** | Title: **Director** |
| Address: **5551 Cedar Creek    Houston TX, USA 77056** | |
| Director 3: **Bryan    Engelbrecht** | Title: **Director** |
| Address: **708 Damascus    Rosenberg TX, USA 77471** | |

**Article 4 - Organization Structure**

☐ A. The corporation will have members.

or

☑ B. The corporation will not have members.

**Article 5 - Purpose**

The corporation is organized for the following purpose or purposes:

**The Corporation is organized for charitable purposes, including such purposes as, making distributions to organizations that qualify as exempt organizations under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, or**

corresponding section of any future federal tax code and the Texas Tax Code, Section 11.18. The specific and primary purpose of the Corporation is to educate/inform and register voters within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, or any future federal tax code and the Texas Tax Code, Section 11.18.

### Supplemental Provisions / Information

**Restrictions and Limitations**

No part of the net earnings of the Corporation shall inure to the benefit of, or be distributable to its members, trustees, or other private persons, except that the Corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth in the purpose clause hereof. No substantial part of the activities of the Corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation, and the Corporation shall not participate in, or intervene in (including the publishing or distribution of statements) any political campaign on behalf of any candidate for public office. Notwithstanding any other provision of this document, the Corporation shall not carry on any other activities not permitted to be carried on (a) by an organization exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code, or corresponding section of any future federal tax code, or (b) by an organization, contributions to which are deductible under section 1-70(c)(2) of the Internal Revenue Code, or corresponding section of any future federal tax code.

**Distribution of Assets Upon Winding Up**

Upon the dissolution of the Corporation, assets shall be distributed for one or more exempt purposes within the meaning of section 501(c)(3) of the Internal Revenue Code, or corresponding section of any future federal tax code, or shall be distributed to the federal government, or to a state or local government, for a public purpose. Any such assets not disposed of shall be disposed of by the Court of commons Pleas of the county in which the principal office of the Corporation is then located, exclusively for such purposes or to such organization or organizations, as said Court shall determine, which are organized and operated exclusively for such purposes.

[The attached addendum, if any, is incorporated herein by reference.]

### Effectiveness of Filing

☑A. This document becomes effective when the document is filed by the secretary of state.

**OR**

☐B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

### Organizer

The name and address of the organizer are set forth below.

**Brian G. Herrington**      **2225 County Road 90, Suite 115, Pearland, TX 77584**

### Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The

USCA Case #14-5316      Document #1558110    Filed: 07/22/15    Page 94 of 228

Fax Server          9/16/2010 2:58:110PM      PAGE   003/005   Fax Server

undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**Brian G. Herrington, Attorney-in-fact**

Signature of organizer

**FILING OFFICE COPY**

USPA Server #14-5316    9/16/2010 12:58:05 PM   PAGE 2/008  Fax Server  age 95 of 228

Corporations Section
P.O.Box 13697
Austin, Texas 78711-3697



Hope Andrade
Secretary of State

## Office of the Secretary of State

The undersigned, as Secretary of State of Texas, does hereby certify that the attached is a true and correct copy of each document on file in this office as described below:

KSP/True the Vote
Filing Number: 801278527

Certificate of Correction                                      September 02, 2010

In testimony whereof, I have hereunto signed my name officially and caused to be impressed hereon the Seal of State at my office in Austin, Texas on September 16, 2010.



Hope Andrade
Secretary of State

Come visit us on the internet at http://www.sos.state.tx.us/

Phone: (512) 463-5555          Fax: (512) 463-5709          Dial: 7-1-1 for Relay Services
Prepared by: CPENA             TID: 10266                   Document: 328026970002

JA-92

USCA Case #14-5316      Document #1518305      Filed: 08/07/2015      Page 96 of 228

| Form 403 (Revised 12/09) Submit in duplicate to: Secretary of State P.O. Box 13697 Austin, TX 78711-3697 512 463-5555 FAX: 512/463-5709 Filing Fee: $15 |  Certificate of Correction | This space reserved for office use. **FILED** In the Office of the Secretary of State of Texas **SEP 02 2010** **Corporations Section** |
|---|---|---|

## Entity Information

1. The name of the filing entity is:

KSP/True the Vote

State the name of the entity as currently shown in the records of the secretary of state. If the certificate of correction corrects the name of the entity, state the present name and not the name as it will be corrected.

The file number issued to the filing entity by the secretary of state is: _____

## Filing Instrument to be Corrected

2. The filing instrument to be corrected is : Certificate of Formation Nonprofit Corporation

The date the filing instrument was filed with the secretary of state:  06/07/2010
                                                                      *mm/dd/yyyy*

## Identification of Errors and Corrections
(Indicate the errors that have been made by checking the appropriate box or boxes; then provide the corrected text.)

☐ The entity name is inaccurate or erroneously stated. The corrected entity name is:

☐ The registered agent name is inaccurate or erroneously stated. The corrected registered agent name is:

**Corrected Registered Agent**
(Complete either A or B, but not both.)

A. The registered agent is an organization (cannot be entity named above) by the name of:

OR

B. The registered agent is an individual resident of the state whose name is:

| First | Middle | Last Name | Suffix |
|---|---|---|---|

The person executing this certificate of correction affirms that the registered agent, whose name is being corrected by this certificate, consented to serve as registered agent at the time the filing instrument being corrected took effect.

Form 403

**RECEIVED**                                    4

**SEP - 2 2010**

**Secretary of State**

☐ The registered office address is inaccurate or erroneously stated. The corrected registered office address is:

Corrected Registered Office Address

| | | TX | |
|---|---|---|---|
| *Street Address (No P.O. Box)* | *City* | *State* | *Zip Code* |

☐ The purpose of the entity is inaccurate or erroneously stated. The purpose is corrected to read as follows:

☐ The period of duration of the entity is inaccurate or erroneously stated.
The period of duration is corrected to read as follows:

**Identification of Other Errors and Corrections**
(Indicate the other errors and corrections that have been made by checking and completing the appropriate box or boxes.)

☑ **Other errors and corrections.** The following inaccuracies and errors in the filing instrument are corrected as follows:

☑ **Add** Each of the following provisions was omitted and should be added to the filing instrument. The identification or reference of each added provision and the full text of the provision is set forth below.
Article 3 - Management

Dianne Josephs - Director
3225 Looke Lane
Houston, TX 77019

☐ **Alter** The following identified provisions of the filing instrument contain inaccuracies or errors to be corrected. The full text of each corrected provision is set forth below:

☑ **Delete** Each of the provisions identified below was included in error and should be deleted.
Article 3 - Management

Director 2
Lynn Lasher
5551 Cedar Creek
Houston, TX USA 77056

JA-94

USCA Case #14-5316      Document #1549305      Filed: 05/06/2015      Page 98 of 228

---

☐ **Defective Execution**   The filing instrument was defectively or erroneously signed, sealed, acknowledged or verified.   Attached is a correctly signed, sealed, acknowledged or verified instrument.

---

### Statement Regarding Correction

The filing instrument identified in this certificate was an inaccurate record of the event or transaction evidenced in the instrument, contained an inaccurate or erroneous statement, or was defectively or erroneously signed, sealed, acknowledged or verified.  This certificate of correction is submitted for the purpose of correcting the filing instrument.

### Correction to Merger, Conversion or Exchange

The filing instrument identified in this certificate of correction is a merger, conversion or other instrument involving multiple entities.  The name and file number of each entity that was a party to the transaction is set forth below. (If the space provided is not sufficient, include information as an attachment to this form.)

_____     _____
*Entity name*                                                                             *SOS file number*

_____     _____
*Entity name*                                                                             *SOS file number*

### Effectiveness of Filing

After the secretary of state files the certificate of correction, the filing instrument is considered to have been corrected on the date the filing instrument was originally filed except as to persons adversely affected.  As to persons adversely affected by the correction, the filing instrument is considered to have been corrected on the date the certificate of correction is filed by the secretary of state.

### Execution

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

Date:  8-30-10

By:  *Organizer*

_____
Signature of authorized person

*Brian G. Herrington, attorney-in-fact*
Printed or typed name of authorized person (see instructions)

Form 403

6

**BYLAWS OF**
**KSP/TRUE THE VOTE**

## ARTICLE I - OFFICES

### 1.    REGISTERED OFFICE AND AGENT

The registered office and registered agent of the Corporation shall be as set forth in the Corporation's Certificate of Formation.   The registered office or the registered agent may be changed by resolution of the Board of Directors, upon making the appropriate filing with the Secretary of State.

### 2.    PRINCIPAL OFFICE

The principal office of the Corporation shall be at 708 Damascus, Rosenberg, Texas 77471, provided that the Board of Directors shall have the power to change the location of the principal office.

### 3.    OTHER OFFICES

The Corporation may also have other offices at such places, within or without the State of Texas, as the Board of Directors may designate, or as the business of the Corporation may require or as may be desirable.

## ARTICLE II - DIRECTORS

### 1.    BOARD OF DIRECTORS

To the extent not limited or prohibited by law, the Certificate of Formation or these Bylaws, the powers of the Corporation shall be exercised by or under the authority of, and the business and affairs of the Corporation shall be managed under the direction of the Board of Directors of the Corporation.    Directors need not be residents of the State of Texas or members of the Corporation unless the Certificate of Formation or these Bylaws so require.

### 2.    NUMBER AND ELECTION OF DIRECTORS

The number of directors shall be three (3) provided that the number may be increased or decreased from time to time by an amendment to these Bylaws or resolution adopted by the Board of Directors, provided that the number of directors may not be decreased to fewer than three (3).   No decrease in the number of Directors shall have the effect of shortening the term of any incumbent director.

At the first annual meeting of the Board of Directors and at each annual meeting thereafter, the directors shall elect directors.   A director shall hold office until the next annual election of directors and until said director's successor shall have been elected, appointed, or designated and qualified.

### 3.    REMOVAL

A director may be removed from office, with or without cause, by the persons entitled to elect, designate, or appoint the director.  If the director was elected to office, removal requires an affirmative vote equal to the vote necessary to elect the director.

### 4.    RESIGNATION

A director may resign by providing written notice of such resignation to the Corporation.  The resignation shall be effective upon the date of receipt of the notice of resignation or the date specified in such notice.  Acceptance of the resignation shall not be required to make the resignation effective.

### 5.    VACANCIES AND INCREASE IN NUMBER OF DIRECTORS

Any vacancy occurring in the Board of Directors shall be filled by the affirmative vote of a majority of the remaining directors though less than a quorum of the Board of Directors.  A director elected to fill a vacancy shall be elected for the unexpired term of the previous director. Any directorship to be filled by reason of an increase in the number of directors shall be filled by election at an annual meeting or at a special meeting of the Board of Directors called for that purpose.

### 6.    ANNUAL MEETING OF DIRECTORS

The annual meeting of the Board of Directors shall be held no later than the last Monday during the month of July, at which they shall elect officers and transact such other business as shall come before the meeting.  The time and place of the annual meeting of the Board of Directors may be changed by resolution of the Board of Directors.

Failure to hold the annual meeting at the designated time shall not work a dissolution of the Corporation.  In the event the Board of Directors fails to call the annual meeting at the designated time, any Director may make demand that such meeting be held within a reasonable time, such demand to be made in writing by registered mail directed to any officer of the Corporation.  If the annual meeting of the Board of Directors is not called within sixty (60) days following such demand, any Director may compel the holding of such annual meeting by legal action directed against the Board of Directors, and all of the extraordinary writs of common law and of courts of equity shall be available to such Director to compel the holding of such annual meeting.

### 7.    REGULAR MEETING OF DIRECTORS

Regular meetings of the Board of Directors may be held with or without notice at such time and

2

place as may be from time to time determined by the Board of Directors.

## 8.   SPECIAL MEETINGS OF DIRECTORS

The Secretary shall call a special meeting of the Board of Directors whenever requested to do so by the President or by two (2) or more directors.   Such special meeting shall be held at the date and time specified in the notice of meeting.

## 9.   PLACE OF DIRECTORS' MEETINGS

All meetings of the Board of Directors shall be held either at the principal office of the Corporation or at such other place, either within or without the State of Texas, as shall be specified in the notice of meeting or executed waiver of notice.

## 10.   NOTICE OF DIRECTORS' MEETINGS

Notice of any special meeting of the Board of Directors shall be given at least two (2) days previously thereto by written notice delivered personally or sent by mail or telegram to each Director at that Director's address as shown by the records of the Corporation.   If mailed, such notice shall be deemed to be delivered when deposited in the United States mail in a sealed envelope so addressed, the postage thereon prepaid.   If notice is given by telegram, such notice shall be deemed to be delivered when the telegram is delivered to the telegraph company.   Any Director may waive notice of any meeting.   The attendance of a Director at any meeting shall constitute a waiver of notice of such meeting, except where a Director attends a meeting for the express purpose of objecting to the transaction of any business because the meeting is not lawfully called or convened.   Neither the business to be transaction at, nor the purpose of, any regular or special meeting of the Board need be specified in the notice or waiver of notice of such meeting, unless specifically required by law or by these Bylaws.

## 11.   QUORUM AND VOTING OF DIRECTORS

A quorum for the transaction of business by the Board of Directors shall be a majority of the number of directors fixed by these Bylaws.   Directors present by proxy may not be counted toward a quorum.   The act of the majority of the directors present in person or by proxy at a meeting at which a quorum is present shall be the act of the Board of Directors, unless the act of a greater number is required by law or the Certificate of Formation.

A director may vote in person or by proxy executed in writing by the director.   No proxy shall be valid after three months from the date of its execution.   Each proxy shall be revocable unless expressly provided therein to be irrevocable, and unless otherwise made irrevocable by law.

## 12.   COMPENSATION

3

Directors, as such, shall not receive any stated salary for their services, but by resolution of the Board of Directors a fixed sum and expenses of attendance, if any, may be allowed for attendance at any meeting of the Board or Directors. A director shall not be precluded from serving the Corporation in any other capacity and receiving compensation for such services. Member of committees may be allowed similar compensation and reimbursement of expenses for attending committee meetings.

## 13.    ACTION BY DIRECTORS WITHOUT MEETING

Any action required by the Texas Business Organizations Code to be taken at a meeting of the Board of Directors, or any action which may be taken at a meeting of the Board of Directors or any committee, may be taken without a meeting if a consent in writing, setting forth the action to be taken, shall be signed by all the Board of Directors entitled to vote with respect to the subject matter thereof, or all of the members of the committee, as the case may be. Such consent shall have the same force and effect as a unanimous vote.

If the Corporation's Certificate of Formation so provide, any action required by the Texas Business Organizations Code to be taken at a meeting of the Board of Directors or any action that may be taken at a meeting of the Board of Directors of any committee may be taken without a meeting if a consent in writing, setting forth the action to be taken, is signed by a sufficient number of Board of Directors or committee members as would be necessary to take that action at a meeting at which all of the Board of Directors or members of the committee were present and voted.

Each written consent shall bear the date of signature of each Director or committee member who signs the consent. A written consent signed by less than all of the Board of Directors or committee members is not effective to take the action that is the subject of the consent unless, within sixty (60) days after the date of the earliest dated consent delivered to the Corporation in the manner required by this section, a consent or consents signed by the required number of Board of Directors or committee members is delivered to the Corporation at its registered office, registered agent, principal place of business, transfer agent, registrar, exchange agent, or an officer or agent of the Corporation having custody of the books in which proceedings of meetings of Board of Directors or committees are recorded. Delivery shall be by hand or certified or registered mail, return receipt requested. Delivery to the Corporation's principal place of business shall be addressed to the President or principal executive officer of the Corporation.

Prompt notice of the taking of any action by Board of Directors or a committee without a meeting by less than unanimous written consent shall be given to all Board of Directors or committee members who did not consent in writing to the action.

If any action by Board of Directors or a committee is taken by written consent signed by less than all of the Board of Directors or committee members, any articles or documents filed with

4

the Secretary of State as a result of the taking of the action shall state, in lieu of any statement required by this Act concerning any vote of the Board of Directors or committee members, that written consent has been given in accordance with the provisions of section 6.202 of the Texas Business Organizations Code and that any written notice required by such section has been given.

A telegram, telex, cablegram, or similar transmission by a Director or member of a committee or a photographic, photostatic, facsimile, or similar reproduction of a writing signed by a Director or member of a committee shall be regarded as signed by the Director or member of a committee for purposes of this section.

## 14.    COMMITTEES OF THE BOARD OF DIRECTORS

The Board of Directors, by resolution adopted by a majority of the Directors in office, may designate and appoint one or more committees, each of which shall consist of two or more Directors, which committees, to the extent provided in said resolution, shall have and exercise the authority of the Board of Directors in the management of the Corporation, except that no such committee shall have the authority of the Board of Directors in reference to amending, altering or repealing the Bylaws; electing, appointing or removing any member of any such committee or any Director or officer of the Corporation; amending or restating the Certificate of Formation; adopting a plan of merger or adopting a plan of consolidation with another Corporation; authorizing the sale, lease, exchange or mortgage of all or substantially all of the property and assets of the Corporation; authorizing the voluntary dissolution of the Corporation or revoking proceedings therefore; adopting a plan for the distribution of the assets of the Corporation; or amending, altering or repealing any resolution of the Board of Directors which by its terms provides that it shall not be amended, altered or repeated by such committee.  The designation and appointment of any such committee and the delegation of authority to such committee shall not operate to relieve the Board of Directors, or any individual Director, of any responsibility imposed by law upon the Board of Directors or upon any individual Director.

Other committees not having and exercising the authority of the Board of Directors in the management of the Corporation may be appointed in such manner as may be designated by a resolution adopted by a majority of the Directors present at a meeting at which a quorum is present.  Except as otherwise provided in such resolution, members of each such committee shall be Directors of the Corporation, and the President of the Corporation shall appoint the members thereof.   Any member thereof may be removed by the person or persons authorized to appoint such member whenever in their judgment the best interests of the Corporation shall be served by such removal.

Each member of a committee shall continue as such until the next annual meeting of the Board of Directors and until a successor is appointed, unless the committee shall be sooner terminated, or unless such member be removed from such committee, or unless such member cease to qualify as a member thereof.

5

One member of each committee shall be appointed chairman by the person or persons authorized to appoint the members thereof.

Vacancies in the membership of any committee may be filled by appointments made in the same manner as provided in the case of the original appointments.

Unless otherwise provided in the resolution of the Board of Directors designating a committee, a majority of the whole committee shall constitute a quorum and the act of a majority of the members present at a meeting at which a quorum is present shall be the act of the committee.

Each committee may adopt rules for its own government not inconsistent with these Bylaws or with rules adopted by the Board of Directors.

## ARTICLE III - OFFICERS

### 1.   NUMBER OF OFFICERS

The officers of a Corporation shall consist of a president and a secretary and may also consist of one or more vice-presidents, a treasurer, and such other officers and assistant officers as may be deemed necessary.  New offices may be created and filled at any meeting of the Board of Directors.  Any two or more offices may be held by the same person, except the offices of president and secretary.  A committee duly designated may perform the functions of any officer and the functions of any two or more officers may be performed by a single committee, including the functions of both president and secretary.

### 2.   ELECTION OF OFFICERS AND TERM OF OFFICE

All officers shall be elected or appointed annually by the Board of Directors at the regular annual meeting of the Board of Directors for such terms not exceeding three (3) years.

### 3.   REMOVAL OF OFFICERS, VACANCIES

Any officer elected or appointed may be removed by the Board of Directors whenever in their judgment the best interests of the Corporation will be served thereby.  The removal of an officer shall be without prejudice to the contract rights, if any, of the officer so removed.  Election or appointment of an officer or agent shall not of itself create contract rights.  A vacancy in any office because of death, resignation, removal, disqualification or otherwise, may be filled by the Board of Directors for the unexpired portion of the term.

### 4.   POWERS OF OFFICERS

Each officer shall have, subject to these Bylaws, in addition to the duties and powers specifically

6

set forth herein, such powers and duties as are commonly incident to that office and such duties and powers as the Board of Directors shall from time to time designate. All officers shall perform their duties subject to the directions and under the supervision of the Board of Directors. The President may secure the fidelity of any and all officers by bond or otherwise.

All officers and agents of the Corporation, as between themselves and the Corporation, shall have such authority and perform such duties in the management of the Corporation as may be provided in theses Bylaws, or as may be determined by resolution of the Board of Directors not inconsistent with these Bylaws.

In the discharge of a duty imposed or power conferred on an officer of a Corporation, the officer may in good faith and with ordinary care rely on information, opinions, reports, or statements, including financial statements and other financial data, concerning the Corporation or another person, that were prepared or presented by: (1) one or more other officers or employees of the Corporation, including members of the Board of Directors; or (2) legal counsel, public accountants, or other persons as to matters the officer reasonably believes are within the person's professional or expert competence.

An officer is not relying in good faith within the meaning of this section if the officer has knowledge concerning the matter in question that makes reliance otherwise permitted by this subsection unwarranted.

## 5.    PRESIDENT

The President shall be the chief executive officer of the Corporation and shall preside at all meetings of all directors.  Such officer shall see that all orders and resolutions of the board are carried out, subject however, to the right of the directors to delegate specific powers, except such as may be by statute exclusively conferred on the President, to any other officers of the Corporation.

The President or any Vice-President shall execute bonds, mortgages and other instruments requiring a seal, in the name of the Corporation.  When authorized by the board, the President or any Vice-President may affix the seal to any instrument requiring the same, and the seal when so affixed shall be attested by the signature of either the Secretary or an Assistant Secretary.

The President shall be ex-officio a member of all standing committees.

The President shall submit a report of the operations of the Corporation for the year to the directors at their meeting next preceding the annual meeting of the Board of Directors.

## 6.    VICE-PRESIDENTS

The Vice-President, or Vice-Presidents in order of their rank as fixed by the Board of Directors,

7

shall, in the absence or disability of the President, perform the duties and exercise the powers of the President, and they shall perform such other duties as the Board of Directors shall prescribe.

## 7.    THE SECRETARY AND ASSISTANT SECRETARIES

The Secretary shall attend all meetings of the Board of Directors and shall record all votes and the minutes of all proceedings and shall perform like duties for the standing committees when required. The Secretary shall give or cause to be given notice of all meetings of the Board of Directors and shall perform such other duties as may be prescribed by the Board of Directors. The Secretary shall keep in safe custody the seal of the Corporation, and when authorized by the Board of Directors, affix the same to any instrument requiring it, and when so affixed, it shall be attested by the Secretary's signature or by the signature of an Assistant Secretary.

The Assistant Secretaries shall in order of their rank as fixed by the Board of Directors, in the absence or disability of the Secretary, perform the duties and exercise the powers of the Secretary, and they shall perform such other duties as the Board of Directors shall prescribe.

In the absence of the Secretary or an Assistant Secretary, the minutes of all meetings of the board shall be recorded by such person as shall be designated by the President or by the Board of Directors.

## 8.    THE TREASURER AND ASSISTANT TREASURERS

The Treasurer shall have the custody of the corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation and shall deposit all moneys and other valuable effects in the name and to the credit of the Corporation in such depositories as may be designated by the Board of Directors.

The Treasurer shall disburse the funds of the Corporation as may be ordered by the Board of Directors, taking proper vouchers for such disbursements. The Treasurer shall keep and maintain the Corporation's books of account and shall render to the President and directors an account of all of the Treasurer's transactions and of the financial condition of the Corporation and exhibit the books, records and accounts to the President or directors at any time. The Treasurer shall disburse funds for capital expenditures as authorized by the Board of Directors and in accordance with the orders of the President, and present to the President's attention any requests for disbursing funds if in the judgment of the Treasurer any such request is not properly authorized. The Treasurer shall perform such other duties as may be directed by the Board of Directors or by the President.

If required by the Board of Directors, the Treasurer shall give the Corporation a bond in such sum and with such surety or sureties as shall be satisfactory to the Board of Directors for the faithful performance of the duties of the office and for the restoration to the Corporation, in case of death, resignation, retirement or removal from office, of all books, papers, vouchers, money

8

and other property of whatever kind in the incumbent's possession or under the incumbent's control belonging to the Corporation.

The Assistant Treasurers in the order of their seniority shall, in the absence or disability of the Treasurer, perform the duties and exercise the powers of the Treasurer, and they shall perform such other duties as the Board of Directors shall prescribe.

## ARTICLE IV - INDEMNIFICATION AND INSURANCE

### 1.   INDEMNIFICATION

The Corporation shall have the full power to indemnify and advance or reimburse expenses pursuant to the provisions of the Texas Business Organizations Code to any person entitled to indemnification under the provisions of the Texas Business Organizations Code.

### 2.   INSURANCE

The Corporation may purchase and maintain insurance or another arrangement on behalf of any person who is or was a member, director, officer, employee, or agent of the Corporation or who is or was serving at the request of the Corporation as a director, officer, partner, venturer, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic corporation, employee benefit plan, other enterprise, or other entity, against any liability asserted against him or her and incurred by him or her in such a capacity or arising out of his or her status as such a person, whether or not the Corporation would have the power to indemnify him or her against that liability.  Without limiting the power of the Corporation to procure or maintain any kind of insurance or other arrangement, the Corporation may, for the benefit of persons indemnified by the Corporation, (1) create a trust fund; (2) establish any form of self-insurance; (3) secure its indemnity obligation by grant of a security interest or other lien on the assets of the Corporation; or (4) establish a letter of credit, guaranty, or surety arrangement.  The insurance or other arrangement may be procured, maintained, or established within the Corporation or with any insurer or other person deemed appropriate by the Board of Directors regardless of whether all or part of the stock or other securities of the insurer or other person are owned in whole or part by the Corporation.  In the absence of fraud, the judgment of the Board of Directors as to the terms and conditions of the insurance or other arrangement and the identity of the insurer or other person participating in an arrangement shall be conclusive and the insurance or arrangement shall not be voidable and shall not subject the directors approving the insurance or arrangement to liability, on any ground, regardless of whether directors participating in the approval are beneficiaries of the insurance or arrangement.

## ARTICLE V - MISCELLANEOUS

### 1.   WAIVER OF NOTICE

9

Whenever any notice is required to be given to any member or director of the Corporation under the provisions of the Texas Business Organizations Code, the Certificate of Formation, or these Bylaws, a waiver thereof in writing signed by the person or persons entitled to such notice, whether before or after the time stated therein, shall be equivalent to the giving of such notice.

## 2.   MEETINGS BY TELEPHONE CONFERENCE, ELECTRONIC OR OTHER REMOTE COMMUNICATIONS TECHNOLOGY

Subject to the provisions required or permitted by the Texas Business Organizations Code and these Bylaws for notice of meetings, members of the Board of Directors, or members of any committee may participate in and hold a meeting of such board, or committee by means of: (1) conference telephone or similar communications equipment by which all persons participating in the meeting can communicate with each other; or (2) another suitable electronic communications system, including videoconferencing technology or the Internet, only if: (a) each member entitled to participate in the meeting consents to the meeting being held by means of that system; and (b) the system provides access to the meeting in a manner or using a method by which each member participating in the meeting can communicate concurrently with each other participant. Participation in a meeting pursuant to this section shall constitute presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

## 3.   SEAL

The Corporation may adopt a corporate seal in such form as the Board of Directors may determine.   The Corporation shall not be required to use the corporate seal and the lack of the corporate seal shall not affect an otherwise valid contract or other instrument executed by the Corporation.

## 4.   CONTRACTS

The Board of Directors may authorize any officer or officers, agent or agents of the Corporation, in addition to the officers so authorized by these Bylaws, to enter into any contract or execute and deliver any instrument in the name of and on behalf of the Corporation, and such authority may be general or confined to specific instances.

## 5.   CHECKS, DRAFTS, ETC.

All checks, drafts or other instruments for payment of money or notes of the Corporation shall be signed by such officer or officers or such other person or persons as shall be determined from time to time by resolution of the Board of Directors.

## 6.   DEPOSITS

10

All funds of the Corporation shall be deposited from time to time to the credit of the Corporation in such banks, trust companies, or other depositories as the Board of Directors may select.

## 7. GIFTS

The Board of Directors may accept on behalf of the Corporation any contribution, gift, bequest or devise for the general purposes or for any special purpose of the Corporation.

## 8. BOOKS AND RECORDS

The Corporation shall keep correct and complete books and records of account and shall keep minutes of the proceedings of the Board of Directors, and committees and shall keep at the registered office or principal office in this State a record of the names and addresses of its members entitled to vote. A Director of the Corporation, on written demand stating the purpose of the demand, has the right to examine and copy, in person or by agent, accountant, or attorney, at any reasonable time, for any proper purpose, the books and records of the Corporation relevant to that purpose, at the expense of the member.

## 9. FINANCIAL RECORDS AND ANNUAL REPORTS

The Corporation shall maintain current true and accurate financial records with full and correct entries made with respect to all financial transactions of the Corporation, including all income and expenditures, in accordance with generally accepted accounting practices. All records, books, and annual reports (if required by law) of the financial activity of the Corporation shall be kept at the registered office or principal office of the Corporation in this state for at least three years after the closing of each fiscal year and shall be available to the public for inspection and copying there during normal business hours. The Corporation may charge for the reasonable expense of preparing a copy of a record or report.

## 10. FISCAL YEAR

The fiscal year of the Corporation shall be as determined by the Board of Directors.

<div align="center">

### ARTICLE VI - CONSTRUCTION

</div>

## 1. PRONOUNS AND HEADINGS

All personal pronouns used in these Bylaws shall include the other gender whether used in masculine or feminine or neuter gender, and the singular shall include the plural whenever and as often as may be appropriate. All headings herein are for convenience only and neither limit nor amplify the provisions of these Bylaws.

<div align="center">11</div>

## 2.    INVALID PROVISIONS

If any one or more of the provisions of these Bylaws, or the applicability of any such provision to a specific situation, shall be held invalid or unenforceable, such provision shall be modified to the minimum extent necessary to make it or its application valid and enforceable, and the validity and enforceability of all other provisions of these Bylaws and all other applications of any such provision shall not be affected thereby.

### ARTICLE VII - DISSOLUTION/DISCONTINUANCE OF THE CORPORATION

In the event the Board issues a unanimous proclamation that the activities of the Corporation are forever discontinued, all of the Corporation's assets shall be transferred to an organization that is qualified as a charitable organization under Section 501(c)(3) of the Internal Revenue Code of 1954 (as amended), with similar values and beliefs consistent with that of KSP/TRUE THE VOTE, as selected and proclaimed by the Board of Directors.

### ARTICLE VIII - AMENDMENT OF BYLAWS

The Board of Directors may amend or repeal these Bylaws, or adopt new Bylaws, unless the Certificate of Formation or the Texas Business Organizations Code limits such powers.

Adopted by the Board of Directors on July 26, 2010.

Bryan Engelbrecht

Secretary

12

USCA Case #14-5316      Document #1587305      Filed: 12/07/2015      Page 111 of 228

# Exhibit C:

# IRS Request for Information #1

# (February 15, 2011)

**Internal Revenue Service**
**P.O. Box 2508 - Room 4511**
**Cincinnati, Ohio 45201**

**Date: February 15, 2011**

**Department of the Treasury**

KSP/True the Vote
C/O Deron R Harrington JD CPA
2225 County Road 90, Ste 115
Pearland, TX 77584

**Employer Identification Number:**
   27-2860095
**Person to Contact - Group #:**
   Susan Maloney - 7824
   ID# 0203218
**Contact Telephone Numbers:**
   513-263-3649    Phone
   513-263-3690    Fax
**Response Due Date:**
   March 8, 2011

Dear Sir or Madam:

We need more information before we can complete our consideration of your application for exemption. Please provide the information requested on the enclosure by the response due date shown above. Your response must be signed by an authorized person or an officer whose name is listed on your application. Also, the information you submit should be accompanied by the following declaration:

> *Under penalties of perjury, I declare that I have examined this information, including accompanying documents, and, to the best of my knowledge and belief, the information contains all the relevant facts relating to the request for the information, and such facts are true, correct, and complete.*

To facilitate processing of your application, **please attach a copy of this letter to your response.** This will enable us to quickly and accurately associate the additional documents with your case file.

If we do not hear from you within that time, we will assume you no longer want us to consider your application for exemption and will close your case. As a result, the Internal Revenue Service will treat you as a taxable entity. If we receive the information after the response due date, we may ask you to send us a new application.

In addition, if you do not respond to the information request by the due date, we will conclude that you have not taken all reasonable steps to complete your application for exemption. Under Code section 7428(b)(2), you must show that you have taken all the reasonable steps to obtain your exemption letter under IRS procedures in a timely manner and exhausted your administrative remedies before you can pursue a declaratory judgment. Accordingly, if you fail to timely provide the information we need to enable us to act on your application, you may lose your rights to a declaratory judgment under Code section 7428.

If you have any questions, please contact the person whose name and telephone number are shown in the heading of this letter.

Letter 1312 (TEDS)

Case 1:13-cv-00734-RBW   Document 14-3   Filed 07/22/13   Page 3 of 6

Page 2

**KSP/True the Vote**
**27-2860095**

Sincerely yours,

Susan Maloney
Exempt Organizations Specialist

**Enclosure:**   Information Request

Page 3

KSP/True the Vote
27-2860095
Additional Information Requested:

1. In order to meet the organizational test for exemption under section
   501(c)(3), your organizational document, Articles of Incorporation, must be
   amended to include the following provision:

   a.   Said organization is organized exclusively for charitable, religious,
        educational, and scientific purposes, including, for such purposes, the
        making of distributions to organizations that qualify as exempt
        organizations under section 501(c)(3) of the Internal Revenue Code, or
        corresponding section of any future federal tax code.

   PLEASE SUBMIT A COMPLETE COPY OF THIS AMENDMENT.   SINCE YOU ARE INCORPORATED
   IN THE STATE OF TEXAS, THE COPY YOU SUBMIT TO US MUST SHOW THAT IT HAS BEEN
   PROPERLY FILED WITH YOUR APPROPRIATE STATE AGENCY.   WE CANNOT ACCEPT A COPY
   STAMPED "RECEIVED".

2. Your board is narrow and related. This could lead to substantial private
   benefit or inurement, both of which are prohibited under 501(c)(3).   In
   Better Business Bureau of Washington, D.C., Inc. v. United States, 326 U.S.
   279 (1945), the Court held that the presence of a single non-exempt purpose,
   if substantial in nature, will destroy a claim for exemption regardless of
   the number or importance of truly exempt purposes.

   To insure that your organization will serve public interests and not the
   personal or private interests of a few individuals, unrelated individuals
   selected from the community you will serve should control your Board of
   Directors.   Members of the Board should be selected from the following
   categories; (1) community leaders, such as elected or appointed officials,
   members of the clergy, educators, civic leaders, or other such individuals
   representing a broad cross-section of the views and interests of your
   community, (2) individuals having special knowledge or expertise in your
   particular field or discipline in which your organization is operating, (3)
   public officials acting in their capacities as such, (4) individuals
   selected by public officials, and (5) individuals selected pursuant to your
   organizations governing instrument or bylaws by a broadly based membership.

   Therefore, it is recommended that you modify your Board of Directors to place
   control in the hands of unrelated individuals selected from the community you
   will serve.

   Please submit the names and qualifications of the new board members, as well
   as a statement signed by each that they will take an active part in your
   operation.

   If you are unwilling to do so, please explain your position.

3. The activities narrative submitted with your application states, "KSP/True
   the Vote is a non-partisan initiative to recruit and train volunteers to
   work inside polling places for elections. True the Vote initiatives are the
   following:

Page 4

KSP/True the Vote
27-2860095

- Mobilizing and training volunteers who are willing to work as election monitors.
- Aggressively pursuing fraud reports to ensure prosecution when appropriate.
- Providing a support system for volunteers that includes live and online training, quick reference guides, a call bank to phone in problem reports, information on videotaping at polling places, and security as necessary.
- Creating documentaries and instructional videos for use in recruiting and training.
- Raising awareness of the problem through strategic outreach efforts including advertising, social networking, media relations, and relational marketing.
- Voter registration programs and efforts to validate existing registration lists, including the use of pattern recognition software to detect problem areas."

Please answer the following questions regarding your activities:

a. Provide a job description of an election monitor. Do they go to the polls on election day? If so, where are they located at the polls? What do they do?

b. How will the organization pursue fraud reports and ensure prosecution. Explain each step in detail. Who will do this?

c. Explain videotaping at a polling place. Who will do this? What purpose will it serve? Explain in detail.

d. How will the organization raise awareness through advertising, social networking, media relations and relational marketing? Provide examples and explain in detail.

e. Why is pattern recognition software needed to detect problem areas? What problem areas? Explain in detail.

f. Explain how voter registration fulfills an exempt purpose.

g. What percentage of the organization's time and resources is devoted to each of the listed activities? The percentage, when applied, should total 100.

h. Explain how each of your activities fulfill an exempt purpose.

4. Form 1023, Part V, page 4 (enclosed) was answered with an N/A. Please check the boxes yes or no and return to us.

Page 5

KSP/True the Vote
27-28600095

PLEASE DIRECT ALL CORRESPONDENCE REGARDING YOUR CASE TO:

US Mail:                                   Street Address:

Internal Revenue Service                   Internal Revenue Service
Exempt Organizations                       Exempt Organizations
P. O. Box 2508                             550 Main St., Federal Bldg.
Cincinnati, OH 45201                       Cincinnati, OH 45202
ATT: Susan Maloney                         ATT: Susan Maloney
          Room  4511                                 Room  4511
          Group 7824                                 Group 7824

Letter 1312 (Rev. 12/2007)

# Exhibit D:

# IRS Request for Information #2

# (February 8, 2012)

**Internal Revenue Service**
P.O. Box 2508
Cincinnati, OH 45201

**Date:  February 8, 2012**

True the Vote
C/O Foley & Lardner LLP
Attn: Richard F. Riley
3000 K Street NW, Ste 600
Washington, DC 20007-5109

**Department of the Treasury**

**Employer Identification Number:**
  27-2860095
**Person to Contact – Group #:**
  Janine L. Estes - 7829
  ID# 0203052
**Contact Telephone Numbers:**
  513-263-3627  Phone
  513-263-4590  Fax
**Response Due Date:**
  February 22, 2012

Dear Sir or Madam:

Thank you for the information submitted November 8, 2011 regarding your application for exemption.  Unfortunately, we need more information before we can complete our consideration of your application.

Please provide the information requested on the enclosed Information Request by the response due date shown above.  Your response must be signed by an authorized person or an officer whose name is listed on the application.  Also, the information you submit should be accompanied by the following declaration:

> *Under penalties of perjury, I declare that I have examined this information,*
> *including accompanying documents, and, to the best of my knowledge and belief,*
> *the information contains all the relevant facts relating to the request for the*
> *information, and such facts are true, correct, and complete.*

If we approve your application for exemption, we will be required by law to make the application and the information that you submit in response to this letter available for public inspection. Please ensure that your response doesn't include unnecessary personal identifying information, such as bank account numbers or Social Security numbers, that could result in identity theft or other adverse consequences if publicly disclosed.  If you have any questions about the public inspection of your application or other documents, please call the person whose name and telephone number are shown above.

To facilitate processing of your application, please attach a copy of this letter and the enclosed Application Identification Sheet to your response and all correspondence related to your application.  This will enable us to quickly and accurately associate the additional documents with your case file.  Also, please note the following important response submission information:

- Please don't fax and mail your response.  Faxing and mailing your response will result in unnecessary delays in processing your application. Each piece of correspondence submitted (whether fax or mail) must be processed, assigned, and reviewed by an EO Determinations specialist.

- Please don't fax your response multiple times. Faxing your response multiple times will delay the processing of your application for the reasons noted above.

- Please don't call to verify receipt of your response without allowing for adequate processing time. It takes a minimum of three workdays to process your faxed or mailed response from the day it is received.

If we don't hear from you by the response due date shown above, we will assume you no longer want us to consider your application for exemption and will close your case. As a result, the Internal Revenue Service will treat you as a taxable entity. If we receive the information after the response due date, we may ask you to send us a new application.

In addition, if you don't respond to the information request by the due date, we will conclude that you have not taken all reasonable steps to complete your application for exemption. Under Internal Revenue Code section 7428(b)(2), you must show that you have taken all the reasonable steps to obtain your exemption letter under IRS procedures in a timely manner and exhausted your administrative remedies before you can pursue a declaratory judgment. Accordingly, if you fail to timely provide the information we need to enable us to act on your application, you may lose your rights to a declaratory judgment under Code section 7428.

We have sent a copy of this letter to your representatives as indicated in Form 2848, Power of Attorney and Declaration of Representative.

If you have any questions, please contact the person whose name and telephone number are shown in the heading of this letter.

Sincerely yours,

Janine L. Estes
Exempt Organizations Specialist

Enclosures: Information Request

Cc:   Cleta Mitchell, Esq.
       Richard F. Riley, Esq

True the Vote
27-2860095

Additional Information Requested:

1.  Provide a print-out of each of your website's pages or proposed website's pages, including any pages with restricted access.

2.  Provide details regarding all of your activity on Facebook and Twitter. Also, provide hard copies of all advertising you have conducted using social media outlets.

3.  Submit the following information relating to your past and present directors, officers, and key employees:

    a)  Provide a resume for each.
    b)  Indicate the number of hours per month each individual has provided or is providing services to you.
    c)  Provide a description of all the services each individual provides or has provided to you.
    d)  Indicate the total compensation provided to each individual.
    e)  Describe how each compensation package was determined.
    f)  Indicate if any of your current and former officers, directors, and key employees are related to each other (include family and business relationships) and describe the nature of the relationship.

4.  List each past or present board member, officer, key employee and members of their families who:

    a)  Has served on the board of another organization.
    b)  Was, is or plans to be a candidate for public office. Indicate the nature of each candidacy.
    c)  Has previously conducted similar activities for another entity.
    d)  Has previously submitted an application for tax exempt status.

5.  Do you have a conflict of interest policy? If yes, submit a copy.

6.  Provide minutes of all board meetings since your creation.

7.  Regarding your fundraising:

    a)  Provide copies of all solicitations the organization has made regarding fundraising.
    b)  Provide copies of all documents related to the organization's fundraising events, including pamphlets, flyers, brochures, webpage solicitations.
    c)  Provide a listing and details regarding all fundraising expenses.

8.  Provide actual financial information for 2010 and 2011 and a budget for 2012. Provide details regarding each item listed.

True the Vote
27-2860095

9.   Provide a description of the collateral materials used by the organization.

10.  Although no salaries and wages on the financial information submitted with your initial
     application does the organization currently have or plan to have employees?  Provide
     the following information:

     a)  How many employees do you have?
     b)  Indicate the total of full-time, part-time, and seasonal employees?
     c)  If employees are part-time, when did/do they work?
     d)  If employees are seasonal, during what season (months) did/do they work?
     e)  How many employees are/were devoted to each activity of the organization throughout
         the year?

11.  Regarding your current and planned volunteers:

     a)  How many volunteers do you have?
     b)  How many volunteers are/were devoted to each activity of the organization throughout
         the year?
     c)  How many and what sort of resources are devoted to volunteer activities?

12.  In your Form 1023 application, you stated you conduct the following activities: Training
     Election Workers and Public Education.  Provide the following information for all the
     events you have held from inception to the present:

     a)  The time, location, and content schedule of each event

     b)  A copy of the handouts you provided to the audience

     c)  Identify the education and workshop materials that instructors used

     d)  The names and credentials of the instructors

     e)  If speeches or forums were conducted in the event, provide detailed contents of the
         speeches or forums, names of the speakers or panels, and their credentials.  If any
         speakers or panel members were paid, provide the amount paid for each person.  If
         not, please indicate that they volunteered to conduct the event.

     f)  The names of persons from your organization and the amount of time they spent on
         the event. Indicate the name and amount of time they spent on the event. Indicate
         the name and amount of compensation that was paid to each person.  If no one was
         paid, indicate this event was conducted by volunteers to each person.

13.  Provide the following information for all the events you will conduct for 2012 and 2013:

     a)  The time, location, and content schedule of each event

     b)  Identify handouts you provided to the audience

     c)  Identify workshop materials that instructors will use

True the Vote
27-2860095

d) The names and credentials of the instructors

e) If speeches or forums will be conducted in the event, provide detailed contents of the speeches or forums, names of the speakers or panels, and their credentials. If any speakers or panel members will be paid, provide the amount will be paid for each person. If not, please indicate they volunteered to conduct the event.

f) The names of persons from your organization and the amount of time they will spend on the event. Indicate the name and amount of time they will spend on the event. Indicate the name and amount of compensation that will be paid to each person. If no one will be paid, indicate this event will be conducted by volunteers to each person.

g) Indicate the percentage of time and resources you will spend on these activities in relation to 100% of all your activities.

14. You have stated you will recruit individuals to serve as election administration workers or as election observers. Provide the following information:

a) Explain the process used to recruit individuals willing to fill these positions.

b) Provide copies of any materials distributed to recruit individuals.

c) How many individuals have you trained to date?

d) How many individuals are currently undergoing training?

e) How many elections have you provided election workers for?

f) What percentage of individuals recruited go on to serve as administration workers?

g) What percentage of individuals recruited go on to serve as election observers?

h) What percentage of individuals recruited do not go on serve as election workers?

i) Do you only train election workers for the state of Texas? If yes, do you plan to expand your activities to other states? List the states in which you plan to train election workers. If you have already expanded provide a list states in which you are currently training election workers.

j) Are there any regulations that govern the role of an election observer? If yes, provide copies of the applicable regulations.

15. You stated that election administration workers are trained by local election administrators. Provide the following information:

a) Do election administration workers receive any training from you? Explain the training received.

b) If training is received from you how does this training differ from the training received by election observers?

c) When do the election administration workers receive this training: prior to the training, concurrently with the training, or after receiving the training from local election administrators?



True the Vote
27-2860095

16.   You have stated the organization's materials are carefully vetted by election law experts. Provide the names and credentials of the election law experts used by the organization

17.   You have stated the organization's voter integrity center will be staffed with legal and election experts. Provide the names and credentials of the legal and election experts used by the organization.

18.   How many reports have election observers made to the voter integrity center? Of those reports how many have been elevated to the appropriate election administration official to correct the violation?

19.   You have stated the organization may participate in civil lawsuits to compel compliance with the election law. Provide a description of any of your organization's involvement in civil lawsuits to date.

20.   Provide the following information about the organization's voter registration integrity activity:

   a)   Explain the process used to recruit individuals.

   b)   Provide copies of any materials distributed to recruit individuals.

   c)   Describe the training process used by the organization. Provide a copy of any training materials used.

   d)   How many individuals have you trained to date?

   e)   How many individuals are currently undergoing training?

   f)   Identify the states in which the organization conducts, has conducted, or plans to conduct this activity.

   g)   In how many jurisdictions have you conducted this activity?

21.   You stated the organization has developed, through volunteers, a software capability for downloading the registered voter lists, then reviewing and identifying potential inaccurate registrations. Is there any intellectual property rights associated with this software? If so, who owns those rights?

22.   You stated the organization is lessening the burdens of government by assisting governmental bodies in accomplishing their requirements under law. You go on to state the organization's review of registration lists directly fulfills the HAVA requirements imposed on government and offers a resource to accomplish this task that many local jurisdictions lack. Provide the following information:

   a)   Has the organization ever been approached by a jurisdiction specifically to perform a review of registration lists? If so, please explain.

   b)   To your knowledge has a local election administration official ever used your review

True the Vote
27-2860095

of voter rolls to assist them in discharging their statutory obligation to maintain
integrity of the voter registration rosters?  If so, please explain.

c) In how many jurisdictions have you presented your review of voter rolls to election
administration?

23. You stated you will provide voter registration training. In addition to voter registration will
you, or have you ever, conducted get out to vote drives, or publish or distribute voter
guides? Provide the following information:

a) What is the location, date and time of the events?

b) Who on the organization's behalf have conducted or will conduct the voter
registration or get out to vote drives?

c) Provide copies of all materials published or distributed regarding the activities,
including copies of any voter guides.

24. You stated the organization may create documentaries. Provide copies of any
completed documentaries including printed transcripts.

25. In regards to the organization's public education activities you state the organization
seeks to educate the public and influential individuals. Define influential individuals.

26. You stated the organization hopes to raise awareness of voter integrity tissues through
strategic outreach efforts including media relations. Has your organization engaged in
any activities with the news media? If so, please describe those activities in further
detail and, if available, provide copies of articles printed or transcripts of items aired
because of that activity.  News media activity may include the following:

a) Press releases
b) Interviews with news media
c) Letters to the editor
d) Op-ed pieces

27. In your initial application you stated True the Vote would like to see Texas enact
legislation to support the use of a Voter ID card.  20% of the budget would be used to
support printing to educate on the cause.  In your most recent response you stated True
the Vote will provide information on its findings to elected officials.  Provide the following
information regarding these activities:

a) Provide copies of all communications, pamphlets, advertisements, and other materials
distributed by you regarding the legislation.

b) Do you conduct media advertisements lobbying for or against legislation? If yes, provide
copies of any radio, television, or internet advertisements relating to the organization's
lobbying activities.

c) Do you directly or indirectly communicate with members of legislative bodies? If so,
explain the amount and nature of the communication.

True the Vote
27-2860095

28.   Are you a membership organization?   Provide details regarding all members' fees and benefits.

29.   Do you publish or distribute materials or conduct other communications that are prepared by or reviewed by another organization? If yes, explain and provide a copy of such materials or communications.

30.   Will you publish and/or distribute material in favor of any candidate for public office? If yes, explain.

31.   Do you or will you rate candidates? If yes, explain.

32.   Do you or will you endorse candidates? If yes, explain and answer the following:

   a)   Provide your endorsement criteria.
   b)   Once a candidate is endorsed, how does your organization handle the endorsement?
   c)   Provide a list of all candidates you have endorsed.
   d)   Does your organization notify the candidate of the endorsement? If yes, explain.
   e)   Do you provide any materials to candidates, which they may use to promote their candidacy?  If so, please describe and provide copies of those materials.

33.   You have indicated you have a close connection with King Street Patriots.

   a)   Provide the address of the organization.
   b)   Describe in detail the nature of the relationship.
   c)   Do you work with the organization(s) regularly?
   d)   Provide copies of all related contracts with such organizations.
   e)   Describe the nature of all contacts with the organizations.
   f)   Do you share employees, volunteers, resources, office space, etc. with the organization(s)? If yes, explain.

34.   Are you associated with any other IRC 501(c)(3), 501(c)(4) or 527 organizations? If yes:

   a)   Provide the name, federal employer identification number and address of each organization.
   b)   Describe in detail the nature of the relationship(s).
   c)   Do you work with the organization(s) regularly?
   d)   Provide copies of all related contracts with such organizations.
   e)   Describe the nature of all contacts with the organizations.
   f)   Do you share employees, volunteers, resources, office space, etc. with the organization(s)? If yes, explain.

True the Vote
27-2860095

35. Are you associated with any for-profit organizations? If yes:

   a) Provide the name, federal employer identification number and address of each organization.
   b) Describe in detail the nature of the relationship(s).
   c) Do you work with the organization(s) regularly?
   d) Provide copies of all related contracts with such organizations.
   e) Describe the nature of all contacts with the organizations.
   f) Do you share employees, volunteers, resources, office space, etc. with the organization(s)? If yes, explain.

36. Do you engage in business dealings with any candidate(s) for public office or an organization associated with the candidate, such as renting office space or providing access to a membership list? If so, describe the relationship in detail and provide contracts or other agreements documenting the business relationship.

37. Has any person or organization provided educational services to you? If yes, provide the following:

   a) The name of the person or organization.
   b) A full description of the services provided.
   c) The political affiliation of the person or organization.

38. Have you conducted candidate forums at which candidates for public office were invited to speak? If yes, provide the following:

   a) Details, including the nature of the forums
   b) The candidates invited to participate
   c) The candidates that did participate
   d) The issues discussed
   e) The time and location of the event.
   f) Copies of all materials distributed regarding the forum and provided at the forum, including any internet material discussing or advertising the forum.

39. Have any candidates for public office spoken at a function of the organization other than a candidate forum? If yes, provide the following:

   a) The names of the candidates
   b) The functions at which they spoke
   c) Any materials distributed or published with regard to their appearance and the event
   d) Any video or audio recordings of the event
   e) A transcript of any speeches given by the candidate(s)

True the Vote
27-2860095

## PLEASE DIRECT ALL CORRESPONDENCE REGARDING YOUR CASE TO:

US Mail:

Internal Revenue Service
Exempt Organizations
P. O. Box 2508
Cincinnati, OH 45201
ATT:   Janine L. Estes
        Room 4525
        Group 7829

Street Address for Delivery Service:

Internal Revenue Service
Exempt Organizations
550 Main St, Federal Bldg.
Cincinnati, OH 45202
ATT: Janine L. Estes
        Room 4525
        Group 7829

**Letter 2382 (5-2011)**
Catalog Number 57829T

USCA Case #14-5316      Document #1587305      Filed: 12/07/2015      Page 128 of 228

# Exhibit E:

# IRS Request for Information #3

# (October 9, 2012)

**Internal Revenue Service**                          **Department of the Treasury**
P.O. Box 2508
Cincinnati, OH 45201

**Date:** October 9, 2012

                                                      **Employer Identification Number:**
                                                        27-2860095
True the Vote, Inc.                                    **Person to Contact – Group #:**
C/o Cleta Mitchell, Esq.,                                Faye Ng – 7821
Foley & Lardner LLP                                      ID# 0203259
3000 K Street N.W., Suite 600                         **Contact Telephone Numbers:**
Washington, DC  20007-5109                               513-263-3699  Phone
                                                         513-263-3662  Fax

                                                      **Response Due Date:**
                                                        November 26, 2012

Dear Sir or Madam:

Thank you for the information recently submitted regarding your application for exemption.
Unfortunately, we need more information before we can complete our consideration of your
application.

Please provide the information requested on the enclosed Information Request by the response
due date shown above.  Your response must be signed by an authorized person or an officer
whose name is listed on the application.  Also, the information you submit should be
accompanied by the following declaration:

> *Under penalties of perjury, I declare that I have examined this information,*
> *including accompanying documents, and, to the best of my knowledge and belief,*
> *the information contains all the relevant facts relating to the request for the*
> *information, and such facts are true, correct, and complete.*

If we approve your application for exemption, we will be required by law to make the application
and the information that you submit in response to this letter available for public inspection.
Please ensure that your response doesn't include unnecessary personal identifying information,
such as bank account numbers or Social Security numbers, that could result in identity theft or
other adverse consequences if publicly disclosed.  If you have any questions about the public
inspection of your application or other documents, please call the person whose name and
telephone number are shown above.

To facilitate processing of your application, please attach a copy of this letter and the enclosed
Application Identification Sheet to your response and all correspondence related to your
application.  This will enable us to quickly and accurately associate the additional documents
with your case file.  Also, please note the following important response submission information:

- Please don't fax _and_ mail your response.  Faxing and mailing your response will result in
  unnecessary delays in processing your application. Each piece of correspondence
  submitted (whether fax or mail) must be processed, assigned, and reviewed by an EO

Determinations specialist.

- Please don't fax your response multiple times.  Faxing your response multiple times will delay the processing of your application for the reasons noted above.

- Please don't call to verify receipt of your response without allowing for adequate processing time.  It takes a minimum of three workdays to process your faxed or mailed response from the day it is received.

If we don't hear from you by the response due date shown above, we will assume you no longer want us to consider your application for exemption and will close your case.  As a result, the Internal Revenue Service will treat you as a taxable entity.  If we receive the information after the response due date, we may ask you to send us a new application.

In addition, if you don't respond to the information request by the due date, we will conclude that you have not taken all reasonable steps to complete your application for exemption.  Under Internal Revenue Code section 7428(b)(2), you must show that you have taken all the reasonable steps to obtain your exemption letter under IRS procedures in a timely manner and exhausted your administrative remedies before you can pursue a declaratory judgment.  Accordingly, if you fail to timely provide the information we need to enable us to act on your application, you may lose your rights to a declaratory judgment under Code section 7428.

We have sent a copy of this letter to your representative as indicated in Form 2848, Power of Attorney and Declaration of Representative.

If you have any questions, please contact the person whose name and telephone number are shown in the heading of this letter.

Sincerely yours,

Faye Ng
Exempt Organizations Specialist

Enclosures:  Information Request

Additional Information Requested:

1. The purpose clause on your amended Articles of Incorporation dated February 22, 2011 states the following:

> Said organization is organized exclusively for charitable, religious, education, and scientific purposes, including, for such purposes, the making of distributions to organizations that qualify as exempt organizations under section 501(c)(3) of the Internal Revenue code, or corresponding section of any future federal tax code. The specific and primary purpose of the Corporation is to educate/inform and register voters *within the meaning of* Section 501(c)(3) of the Internal Revenue Code, or *any federal tax code and the Texas Tax Code, Section 11.18.*

Your current amended purpose clause appears to permit you to operate for purposes beyond the scope of IRC 501(c)(3) exempt purposes. In order to meet the organizational test for exemption under section 501(c)(3) of the Code, please amend your Articles of Incorporation to state the following:

> Said organization is organized exclusively for charitable, religious, education, and scientific purposes, including, for such purposes, the making of distributions to organizations that qualify as exempt organizations under section 501(c)(3) of the Internal Revenue code, or corresponding section of any future federal tax code. The specific and primary purpose of the Corporation is to educate/inform and register voters within the meaning of Section 501(c)(3) of the Internal Revenue Code, *or the corresponding section of any future federal tax code*.

Please file the amendment to your Articles of Incorporation with the Secretary of State's office in the State of Texas and submit a complete copy of the approved amendment to us. The copy you submit to us must show that it has been properly filed and approved by your appropriate state agency.

2. You have submitted handouts on teambuilding and presentations used to mobilize and train your volunteers (including Tab 19 and Tab 20 of your response). However, we need additional information on the following:

   a. You indicated that your team builders will contact and speak with various groups to solicit for volunteers. Please provide a list of the names of the groups you have contacted to request an opportunity to speak with regarding your election integrity project.

   b. Please submit to us a copy of your volunteer registration form.

   c. On your presentation for Mobilization and Logistics Training, you mentioned that Command Center Coordinators are responsible for the handling of the Certificates of Appointments. Please describe in detail the responsibilities of your Command Center Coordinators with regard to the Certificates of Appointments for your poll watchers.

   d. Please describe how you partner with Local Parties, local Election Officials and other authorities to place your volunteers as poll workers or poll watchers.

   e. Please describe how your volunteers are deployed as election workers and poll watchers following the training they receive from you. Please describe the process you use to assign volunteers to perform as poll workers or poll watchers.

   f. Please describe how you keep your volunteers in teams within the assignment process.

3. Please provide a breakdown of the total number of volunteers you have trained as poll watchers that:
   i.   were appointed by Democratic candidates or the Democratic Party,
   ii.  were appointed by Republican candidates or the Republican Party,
   iii. were appointed by other candidates and other political parties (please specify the names the other parties).

4. Please provide a breakdown of the total number of volunteers you have trained as poll workers that:
   i.   were appointed by the Democratic Party,
   ii.  were appointed by the Republican Party,
   iii. were appointed by other political parties (please specify the names of the other parties)?

5. You stated that you share volunteers, office space, costs as well as directors and officers (including your executive director) with the King Street Patriots.
   a. Please state the amounts you pay for your portion of operational costs and for the sharing of directors and officers.
   b. Please describe how your portion of the costs was determined in your cost sharing arrangement with Street Patriots. Please provide any documentation you have, which demonstrates that your portion of operational costs (facility rental fees, other costs, and sharing of directors and officers) is reasonable including documentation of other facility space considered.

**PLEASE DIRECT ALL CORRESPONDENCE REGARDING YOUR CASE TO:**

| US Mail: | Street Address for Delivery Service: |
|---|---|
| Internal Revenue Service | Internal Revenue Service |
| Exempt Organizations | Exempt Organizations |
| P. O. Box 2508 | 550 Main St, Federal Bldg. |
| Cincinnati, OH 45201 | Cincinnati, OH 45202 |
| ATT:  Faye Ng | ATT: Faye Ng |
|          Room 4522 |          Room 4522 |
|          Group 7821 |          Group 7821 |

**Letter 2382 (5-2011)**
Catalog Number 57829T

# Exhibit F:

# Inappropriate Criteria Were Used to Identify Tax-Exempt Applications for Review, Treasury Inspector General for Tax Administration Report

# TREASURY INSPECTOR GENERAL FOR TAX ADMINISTRATION



## *Inappropriate Criteria Were Used to Identify Tax-Exempt Applications for Review*

**May 14, 2013**

**Reference Number:  2013-10-053**

This report has cleared the Treasury Inspector General for Tax Administration disclosure review process and information determined to be restricted from public release has been redacted from this document.

**Redaction Legend**:
1 = Tax Return/Return Information

**Phone Number  |  202-622-6500**
**E-mail Address  |  TIGTACommunications@tigta.treas.gov**
**Website  |  http://www.treasury.gov/tigta**



# *HIGHLIGHTS*

**INAPPROPRIATE CRITERIA WERE USED TO IDENTIFY TAX-EXEMPT APPLICATIONS FOR REVIEW**

# Highlights

**Final Report issued on May 14, 2013**

Highlights of Reference Number: 2013-10-053 to the Internal Revenue Service Acting Commissioner, Tax Exempt and Government Entities Division.

## IMPACT ON TAXPAYERS

Early in Calendar Year 2010, the IRS began using inappropriate criteria to identify organizations applying for tax-exempt status to review for indications of significant political campaign intervention. Although the IRS has taken some action, it will need to do more so that the public has reasonable assurance that applications are processed without unreasonable delay in a fair and impartial manner in the future.

## WHY TIGTA DID THE AUDIT

TIGTA initiated this audit based on concerns expressed by members of Congress. The overall objective of this audit was to determine whether allegations were founded that the IRS: 1) targeted specific groups applying for tax-exempt status, 2) delayed processing of targeted groups' applications, and 3) requested unnecessary information from targeted groups.

## WHAT TIGTA FOUND

The IRS used inappropriate criteria that identified for review Tea Party and other organizations applying for tax-exempt status based upon their names or policy positions instead of indications of potential political campaign intervention. Ineffective management: 1) allowed inappropriate criteria to be developed and stay in place for more than 18 months, 2) resulted in substantial delays in processing certain applications, and 3) allowed unnecessary information requests to be issued.

Although the processing of some applications with potential significant political campaign

intervention was started soon after receipt, no work was completed on the majority of these applications for 13 months. This was due to delays in receiving assistance from the Exempt Organizations function Headquarters office. For the 296 total political campaign intervention applications TIGTA reviewed as of December 17, 2012, 108 had been approved, 28 were withdrawn by the applicant, none had been denied, and 160 were open from 206 to 1,138 calendar days (some for more than three years and crossing two election cycles).

More than 20 months after the initial case was identified, processing the cases began in earnest. Many organizations received requests for additional information from the IRS that included unnecessary, burdensome questions (*e.g.*, lists of past and future donors). The IRS later informed some organizations that they did not need to provide previously requested information. IRS officials stated that any donor information received in response to a request from its Determinations Unit was later destroyed.

## WHAT TIGTA RECOMMENDED

TIGTA recommended that the IRS finalize the interim actions taken, better document the reasons why applications potentially involving political campaign intervention are chosen for review, develop a process to track requests for assistance, finalize and publish guidance, develop and provide training to employees before each election cycle, expeditiously resolve remaining political campaign intervention cases (some of which have been in process for three years), and request that social welfare activity guidance be developed by the Department of the Treasury.

In their response to the report, IRS officials agreed with seven of our nine recommendations and proposed alternative corrective actions for two of our recommendations. TIGTA does not agree that the alternative corrective actions will accomplish the intent of the recommendations and continues to believe that the IRS should better document the reasons why applications potentially involving political campaign intervention are chosen for review and finalize and publish guidance.



**DEPARTMENT OF THE TREASURY**

WASHINGTON, D.C.  20220

TREASURY INSPECTOR GENERAL
FOR TAX ADMINISTRATION

May 14, 2013

**MEMORANDUM FOR** ACTING COMMISSIONER, TAX EXEMPT AND GOVERNMENT
ENTITIES DIVISION

**FROM:**　　　　　Michael E. McKenney
Acting Deputy Inspector General for Audit

**SUBJECT:**　　　Final Audit Report – Inappropriate Criteria Were Used to Identify
Tax-Exempt Applications for Review (Audit # 201210022)

This report presents the results of our review to determine whether allegations were founded that
the Internal Revenue Service (IRS):  1) targeted specific groups applying for tax-exempt status,
2) delayed processing of targeted groups' applications for tax-exempt status, and 3) requested
unnecessary information from targeted groups.  This audit was initiated based on concerns
expressed by members of Congress and reported in the media regarding the IRS's treatment of
organizations applying for tax-exempt status.  This review is included in our Fiscal Year 2013
Annual Audit Plan and addresses the major management challenge of Tax Compliance
Initiatives.

We would like to clarify a few issues based on the IRS response to our report.  The response
states that our report views approvals as evidence that the Exempt Organizations function should
not have looked closely at those applications.  We disagree with this statement.  Our objection
was to the criteria used to identify these applications for review.  We believe all applications
should be reviewed prior to approval to determine whether tax-exempt status should be granted.
The IRS's response also states that issues discussed in the report have been resolved.  We
disagree with this statement as well.  Nine recommendations were made to correct concerns we
raised in the report, and corrective actions have not been fully implemented.  Further, as our
report notes, a substantial number of applications have been under review, some for more than
three years and through two election cycles, and remain open.  Until these cases are closed by the
IRS and our recommendations are fully implemented, we do not consider the concerns in this
report to be resolved.  Management's complete response to the draft report is included as
Appendix VIII.



*Inappropriate Criteria Were Used to*
*Identify Tax-Exempt Applications for Review*

Copies of this report are also being sent to the IRS managers affected by the report recommendations.  If you have any questions, please contact me or Gregory D. Kutz, Assistant Inspector General for Audit (Management Services and Exempt Organizations).

2



*Inappropriate Criteria Were Used to*
*Identify Tax-Exempt Applications for Review*

# *Table of Contents*

**Background** ....................................................................................Page   1

**Results of Review** ..........................................................................Page   5

    The Determinations Unit Used Inappropriate Criteria
    to Identify Potential Political Cases ................................................Page   5

        Recommendation 1: ..............................................Page 10

        Recommendations 2 and 3: ....................................Page 11

    Potential Political Cases Experienced Significant
    Processing Delays ............................................................................Page 11

        Recommendations 4 and 5: ...................................Page 16

        Recommendations 6 through 8: .............................Page 17

    The Determinations Unit Requested Unnecessary
    Information for Many Potential Political Cases..............................Page 18

        Recommendation 9: ..............................................Page 21

**Appendices**

    Appendix I – Detailed Objective, Scope, and Methodology .......................Page 22

    Appendix II – Major Contributors to This Report ........................................Page 25

    Appendix III – Report Distribution List .....................................................Page 26

    Appendix IV – Outcome Measures..............................................................Page 27

    Appendix V – High-Level Organizational Chart of Offices
    Referenced in This Report ..........................................................................Page 29

    Appendix VI – Timeline of Written Criteria for Identifying
    Potential Political Cases...............................................................................Page 30

    Appendix VII – Comprehensive Timeline of Events ...................................Page 31

    Appendix VIII – Management's Response to the Draft Report ...................Page 44



*Inappropriate Criteria Were Used to*
*Identify Tax-Exempt Applications for Review*

# *Abbreviations*

| | |
|---|---|
| BOLO | Be On the Look Out |
| EO | Exempt Organizations |
| I.R.C. | Internal Revenue Code |
| IRS | Internal Revenue Service |



*Inappropriate Criteria Were Used to*
*Identify Tax-Exempt Applications for Review*

# Background

Organizations, such as charities, seeking Federal tax exemption are required to file an application with the Internal Revenue Service (IRS).  Other organizations, such as social welfare organizations, may file an application but are not required to do so.  The IRS's Exempt Organizations (EO) function, Rulings and Agreements office, which is headquartered in Washington, D.C., is responsible for processing applications for tax exemption.  Within the Rulings and Agreements office, the Determinations Unit in Cincinnati, Ohio, is responsible for reviewing applications as they are received to determine whether the organization qualifies for tax-exempt status.

In Fiscal Year 2012,[1] 70 percent of all closed applications for tax-exempt status were approved during an initial review with little or no additional information from the organizations.  If substantial additional information is needed, the application is placed in unassigned inventory until it can be assigned to a specialist in the Determinations Unit for further processing.  The specialist develops a letter(s) requesting the additional information and issues it to the organization.  Once the specialist receives all the necessary information to determine whether an organization should be afforded tax-exempt status, a final determination letter is issued to the organization either approving or denying the request for tax-exempt status.

If the Determinations Unit needs technical assistance processing applications, it may call upon the Technical Unit in the Rulings and Agreements office in Washington, D.C.[2]  The IRS's goal for processing all types of applications for tax-exempt status was 121 days in Fiscal Year 2012; however, some cases may take substantially longer.  For example, the EO function states in its *Fiscal Year 2013 Work Plan* that applications requiring additional information are not assigned for review until an average of five months after they are received.

Most organizations requesting tax-exempt status must submit either a Form 1023, *Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code*, or Form 1024, *Application for Recognition of Exemption Under Section 501(a)*, depending on the type of tax-exempt organization it desires to be.  For example, a charitable organization would request exemption under Internal Revenue Code (I.R.C.) Section (§) 501(c)(3),[3] whereas a social welfare organization would request exemption under I.R.C. § 501(c)(4).[4]

---

[1] A 12-consecutive-month period ending on the last day of any month.  The Federal Government's fiscal year begins on October 1 and ends on September 30.
[2] For a high-level organizational chart of offices referenced in this report, see Appendix V.
[3] I.R.C. § 501(c)(3) (2012).
[4] I.R.C. § 501(c)(4) (2012).



*Inappropriate Criteria Were Used to*
*Identify Tax-Exempt Applications for Review*

The I.R.C. section and subsection an organization is granted tax exemption under affects the activities it may undertake.  For example, I.R.C. § 501(c)(3) charitable organizations are prohibited from directly or indirectly participating in or intervening in any political campaign on behalf of or in opposition to any candidate for public office (hereafter referred to as political campaign intervention).[5]  However, I.R.C. § 501(c)(4) social welfare organizations, I.R.C. § 501(c)(5)[6] agricultural and labor organizations, and I.R.C. § 501(c)(6)[7] business leagues may engage in limited political campaign intervention.  Figure 1 highlights certain characteristics of common types of tax-exempt organizations.

### Figure 1:  Characteristics of Certain Common Types of Tax-Exempt Organizations

| Characteristic | I.R.C. § 501(c)(3) | I.R.C. §§ 501(c)(4), (c)(5), and (c)(6) |
|---|---|---|
| May receive tax deductible charitable contributions. | Yes | No |
| May engage in political campaign intervention. | No | Limited (must not constitute primary activity of organization) |
| Must publicly disclose the identity of its donors. | No | No |
| May engage in lobbying[8] (*i.e.*, legislative activity). | Limited (must not be substantial) | Yes (unlimited amount if in furtherance of tax-exempt purposes) |
| May engage in general advocacy[9] not related to legislation or the election of candidates. | Yes (permitted as an educational activity) | Yes (unlimited amount if in furtherance of tax-exempt purposes) |
| Must apply with the IRS. | Yes | No |

*Source:  Draft Advocacy Guide Sheet and Internal Revenue Manual.*

---

[5] Political campaign intervention is the term used in Treasury Regulations §§ 1.501(c)(3)-1, 1.501(c)(4)-1, 1.501(c)(5)-1, and 1.501(c)(6)-1.

[6] I.R.C. § 501(c)(5) (2012).

[7] I.R.C. § 501(c)(6) (2012).

[8] An organization engages in lobbying, or legislative activities, when it attempts to influence specific legislation by directly contacting members of a legislative body (Federal, State, or local) or encouraging the public to contact those members regarding that legislation.  An organization also engages in lobbying when it encourages the public to take a position on a referendum.  Lobbying is distinguished from political campaign intervention because lobbying does not involve attempts to influence the election of candidates for public office.

[9] An organization engages in general advocacy when it attempts to 1) influence public opinion on issues germane to the organization's tax-exempt purposes, 2) influence nonlegislative governing bodies (*e.g.*, the executive branch or regulatory agencies), or 3) encourage voter participation through "get out the vote" drives, voter guides, and candidate debates in a nonpartisan, neutral manner.  General advocacy basically includes all types of advocacy other than political campaign intervention and lobbying.



**Inappropriate Criteria Were Used to
Identify Tax-Exempt Applications for Review**

During the 2012 election cycle, the activities of tax-exempt organizations received media coverage concerning the amount of money spent on influencing elections.  According to the Center for Responsive Politics, tax-exempt groups, such as I.R.C. § 501(c)(4), I.R.C. § 501(c)(5), and I.R.C. § 501(c)(6) organizations, spent $133 million in Calendar Year 2010 on Federal candidate-oriented expenditures.  In Calendar Year 2012, this figure increased to $315 million.[10] In addition, as shown in Figure 2, the number of applications for tax-exempt status has increased over the past four fiscal years.[11]

**Figure 2:  Number of Applications for
I.R.C. §§ 501(c)(3)–(6) Tax-Exempt
Status Received by the IRS**

| Fiscal Year | I.R.C. Subsection | | | |
|---|---|---|---|---|
| | 501(c)(3) | 501(c)(4) | 501(c)(5) | 501(c)(6) |
| 2009 | 65,179 | 1,751 | 543 | 1,828 |
| 2010 | 59,486 | 1,735 | 290 | 1,637 |
| 2011 | 58,712 | 2,265 | 409 | 1,836 |
| 2012 | 66,543 | 3,357 | 1,081 | 2,338 |

*Source:  These data were provided by the EO function as
background and were not validated for accuracy or reliability.*

During the 2012 election cycle, some members of Congress raised concerns to the IRS about selective enforcement and the duty to treat similarly situated organizations consistently.  In addition, several organizations applying for I.R.C. § 501(c)(4) tax-exempt status made allegations that the IRS 1) targeted specific groups applying for tax-exempt status, 2) delayed the processing of targeted groups' applications for tax-exempt status, and 3) requested unnecessary information from targeted organizations. Lastly, several members of Congress requested that the IRS investigate whether existing social welfare organizations are improperly engaged in a substantial, or even predominant, amount of campaign activity.

> **This audit focused on allegations that the IRS targeted specific groups applying for tax-exempt status, delayed the processing of targeted groups' applications, and requested unnecessary information from targeted organizations.**

We initiated this audit based on concerns expressed by Congress and reported in the media regarding the IRS's treatment of organizations applying for tax-exempt status.  We focused our

---

[10] The Center for Responsive Politics obtained its information from the Federal Election Commission.  We only included expenditures reported to the Federal Election Commission specifically for advocating the election or defeat of clearly identified Federal candidates.

[11] Some of this increase may be due to the reapplication of those organizations whose tax-exempt status was revoked as a result of not filing information returns for three consecutive years.



*Inappropriate Criteria Were Used to*
*Identify Tax-Exempt Applications for Review*

efforts on reviewing the processing of applications for tax-exempt status and determining whether allegations made against the IRS were founded.[12]  Tax-exempt application case files were selected for review in June 2012 and were reviewed as provided by the EO function between July and November 2012.  We did not review whether specific applications for tax-exempt status should be approved or denied.

This review was performed at the EO function Headquarters office in Washington, D.C., and the Determinations Unit in Cincinnati, Ohio, during the period June 2012 through February 2013.  We conducted this performance audit in accordance with generally accepted government auditing standards.  Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objective.  We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objective.  Detailed information on our audit objective, scope, and methodology is presented in Appendix I.  Major contributors to the report are listed in Appendix II.

---

[12] A future audit is being considered to assess how the EO function monitors I.R.C. §§ 501(c)(4)–(6) organizations to ensure that political campaign intervention does not constitute their primary activity.

Page  4

Exhibit F, Page 10



*Inappropriate Criteria Were Used to
Identify Tax-Exempt Applications for Review*

# Results of Review

## The Determinations Unit Used Inappropriate Criteria to Identify Potential Political Cases

The Determinations Unit developed and used inappropriate criteria to identify applications from organizations with the words Tea Party in their names. These applications (hereafter referred to as potential political cases)[13] were forwarded to a team of specialists[14] for review. Subsequently, the Determinations Unit expanded the criteria to inappropriately include organizations with other specific names (Patriots and 9/12) or policy positions. While the criteria used by the Determinations Unit specified particular organization names, the team of specialists was also processing applications from groups with names other than those identified in the criteria. The inappropriate and changing criteria may have led to inconsistent treatment of organizations applying for tax-exempt status. For example, we identified some organizations' applications with evidence of significant political campaign intervention that were not forwarded to the team of specialists for processing but should have been. We also identified applications that were forwarded to the team of specialists but did not have indications of significant political campaign intervention. All applications that were forwarded to the team of specialists experienced substantial delays in processing. Although the IRS has taken some action, it will need to do more so that the public has reasonable assurance that applications are processed without unreasonable delay in a fair and impartial manner in the future.

### *Criteria for selecting applications inappropriately identified organizations based on their names and policy positions*

The Determinations Unit developed and began using criteria to identify potential political cases for review that inappropriately identified specific groups applying for tax-exempt status based on their names or policy positions instead of developing criteria based on tax-exempt laws and Treasury Regulations.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*|\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*|\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*1\*\*\*.  According to media reports, some organizations were classified as I.R.C. § 501(c)(4) social welfare organizations but operated like political organizations.  \*\*\*\*\*\*\*\*|\*\*\*\*\*\*\*\*\*\*

---

[13] Until July 2011, the Rulings and Agreements office referred to these cases as Tea Party cases.  Afterwards, the EO function referred to these cases as advocacy cases.
[14] Initially, the team consisted of one specialist, but it was expanded to several specialists in December 2011.  The EO function referred to this team as the advocacy team.

JA-141



*Inappropriate Criteria Were Used to*
*Identify Tax-Exempt Applications for Review*

********************************1********************************.  Soon
thereafter, according to the IRS, a Determinations Unit specialist was asked to search for
applications with Tea Party, Patriots, or 9/12 in the organization's name as well as other
"political-sounding" names.  EO function officials stated that, in May 2010, the Determinations
Unit began developing a spreadsheet that would become known as the "Be On the Look Out"
listing (hereafter referred to as the BOLO listing),[15] which included the emerging issue of Tea
Party applications.  In June 2010, the Determinations Unit began training its specialists on issues
to be aware of, including Tea Party cases.  By July 2010, Determinations Unit management
stated that it had requested its specialists to be on the lookout for Tea Party applications.

In August 2010, the Determinations Unit distributed the first formal BOLO listing.  The criteria
in the BOLO listing were Tea Party organizations applying for I.R.C. § 501(c)(3) or
I.R.C. § 501(c)(4) status.  Based on our review of other BOLO listing criteria, the use of
organization names on the BOLO listing is not unique to potential political cases.[16]  EO function
officials stated that Determinations Unit specialists interpreted the general criteria in the
BOLO listing and developed expanded criteria for identifying potential political cases.[17]
Figure 3 shows that, by June 2011, the expanded criteria included additional names (Patriots and
9/12 Project) as well as policy positions espoused by organizations in their applications.

### Figure 3:  Criteria for Potential Political Cases (June 2011)

| "Tea Party," "Patriots" or "9/12 Project" is referenced in the case file |
|---|
| Issues include government spending, government debt or taxes |
| Education of the public by advocacy/lobbying to "make America a better place to live" |
| Statement in the case file criticize how the country is being run |

*Source:  EO function briefing dated June 2011.*

The mission of the IRS is to provide America's taxpayers top quality service by helping them
understand and meet their tax responsibilities and by applying the tax law with integrity and
fairness to all.  According to IRS Policy Statement 1-1, IRS employees accomplish this mission
by being impartial and handling tax matters in a manner that will promote public confidence.
However, the criteria developed by the Determinations Unit gives the appearance that the IRS is
not impartial in conducting its mission.  The criteria focused narrowly on the names and policy

---

[15] The BOLO listing includes a consolidated list of emerging issues the EO function identifies for dissemination to
Determinations Unit specialists.
[16] We did not review the use of other named organizations on the BOLO listing to determine if their use was
appropriate.
[17] During interviews with Determinations Unit specialists and managers, we could not specifically determine who
had been involved in creating the criteria.  EO function officials later clarified that the expanded criteria were a
compilation of various Determinations Unit specialists' responses on how they were identifying Tea Party cases.

Page  6



*Inappropriate Criteria Were Used to
Identify Tax-Exempt Applications for Review*

positions of organizations instead of tax-exempt laws and Treasury Regulations.  Criteria for selecting applications for the team of specialists should focus on the activities of the organizations and whether they fulfill the requirements of the law.  Using the names or policy positions of organizations is not an appropriate basis for identifying applications for review by the team of specialists.

We asked the Acting Commissioner, Tax Exempt and Government Entities Division; the Director, EO; and Determinations Unit personnel if the criteria were influenced by any individual or organization outside the IRS.  All of these officials stated that the criteria were not influenced by any individual or organization outside the IRS.  Instead, the Determinations Unit developed and implemented inappropriate criteria in part due to insufficient oversight provided by management.  Specifically, only first-line management approved references to the Tea Party in the BOLO listing criteria before it was implemented.  As a result, inappropriate criteria remained in place for more than 18 months.  Determinations Unit employees also did not consider the public perception of using politically sensitive criteria when identifying these cases.  Lastly, the criteria developed showed a lack of knowledge in the Determinations Unit of what activities are allowed by I.R.C. § 501(c)(3) and I.R.C. § 501(c)(4) organizations.

Determinations Unit employees stated that they considered the Tea Party criterion as a shorthand term for all potential political cases.  Whether the inappropriate criterion was shorthand for all potential political cases or not, developing and using criteria that focuses on organization names and policy positions instead of the activities permitted under the Treasury Regulations does not promote public confidence that tax-exempt laws are being adhered to impartially.  In addition, the applications for those organizations that were identified for processing by the team of specialists experienced significant delays and requests for unnecessary information that is detailed later in this report.

After being briefed on the expanded criteria in June 2011, the Director, EO, immediately directed that the criteria be changed.  In July 2011, the criteria were changed to focus on the potential "political, lobbying, or [general] advocacy" activities of the organization.  These criteria were an improvement over using organization names and policy positions.  However, the team of specialists subsequently changed the criteria in January 2012 without executive approval because they believed the July 2011 criteria were too broad.  The January 2012 criteria again focused on the policy positions of organizations instead of tax-exempt laws and Treasury Regulations.  After three months, the Director, Rulings and Agreements, learned the criteria had been changed by the team of specialists and subsequently revised the criteria again in May 2012.  (See Appendix VI for a complete timeline of criteria used to identify potential political cases).  The May 2012 criteria more clearly focus on activities permitted under the Treasury Regulations.  As a result of changes made to the criteria without management knowledge, the Director, Rulings and Agreements, issued a memorandum requiring all original entries and changes to criteria included on the BOLO listing be approved at the executive level prior to implementation.



*Inappropriate Criteria Were Used to
Identify Tax-Exempt Applications for Review*

### *The team of specialists processed applications by organizations with names other than Tea Party, Patriots, and 9/12*

To determine if organizations other than those specifically identified in the inappropriate criteria were processed by the team of specialists, we reviewed the names on all applications identified as potential political cases.[18]  Figure 4 shows that approximately one-third of the applications identified for processing by the team of specialists included Tea Party, Patriots, or 9/12 in their names, while the remainder did not.  According to the Director, Rulings and Agreements, the fact that the team of specialists worked applications that did not involve the Tea Party, Patriots, or 9/12 groups demonstrated that the IRS was not politically biased in its identification of applications for processing by the team of specialists.

**Figure 4:  Breakdown of Potential Political Cases by Organization Name**



*Source:  EO function Potential Political Case Tracking Sheet as of May 31, 2012.*

While the team of specialists reviewed applications from a variety of organizations, we determined during our reviews of statistical samples of I.R.C. § 501(c)(4) tax-exempt applications that all cases with Tea Party, Patriots, or 9/12 in their names were forwarded to the team of specialists.[19]

---

[18] We could not determine which potential political cases may have been identified based on an organization's policy positions.
[19] We determined this through two statistical samples of 338 (7.5 percent) from a universe of 4,510 I.R.C. § 501(c)(4) tax-exempt applications filed during May 2010 through May 2012 that were not forwarded to the team of specialists. See Appendix I for details on our sampling methodology.



*Inappropriate Criteria Were Used to*
*Identify Tax-Exempt Applications for Review*

### *Some applications with indications of significant political campaign intervention were not identified for review by the team of specialists*

In May 2012, the Director, Rulings and Agreements, approved the current criteria for identifying potential political cases.  The criteria are "501(c)(3), 501(c)(4), 501(c)(5), and 501(c)(6) organizations with indicators of significant amounts of political campaign intervention…."  To determine if all cases with indications of significant political campaign intervention were sent to the team of specialists, we reviewed two statistical samples of I.R.C. § 501(c)(4) applications.

- **Applications That the IRS Determined Required Minimal or No Additional Information for Processing** – We reviewed a statistical sample of 94 I.R.C. § 501(c)(4) cases closed from May 2010[20] through May 2012 from a universe of 2,051 applications that the IRS determined required minimal or no additional information from the organizations (also referred to by the EO function as merit closures).  We determined that two (2 percent) of 94 approved applications had indications of significant political campaign intervention and should have been forwarded to the team of specialists.[21] Based on our statistical sample, we project an estimated 44 merit closure applications were not appropriately identified as potential political cases during this time period.[22]

- **Applications Identified by the IRS That Required Additional Information for Processing** – We reviewed a statistical sample of 244 I.R.C. § 501(c)(4) cases closed from May 2010 through May 2012 or open as of May 31, 2012, from a universe of 2,459 applications that the IRS determined required additional information from the organizations applying for tax-exempt status (also referred to by the EO function as full development applications) but were not forwarded to the team of specialists.  For the applications that were available for our review, we found that 14 (6 percent)[23] of 237 applications[24] included indications of significant political campaign intervention and should have been processed by the team of specialists.[25]  We project an estimated 141 full development applications were not appropriately identified as potential political cases during this time period.[26]

---

[20] May 2010 was chosen because it is the first date that we were informed that the Determinations Unit was using criteria which identified specific organizations by name.
[21] Neither of the two cases involved a Tea Party, Patriots, or 9/12 organization.
[22] See Appendix IV.
[23] None of the 14 cases involved a Tea Party, Patriots, or 9/12 organization.
[24] We could not analyze seven sampled application case files because of incomplete documentation in the case files (six applications) or the case file could not be located (one application).  See Appendix IV.
[25] We determined that eight applications were appropriately forwarded to the team of specialists.  Five of the eight application case files involved Tea Party, Patriots, or 9/12 organizations.
[26] See Appendix IV.



*Inappropriate Criteria Were Used to
Identify Tax-Exempt Applications for Review*

To determine if cases without indications of significant political campaign intervention were sent to the team of specialists, we reviewed all of the applications identified as potential political cases as of May 31, 2012.

- **Applications That the IRS Determined Should Be Processed by the Team of Specialists** – We reviewed all 298 applications that had been identified as potential political cases as of May 31, 2012.  In the majority of cases, we agreed that the applications submitted included indications of significant political campaign intervention.  However, we did not identify any indications of significant political campaign intervention for 91 (31 percent) of the 296 applications[27] that had complete documentation.[28]

We discussed our results with EO function officials, who disagreed with our findings.  Although EO function officials provided explanations about why the applications should have been identified as potential political cases, the case files did not include the specific reason(s) the applications were selected.  EO function officials also stated that applications may not literally include statements indicating significant political campaign intervention.[29]  According to EO function officials, organizations may not understand what constitutes political campaign intervention or may provide vague descriptions of certain activities that the EO function knows from past experience potentially involve political campaign intervention.  In these cases, the EO function believes it is important to review the applications to ensure that political campaign intervention is not the organizations' primary activity.  To provide further assurance that Determinations Unit employees are handling tax matters in an impartial manner, it would be helpful to document specifically why applications are chosen for further review.

## Recommendations

The Director, EO, should:

**Recommendation 1:**  Ensure that the memorandum requiring the Director, Rulings and Agreements, to approve all original entries and changes to criteria included on the BOLO listing prior to implementation be formalized in the appropriate Internal Revenue Manual.

> **Management's Response:**  The IRS agreed with this recommendation and will ensure that the procedures set forth in the memorandum requiring the Director,

---

[27] We could not complete our review of two cases due to inadequate documentation in the case files.  See Appendix IV.

[28] Seventeen (19 percent) of the 91 applications involved Tea Party, Patriots, or 9/12 organizations.

[29] It should also be noted that, in some cases, specialists obtained additional information after the application was received that indicated the organizations were involved in political campaign intervention which was not available in the initial application documentation we reviewed.



*Inappropriate Criteria Were Used to*
*Identify Tax-Exempt Applications for Review*

Rulings and Agreements, to approve in advance all original entries and changes to the
BOLO listing are made part of the Internal Revenue Manual.

**Recommendation 2:**  Develop procedures to better document the reason(s) applications are
chosen for review by the team of specialists (*e.g.*, evidence of specific political campaign
intervention in the application file or specific reasons the EO function may have for choosing to
review the application further based on past experience).

> **Management's Response:**  The IRS proposed an alternative corrective action to
> our recommendation.  The IRS stated it will review its screening procedures to
> determine whether, and to what extent, additional documentation can be implemented
> without having an adverse impact on the timeliness of case processing.
>
> **Office of Audit Comment:**  We do not believe this alternative corrective action fully
> addresses the recommendation.  Developing procedures to better document the reasons
> applications are chosen for further review would help ensure that applications are being
> handled in an impartial manner.  In addition, as detailed in the next section of this report,
> the average time these applications have been open is 574 days as of December 17, 2012.
> We do not believe documenting a brief explanation about why applications are chosen for
> review would have an adverse impact on the timeliness of case processing.

**Recommendation 3:**  Develop training or workshops to be held before each election cycle
including, but not limited to, the proper ways to identify applications that require review of
political campaign intervention activities.

> **Management's Response:**  The IRS agreed with this recommendation and will
> develop training on the topics described in Recommendations 3, 5, 6, and 9.  Because
> election cycles are continuous, the IRS will develop a schedule which ensures that
> staff have the training as needed to handle potential political intervention matters.

## Potential Political Cases Experienced Significant Processing Delays

Organizations that applied for tax-exempt status and had their applications forwarded to the team
of specialists experienced substantial delays.  As of December 17, 2012, many organizations had
not received an approval or denial letter for more than two years after they submitted their
applications.  Some cases have been open during two election cycles (2010 and 2012).  The
*IRS Strategic Plan 2009–2013* has several goals and objectives that involve timely interacting
with taxpayers, including enforcement of the tax law in a timely manner while minimizing
taxpayer burden.  The EO function does not have specific timeliness goals for processing
applications, such as potential political cases, that require significant follow-up with the



***Inappropriate Criteria Were Used to
Identify Tax-Exempt Applications for Review***

organizations.[30]  The time it takes to process an application depends upon the facts and circumstances of the case.

Potential political cases took significantly longer than average to process due to ineffective management oversight.  Once cases were initially identified for processing by the team of specialists, the Determinations Unit Program Manager requested assistance via e-mail from the Technical Unit to ensure consistency in processing the cases.  However, EO function management did not ensure that there was a formal process in place for initiating, tracking, or monitoring requests for assistance.  In addition, there were several changes in Rulings and Agreements management responsible for overseeing the fulfillment of requests for assistance from the Determinations Unit during this time period.  This contributed to the lengthy delays in processing potential political cases.  As a result, the Determinations Unit waited more than 20 months (February 2010 to November 2011) to receive draft written guidance from the Technical Unit for processing potential political cases.

As a result, the IRS delayed the issuance of letters to organizations approving their tax-exempt status.  For I.R.C. § 501(c)(3) organizations, this means that potential donors and grantors could be reluctant to provide donations or grants.[31]  In addition, some organizations withdrew their applications and others may not have begun conducting planned charitable or social welfare work.  The delays may have also prevented some organizations from receiving certain benefits of the tax-exempt status.  For example, if organizations are approved for tax-exempt status, they may receive exemption from certain State taxes and reduced postal rates.  For organizations that may eventually be denied tax-exempt status but have been operating while their applications are pending, the organizations will be required to retroactively file income tax returns and may be liable to pay income taxes for, in some cases, more than two years.

To analyze the delays, we:  1) reviewed the events that led to delays in processing potential political cases, 2) compared the amount of time cases assigned to the team of specialists were open to applications that were not assigned to the team of specialists, and 3) determined if organizations were eligible to sue the IRS due to delays in processing certain applications.

### *Potential political cases experienced long processing delays*

The team of specialists stopped working on potential political cases from October 2010 through November 2011, resulting in a 13-month delay, while they waited for assistance from the Technical Unit.  Figure 5 illustrates significant events and delays concerning potential political cases.  For a comprehensive timeline of events related to potential political cases, see Appendix VII.

---

[30] The EO function, however, had an overall goal to process merit and full development tax-exempt applications in 121 days for Fiscal Year 2012.
[31] Of 298 cases reviewed, 89 were I.R.C. § 501(c)(3) organizations.



***Inappropriate Criteria Were Used to
Identify Tax-Exempt Applications for Review***

**Figure 5:  Timeline of Events and Delays Involving the Processing
of Potential Political Cases (*****1******* Through May 2012)**

| Date | Events and Delays |
|---|---|
| ******1****** | ********************************1******************************** ********************1**********. |
| April 2010 | The team of specialists is formed with one specialist who is assigned potential political cases and begins working on them with the assistance of a Technical Unit employee. |
| October 2010 | The team of specialists stops processing potential political cases while waiting for assistance from the Technical Unit. |
| July 2011 | The EO function decides to develop written guidance for the Determinations Unit to process the potential political cases. |
| November 2011 | Draft written guidance is provided to the Determinations Unit. |
| December 2011 | Additional specialists are added to the team of specialists. |
| January 2012 | Specialists begin issuing additional information request letters to organizations applying for tax-exempt status, requesting that the information be provided in two to three weeks.  These time periods are standard response times given for any information request and are included in the Internal Revenue Manual. |
| February 2012 | Concerns are raised in the media regarding requests for significant amounts of information from organizations applying for tax-exempt status.  The Director, EO, stops specialists from issuing any more letters requesting information.  Instead, letters allowing extensions of 60 days to respond to previous additional information letters were developed and issued in March and April 2012.  These letters also noted that applicants should contact the IRS if they needed longer than 60 days to respond. |
| May 2012 | A workshop is given to Determinations Unit specialists assigned to potential political cases.  Afterwards, a review of all the open cases is completed to recommend whether additional processing is necessary or whether the cases can be closed (as of December 17, 2012, 160 applications were still being processed). |

*Source:  Interviews of EO function employees and our review of EO function e-mails.*

Ineffective oversight by management led to significant delays in processing potential political cases.  ****************************************1****************************** **********1*****************************.  In April 2010, the Determinations Unit Program Manager requested via e-mail a contact in the Technical Unit to provide assistance with processing the applications.  A Technical Unit specialist was assigned this task and began working with the team of specialists.  The team of specialists stopped processing cases in October 2010 without closing any of the 40 cases that were begun.  However, the Determinations Unit Program Manager thought the cases were being processed.  Later, we were informed by the Director, Rulings and Agreements, that there was a miscommunication about processing the cases.  The Determinations Unit waited for assistance from the Technical Unit instead of



*Inappropriate Criteria Were Used to*
*Identify Tax-Exempt Applications for Review*

continuing to process the cases.  The Determinations Unit Program Manager requested status
updates on the request for assistance several times via e-mail.  Draft written guidance was not
received from the Technical Unit until November 2011, 13 months after the Determinations Unit
stopped processing the cases.  As of the end of our audit work in February 2013, the guidance
had not been finalized because the EO function decided to provide training instead.[32]

Many organizations waited much longer than 13 months for a decision, while others have yet to
receive a decision from the IRS.  For example, as of December 17, 2012, the IRS had been
processing several potential political cases for more than 1,000 calendar days.  Some of these
organizations received requests for additional information in Calendar Year 2010 and then did
not hear from the IRS again for more than a year while the Determinations Unit waited for
assistance from the Technical Unit.  For the 296 potential political cases we reviewed,[33] as of
December 17, 2012, 108 applications had been approved, 28 were withdrawn by the applicant,
none had been denied, and 160 cases were open from 206 to 1,138 calendar days (some crossing
two election cycles).

In March 2012, the Deputy Commissioner, Services and Enforcement, asked the Senior
Technical Advisor to the Acting Commissioner, Tax Exempt and Government Entities Division,
to look into concerns raised by the media about delays in processing applications for tax-exempt
status from Tea Party groups and the nature of the questions being asked related to the
applications.  In April 2012, the Senior Technical Advisor to the Acting Commissioner, Tax
Exempt and Government Entities Division, along with a team of EO function Headquarters
office employees, reviewed many of the potential political cases and determined that there
appeared to be some confusion by Determinations Unit specialists and applicants on what
activities are allowed by I.R.C. § 501(c)(4) organizations.  We believe this could be due to the
lack of specific guidance on how to determine the "primary activity" of an I.R.C. § 501(c)(4)
organization.  Treasury Regulations state that I.R.C. § 501(c)(4) organizations should have social
welfare as their "primary activity"; however, the regulations do not define how to measure
whether social welfare is an organization's "primary activity."

As a result of this confusion, the EO function Headquarters employees provided a two-day
workshop to the team of specialists in May 2012 to train them on what activities are allowable by
I.R.C. § 501(c)(4) organizations, including lobbying and political campaign intervention.  After
this workshop, potential political cases were independently reviewed by two people to determine
what, if any, additional work needed to be completed prior to making a decision to approve or
deny the applications for tax-exempt status.  This review continued on any newly identified
potential political cases.  Prior to the hands-on training and independent reviews, the team of
specialists had only approved six (2 percent) of 298 applications.  After the hands-on training

---

[32] In response to the National Taxpayer Advocate's *2007 Annual Report to Congress*, the IRS commented that
putting guide sheets for processing applications for tax-exempt status on its Internet site would result in fewer
delays.
[33] **************************************1*********************************************.



***Inappropriate Criteria Were Used to
Identify Tax-Exempt Applications for Review***

and independent reviews began, the Determinations Unit approved an additional 102 applications by December 2012.[34]  In addition, it was decided that applications could be approved, but a referral for follow-up could be sent to another unit,[35] which could review the activities of an organization at a later date to determine if they were consistent with the organization's tax-exempt status.

### *Potential political cases were open much longer than similar cases that were not identified for processing by the team of specialists*

For Fiscal Year 2012, the average time it took the Determinations Unit to complete processing applications requiring additional information from organizations applying for tax-exempt status (also referred to by the EO function as full development cases) was 238 calendar days according to IRS data.  In comparison, the average time a potential political case was open as of December 17, 2012, was 574 calendar days (with 158 potential political cases being open longer than the average calendar days it took to close other full development cases).[36]  Figure 6 shows that more than 80 percent of the potential political cases have been open more than one year.

**Figure 6:  Number of Calendar Days Potential Political Cases
Were Open (as of December 17, 2012)**

| Total Cases | Number and Percentage[37] of Potential Political Cases Open by Calendar Day Range | | | | |
|---|---|---|---|---|---|
| | 0–120 Calendar Days | 121–180 Calendar Days | 181–270 Calendar Days | 271–365 Calendar Days | More Than 365 Calendar Days |
| 160 | 0 (0%) | 0 (0%) | 3 (2%) | 28 (18%) | 129 (81%) |

*Source:  Our analysis of EO function documentation.*

---

[34] Of the 102 applications, 29 (28 percent) involved Tea Party, Patriots, or 9/12 organizations.
[35] The Review of Operations Unit completes compliance reviews on tax-exempt organizations to determine whether they are operating in accordance with their tax-exempt purposes and are current with their filing requirements.  Unit personnel review information available on IRS systems, filed returns, applications for tax exemption, and the Internet to assess the organizations' operations and make recommendations for further actions.
[36] See Appendix IV.
[37] Percentages may not equal 100 percent due to rounding.



*Inappropriate Criteria Were Used to*
*Identify Tax-Exempt Applications for Review*

### *Some charitable organizations were eligible to sue the IRS for declaratory judgment due to the delays in processing applications*

The Determinations Unit did not always timely approve or deny the applications for I.R.C. § 501(c)(3) tax-exempt status for potential political cases.  However, the tax law provides organizations with the ability to sue the IRS to force a decision on their applications if the IRS does not approve or deny their applications within 270 calendar days.[38]

As of May 31, 2012,[39] 32 (36 percent) of 89 I.R.C. § 501(c)(3) potential political cases were open more than 270 calendar days, and the organizations had responded timely to all requests for additional information, as required.  As of the end of our fieldwork, none of these organizations had sued the IRS, even though they had the legal right.  In another 38 open cases, organizations were timely in their responses to additional information requests, but the 270-calendar-day threshold had not been reached as of May 31, 2012.  These 38 organizations may have the right to sue the IRS in the future if determinations are not made within the 270-calendar-day period.

## *Recommendations*

The Director, EO, should:

**Recommendation 4**:  Develop a process for the Determinations Unit to formally request assistance from the Technical Unit and the Guidance Unit.[40]  The process should include actions to initiate, track, and monitor requests for assistance to ensure that requests are responded to timely.

> **Management's Response**:  The IRS agreed with this recommendation and will develop a formal process for the Determination Unit to request assistance and to monitor such requests.

**Recommendation 5**:  Develop guidance for specialists on how to process requests for tax-exempt status involving potentially significant political campaign intervention.  This guidance should also be posted to the Internet to provide transparency to organizations on the application process.

> **Management's Response**:  The IRS proposed alternative corrective action to our recommendation.  The IRS will develop training on the topics described in Recommendations 3, 5, 6, and 9.  Because election cycles are continuous, the IRS

---

[38] Revenue Procedure 2012-09 provides further guidance on the implementation of this right.
[39] Tax-exempt application case files were selected for review in June 2012 based on a May 31, 2012, listing of applications being processed by the team of specialists.
[40] The Guidance Unit provides formal and informal guidance that explains how certain laws, such as regulations, revenue rulings, revenue procedures, notices, and announcements, may apply to exempt organizations.



***Inappropriate Criteria Were Used to***
***Identify Tax-Exempt Applications for Review***

noted that it will develop a schedule which ensures that staff have the training as
needed to handle potential political intervention matters.

*__Office of Audit Comment__*:  We do not believe that this alternative corrective action
fully addresses our recommendation.  We believe that specific guidance should be
developed and made available to specialists processing potential political cases.  Making
this guidance available on the Internet for organizations could also address a concern
raised in the IRS's response that many applications appear to contain incomplete and
inconsistent information.

*__Recommendation 6__*:  Develop training or workshops to be held before each election cycle
including, but not limited to:  a) what constitutes political campaign intervention versus general
advocacy (including case examples) and b) the ability to refer for follow-up those organizations
that may conduct activities in a future year which may cause them to lose their tax-exempt status.

*__Management's Response__*:  The IRS agreed with this recommendation and will
develop training on the topics described in Recommendations 3, 5, 6, and 9.  Because
election cycles are continuous, the IRS reported that it will develop a schedule which
ensures that staff have the training as needed to handle potential political intervention
matters.

*__Recommendation 7__*:  Provide oversight to ensure that potential political cases, some of which
have been in process for three years, are approved or denied expeditiously.

*__Management's Response__*:  The IRS agreed with this recommendation and stated
that, while this is an ongoing project, it is closely overseeing the remaining open cases
to ensure that it reaches determinations as expeditiously as possible.

The Acting Commissioner, Tax Exempt and Government Entities Division, should:

*__Recommendation 8__*:  Recommend to IRS Chief Counsel and the Department of the Treasury
that guidance on how to measure the "primary activity" of I.R.C. § 501(c)(4) social welfare
organizations be included for consideration in the Department of the Treasury Priority Guidance
Plan.[41]

*__Management's Response__*:  The IRS agreed with this recommendation and will
share this recommendation with the IRS Chief Counsel and the Department of
Treasury's Office of Tax Policy.

---

[41] The Department of the Treasury issues a Priority Guidance Plan each year to identify and prioritize the tax issues
that should be addressed through regulations, revenue rulings, revenue procedures, notices, and other published
administrative guidance.

JA-153



***Inappropriate Criteria Were Used to
Identify Tax-Exempt Applications for Review***

## *The Determinations Unit Requested Unnecessary Information for Many Potential Political Cases*

The Determinations Unit sent requests for information that we later (in whole or in part) determined to be unnecessary for 98 (58 percent) of 170 organizations that received additional information request letters.[42]  According to the Internal Revenue Manual, these requests should be thorough, complete, and relevant.  However, the Determinations Unit requested irrelevant (unnecessary) information because of a lack of managerial review, at all levels, of questions before they were sent to organizations seeking tax-exempt status.  We also believe that Determinations Unit specialists lacked knowledge of what activities are allowed by I.R.C. § 501(c)(3) and I.R.C. § 501(c)(4) tax-exempt organizations.  This created burden on the organizations that were required to gather and forward information that was not needed by the Determinations Unit and led to delays in processing the applications.  These delays could result in potential donors and grantors being reluctant to provide donations or grants to organizations applying for I.R.C. § 501(c)(3) tax-exempt status.  In addition, some organizations may not have begun conducting planned charitable or social welfare work.

After receiving draft guidance in November 2011, the team of specialists began sending requests for additional information in January 2012 to organizations that were applying for tax-exempt status.  For some organizations, this was the second letter received from the IRS requesting additional information, the first of which had been received more than a year before this date.  These letters requested that the information be provided in two or three weeks (as is customary in these letters) despite the fact that the IRS had done nothing with some of the applications for more than one year.  After the letters were received, organizations seeking tax-exempt status, as well as members of Congress, expressed concerns about the type and extent of questions being asked.  For example, the Determinations Unit requested donor information from 27 organizations[43] that it would not be required to make public if the application was approved, even though this information could not be disclosed by the IRS when provided by organizations whose tax-exempt status had been approved.  Figure 7 shows an example of requests sent to organizations applying for tax-exempt status regarding donors.

---

[42] See Appendix IV.
[43] Of the 27 organizations, 13 had Tea Party, Patriots, or 9/12 in their names.



*Inappropriate Criteria Were Used to*
*Identify Tax-Exempt Applications for Review*

**Figure 7:  Example of Requests for Information Regarding**
**Past and Future Donors in Letters Sent in January/February 2012**

Provide the following information for the income you received and raised for the years from
inception to the present.  Also, provide the same information for the income you expect to
receive and raise for 2012, 2013, and 2014.

    a.   Donations, contributions, and grant income for each year, which includes the following
information:

        1.   The names of the donors, contributors, and grantors.  If the donor, contributor, or
grantor has run or will run for a public office, identify the office.  If not, please
confirm by answering this question "No."

        2.   The amounts of each of the donations, contributions, and grants and the dates you
received them.

        3.   How did you use these donations, contributions, and grants?  Provide the details.

If you did not receive or do not expect to receive any donation, contribution, and grant income,
please confirm by answering "None received" and/or "None expected."

*Source:  Application case files.*

After media attention, the Director, EO, stopped issuance of additional information request
letters and provided an extension of time to respond to previously issued letters.  The Deputy
Commissioner for Services and Enforcement then asked the Senior Technical Advisor to the
Acting Commissioner, Tax Exempt and Government Entities Division, to find out how
applications were being processed and make recommendations.  The Senior Technical Advisor
and a team of specialists visited the Determinations Unit in Cincinnati, Ohio, and began
reviewing cases.  As part of this effort, EO function Headquarters office employees reviewed the
additional information request letters prepared by the team of specialists and identified
seven questions that they deemed unnecessary.  Subsequently, the EO function instituted the
practice that all additional information request letters for potential political cases be reviewed by
the EO function Headquarters office before they are sent to organizations seeking tax-exempt
status.  In addition, EO function officials informed us that they decided to destroy all donor lists
that were sent in for potential political cases that the IRS determined it should not have
requested.  Figure 8 lists the seven questions identified as being unnecessary.



*Inappropriate Criteria Were Used to
Identify Tax-Exempt Applications for Review*

### Figure 8:  Seven Questions Identified As Unnecessary by the EO Function

| Number | Question |
|--------|----------|
| 1 | Requests the names of donors. |
| 2 | Requests a list of all issues that are important to the organization and asks that the organization indicate its position regarding such issues. |
| 3 | Requests 1) the roles and activities of the audience and participants other than members in the activity and 2) the type of conversations and discussions members and participants had during the activity. |
| 4 | Asks whether the officer, director, *etc.*, has run or will run for public office. |
| 5 | Requests the political affiliation of the officer, director, speakers, candidates supported, *etc.*, or otherwise refers to the relationship with identified political party–related organizations. |
| 6 | Requests information regarding employment, other than for the organization, including hours worked. |
| 7 | Requests information regarding activities of another organization – not just the relationship of the other organization to the applicant. |

*Source:  EO function review of additional information request letters.*

We reviewed case file information for all 170 organizations that received additional information request letters and determined that 98 (58 percent) had received requests for information that was later deemed unnecessary by the EO function.  Of the 98 organizations:

- 15 were informed that they did not need to respond to previous requests for information and, instead, received a revised request for information.

- 12 either received a letter or a telephone call stating that their application was approved and they no longer needed to respond to information requests they had received from the IRS.



*Inappropriate Criteria Were Used to
Identify Tax-Exempt Applications for Review*

Figure 9 shows excerpts from the approval letter developed for organizations that did not need to respond to a previous additional information request letter.

**Figure 9:  Excerpts From a Template Approval Letter, Which Includes a Statement That Previously Requested Information Is No Longer Needed**

> **Dear Applicant:**
>
> **We are pleased to inform you that upon review of your application for tax-exempt status we have determined that you are exempt from Federal income tax under section 501 (c) (4) of the Internal Revenue Code.  Because this letter could help resolve any questions regarding your exempt status, you should keep it in your permanent records.**

> **Please not that we have just completed another review of your request to be recognized as tax-exempt under section 501 (c) (4) of the Internal Revenue Codes.  Based on that review, we concluded that we do not need the additional materials previously requested because your application and materials provide sufficient information.**

*Source:  IRS template approval letter.*

## Recommendation

<u>**Recommendation 9**</u>:  The Director, EO, should develop training or workshops to be held before each election cycle including, but not limited to, how to word questions in additional information request letters and what additional information should be requested.

> <u>***Management's Response***</u>:  The IRS agreed with this recommendation and will develop training on the topics described in Recommendations 3, 5, 6, and 9.  Because election cycles are continuous, the IRS reported that it will develop a schedule which ensures that staff have the training as needed to handle potential political intervention matters.



*Inappropriate Criteria Were Used to*
*Identify Tax-Exempt Applications for Review*

**Appendix I**

# *Detailed Objective, Scope, and Methodology*

The overall objective was to determine whether allegations were founded that the IRS: 1) targeted specific groups applying for tax-exempt status, 2) delayed processing targeted groups' applications for tax-exempt status, and 3) requested unnecessary information from targeted groups.  To accomplish our objective, we:

I.  Assessed the actions taken by the EO function in response to the increase in applications for tax-exempt status from organizations potentially involved in political campaign intervention.

A.  Interviewed EO function management to identify steps taken and who authorized them.  We also developed a timeline of events.

B.  Obtained a list of applications that were identified for processing by the team of specialists and determined the status of the identified cases (open, approved, denied, *etc.*) through May 31, 2012.  We also received an updated list of identified cases through December 17, 2012, to determine the status of each initial case as of this date.

C.  Determined whether procedures and controls in place since May 2010 resulted in inconsistent treatment of applications potentially involving political campaign intervention.

II.  Determined whether changes to procedures and controls since May 2010 affected the timeliness of reviewing applications potentially involving political campaign intervention.

A.  Interviewed EO function personnel to determine whether there were any outside influences that affected the timeliness of reviewing potential political cases.

B.  Reviewed all 89 I.R.C. § 501(c)(3) potential political cases to determine whether they were processed within the 270-day standard required by law.

III.  Determined whether the actions taken by the EO function to identify applications for tax-exempt status of organizations potentially involved in political campaign intervention were consistent.

A.  Selected a statistical sample of 244 open and closed I.R.C. § 501(c)(4) application cases from a universe of 2,459 cases that the IRS determined needed significant additional information (full development) on the Employee Plans/Exempt Organizations Determination System from May 2010 through May 2012 to determine whether they should have been identified for processing by the team of specialists.

Page  22

Exhibit F, Page 28



*Inappropriate Criteria Were Used to*
*Identify Tax-Exempt Applications for Review*

We selected our statistical sample using the following criteria: 90 percent confidence level, 50 percent error rate,[1] and ± 5 percent precision rate. We used a random sample to ensure that each application case had an equal chance of being selected, which enabled us to obtain sufficient evidence to support our results. A contracted statistician reviewed our projections.

1. Obtained the universe of 2,459 cases from the Employee Plans/Exempt Organizations Determination System and performed validity checks to ensure that the data were accurate. We found the data could be relied on for this review.

2. Obtained a statistical sample of open and closed application cases.

3. Determined whether application cases with potential political campaign intervention issues were identified for processing by the team of specialists.

4. Interviewed EO function personnel to obtain their perspective on any application cases we identified that should have been identified for processing by the team of specialists but were not.

B. Selected a statistical sample of 94 closed I.R.C. § 501(c)(4) application cases from a universe of 2,051 cases that the IRS determined did not need significant additional information (merit cases) on the Employee Plans/Exempt Organizations Determination System from May 2010 through May 2012 to determine whether they should have been identified for processing by the team of specialists. We selected our statistical sample using the following criteria: 90 percent confidence level, 10 percent error rate,[2] and ± 5 percent precision rate. We used a random sample to ensure that each application case had an equal chance of being selected, which enabled us to obtain sufficient evidence to support our results. A contracted statistician reviewed our projections.

1. Obtained the universe of 2,051 cases from the Employee Plans/Exempt Organizations Determination System and performed validity checks to ensure that the data were accurate. We found the data could be relied on for this review.

2. Obtained a statistical sample of closed application cases.

3. Determined whether application cases with potential political campaign intervention issues were not identified for processing by the team of specialists.

---

[1] An expected error rate of 50 percent was chosen because we determined that cases needing significant additional information had criteria that included the names of specific groups.
[2] An expected error rate of 10 percent was chosen because procedures require that cases with political issues generally need significant additional information.



*Inappropriate Criteria Were Used to*
*Identify Tax-Exempt Applications for Review*

4. Interviewed EO function personnel to obtain their perspective on any applications we identified that should have been identified for processing by the team of specialists but were not.

C. Obtained and reviewed all 298 application cases identified for processing by the team of specialists as of May 31, 2012, to determine whether they were correctly identified.

   1. Determined whether application cases were correctly identified for processing by the team of specialists.

   2. Interviewed EO function personnel to obtain their perspective on any cases we identified that should not have been identified for processing by the team of specialists.

D. Computed the average cycle time of processing potential political cases and compared it to the average cycle time for processing similar cases that were not processed by the team of specialists.

E. Determined the number of organizations that may have been adversely affected by inconsistent treatment.

IV. Determined whether the EO function consistently had a reasonable basis for requesting information from organizations seeking tax-exempt status that were potentially involved in political campaign intervention.

A. Reviewed all 170 potential political cases that were issued additional information request letters to determine whether the letters included questions deemed unnecessary by the EO function.

B. Interviewed EO function personnel to obtain their perspective on additional information that was requested that may not have been necessary to help make a determination decision.

C. Determined the number of taxpayers that may have been adversely affected.

### *Internal controls methodology*

Internal controls relate to management's plans, methods, and procedures used to meet their mission, goals, and objectives. Internal controls include the processes and procedures for planning, organizing, directing, and controlling program operations. They include the systems for measuring, reporting, and monitoring program performance. We determined the following internal controls were relevant to our audit objective: EO function policies, procedures, and practices for identifying and processing applications for tax-exempt status with indications of political campaign intervention. We evaluated these controls by interviewing personnel, reviewing documentation, reviewing statistical samples of applications for tax-exempt status, and reviewing applications identified as involving potential political campaign intervention.

Page 24



*Inappropriate Criteria Were Used to*
*Identify Tax-Exempt Applications for Review*

**Appendix II**

# *Major Contributors to This Report*

Gregory D. Kutz, Assistant Inspector General for Audit (Management Services and Exempt Organizations)
Russell P. Martin, Acting Assistant Inspector General for Audit (Management Services and Exempt Organizations)
Troy D. Paterson, Director
Thomas F. Seidell, Audit Manager
Cheryl J. Medina, Lead Auditor
Julia Moore, Senior Auditor
Michael A. McGovern, Auditor
Evan A. Close, Audit Evaluator



*Inappropriate Criteria Were Used to*
*Identify Tax-Exempt Applications for Review*

**Appendix III**

# *Report Distribution List*

Acting Commissioner  C
Office of the Commissioner – Attn:  Chief of Staff  C
Chief Counsel  CC
Deputy Commissioner for Services and Enforcement  SE
National Taxpayer Advocate  TA
Acting Deputy Commissioner, Tax Exempt and Government Entities Division  SE:T
Director, Exempt Organizations, Tax Exempt and Government Entities Division  SE:T:EO
Director, Office of Legislative Affairs  CL:LA
Director, Office of Program Evaluation and Risk Analysis  RAS:O
Office of Internal Control  OS:CFO:CPIC:IC
Audit Liaison:  Director, Communications and Liaison, Tax Exempt and Government Entities
Division  SE:T:CL

Page  26



*Inappropriate Criteria Were Used to*
*Identify Tax-Exempt Applications for Review*

<div align="right">

**Appendix IV**

</div>

# *Outcome Measures*

This appendix presents detailed information on the measurable impact that our recommended corrective actions will have on tax administration.  These benefits will be incorporated into our Semiannual Report to Congress.

### *Type and Value of Outcome Measure*:

- Reliability of Information – Actual; nine application case files that were either incomplete or could not be located for us to review (see page 5).

### *Methodology Used to Measure the Reported Benefit*:

During our review of applications for tax-exempt status that were not identified for the team of specialists, we were unable to review seven case files because the case file lacked complete documentation (six cases) or the case file could not be located (one case).  In addition, during our review of all identified potential political cases through May 31, 2012, we were unable to analyze two case files because of incomplete documentation.

### *Type and Value of Outcome Measure*:

- Reliability of Information – Potential; 44 organizations whose tax-exempt applications were not appropriately identified as having significant potential political campaign intervention (see page 5).

### *Methodology Used to Measure the Reported Benefit*:

We selected a simple random sample of 94 I.R.C. § 501(c)(4) cases closed from May 2010 through May 2012 from a universe of 2,051 applications that the IRS determined required minimal or no additional information from organizations applying for tax-exempt status.  During our case reviews, we determined that two cases were not appropriately identified as having significant potential political campaign intervention.  We projected, with 90 percent confidence, an actual error rate of between 0.38 percent and 6.55 percent[1] and that between eight and 134 applications[2] were not properly identified for processing by the team of specialists.

---

[1] The point estimate error rate for the sample is 2.13 percent.  The 90 percent confidence interval was calculated using the Exact Binomial Method.
[2] The point estimate number of error applications is 44.  The 90 percent confidence interval was calculated using the Exact Binomial Method.

<div align="right">

Page  27

</div>

<div align="right">

Exhibit F, Page 33

</div>



*Inappropriate Criteria Were Used to*
*Identify Tax-Exempt Applications for Review*

## Type and Value of Outcome Measure:

- Reliability of Information – Potential; 141 organizations whose tax-exempt applications were not appropriately identified as having significant potential political campaign intervention (see page 5).

## Methodology Used to Measure the Reported Benefit:

We selected a simple random sample of 244 I.R.C. § 501(c)(4) cases closed from May 2010 through May 2012 or open as of May 31, 2012, from a universe of 2,459 applications that the IRS determined required additional information from organizations applying for tax-exempt status.[3]  During our case reviews, we determined that 14 cases were not appropriately identified as having significant potential political campaign intervention.  We projected, with 90 percent confidence, an actual error rate of between 3.38 percent and 8.43 percent[4] and that between 84 and 198 applications[5] were not properly identified for processing by the team of specialists.

## Type and Value of Outcome Measure:

- Taxpayer Burden – Potential; 158 organizations that waited longer than average for the IRS to make a decision regarding their tax-exempt status (see page 11).

## Methodology Used to Measure the Reported Benefit:

We obtained data from the EO function on the average number of days it took to determine whether an application for tax-exempt status was approved or denied.  In Fiscal Year 2012, it took on average 238 days to close a case that needed additional information from the organization prior to approving or denying the application.  As of December 17, 2012, there were 158 potential political cases that were open more than 238 calendar days.

## Type and Value of Outcome Measure:

- Taxpayer Burden – Potential; 98 organizations that received additional information request letters with questions that were later deemed unnecessary by the EO function (see page 18).

## Methodology Used to Measure the Reported Benefit:

We reviewed 170 potential political cases that had received additional information request letters from the Determinations Unit.  Using a list of seven questions/topics that the EO function categorized as unnecessary, we identified 98 potential political cases that included additional information request letters asking questions deemed unnecessary by the EO function.

---

[3] We found that seven cases from the sample of 244 were not reviewable because of incomplete documentation.
[4] The point estimate error rate for the sample is 5.91 percent with a precision of ± 2.52 percent.
[5] The point estimate number of error applications is 141 with a precision of ± 57 applications.



*Inappropriate Criteria Were Used to*
*Identify Tax-Exempt Applications for Review*

**Appendix V**

# High-Level Organizational Chart
# of Offices Referenced in This Report

The following is a high-level organizational chart of offices we discuss in this report, starting with the Deputy Commissioner for Services and Enforcement, who reports to the IRS Commissioner.





*Inappropriate Criteria Were Used to*
*Identify Tax-Exempt Applications for Review*

**Appendix VI**

# *Timeline of Written Criteria for*
# *Identifying Potential Political Cases*

The following illustrates the changes to the written criteria provided to Determinations Unit employees for identifying applications for the team of specialists.

| Date | Criteria Developed or Actions Taken |
|------|-------------------------------------|
| February 2010 | \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*1\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*1\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*. |
| March–April 2010 | The Determinations Unit began searching for other requests for tax exemption involving the Tea Party, Patriots, 9/12, and I.R.C. § 501(c)(4) applications involving political sounding names, *e.g.*, "We the People" or "Take Back the Country." |
| July 2010 | Determinations Unit management requested its specialists to be on the lookout for Tea Party applications. |
| August 2010 | First BOLO listing issued with criteria listed as "…various local organizations in the Tea Party movement…applying for exemption under 501(c)(3) or 501(c)(4)." |
| July 2011 | Criteria changed to "Organizations involved with political, lobbying, or advocacy for exemption under 501(c)(3) or 501(c)(4)" based on the concerns the Director, EO, raised in June 2011. |
| January 2012 | Criteria changed to "Political action type organizations involved in limiting/expanding government, educating on the constitution and bill of rights, social economic reform/movement" based on Determinations Unit concerns that the July 2011 criteria was too generic. |
| May 2012 | Criteria changed to "501(c)(3), 501(c)(4), 501(c)(5), and 501(c)(6) organizations with indicators of significant amounts of political campaign intervention (raising questions as to exempt purpose and/or excess private benefit)." |



*Inappropriate Criteria Were Used to*
*Identify Tax-Exempt Applications for Review*

Appendix VII

# *Comprehensive Timeline of Events*

The following chart illustrates a timeline of events from February 2010 through July 2012 involving the identification and processing of potential political cases.  It shows that there was confusion about how to process the applications, delays in the processing of the applications, and a lack of management oversight and guidance.  The timeline was developed using documentation provided by the EO function as well as numerous interviews with EO function personnel.

| Date | Event | Additional Details | Source |
|---|---|---|---|
| February 25, 2010 | ***************1************************* | | E-Mail |
| Around March 1, 2010 | The Determinations Unit Group Manager asked a specialist to search for other Tea Party or similar organizations' applications in order to determine the scope of the issue.  The specialist continued to complete searches for additional cases until the precursor to the BOLO listing was issued in May 2010. | Determinations Unit personnel indicated that they used the description Tea Party as a shorthand way of referring to the group of cases involving political campaign intervention rather than to target any particular group. The specialist used Tea Party, Patriots, and 9/12 as part of the criteria for these searches. | Interview |
| March 16–17, 2010 | Ten Tea Party cases were identified.  The Acting Manager, Technical Unit, requested two more cases be transferred to Washington, D.C.  ***********************1********************** | Not all of the ten cases had Tea Party in their names. | E-Mail |
| April 1–2, 2010 | The new Acting Manager, Technical Unit, suggested the need for a Sensitive Case Report on the Tea Party cases. The Determinations Unit Program Manager agreed. | | E-Mail |
| April 5, 2010 | ***************1************************* | | E-Mail |
| April 5, 2010 | A Determinations Unit specialist developed a list of 18 identified Tea Party cases during a search of applications.  Three had already been approved as tax-exempt. | While the heading of the document listing these 18 cases referred to Tea Party cases, not all of the organizations listed had Tea Party in their names. | E-Mail |

Page  31

Exhibit F, Page 37



*Inappropriate Criteria Were Used to*
*Identify Tax-Exempt Applications for Review*

| Date | Event | Additional Details | Source |
|------|-------|--------------------|--------|
| April 19, 2010 | The first Sensitive Case Report was prepared by the Technical Unit. | Sensitive Case Reports are shared with the Director, Rulings and Agreements, and a chart summarizing all Sensitive Case Reports is provided to the Director, EO. | Documentation |
| April 25–26, 2010 | The Determinations Unit Program Manager requested Technical Unit contacts for the specialist assigned to work other Tea Party cases.  Contacts were received.<br><br>*********************\|*********************<br>********************** | | E-Mail |
| May 17, 2010 | The Determinations Unit specialist will send additional information request letters to the Technical Unit for review prior to issuance as part of the Technical Unit's attempt to provide assistance to the Determinations Unit. | | E-Mail |
| May 26, 2010 | ******************\|*************************<br>************** | | E-Mail |
| May 27, 2010 | The Technical Unit began reviewing additional information request letters prepared by the Determinations Unit. | | Interview and E-Mail |
| June 7, 2010 | Determinations Unit began training its specialists on emerging issues to watch for, including an emerging issue referred to as Tea Party Cases. | | Documentation |
| June 14, 2010 | *******************\|************************* | | E-Mail |
| June 30, 2010 | ******************\|************************* | **********\|*********** | E-Mail |
| July 2010 | Determinations Unit management requested its specialists to be on the lookout for Tea Party applications. | | E-Mail |
| July 2, 2010 | ****************\|************************* | | E-Mail |
| July 27, 2010 | Prior to the BOLO listing development, an e-mail was sent updating the description of applications involving potential political campaign intervention and providing a coordinator contact for the cases.  The description was changed to read, "These cases involve various local organizations in the Tea Party movement [that] are applying for exemption under 501(c)(3) or 501(c)(4)." | | Interview and Documentation |



*Inappropriate Criteria Were Used to*
*Identify Tax-Exempt Applications for Review*

| Date | Event | Additional Details | Source |
|------|-------|-------------------|--------|
| August 12, 2010 | The BOLO listing was developed by the Determinations Unit in order to replace the existing practice of sending separate e-mails to all Determinations Unit employees as to cases to watch for, potentially abusive cases, cases requiring processing by the team of specialists, and emerging issues.  The description of applications involving potential political campaign intervention on the BOLO listing was the same description used in the July 27, 2010, e-mail. | | Interview and Documentation |
| August 2010 | The responsibility for applications involving potential political campaign intervention was moved to a different team of specialists as part of a group realignment within the Determinations Unit. | | Interview and Documentation |
| October 2010 | Applications involving potential political campaign intervention were transferred to another Determinations Unit specialist.  The specialist did not work on the cases while waiting for guidance from the Technical Unit. | Per the Director, Rulings and Agreements, there was a miscommunication about not working the cases while waiting for guidance. | Interviews |
| October 19, 2010 | Technical Unit personnel forwarded a memorandum to their Acting Manager describing the work completed on the Tea Party cases by the Technical Unit.  Included was a list of the cases the Technical Unit had assisted the Determinations Unit with. | The list included 40 cases, 18 of which did not have Tea Party in their names. | E-Mail |
| October 26, 2010 | Determinations Unit personnel raised concerns to the Technical Unit with the approach being used to develop the Tea Party cases:  Why does the Technical Unit need to review every additional information request letter when a template letter could be approved and used on all the cases? | | E-Mail |
| November 16, 2010 | A new coordinator contact for potential political cases was announced. | | Interview and Documentation |
| November 16–17, 2010 | A Determinations Unit Group Manager raised concern to the Determinations Unit Area Manager that they are still waiting for an additional information request letter template from the Technical Unit for the Tea Party cases.  The coordinator had received calls from taxpayers checking on the status of their applications. | | E-Mail |
| November 17, 2010 | The Determinations Unit Program Manager discussed Tea Party cases with the Technical Unit manager.  Review of the cases by the Technical Unit found that not all of the cases had the same issues so a template letter had not been developed. | | E-Mail |

Page  33



*Inappropriate Criteria Were Used to*
*Identify Tax-Exempt Applications for Review*

| Date | Event | Additional Details | Source |
|------|-------|-------------------|--------|
| December 13, 2010 | The Determinations Unit Program Manager asked the Technical Unit manager for a status on the Tea Party cases.  The Technical Unit manager responded that they were going to discuss the cases with the Senior Technical Advisor to the Director, EO, shortly. | | E-Mail |
| January 28, 2011 | The Determinations Unit Program Manager requested an update on the Tea Party cases from the Technical Unit Acting Manager. | | E-Mail |
| January 2011 | A new person took over the Technical Unit Acting Manager role. | | Interview |
| February 3, 2011 | The Technical Unit Acting Manager provided an update to the Determinations Unit Program Manager on the cases being worked by the Technical Unit.  Letters were being developed and would be reviewed shortly. | | E-Mail |
| March 2, 2011 | A Determinations Unit Group Manager reminded the Determinations Unit Program Manager to follow up with the Technical Unit on the status of the Tea Party cases. | | E-Mail |
| March 30, 2011 | ********************|***********************.[1] | | E-Mail |
| March 31, 2011 | The Determinations Unit Program Manager stated that, while waiting for assistance from the Technical Unit, the Determinations Unit still needed to work Tea Party cases to the extent possible. | This contradicts the October 2010 decision not to work cases until assistance is received from the Technical Unit and supports the statement of the Director, Rulings and Agreements, that there was a miscommunication about not working the cases while awaiting assistance. | E-Mail |
| April 13, 2011 | ******************|***************************. | | E-Mail |
| June 1–2, 2011 | The Acting Director, Rulings and Agreements, requested criteria used to identify Tea Party cases from the Determinations Unit Program Manager.  The Determinations Unit Program Manager requested criteria from a Determinations Unit Group Manager. | | E-Mail |

---

[1] The Taxpayer Advocate Service is an independent organization within the IRS that provides assistance to taxpayers whose tax problems have not been resolved through normal IRS channels.  Taxpayer Advocate Service employees must, at times, rely on assistance from employees assigned to other IRS functions.  To request assistance, the Taxpayer Advocate Service issues an Operations Assistance Request specifying the actions needed to help resolve the taxpayer's problem.



*Inappropriate Criteria Were Used to*
*Identify Tax-Exempt Applications for Review*

| Date | Event | Additional Details | Source |
|---|---|---|---|
| June 2, 2011 | A Determinations Unit Group Manager provided criteria for identifying potential Tea Party cases to the Determinations Unit Program Manager. Information was then forwarded to the Acting Director, Rulings and Agreements. | These criteria are very different than the BOLO listing criteria available at the time. | E-Mail |
| June 6, 2011 | \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\|\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* | | E-Mail |
| June 6, 2011 | The Acting Director, Rulings and Agreements, commented that the criteria being used to identify Tea Party cases may have resulted in over-inclusion. \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\|\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* \*\* | | E-Mail |
| June 6, 2011 | The Determinations Unit Program Manager mentioned that the Determinations Unit needed assistance from the Technical Unit to ensure consistency. | | E-Mail |
| June 29, 2011 | A briefing was held with the Director, EO.  The briefing paper noted that the Determinations Unit sent cases that met any of the criteria below to a designated team of specialists to be worked:<br><br>• "Tea Party," "Patriots," or "9/12 Project" is referenced in the case file.<br><br>• Issues include Government spending, Government debt, or taxes.<br><br>• Education of the public via advocacy/lobbying to "make America a better place to live."<br><br>• Statements in the case file criticize how the country is being run.<br><br>Over 100 applications were identified by this time.  It was decided to develop a guide sheet for processing these cases. | The briefing paper for the Director, EO, was prepared by Tax Law Specialists in the Technical Unit and the Guidance Unit and was reviewed by the Acting Manager, Technical Unit. A Guidance Unit specialist was the primary author of the briefing paper.<br><br>During the briefing, the Director, EO, raised concerns over the language of the BOLO listing criteria.  The Director, EO, instructed that the criteria be immediately revised. | Documentation and E-Mail |
| July 5, 2011 | A conference call was held with the Technical Unit; the Director, EO; and the Determinations Unit Program Manager.  They developed new criteria for identifying cases.  The Determinations Unit Program Manager made changes to the BOLO listing.  The criteria were changed to "organizations involved with political, lobbying, or advocacy for exemption under 501(c)(3) or 501(c)(4)." | | E-Mail |

Page  35

Exhibit F, Page 41



*Inappropriate Criteria Were Used to*
*Identify Tax-Exempt Applications for Review*

| Date | Event | Additional Details | Source |
|---|---|---|---|
| July 5, 2011 | The EO function Headquarters office would be putting a document together with recommended actions for identified cases. | | E-Mail |
| July 23, 2011 | The Technical Unit was assigned a new person to coordinate with the Determinations Unit. | | E-Mail |
| July 24, 2011 | Work commenced on the guide sheet when the Acting Manager, Technical Unit, asked tax law specialists to draft a list of things for Determinations Unit specialists to look for when working these cases. | | E-Mail |
| August 4, 2011 | Rulings and Agreements office personnel held a meeting with Chief Counsel so that everyone would have the latest information on the issue. | | E-Mail |
| August 4, 2011 | A Guidance Unit specialist asked if Counsel would review a check sheet prior to issuance to the Determinations Unit.  The Acting Director, Rulings and Agreements, responded that Counsel would review it prior to issuance. | | E-Mail |
| August 10, 2011 | ******************\|************************* *********************** | | Documentation |
| September 15, 2011 | The Determinations Unit Program Manager sent a list of all identified cases to the Acting Director, Rulings and Agreements, so that the Technical Unit could complete a limited "triage" of the cases using available information from the electronic case files.  A Technical Unit specialist reviewed the list to determine if any cases could be closed on merit or closed with an adverse determination letter.  This triage was considered a third screening. | | E-Mail |
| September 21, 2011 | The draft guide sheet was sent for review and comment to various EO function Headquarters office employees. | | E-Mail |
| October 2011 | A new person took over as the Acting Director, Rulings and Agreements. | | Interview |
| October 24, 2011 | A Technical Unit manager forwarded initial triage results to the Determinations Unit. | | E-Mail |
| October 25, 2011 | Based on the categories and terminology used in the triage results spreadsheet, the Determinations Unit Program Manager was unclear what the Determinations Unit should do with the triage results – close cases, develop further, *etc.* – and requested the status on the guidance from the Technical Unit. | | E-Mail |



*Inappropriate Criteria Were Used to*
*Identify Tax-Exempt Applications for Review*

| Date | Event | Additional Details | Source |
|------|-------|-------------------|--------|
| October 26, 2011 | A Technical Unit specialist provided further explanation of the triage results in an e-mail to the Determinations Unit Program Manager. | | E-Mail |
| October 30, 2011 | The Determinations Unit Program Manager contacted the Acting Manager, Technical Unit, asking additional questions regarding the triage results and requesting a status update on the Technical Unit guidance. ****************\|*************************** *****************\|*************************** | | E-Mail |
| November 3, 2011 | An updated draft version of the guide sheet was sent to EO function employees for comment. | | E-Mail |
| November 6, 2011 | The Acting Manager, Technical Unit, had a Technical Unit specialist provide more details on the triage results, and informed the Determinations Unit Program Manager that the guidance was being reviewed prior to issuance. | | E-Mail |
| November 6, 2011 | The Acting Director, Rulings and Agreements, informed the Acting Manager, Technical Unit, and the Determinations Unit Program Manager that, based on feedback received, the guidance developed would not work in its present form – it was "too lawyerly" to be useful and needed the Determinations Unit input. | | Interview and E-Mail |
| November 15, 2011 | The Determinations Unit Program Manager forwarded the Technical Unit specialist's triage results to the Senior Technical Advisor to the Director, EO, per the Director's request. | | E-Mail |
| November 22, 2011 | The Acting Manager, Technical Unit, forwarded the clarified triage results to the Determinations Unit Program Manager. | | E-Mail |
| November 23–30, 2011 | A new Determinations Unit coordinator was assigned oversight of the cases by a Determinations Unit Group Manager.  The draft Technical Unit guidance was provided to the Group Manager.  The coordinator began working cases after receiving the guidance in anticipation of a team being assembled to work the cases. | | Interview and E-Mail |
| November 2011 | The Determinations Unit specialist assigned the cases began working them after receiving the draft Technical Unit guidance. | | Interview |

JA-173



*Inappropriate Criteria Were Used to*
*Identify Tax-Exempt Applications for Review*

| Date | Event | Additional Details | Source |
|------|-------|-------------------|--------|
| December 7–9, 2011 | A team of Determinations Unit specialists was created to review all the identified cases.  An employee from Quality Assurance was also part of the team.  The Technical Unit provided contacts for them. | | E-Mail |
| December 16, 2011 | The first meeting was held by the team of specialists. | | Interview and E-Mail |
| January 2012 | The first batch of letters requesting additional information for applications containing incomplete or missing information was issued by Determinations Unit specialists based, in part, on their reading of the draft guidance issued by the Technical Unit. | | Interview and E-Mail |
| January 2012 | A Determinations Unit specialist was tasked with performing a secondary screening of identified potential political cases to ensure that they involved political activities and not just general or lobbying advocacy. | | Interviews |
| January 25, 2012 | The BOLO listing criteria were again updated.  The criteria was revised as "political action type organizations involved in limiting/expanding Government, educating on the Constitution and Bill of Rights, social economic reform/movement."  The coordinator contact was changed as well. | | Interview and Documentation |
| February 27, 2012 | A member of the team of specialists asked when to start issuing additional information request letters to applicants again. | | E-Mail |
| February 27, 2012 | The Determinations Unit Program Manager questioned why the team of specialists was not issuing additional information request letters.  The Determinations Unit Group Manager for the team of specialists had told the team coordinator to stop developing template questions, not to stop issuing additional information request letters. The miscommunication was corrected on February 29, 2012. | | E-Mail |
| February 29, 2012 | The Director, EO, requested that the Acting Director, Rulings and Agreements, develop a letter to clearly inform applicants what was going to happen if they did not respond to the additional information request letters and giving them more time for their responses. | | E-Mail |

Page  38

Exhibit F, Page 44



*Inappropriate Criteria Were Used to*
*Identify Tax-Exempt Applications for Review*

| Date | Event | Additional Details | Source |
|------|-------|--------------------|--------|
| February 29, 2012 | The Director, EO, stopped any more additional information request letters from being issued on advocacy cases until new guidance was provided to the Determinations Unit.  In addition, the Acting Director, Rulings and Agreements, discussed with the Determinations Unit Program Manager about having specialists print out website information and asking the organizations to verify the information instead of asking for applicants to print out the website information. | | E-Mail |
| February–March 2012 | Numerous news articles began to be published with complaints from Tea Party organizations about the IRS's unfair treatment.  Congress also began to show interest in the IRS's treatment of Tea Party organizations. | | Documentation |
| March 2012 | A new person became Acting Group Manager of the team of specialists. | | Interview |
| March 1, 2012 | A draft list of template questions was prepared by the team of specialists and forwarded to the Guidance Unit. | Questions included asking for donor information. | E-Mail |
| March 5, 2012 | The Acting Manager, Technical Unit, established procedures for reviewing the first favorable determination letter drafted by the Determinations Unit. | | E-Mail |
| March 6, 2012 | ****************1***************************** ************************ | | E-Mail |
| March 8, 2012 | The Deputy Commissioner for Services and Enforcement requested that, if a taxpayer called about having to provide donor information, the Determinations Unit would allow them to not send the donor names but would inform them that the IRS may need it later. | | E-Mail |
| March 8, 2012 | The Acting Director, Rulings and Agreements, sent to the Determinations Unit Program Manager for comment a draft letter on giving applicants additional time to respond to the additional information request letters.  The Determinations Unit Program Manager raised a concern of giving organizations that were not compliant with standard response timelines special treatment. | | E-Mail |
| March 15, 2012 | The Determinations Unit received guidance on how to handle different scenarios based upon the status of their cases.  Those I.R.C. § 501(c)(4) organizations that had not responded to an additional information request letter were issued another letter giving them an additional 60 days to respond.  Those letters were to be issued by March 16, 2012.  This additional time letter was a one-time occurrence. | | Interview and E-Mail |

Page  39

Exhibit F, Page 45



*Inappropriate Criteria Were Used to*
*Identify Tax-Exempt Applications for Review*

| Date | Event | Additional Details | Source |
|---|---|---|---|
| March 23, 2012, and March 27, 2012 | The Senior Technical Advisor to the Acting Commissioner, Tax Exempt and Government Entities Division, and the Deputy Commissioner for Services and Enforcement discussed concerns with the media attention the Tea Party applications were receiving.  The Deputy Commissioner for Services and Enforcement asked the Senior Technical Advisor to look into what was going on in the Determinations Unit and make recommendations. | | Interview |
| April 2012 | The Acting Director, Rulings and Agreements, learned that the BOLO listing criteria had been changed on January 25, 2012, and informed the Director, EO. | | Interview |
| April 4, 2012 | The Determinations Unit received the extension letter for issuance to I.R.C. § 501(c)(3) organizations that had not responded to a previous additional information request letter. | | E-Mail |
| April 17, 2012 | Tax Exempt and Government Entities Division Headquarters office employees received the Technical Unit triage results and the draft guidance provided by the Technical Unit.  Template questions developed by the team of specialists were also provided. | | E-Mail |
| April 23, 2012 | Senior Technical Advisor to the Acting Tax Exempt and Government Entities Division Commissioner visited the Determinations Unit in Cincinnati, Ohio, with a group of EO function employees, and reviewed about half of the identified cases. | | Interview |
| April 24, 2012 | The Acting Director, Rulings and Agreements, requested that the Senior Technical Advisor to the Director, EO, review all the additional information request letters issued and identify troubling questions, which organizations received them, and which members of the team of specialists asked them. | | E-Mail |
| April 25, 2012 | The Senior Technical Advisor to the Director, EO, provided results of the additional information request letter review, including a list of troubling questions. | The results included the names of donors as a troubling question. | E-Mail |
| April 25, 2012 | Chief Counsel's office provided additional comments on the draft guidance developed for the Determinations Unit. | | E-Mail |



*Inappropriate Criteria Were Used to*
*Identify Tax-Exempt Applications for Review*

| Date | Event | Additional Details | Source |
|------|-------|--------------------|--------|
| May 8, 2012 | The Determinations Unit Program Manager was informed that EO function Headquarters office employees planned to visit Cincinnati, Ohio, to provide training on cases and perform a review of the cases to recommend what additional actions, if any, were needed to make a determination. | | E-Mail |
| May 9, 2012 | The Director, Rulings and Agreements, asked about the process for updating the BOLO listing. | | E-Mail |
| May 14–15, 2012 | Training was held in Cincinnati, Ohio, on how to process identified potential political cases. The Senior Technical Advisor to the Director, EO, took over coordination of the team of specialists from the Determinations Unit. | | E-Mail |
| May 16, 2012 | A joint team of Determinations Unit specialists and EO function Headquarters office employees began reviewing all potential political cases began in Cincinnati, Ohio. Cases were divided into four groups with recommendations for how to proceed: favorable determination, favorable with limited development, significant development, and probably adverse. This took around three weeks to complete. A worksheet was used to document the reviews. | | E-Mail |
| May 17, 2012 | The Director, Rulings and Agreements, issued a memorandum outlining new procedures for updating the BOLO listing. The BOLO listing criteria were updated again. New criteria reads: "501(c)(3), 501(c)(4), 501(c)(5), and 501(c)(6) organizations with indicators of significant amounts of political campaign intervention (raising questions as to exempt purpose and/or excess private benefit)." | Suggested additions and changes must be approved by a Determinations Unit coordinator, the Determinations Unit Program Manager, and the Director, Rulings and Agreements. | Interview and E-Mail |
| May 21, 2012 | The EO function determined that the requested donor information could be destroyed or returned to the applicant if not used to make the final determination of tax-exempt status. It does not need to be kept in the administrative file. A letter would be issued to the organizations informing them that the donor information was destroyed. | | Interview and E-Mail |
| May 24, 2012 | A telephone call script was developed to inform some organizations that had not responded to the additional information requests that it was not necessary to send the requested information and that their applications had been approved. Also, an additional paragraph was developed for the determination letter. | | E-Mail |



*Inappropriate Criteria Were Used to*
*Identify Tax-Exempt Applications for Review*

| Date | Event | Additional Details | Source |
|------|-------|--------------------|--------|
| May 2012 | After the review of identified cases was completed, each Determinations Unit specialist working cases was assigned a Technical Unit employee to work with on the cases. The Technical Unit employee reviewed all additional information request letters prior to issuance. The Quality Assurance Unit began reviewing 100 percent of the cases prior to closure. The Quality Assurance Unit review will shift from 100 percent review to a sample review once a comfort level with the results of the quality review was achieved. | | Interview |
| May 2012 | A decision was made to refer cases to the Review of Operations Unit for follow-up if there were indications of political campaign intervention but not enough to prevent approval of tax-exempt status. | | Interview and E-Mail |
| June 4, 2012 | A draft letter was developed to send to organizations that provided donor information. The letter would inform the organizations that the information was destroyed. | | E-Mail |
| June 7, 2012 | The Director, Rulings and Agreements, provided guidance on how to process cases now that they had been reviewed and divided into categories. Any new cases received would go through the same review process prior to assignment. | | E-Mail |
| July 15, 2012 | A new Acting Determinations Unit Group Manager was overseeing the team of specialists. | | Interview |



*Inappropriate Criteria Were Used to*
*Identify Tax-Exempt Applications for Review*

## Appendix VIII

# *Management's Response to the Draft Report*



DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
WASHINGTON, D.C. 20224

APR 3 0 2013

COMMISSIONER
TAX EXEMPT AND
GOVERNMENT ENTITIES
DIVISION

MEMORANDUM FOR DEPUTY INSPECTOR GENERAL FOR AUDIT

FROM:       Joseph H. Grant, Acting Commissioner, Tax Exempt and
            Government Entities

SUBJECT:    "Inappropriate Criteria Were Used to Identify Tax-Exempt
            Applications for Review"

Thank you for the opportunity to review the draft report and for your review of this
issue. We appreciate your recommendations for improvements to our processes.

We recognize that some errors occurred in the handling of the influx of advocacy
cases and we appreciate TIGTA's acknowledgment of our steps to improve the
process. As further outlined below, significant improvements in this area are in
place and we are confident that what transpired here will not recur.

We believe it is important to put this matter into context. Starting in 2010, Exempt
Organizations (EO) observed a significant increase in the number of section
501(c)(3) and section 501(c)(4) applications from organizations that appeared to be,
or planned to be, engaged in political campaign activity. Between 2008 and 2012,
the number of applications for section 501(c)(4) status more than doubled. We also
received numerous referrals from the public, media, watchdog groups, and members
of Congress alleging that specific section 501(c)(4) organizations were engaged in
political campaign activity to an impermissible extent.

Similar to our approach in other areas (e.g., credit counseling, down payment
assistance organizations, etc.), EO sought to assign cases to designated
employees. Centralization of like cases ensures that specific employees who have
been trained on the relevant issues can adequately review the applications. In this
way the IRS learns of new trends (as was the case in credit counseling), and can
approach cases in a uniform way to promote consistency and quality. While this is
the correct approach for handling certain classes of cases, centralization does slow
the progress of some applications (at least initially). Therefore, it is important to take
this action only in appropriate situations and to designate cases for centralization in
an equitable manner.

It is our view that centralization was warranted in this situation. First, it is important
to recognize the intensely fact-specific nature of the determination of whether an

Page 43



### *Inappropriate Criteria Were Used to Identify Tax-Exempt Applications for Review*

organization is described in section 501(c)(4). To be recognized as exempt under section 501(c)(4), an organization must be engaged primarily in the promotion of social welfare. This requires a review of all activities, a classification of activities into those that promote social welfare and those that do not, and a balancing of both classes of activities. Note that the promotion of social welfare does not include political campaign intervention.  And in cases where there is the potential of political campaign intervention, the application process becomes even more difficult.  EO must first determine whether any activities described in the application constitute political campaign intervention and must also determine whether the applicant is primarily engaged in social welfare activity in light of any political campaign intervention and any other non-exempt activity. There are no bright line tests for what constitutes political campaign intervention (in particular, the line between such activity and education) or whether an organization is primarily engaged in social welfare activities.

The second reason that centralization was warranted in this case is that the applications EO began to receive in 2010 were in many cases vague as to the activities the applicants planned to conduct.  Many applications included what appeared to be incomplete or inconsistent information.  For example, a number of applications indicated that the organization did not plan to conduct political campaign activity, but elsewhere described activities that appeared in fact to be such activity. It was also clear that many organizations did not understand what activities would constitute political campaign intervention under the tax law.  For these reasons, it was necessary in many cases for us to gather additional information.  And we believe it was important that we be consistent in how we developed these cases.

While centralization was warranted, the manner in which we initially designated cases for centralization was inappropriate. We should centralize like cases by a review of the facts contained in the application and not just by name. While it is necessary to consider a variety of information in the screening process (including flags for current emerging issues) we recognize that selection based on organization name was not appropriate for these cases.  As the report discusses, we have a new approval process by which we designate a class of cases for centralization. Decisions with respect to the centralized collection of cases must be made at a much higher level of the organization.  We believe this will prevent a recurrence of what happened in this case.

The report also describes mistakes that were made in the process by which these applications were worked. The IRS recognizes that there were delays and, in some instances, information requests that were overbroad.  As the report notes, we took steps to modify the original approach. First, we reviewed all cases to determine the appropriate scope of review for each case.  We also established a process by which each assigned revenue agent works in coordination with a specific technical expert. With respect to information requests, in some cases the Internal Revenue Manual prescribed deadlines for applicants to respond were too short, and we requested donor names unnecessarily.  In these instances, we informed organizations that they had more time and that we would work with them if they could provide the

2



**_Inappropriate Criteria Were Used to_**
**_Identify Tax-Exempt Applications for Review_**

information we requested in an alternative manner.  In cases in which the donor names were not used in making the determination, the donor information was expunged from the file.

It is important to understand that centralization of these cases did not dictate how the case ultimately was or will be resolved.  As the report illustrates, EO's selection of an organization for further development does not mean that EO will deny the application, but means that EO needs to resolve questions arising from the application before we can grant tax-exemption. Moreover, the majority of cases selected for full development were not selected based on the organizations' names. Finally, all cases, whether selected by name or not, were worked in the same fashion.

The results to date support our approach. Of the nearly 300 section 501(c)(4) advocacy cases, to date we have approved more than 120 (nearly 30 have withdrawn their requests).  Note that the report appears to view approvals as evidence that EO should not have looked closely at those applications.  That is not the case.  Many of these organizations did not supply enough information in their initial applications to merit approval so that further development was necessary.  In many cases, this further development and back-and-forth discussion with the taxpayer allowed EO to conclude that the legal requirements were satisfied and allowed the applicant to better understand its responsibilities and the law.

EO is dedicated to reviewing applications for tax-exempt status in an impartial manner.  Centralization of like cases furthers quality and consistency. The mistakes outlined in the report resulted from the lack of a set process for working the increase in advocacy cases and insufficient sensitivity to the implications of some of the decisions made. We believe the front line career employees that made the decisions acted out of a desire for efficiency and not out of any political or partisan viewpoint. And as the report discusses, these issues have been resolved.

Our response to your recommendations is found in the attachment.  If you have any questions about this response, please contact Lois G. Lerner, Director, Exempt Organizations, at 202-283-8848.

Attachment

3



**Inappropriate Criteria Were Used to
Identify Tax-Exempt Applications for Review**

**Attachment**

**Recommendation 1:** Ensure that the memorandum requiring the Director, Rulings and Agreements, to approve all original entries and changes to criteria included on the BOLO listing prior to implementation be formalized in the appropriate Internal Revenue Manual.

**Corrective Action:** We will ensure that the procedures set forth in the memorandum requiring the Director, Rulings and Agreements, to approve in advance all original entries and changes to the BOLO are made part of the Internal Revenue Manual.

**Implementation Date:** September 30, 2013

**Responsible Official:** Director, Exempt Organizations

**Recommendation 2:** Develop procedures to better document the reason(s) applications are chosen for review by the team of specialists (e.g., evidence of specific political campaign intervention in the application file or specific reasons the EO function may have for choosing to review the application further based on past experience).

**Corrective Action:** We will review our screening procedures to determine whether, and to what extent, additional documentation can be implemented without having an adverse impact on the timeliness of our case processing.

**Implementation Date:** September 30, 2013

**Responsible Official:** Director, Exempt Organizations

*(Note: We consolidate here the text of Recommendations 3, 5, 6 and 9, and we provide a single, consolidated response to these recommendations following the text of Recommendation 9, below.)*

**Recommendation 3:** Develop training or workshops to be held before each election cycle including, but not limited to, the proper ways to identify applications that require review of political campaign intervention activities.

**Recommendation 5:** Develop guidance for specialists on how to process requests for tax-exempt status involving potentially significant political campaign intervention. This guidance should also be posted to the Internet to provide transparency to organizations on the application process.

1



**Inappropriate Criteria Were Used to
Identify Tax-Exempt Applications for Review**

**Recommendation 6:** Develop training or workshops to be held before each election cycle including, but not limited to: a) what constitutes political campaign intervention versus general advocacy (including case examples) and b) the ability to refer for follow-up those organizations that may conduct activities in a future year which may cause them to lose their tax-exempt status.

**Recommendation 9:** The Director, EO, should develop training or workshops to be held before each election cycle including, but not limited to, how to word questions in additional information request letters and what additional information should be requested.

**Corrective Action:** We will develop training on the topics described in the recommendations 3, 5, 6, and 9. Because election cycles are continuous, we will develop a schedule that ensures staff have the training as needed to handle potential political intervention matters.

**Implementation Date:** January 31, 2014

**Responsible Official:** Director, Exempt Organizations

**Recommendation 4:** Develop a process for the Determinations Unit to formally request assistance from the Technical Unit and the Guidance Unit. The process should include actions to initiate, track, and monitor requests for assistance to ensure that requests are responded to timely.

**Corrective Action:** We will develop a formal process for Determinations to request assistance and to monitor such requests.

**Implementation Date:** June 30, 2013

**Responsible Official:** Director, Exempt Organizations

**Recommendation 7:** Provide oversight to ensure that potential political cases, some of which have been in process for three years, are approved or denied expeditiously.

**Corrective Action:** While this is an ongoing project, we are closely overseeing the remaining open cases to ensure that we reach determinations as expeditiously as possible.

**Implementation Date:** April 30, 2013

**Responsible Official:** Director, Exempt Organizations

2



**Inappropriate Criteria Were Used to
Identify Tax-Exempt Applications for Review**

**Recommendation 8:** Recommend to IRS Chief Counsel and the Department of the Treasury that guidance on how to measure the "primary activity" of I.R.C. § 501(c)(4) social welfare organizations be included for consideration in the Department of the Treasury Priority Guidance Plan.

**Corrective Action:** We will share this recommendation with the IRS Chief Counsel and Treasury Office of Tax Policy.

**Implementation Date:** May 3, 2013

**Responsible Official:** Acting Commissioner, Tax Exempt and Government Entities

3

# Exhibit G:

# Letter from Office of the Taxpayer Advocate to United States Senator John Cornyn



**TAXPAYER ADVOCATE SERVICE**

THE OFFICE OF THE TAXPAYER ADVOCATE OPERATES INDEPENDENTLY OF ANY OTHER IRS OFFICE AND REPORTS DIRECTLY TO CONGRESS THROUGH THE NATIONAL TAXPAYER ADVOCATE.

YOUR VOICE AT THE IRS

1919 Smith Street, MC 1005 HOU
Houston, TX 77002

OCT 2 7 2011

OCT 31 2011

The Honorable John Cornyn
Member, United States Senate
5001 Spring Valley Road, Suite 1125E
Dallas, TX 75244

FILE COPY

Attn:  Michael Johnson

Dear Senator Cornyn:

This is in response to your inquiry dated January 5, 2011, made on behalf of your constituent Ms. Catherine Engelbrecht for True the Vote.  She is concerned that the organization's application for exempt status has not been approved.

I apologize that a determination has not yet been made on the application for exempt status.  We did contacted Internal Revenue Agent Ronald Bell in Cincinnati, Ohio, who is assigned to the case.  He is waiting for a determination from their office in Washington DC.  Mr. Bell is unable to give us a timeframe on when the determination will be made.

I hope this information is helpful in responding to Ms. Engelbrecht .  If you have further questions, please contact me at (713) 209-4800, or a member of your staff may contact Case Advocate Alesia Brantley, Identification Badge No. 0325764 at (713) 209-4785.

Sincerely,

Delia A. Lucas
Local Taxpayer Advocate

# Exhibit H:

# Letter from Members of Congress to Commissioner Werfel

DARRELL E. ISSA, CALIFORNIA
CHAIRMAN

JOHN L. MICA, FLORIDA
MICHAEL R. TURNER, OHIO
JOHN J. DUNCAN, JR., TENNESSEE
PATRICK T. McHENRY, NORTH CAROLINA
JIM JORDAN, OHIO
JASON CHAFFETZ, UTAH
TIM WALBERG, MICHIGAN
JAMES LANKFORD, OKLAHOMA
JUSTIN AMASH, MICHIGAN
PAUL A. GOSAR, ARIZONA
PATRICK MEEHAN, PENNSYLVANIA
SCOTT DesJARLAIS, TENNESSEE
TREY GOWDY, SOUTH CAROLINA
BLAKE FARENTHOLD, TEXAS
DOC HASTINGS, WASHINGTON
CYNTHIA M. LUMMIS, WYOMING
ROB WOODALL, GEORGIA
THOMAS MASSIE, KENTUCKY
DOUG COLLINS, GEORGIA
MARK MEADOWS, NORTH CAROLINA
KERRY L. BENTIVOLIO, MICHIGAN
RON DeSANTIS, FLORIDA

ONE HUNDRED THIRTEENTH CONGRESS

## Congress of the United States
### House of Representatives
COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

MAJORITY (202) 225–5074
FACSIMILE (202) 225–3974
MINORITY (202) 225–5051

http://oversight.house.gov

CAROLYN B. MALONEY, NEW YORK
ELEANOR HOLMES NORTON,
   DISTRICT OF COLUMBIA
JOHN F. TIERNEY, MASSACHUSETTS
WM. LACY CLAY, MISSOURI
STEPHEN F. LYNCH, MASSACHUSETTS
JIM COOPER, TENNESSEE
GERALD E. CONNOLLY, VIRGINIA
JACKIE SPEIER, CALIFORNIA
MATTHEW A. CARTWRIGHT, PENNSYLVANIA
MARK POCAN, WISCONSIN
L. TAMMY DUCKWORTH, ILLINOIS
ROBIN L. KELLY, ILLINOIS
DANNY K. DAVIS, ILLINOIS
PETER WELCH, VERMONT
TONY CARDENAS, CALIFORNIA
STEVEN A. HORSFORD, NEVADA
MICHELLE LUJAN GRISHAM, NEW MEXICO

ELIJAH E. CUMMINGS, MARYLAND
RANKING MINORITY MEMBER

LAWRENCE J. BRADY
STAFF DIRECTOR

July 17, 2013

The Honorable Daniel Werfel
Principal Deputy Commissioner
Internal Revenue Service
1111 Constitution Avenue NW
Washington, DC 20224

Dear Mr. Werfel:

The Committee on Oversight and Government Reform and Committee on Ways and Means are continuing to investigate the Internal Revenue Service's (IRS) inappropriate treatment of certain applicants for tax-exempt status. As a part of this ongoing investigation, the Committees have learned that the IRS Chief Counsel's office in Washington, D.C. has been closely involved in some of the applications. Its involvement and demands for information about political activity during the 2010 election cycle appears to have caused systematic delays in the processing of Tea Party applications. To better understand the IRS Chief Counsel's office role in this matter, we write to prioritize our outstanding document request as well as to request additional documents.

During recent interviews of IRS employees, including Carter Hull, a tax law specialist and self-described 501(c)(4) expert with 48 years of experience at the IRS, the Committees were informed that Tea Party applications under his review were, in an unusual turn of events, referred to the Chief Counsel's office for further review at the direction of Lois Lerner, the head of the Exempt Organizations division. The IRS Chief Counsel is one of two politically appointed officials in the agency.[1]

In April 2010, Mr. Hull was instructed to scrutinize certain Tea Party applications by one of his supervisors in Washington.[2] According to Mr. Hull, these applications were used as "test" cases and assigned to him because of his expertise and because IRS leadership in Washington was "trying to find out how [the IRS] should approach these organizations, and how [the IRS] should handle them."[3] In the course of working on these applications, Mr. Hull requested additional information from the taxpayers through what is termed a development letter. Once he

---

[1] 26 U.S.C. § 7803.
[2] Transcribed Interview of Carter Hull, Internal Revenue Serv., in Wash., D.C. at 23 (June 14, 2013). [hereinafter Hull]
[3] *Id.* at 24-29.

The Honorable Daniel Werfel
July 17, 2013
Page 2

received responses, based on his decades of experience, he determined he had enough facts to make recommendations whether to approve or deny the applications:[4]

> Q:   [B]ased on those responses, were you able to have enough facts to make a determination as to whether they had engaged in a permissible amount of political activity?
>
> A:   It was my opinion that, yes, I did have enough facts.
>
> Q:   So based on your 48 years of experience and your expertise in 501(c)(3)s and 501(c)(4)s you felt that those responses they sent to you had a sufficient amount of facts for you to evaluate whether they engaged in a permissible amount of political activity?
>
> A:   Correct.[5]

However, Mr. Hull's recommendations were not carried out. Instead, according to Michael Seto, the head of Mr. Hull's unit in Washington, Ms. Lerner, gave an atypical instruction that the Tea Party applications undergo special scrutiny that included an uncommon multi-layer review that involved a top advisor to Lerner as well as the Chief Counsel's office. During an interview, Mr. Seto told the Committees' staff:

> [Ms. Lerner] sent me email saying that when these cases need to go through multi-tier review and they will eventually have to go [through her staff] and the chief counsel's office.[6]

Indeed, according to Mr. Hull, sometime in the winter of 2010-2011, the senior advisor to Lois Lerner told him the IRS Chief Counsel's office would need to review these applications. Mr. Hull also indicated this was the first time he sent an application to Ms. Lerner's senior advisor. Hull testified about how this was unusual and a break from ordinary procedure:

> Q:   Have you ever sent a case to [the senior advisor to Ms. Lerner] before?
>
> A;   Not to my knowledge.
>
> Q:   This is the only case you remember?
>
> A:   Uh-huh.
>
> Q:   Correct?
>
> A:   This is the only case I remember sending directly to [the senior advisor

---

[4] *Id.* at 33-38.
[5] *Id.* at 97-98.
[6] Transcribed Interview of Michael Seto, Internal Revenue Serv., in Wash., D.C. at 34 (July 11, 2013).

The Honorable Daniel Werfel
July 17, 2013
Page 3

to Ms. Lerner].[7]

\*\*\*

Q:    Did [the senior advisor to Ms. Lerner] indicate to you whether she
agreed with your recommendations?

A:    She did not say whether she agreed or not.  She said it should go to
Chief Counsel.

Q:    The IRS Chief Counsel?

A:    The IRS Chief Counsel.[8]

After substantial delay, finally, in August 2011, the Chief Counsel's office held a meeting
with Mr. Hull, Ms. Lerner's senior advisor, and other Washington officials to discuss these test
applications.[9]  During the intervening months, these applications lingered.  Moreover, months
after Mr. Hull presented his recommendations to his superiors, the Chief Counsel's office
instructed Mr. Hull that they needed updated information to evaluate the applications.  Since the
applications were up-to-date months earlier, when Mr. Hull made his recommendations, Mr. Hull
found this request from the Chief Counsel's office surprising.  The Chief Counsel's office also
discussed the possibility of a template letter to develop all the Tea Party applications, including
those being held in Cincinnati.  Mr. Hull explained that all the applications were different and
that a template was impractical.

Q:    Did [the IRS Chief Counsel's office] give you any feedback on these
[test] cases?

A:    Yes, they did.

Q:    What did they say?

A:    I needed more information.  I needed more current information.

Q:    What do you mean, more current information?

A:    They had it for a while and the information wasn't as current as it should
be.  They wanted more current information.[10]

\*\*\*

Q:    And what does that mean practically for you?

---

[7] Hull at 44.
[8] *Id.* at 45.
[9] *Id.* at 47-49; IRS1341.
[10] *Id.* at 50-51.

The Honorable Daniel Werfel
July 17, 2013
Page 4

A:   That means that probably I should send out another development letter.

Q:   A second development letter?

A:   A second development letter. I think also at that time there was a discussion of having a template made up so that all the cases could be worked in the same manner. And my reviewer and I both said a template makes absolutely no difference because these organizations, all of them are different. A template would not work.

Q:   You and [your reviewer, an IRS tax law specialist] agreed that a template wouldn't help?

A:   But [an IRS tax law specialist] said he would prepare it, along with [an IRS Chief Counsel employee] and whoever else was from Chief Counsel. I never saw it.[11]

                              ***

Q:   When you say all of these cases, are you referring to Tea Party cases?

A:   How the Tea Party cases should be worked. And I assume that would be the ones in Cincinnati too, since we would provide guidance when we were able to come up with how we were going to act.[12]

                              ***

Q:   Just one follow-up question to that. Did you have any reaction to when they told you they needed current information?

A:   I sort of -- I was taken aback.

Q:   Why were you taken aback?

A:   Because I hadn't had the case for a while. I couldn't ask if I didn't have the case.[13]

It appears the IRS never resolved the test applications. Indeed, Mr. Hull told Committee staff:

Q:   Sir, as you sit here today, do you know the status of those [test] cases?

A:   Only from hearsay, sir.

---

[11] *Id.* at 50-51.
[12] *Id.* at 51-52.
[13] *Id.* at 55-56.

The Honorable Daniel Werfel
July 17, 2013
Page 5

Q:    What do you know?

A:    

Q:    Still open as far as today?

A:    As far as I know.  I do not know for certain.

Q:    So for 3 years since they filed application?

A:    Yes, sir.

Q:

A:                                                                    [14]

     Mr. Hull's supervisor, Ronald Shoemaker, provided insight on the type of additional information sought by the Chief Counsel's office—namely, information about the applicants' political activities leading up to the 2010 election.  While Mr. Shoemaker indicated he did not think the request for election information was unreasonable, the fact that applications had still not been resolved raises important questions about the Chief Counsel's office interest in the applicants' 2010 election activity.  In an interview with the Committees' staff, Mr. Shoemaker testified:

A:    

Q:

A:    Counsel was not very forthcoming on what their opinion was. But we discussed it to some extent and they indicated that they wanted more development of possible political activity or political intervention right before the election period; that that had not occurred and that that's what was missing.

Q:    So they wanted more information about the activities ▇▇▇▇▇ –

A:    Of ▇▇▇▇▇▇▇ right before the election period. In other words, immediately before.[15]

<p style="text-align:center">***</p>

---

[14] *Id.* at 58.

[15] Transcribed Interview of Ronald Shoemaker, Internal Revenue Serv., in Wash., D.C. at 105 (June 21, 2013).

<p style="text-align:center">JA-192</p>

The Honorable Daniel Werfel
July 17, 2013
Page 6

Q:     Sir, as you sit here today, do you know the status of the test cases that
       were sent up since April 2010?

A:     The [test] cases we're talking about?

Q:     Correct.

A:     Yes. 

Q:     Okay.

A:

Q:     Still pending as of today. As far as you know.

A:     As far is [*sic*] I know.

Q:     Over 3 years since the application was filed.

A:     Absolutely.

Q:     Is that an atypical time period?

A:     That's a very long time period.[16]

        The lengthy and unusual review of the test applications in Washington created a
bottleneck and caused the delay of other Tea Party applications in Cincinnati.  Indeed, multiple
IRS employees in Cincinnati have told the Committee they were waiting on guidance from
Washington on how to move the applications forward.  In an interview with the Committees'
staff, Elizabeth Hofacre, the coordinator of the Tea Party applications in Cincinnati, testified:

Q:     When you sent these letters out, the letters that Carter Hull approved, and
       you would get responses from the taxpayers, all of those responses you
       would then forward on to Carter Hull?

A:     That is correct.

Q:     Is that unusual?

---

[16] *Id.* at 108-109.

The Honorable Daniel Werfel
July 17, 2013
Page 7

> A:    Very unusual. I have never known of an agent to do that in the past or to
>       this time.
>
> Q:    Even for other Emerging Issues?
>
> A:    I am not aware of any.
>
> Q:    Do you why he wanted those responses?
>
> A:    No. I would have to speculate.
>
> Q:    So these cases are still assigned to you though, right?
>
> A:    They were sitting on my number and I was essentially a front person,
>       because I had no autonomy or no authority to act on them without Carter
>       Hull's influence or input.[17]

Mr. Hull testified that he could not provide advice to Ms. Hofacre because his hands were
tied by his superiors in Washington. Therefore, none of these applications were approved or
denied during the time he worked with Ms. Hofacre on the cases.[18]  Hull testified:

> Q:    Was it your role with the additional material to evaluate the case and
>       determine whether it could be exempt or not?
>
> A:    That was what I was supposed to do but I couldn't do that because I had
>       no idea which way we were going.  I had to get my own cases done to be
>       able to tell [Cincinnati] which direction the Service was taking and to be
>       able to give guidance that was correct and proper as opposed to guessing.
>
> Q:    And you say you have no idea which direction we were going.  Who is the
>       "we" in that sentence?
>
> A:    The way the Service was going.
>
> Q:    The Internal Revenue Service?
>
> A:    Whether they were going to deny or exempt these organizations.[19]

Moreover, in an interview with the Committees' staff, the head of the Cincinnati office,
Cindy Thomas, testified that she continuously asked senior Washington officials when guidance
was coming, but it was to no avail.  Ms. Thomas told the Committee:

---

[17] Transcribed Interview of Elizabeth Hofacre, Internal Revenue Serv., in Wash., D.C. at 37 (May 31, 2013).
[18] Hull at 108.
[19] Hull at 104-105.

The Honorable Daniel Werfel
July 17, 2013
Page 8

Q:   So the cases that [Cincinnati employee] was working from October 2010
     through September 2011 were still in kind of a holding pattern awaiting
     guidance from Washington? Is that right?

A:   That's correct.

Q:   And were there additional applications that were coming in at this time?

A:   To my knowledge, yes.

Q:   And those were also still in a holding pattern?

A:   That's correct.

Q:   Pending guidance from Washington?

A:   That's correct.[20]

To better understand the IRS Chief Counsel's office involvement with the Tea Party
applications, we request the following documents that the Committees have already requested be
given priority.

1.  All documents and communications between or among employees of the Internal
    Revenue Service Chief Counsel's office, employees of the Department of the Treasury
    General Counsel's office, or employees of the Executive Office of the President between
    February 1, 2010, and the present referring or relating to tax-exempt applications.

In addition, we request the following documents by noon on July 29, 2013.

1.  All documents and communications between or among employees of the Internal
    Revenue Service, employees of the Department of the Treasury, or employees of the
    Executive Office of the President between February 1, 2010, and the present referring or
    relating to the 2010 election.

2.  All documents and communications between or among employees of the Internal
    Revenue Service, employees of the Department of the Treasury, or employees of the
    Executive Office of the President between February 1, 2010, and the present referring or
    relating to the 2010 Supreme Court decision, *Citizens United v. Federal Election
    Commission.*

3.  All documents and communications between or among employees of the Internal
    Revenue Service, employees of the Department of the Treasury, or outside parties

---

[20] Transcribed Interview of Lucinda Thomas, Internal Revenue Serv., in Wash., D.C. at 136-138 (June 28, 2013).

JA-195

The Honorable Daniel Werfel
July 17, 2013
Page 9

between February 1, 2010, and the present referring or relating to the tax-exempt status of Tea Party groups.

When producing documents to the Committee on Oversight and Government Reform, please deliver production sets to the Majority Staff in Room 2157 of the Rayburn House Office Building and the Minority Staff in room 2471 of the Rayburn House Office Building. The Committee prefers, if possible, to receive all documents in electronic format. To the extent that the production contains tax returns or return information pursuant to IRC §6103(f)(1), please provide the Committee on Ways and Means both redacted and unredacted responses. For purposes of delivery to the Committee on Ways and Means, please deliver two sets of redacted responses, one for the Majority and the other for the Minority, and one set of unredacted responses to Matt Hittle in 1136 Longworth. As you know, Mr. Hittle has been authorized to handle IRC §6103(f)(1) material for purposes of this investigation.

If you have any questions about this request, please contact David Brewer or Kristin Nelson of the Committee on Oversight and Government Reform staff at (202) 225-5074 and Mark Epley or Chris Armstrong with the Committee on Ways and Means staff at (202) 225-5522. Thank you for your attention to this matter.

Sincerely,

Darrell Issa
Chairman
Committee on Oversight and Government Reform

Dave Camp
Chairman
Committee on Ways and Means

Jim Jordan
Chairman
Subcommittee on Economic Growth,
Job Creation and Regulatory Affairs

Charles W. Boustany, Jr., M.D.
Chairman
Committee on Ways and Means
Subcommittee on Oversight

cc:   The Honorable Elijah E. Cummings, Ranking Minority Member

The Honorable Sander M. Levin, Ranking Minority Member

The Honorable Matthew A. Cartwright, Ranking Minority Member
Subcommittee on Economic Growth, Job Creation and Regulatory Affairs

The Honorable John Lewis, Ranking Minority Member
Subcommittee on Oversight

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
TRUE THE VOTE, INC.,                                )
                                                    )
                 Plaintiff,                         )
                                                    )
        v.                                          )        Civil Action No. 13-734 (RBW)
                                                    )
INTERNAL REVENUE SERVICE, <u>et al.</u>,            )
                                                    )
                 Defendants.                        )
_____)

## <u>ORDER</u>

For the reasons set forth in the Memorandum Opinion issued contemporaneously with this Order, it is hereby

**ORDERED** that the Defendants' Motion to Dismiss Counts I, II, IV[,] and V is **GRANTED**.  It is further

**ORDERED** that the Individual Management Defendants' Motion to Dismiss is **GRANTED**.  It is further

**ORDERED** that the Motion to Dismiss of Cincinnati Defendants Susan Maloney, Ronald Bell, Janine L. Estes, and Faye Ng is **GRANTED**.  It is further

**ORDERED** that the Plaintiff's Motion to Stay Agency Action is **DENIED AS MOOT**. It is further

**ORDERED** that the plaintiff's request for an oral hearing is **DENIED AS MOOT.**  It is further

**ORDERED** that this case is **CLOSED**.

**SO ORDERED** this 23rd day of October, 2014.


REGGIE B. WALTON
United States District Judge

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ | ) |
| TRUE THE VOTE, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     Civil Action No. 13-734 (RBW) |
| | ) |
| INTERNAL REVENUE SERVICE, et al., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

### <u>MEMORANDUM OPINION</u>

The plaintiff, True the Vote, Inc., filed this civil action against the Internal Revenue

Service ("IRS"), the United States of America, and several IRS officials in both their official and

individual capacities,[1] alleging violations of the First Amendment, the Internal Revenue Code,

26 U.S.C. § 6103 (2012), the Administrative Procedure Act, 5 U.S.C. § 706 (2012), and seeking

declaratory and injunctive relief, as well as monetary damages.  <u>See</u> First Amended Complaint

("Am. Compl.") ¶¶ 13, 139-214.  Currently before the Court are the Defendants' Motion to

Dismiss Counts I, II, IV[,] and V ("Defs.' Mot.") of the Complaint; the Individual Management

Defendants' Motion to Dismiss [Count III of the Complaint] ("Mgmt. Mot."); the Motion to

Dismiss [Count III of the Complaint] of Cincinnati Defendants Susan Maloney, Ronald Bell,

Janine L. Estes, and Faye Ng ("Cincinnati Mot."); and the Plaintiff's Motion to Stay Agency

---

[1]  The individual defendants are: David Fish, Steven Grodnitzky, Lois Lerner, Steven Miller, Holly Paz, Michael
Seto, Douglas Shulman, Cindy Thomas, William Wilkins, Susan Maloney, Ronald Bell, Janine L. Estes, and Faye
Ng.  For purposes of resolving the several motions to dismiss, these individual defendants fall into two categories:
the Individual Management defendants (Steven Grodnitzky, Lois Lerner, Steven Miller, Holly Paz, Michael Seto,
Douglas Shulman, Cindy Thomas, and William Wilkins) and the Cincinnati defendants (Susan Maloney, Ronald
Bell, Janine L. Estes, and Faye Ng).

1

Action ("Pl.'s Mot.").[2]  For the following reasons, the Court concludes that it must grant all of

the defendants' motions to dismiss and deny the plaintiff's motion to stay agency action.[3]

## I. BACKGROUND

The plaintiff asserts that it "is a not-for-profit Texas corporation organized and operated

exclusively or primarily for a charitable purpose."  Am. Compl. ¶ 2.  On July 15, 2010, the

plaintiff filed an application with the Internal Revenue Service ("IRS") for tax-exempt status

pursuant to the Internal Revenue Code, 26 U.S.C. §§ 501(c)(3), 509(a)(1), 170(b)(1)(a)(vi).  Id.

¶¶ 3-4; see also id. ¶ 53.  After "receiv[ing] no further contact from the IRS [d]efendants during

[the] calendar year 2010," id. ¶ 54, the plaintiff asked Texas Senator John Cornyn to "inquire[]

of the IRS as to the status of [the plaintiff]'s application for tax-exempt status," id. ¶ 55.  On

February 5, 2011, the plaintiff received a "letter sent from the Cincinnati, Ohio IRS office"

requesting "additional information from [the plaintiff] to complete the IRS'[s] consideration of

[the plaintiff]'s [a]pplication."  Id. ¶ 56.

---

[2]  In addition to the submissions already identified, the Court considered the following filings submitted by the parties in rendering its decision: (1) True the Vote's Opposition to the Government's Motion to Dismiss Counts I, II, IV, and V ("Opp'n to Defs.' Mot."); (2) the Reply in Support of Motion to Dismiss Counts I, II, IV[,] and V ("Defs.' Reply"); (3) the Supplement to [the] Motion to Dismiss Counts I, II, IV[,] and V ("Defs.' Supplement"); (4) the Plaintiff's Notice of Supplemental Authority [Regarding Counts I, II, IV, and V] ("Pl.'s Supp'l Authority I"); (5) the Federal Defendants' Response to [the] Plaintiff's Notice of Supplemental Authority [Regarding Counts I, II, IV, and V] ("Defs.' Resp. to Pl.'s Supp'l Authority I"); (6) the Memorandum in Support of [the] Individual Management Defendants' Motion to Dismiss ("Mgmt. Mem."); (7) the Memorandum of Points and Authorities in Support of the Cincinnati Defendants' Motion to Dismiss ("Cincinnati Mem."); (8) True the Vote's Opposition to [the] Individual Defendants' Motion to Dismiss ("Opp'n to Mgmt. and Cincinnati Mots."); (9) the Reply Brief in Support of Individual Management Defendants' Motion to Dismiss ("Mgmt. Reply"); (10) the Reply in Support of the Cincinnati Defendants' Motion to Dismiss ("Cincinnati Reply"); (11) the Individual Defendants' Joint Notice of Supplemental Authority ("Joint Supp'l Authority"); (12) the Plaintiff's Notice of Supplemental Authority [Regarding Count III] ("Pl.'s Supp'l Authority II"); (13) the Federal Defendants' Response to [the] Plaintiff['s] Notice of Supplemental Authority [Regarding Count III] ("Defs.' Resp. to Pl.'s Supp'l Authority II"); (14) the Opposition to [the] Plaintiff's Motion to Stay Agency Action ("Opp'n to Pl.'s Mot."); (15) the Plaintiff's Reply to [the] Federal Defendants' Opposition to Motion to Stay Agency Action ("Pl.'s Reply"); (16) the Plaintiff's Notice of Supplemental Authority ("Pl.'s Supp'l Authority III"); and (17) the Individual Defendants' Joint Response to [the] Plaintiff's Notice of Supplemental Authority ("Mgmt. and Cincinnati Resps. to Pl.'s Supp'l Authority III").

[3]  The Court's opinion should not be interpreted as an assessment of the propriety of the alleged conduct by the defendants, as resolution of the motions does not require an assessment of the merits of the plaintiff's claims.

On March 7 and March 8, 2011, that information was "furnished to the IRS."  Id. ¶ 57.  Then, on October 12, 2011, the plaintiff "contacted the IRS" to follow up on its application for tax-exempt status.  Id. ¶ 60.  The plaintiff was allegedly told that "the Washington, [DC] office had assumed primary approval responsibility" for the plaintiff's application.  Id. ¶ 60.  On November 8, 2011, the plaintiff "submitted to the IRS additional information" about itself, as well as "legal precedent . . . that provided the IRS [d]efendants the legal basis" for approving the plaintiff's application.  Id. ¶ 61.

The following year, on February 8, 2012, the plaintiff received another letter "from the Cincinnati, Ohio IRS office" stating that "the IRS needed even more information" from the plaintiff to complete its consideration of the plaintiff's tax-exempt application.  Id. ¶ 63.  That additional information was provided to the IRS on March 20, 2012.  Id. ¶ 64.  After providing that information, the plaintiff received a third letter on October 9, 2012, from "the Cincinnati, Ohio IRS office," "request[ing] still more information."  Id. ¶ 66.  The plaintiff complied with that information request on November 30, 2012.  Id. ¶ 67.

Based on its correspondence with the IRS, the plaintiff alleges that due to its "mission of promoting election integrity and its perceived association with 'Tea Party' organizations, the IRS [d]efendants systematically targeted [the plaintiff's] application for unwarranted delay and heightened review and scrutiny," thereby subjecting the plaintiff "to numerous unnecessary, burdensome, and unlawful requests for information about its operations, activities, leadership, volunteers, associations, and affiliations."  Id. ¶ 5.  As support for its position, the plaintiff cites a May 10, 2013 "meeting of the Exempt Organizations Committee of the Tax Section of the American Bar Association," where one of the individual defendants "admitted . . . that the IRS had selected applications for tax-exempt status for further review and scrutiny 'simply because

the applications' 'used names like Tea Party . . .'" Id. ¶ 77 (citing reference).  During that

meeting, the plaintiff contends that the IRS admitted it "sent some letters out that were far too

broad, asking questions of these organizations that were[ not] really necessary . . . ." Id. ¶ 78

(internal quotations and citations omitted).  As further support of the plaintiff's allegation

concerning the IRS's selective targeting, the plaintiff cites "a report entitled 'Inappropriate

Criteria Were Used to Identify Tax-Exempt Applications for Review' (the '[Report]')" that was

issued "[o]n or around May 14, 2013," by "the Treasury Inspector General for Tax

Administration." Id.¶ 80.  The plaintiff summarizes the Treasury Inspector General for Tax

Administration's conclusion as follows:

> The IRS used inappropriate criteria that identified for review Tea Party and other
> organizations applying for tax-exempt status based upon their names or policy
> positions instead of indications of potential political campaign intervention.
> Ineffective management: 1) allowed inappropriate criteria to be developed and
> stay in place for more than [eighteen] months, 2) resulted in substantial delays in
> processing certain applications, and 3) allowed unnecessary information requests
> to be issued.

Id. ¶ 81 (quoting the Report); see generally id. ¶¶ 82-118 (describing certain IRS actions).

Thus, according to the plaintiff, the IRS defendants engaged in an "unlawful scheme"

whereby the plaintiff was "forced to repeatedly furnish the IRS with information, materials, and

documents that were not necessary to determine whether [the plaintiff] was entitled to tax-

exempt status." Id. ¶ 6.  The plaintiff alleges that the "IRS [d]efendants knowingly developed,

implemented, and applied the IRS [t]argeting [s]cheme in violation of the United States

Constitution, the Internal Revenue Code governing tax-exempt organizations, procedures

historically followed by the IRS, and Treasury Regulations." Id.  ¶ 124; see also id. ¶ 135.  In

the eyes of the plaintiff, the "mistreatment and mishandling of [the plaintiff]'s application for

tax-exempt status and the refusal of the IRS [d]efendants to issue a determination letter

recognizing [the plaintiff]'s tax-exempt status . . . has caused the organization substantial

damages and financial hardship," id. ¶ 134, and "has substantially and materially interfered with

its ability to engage in free speech, free association, and activities in furtherance of its charitable

purpose," id. ¶ 137.

The plaintiff filed this action on May 21, 2013, ECF No. 1, and amended its complaint on

July 22, 2013, Am. Compl. at 48.  Count one seeks declaratory relief that the plaintiff is entitled

to enjoy tax-exempt status as a charitable organization described in 26 U.S.C. § 501(c)(3) (2012).

See Am. Compl. ¶¶ 140-41.  Count two also seeks a declaratory judgment that the "IRS

[t]argeting [s]cheme" violated the plaintiff's First Amendment rights, and injunctive relief to

prevent additional violations.  See id. ¶¶ 150-52, 158.  Count three seeks monetary damages

against certain defendants in their individual capacities for their alleged participation in the "IRS

[t]argeting [s]cheme."  See id. ¶¶ 164-65.  Count four claims violations of 26 U.S.C. § 6103,

which relates to unauthorized disclosures and inspections of any tax return or tax return

information.  See id.  And count five asserts violations of the Administrative Procedure Act for

the alleged "IRS [t]argeting [s]cheme."  Id. ¶¶ 189-206.

After the plaintiff instituted this action, "an internal IRS memorandum released by the

IRS" found that "applications for tax-exempt status continued to be subjected to the . . . IRS

[t]argeting [s]cheme until June 20, 2013, when it was allegedly suspended."  Id. ¶ 136 (citing

Daniel Werfel, Charting a Path Forward at the IRS: Initial Assessment and Plan of Action,

Appendix ("App.") C (June 24, 2013), www.irs.gov/PUP/newsroom/Initial%20Assessment%

20and%20Plan%20of%20Action.pdf ("IRS Action Plan")).  Since the defendants filed their

pending motions to dismiss, the IRS has "grant[ed] the [p]laintiff's application for tax-exempt

status . . . and was in the process of issuing a favorable determination letter."[4]  Defs.'

Supplement at 1.  The plaintiff opposes all pending motions to dismiss.

## II. STANDARDS OF REVIEW

### A.  Rule 12(b)(1) Motion to Dismiss

Rule 12(b)(1) allows a party to move to dismiss "for lack of subject-matter jurisdiction."

Fed. R. Civ. P. 12(b)(1).  When a defendant moves to dismiss under Rule 12(b)(1), "the

plaintiff[] bear[s] the burden of proving by a preponderance of the evidence that the Court has

subject[-]matter jurisdiction."  Biton v. Palestinian Interim Self-Gov't Auth., 310 F. Supp. 2d

172, 176 (D.D.C. 2004); see also Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).  A

court considering a Rule 12(b)(1) motion must "assume the truth of all material factual

allegations in the complaint and 'construe the complaint liberally, granting [a] plaintiff the

benefit of all inferences that can be derived from the facts alleged.'"  Am. Nat'l Ins. Co. v. FDIC,

642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting Thomas v. Principi, 394 F.3d 970, 972 (D.C. Cir.

2005)).  But a "court must give [a] plaintiff's factual allegations closer scrutiny when resolving a

Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a

claim."  Byrum v. Winter, 783 F. Supp. 2d 117, 122 (D.D.C. 2011) (citing Macharia v. United

States, 334 F.3d 61, 64, 69 (D.C. Cir. 2003)).  And "[a]lthough 'the District Court may in

appropriate cases dispose of a motion to dismiss for lack of subject[-]matter jurisdiction under

Fed. R. Civ. P. 12(b)(1) on the complaint standing alone,' 'where necessary, the court may

consider the complaint supplemented by undisputed facts evidenced in the record, or the

---

[4]  The plaintiff has provided the Court with a "true and correct copy of the [d]etermination [l]etter[, which] is a self-authenticating document . . . ."  Opp'n to Defs.' Mot. at 1 n.1; see also id., Exhibit ("Ex.") A (September 26, 2013 Determination Letter Granting the Plaintiff's Application for Tax-Exempt Status ("Determination Letter")).  And in light of the parties' representations, the Court takes judicial notice that the plaintiff's application for tax-exempt status has been approved by the IRS.  Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'"
Coal. for Underground Expansion v. Mineta, 333 F.3d 193, 198 (D.C. Cir. 2003) (quoting
Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir. 1992)).  Finally, in determining
whether it has jurisdiction, the Court "may consider materials outside of the pleadings."  Jerome
Stevens Pharm., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

### B. Rule 12(b)(6) Motion to Dismiss

A Rule 12(b)(6) motion tests whether the complaint "state[s] a claim upon which relief
can be granted."  Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss [under Rule
12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to
relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell
Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In considering a Rule 12(b)(6) motion, the
Court affords the plaintiff the "benefit of all inferences that can be derived from the facts
alleged."  Am. Nat'l Ins. Co. v. FDIC, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (internal quotations
and citation omitted).  But raising a "sheer possibility that a defendant has acted unlawfully" fails
to satisfy the facial plausibility requirement.  Iqbal, 556 U.S. at 678.  Rather, a claim is facially
plausible "when the plaintiff pleads factual content that allows the [C]ourt to draw [a] reasonable
inference that the defendant is liable for the misconduct alleged."  Id. (citing Twombly, 550 U.S.
at 556).  While the Court must "assume [the] veracity" of any "well-pleaded factual allegations"
in the complaint, conclusory allegations "are not entitled to the assumption of truth."  Id. at 679.
"In determining whether a complaint states a claim, the [C]ourt may consider the facts alleged in
the complaint, documents attached thereto or incorporated therein, and matters of which it may
take judicial notice."  Abhe & Svoboda, Inc. v. Chao, 508 F.3d 1052, 1059 (D.C. Cir. 2007)
(internal quotations omitted).  And among the documents "subject to judicial notice on a motion

to dismiss" are "public records," <u>Kaempe v. Myers</u>, 367 F.3d 958, 965 (D.C. Cir. 2004), which

includes records from other court proceedings, <u>Covad Commc'ns Co. v. Bell Atl. Corp.</u>, 407

F.3d 1220, 1222 (D.C. Cir. 2005).

### III. ANALYSIS

#### A. Counts One, Two, and Five of the Plaintiff's Complaint

The defendants contend that the Court does not have subject-matter jurisdiction over

counts one, two, and five of the plaintiff's complaint because the IRS ultimately approved the

plaintiff's application for tax-exempt status, and thus counts one, two, and five—all of which

seek "to correct [the] alleged targeting [of the IRS] and delay during its application process" for

tax-exempt status—are now moot as there is no longer any case or controversy for the Court to

resolve. Defs.' Reply at 1; <u>see also</u> Defs.' Mot. at 2-4. The plaintiff, on the other hand, insists

that there are "ongoing, live controversies" because "[t]his case is about declaring the

illegitimacy of the IRS [t]argeting [s]cheme in <u>all</u> its forms [and] enjoining its ongoing

implementation." Opp'n to Defs.' Mot. at 9 (emphasis in original). And the plaintiff argues that

without this "additional relief, the IRS can continue to employ its [t]argeting [s]cheme." <u>Id.</u>

As the outset, the Court notes that the plaintiff does <u>not</u> contest that count <u>one</u> of its

complaint is moot. <u>See id.</u> ("Counts <u>[two] and [five]</u> present, actual ongoing, live controversies"

(emphasis added)). Thus, the Court finds that the plaintiff has conceded the motion to dismiss

count one for lack of subject-matter jurisdiction. <u>See Lewis v. District of Columbia</u>, No. 10-

5275, 2011 WL 321711, at *1 (D.C. Cir. Feb. 2, 2011) (per curiam) ("'It is well understood in

this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only

certain arguments raised by the defendant, a court may treat those arguments that the plaintiff

failed to address as conceded.'" (quoting <u>Hopkins v. Women's Div., Gen. Bd. of Global</u>

Ministries, 284 F. Supp. 2d 15, 25 (D.D.C. 2003), aff'd, 98 F. App'x 8 (D.C. Cir. 2004))); Local

Civ. R. 7(b).

Unless an actual, ongoing controversy exists in this case, this Court is without power to

decide it.  See Clarke v. United States, 915 F.2d 699, 700-01 (D.C. Cir. 1990).  Even where a

case once posed "a live controversy when filed, the [mootness] doctrine requires" the Court "to

refrain from deciding it if 'events have so transpired that the decision will neither presently affect

the parties' rights nor have a more-than-speculative chance of affecting them in the future.'"  Id.

(quoting Transwestern Pipeline Co. v. FERC, 897 F.2d 570, 575 (D.C. Cir. 1990)).  Here, after

the plaintiff initiated this case, its application to the IRS for tax-exempt status was approved by

the IRS.  See Opp'n to Defs.' Mot., Ex. A (Determination Letter) at 1.[5]  The allegedly

unconstitutional governmental conduct, which delayed the processing of the plaintiff's tax-

exempt application and brought about this litigation, is no longer impacting the plaintiff.  See

NorCal Tea Party Patriots v. IRS, No.1:13-cv-341, 2014 WL 3547369, at *9 n.11 (S.D. Ohio

July 17, 2014) ("The claim for declaratory and injunctive relief cannot be brought by other

Plaintiff Groups who have either had their applications for tax-exempt status ruled upon or have

withdrawn their applications.").  Counts two and five, therefore, are moot.

Notwithstanding the IRS's favorable resolution of the plaintiff's tax-exempt application,

the plaintiff wants to forge ahead with these counts of its complaint.  The plaintiff attempts to

salvage these counts by invoking the "voluntary cessation" exception to the mootness doctrine.[6]

See Opp'n to Defs.' Mot. at 11-15.  As the District of Columbia Circuit has explained:

---

[5]  This critical fact renders Z St., Inc. v. Koskinen, _ F. Supp. 2d _, 12-cv-0401(KBJ), 2014 WL 2195492 (D.D.C. May 27, 2014), inapplicable to the Court's analysis.

[6]  By invoking an exception to the mootness doctrine, the plaintiff implicitly seems to concede that these claims are moot.

> The rationale supporting the defendant's voluntary cessation as an exception to mootness is that, while the defendant's unilateral cessation of the challenged conduct may grant the plaintiff relief, the defendant is free to return to its old ways—thereby subjecting the plaintiff to the same harm but, at the same time, avoiding judicial review.  Accordingly, a case can be mooted by virtue of the defendant's cessation of its allegedly illegal conduct only if (1) there is no reasonable expectation that the conduct will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.

Qassim v. Bush, 466 F.3d 1073, 1075 (D.C. Cir. 2006) (internal alterations, quotations, and citations omitted).  "The defendant carries the burden of demonstrating 'that there is no reasonable expectation that the wrong will be repeated,' and 'the burden is a heavy one.'"  Am. Bar Ass'n v. FTC, 636 F.3d 641, 648 (D.C. Cir. 2011) (internal alteration omitted) (quoting United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953)).  But "'where the defendant is a government actor—and not a private litigant—there is less concern about the recurrence of objectionable behavior.'"  D.C. Prof'l Taxicab Drivers Ass'n v. District of Columbia, 880 F. Supp. 2d 67, 75 (D.D.C. 2012) (quoting Citizens for Responsibility & Ethics in Wash. v. SEC, 858 F. Supp. 2d 51, 61 (D.D.C. 2012) (citing Circuit cases)).

The "voluntary cessation" exception does not rescue counts two and five of the plaintiff's complaint from dismissal on the ground of mootness.  According to the plaintiff, the IRS publicly "suspended" its "targeting scheme" on June 20, 2013.[7]  Am. Compl. ¶ 136 (emphasis added); see also Initiative & Referendum Inst. v. U.S. Postal Serv., 685 F.3d 1066, 1074 (D.C. Cir. 2012), cert. denied, _ U.S. _, 133 S. Ct. 1802 (2013) ("It is implausible that the [defendant] would have gone through the cumbersome process of amending its regulation . . . only to

---

[7]  Although the complaint states that the IRS "allegedly suspended" the "targeting scheme," Am. Compl. ¶ 136, the Court takes judicial notice that the IRS has in fact suspended the alleged scheme and taken remedial steps to address the alleged conduct, see IRS Action Plan at 7, 14, App. C; IRS Charts a Path Forward [W]ith Immediate Actions, http://www.irs.gov/uac/Newsroom/IRS-Charts-a-Path-Forward-with-Immediate-Actions (last visited Oct. 23, 2014) ("IRS Path Forward"), as it has publicly stated so on its website, see, e.g., Seifert v. Winter, 555 F. Supp. 2d 3, 11 n.5 (D.D.C. 2008) (Walton, J.) (citing cases that allow the taking of judicial notice of information published on government websites).

[unconstitutionally] re-amend the regulation after this case is resolved"); Coal. of Airline Pilots

Ass'ns v. FAA, 370 F.3d 1184, 1191 (D.C. Cir. 2004) (mooting case where government

provided "unequivocal assurances" that application of challenged regulation was "effectively

dead"); Citizens for Responsibility, 858 F. Supp. 2d at 62-63 (finding that a submission by the

plaintiff reflecting defendant's abandonment of challenged policy was enough to provide the

Court with "comfort that the [defendant] [wa]s taking seriously [the] [p]laintiff's concerns with

the prior policy and [wa]s undertaking efforts to ensure" its "discontinu[ation]"); Mont. Shooting

Sports Ass'ns v. Norton, 355 F. Supp. 2d 19, 21 n.1, 23 (D.D.C. 2004) (mooting case where

government "rescinded" its challenged action), aff'd, No. 04-5434, 2005 WL 2810686 (D.C. Cir.

June 14, 2005); Jean v. Dep't of Labor, No. 89-cv-0611-OG, 1990 WL 515163, at *4 (D.D.C.

Jan. 9, 1990) (rendering case moot by defendants' actions and assurances of good faith as to

future behavior).  And subsequent to that suspension, the plaintiff's application for tax-exempt

status was granted.  Opp'n to Defs.' Mot., Ex. A (Determination Letter) (approving plaintiff's

application on September 26, 2013).  Now that the plaintiff has received tax-exempt status,

which has "completely and irrevocably eradicated the effects of the alleged violation[s]" by the

defendants, Qassim, 466 F.3d at 1075, there is no reasonable expectation that the defendants will

"return to [their allegedly] old ways," i.e., utilizing an allegedly unlawful "targeting scheme" on

certain organizations seeking tax-exempt status during the tax-exempt application process, and

"subjecting the plaintiff to the same harm" again, id.  Therefore, the defendants' grant of tax-

exempt status to the plaintiff, and the defendants' suspension of the alleged IRS targeting scheme

during the tax-exempt application process, including remedial steps to address the alleged

conduct, coupled with the reduced "concern about the recurrence of objectionable behavior" by

government actors, D.C. Prof'l Taxicab Drivers, 880 F. Supp. 2d at 75, convinces the Court that

the "voluntary cessation" exception is not applicable here.[8]

Endeavoring to prolong the life of counts two and five of the complaint, the plaintiff

hypothetically suggests that the IRS could audit the plaintiff at a later point in time and "be

singled out [again] for reasons unrelated to the provisions of the Internal Revenue Code."  Opp'n

to Defs.' Mot. at 13.  But not only is this prospect of future harm speculative, see Munsell v.

Dep't of Agric., 509 F.3d 572, 581 (D.C. Cir. 2007) ("[E]ven if [the plaintiff] could establish that

agency officials violated his First Amendment rights . . . [the plaintiff could not] demonstrate[] a

real and immediate threat that [the plaintiff] would be subject to the same conduct in the

future."); Don't Tear it Down, Inc., v. Gen. Servs. Admin., 401 F. Supp. 1194 1199 (D.D.C.

1975) (mooting case where challenged governmental conduct "[s]o far as the Court [wa]s aware .

. . ha[d] not been duplicated in any other instance," and "that it will be duplicated must be

deemed speculative"), it is also a harm that is different than the one identified in the complaint,

which is entirely focused on an alleged IRS "targeting scheme" during the plaintiff's tax-exempt

application process,[9] Qassim, 466 F.3d at 1075 ("voluntary cessation . . . exception" applicable

where plaintiff would be "subject[ed] . . . to the same harm" (emphasis added)).  As such, counts

two and five no longer warrant the Court's attention and further use of its resources.[10]  Newdow

---

[8]  The cases cited by the plaintiff invoking the "voluntary cessation" exception are thus inapposite.

[9]  This rationale applies equally to the plaintiff's argument in its motion to stay agency action that the IRS may potentially disclose the plaintiff's confidential information at some point in the future pursuant to 26 U.S.C. § 6104. See Opp'n to Defs.' Mot. at 10-11.

[10]  The plaintiff urges the Court to allow it to maintain these counts because "there are indications that the IRS [t]argeting [s]cheme has not ceased, that it has spread beyond the application process, and that it is likely to continue."  Opp'n to Defs.' Mot. at 13.  This plea is rejected for several reasons.  First, this projected harm is contrary to what the plaintiff has alleged in its complaint, which is that the IRS targeting scheme is no longer ongoing.  Am. Compl. ¶ 136 (alleging that IRS targeting scheme was "suspended" on June 20, 2013 (emphasis added)).  Second, the Court will not allow the plaintiff to amend the already-amended complaint through an opposition brief and recast its claims concerning the IRS's alleged targeting scheme that stalled the approval of its

(continued . . .)

v. Roberts, 603 F.3d 1002, 1008 (D.C. Cir. 2010) (holding that while the constitutionality of

certain governmental conduct "may be an important question to [the] plaintiffs, . . . it is not a live

controversy that can avail itself of the judicial powers of the federal courts[, and the question] is

therefore moot").  Accordingly, counts two and five are dismissed for want of subject-matter

jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).[11]

### B.  Count Three of the Plaintiff's Complaint

The plaintiff seeks "money damages," also commonly known as a Bivens remedy,[12]

against the individual IRS defendants in their individual capacities for their alleged constitutional

---

(. . . continued)

tax-exempt application, e.g., id. ¶ 73 (identifying IRS targeting scheme as limited to a "written and unwritten policy for identifying and subjecting certain applicants for tax-exempt status to additional and heightened review and scrutiny" (emphasis added)), as a broader challenge to a potentially unlawful ongoing scheme or policy at the IRS in carrying out its responsibilities other than reviewing tax-exempt applications.  Indeed, "it is a well-established principle of law in this Circuit that [the plaintiff] may not amend [its] complaint by making new allegations in [the] opposition brief."  Budik v. Ashley, _ F. Supp. 2d _, _, No. 12-cv-1949(RBW), 2014 WL 1423293, at *8 (D.D.C. Apr. 14, 2014) (Walton, J.) (citing Larson v. Northrop Corp., 21 F.3d 1164, 1173-74 (D.C. Cir. 1994)).  And third, even assuming that the defendants continue to implement the IRS targeting scheme against other organizations like the plaintiff in its review of their applications for tax-exempt status—which is contradicted by the plaintiff's complaint, Am. Compl. ¶ 136—the plaintiff filed its complaint on the basis of alleged harm to itself during its application process for tax-exempt status and not on the behalf of others that may have been similarly situated to the plaintiff, i.e., other organizations subjected to the same alleged conduct during their application processes for tax-exempt status, see Qassim, 466 F.3d at 1076 (explaining that constitutional challenge to a government policy can proceed if seeking "relief for individuals similarly situated").

[11]  The plaintiff's reliance on City of Hous. v. Dep't of Hous. & Urban Dev., 24 F.3d 1421, 1428 (D.C. Cir. 1994), is misplaced; and in fact, the Court's conclusion is consistent with the case.  The District of Columbia Circuit enumerated three possible outcomes when a plaintiff's claim for declaratory relief regarding agency action taken against the plaintiff pursuant to an unlawful policy is moot: (1) the plaintiff can invoke the "capable of repetition, yet evading review" or "voluntary cessation" exceptions to continue the litigation and challenge the policy; (2) the plaintiff "lacks standing to attack future applications of that policy" and "the [C]ourt is unable to award relief"; or (3) the plaintiff "has standing to challenge the future implementation of that policy" and "declaratory relief may be granted if the claim is ripe for review."  Id. at 1429-30.  Here, the Court has already determined that the "voluntary cessation" exception is inapplicable.  And the plaintiff has not properly pleaded imminent future harm in the complaint, as the pleaded future harm is not only different than the one spelled out in the complaint, but the defendants have also suspended the disputed policy, such that the Court could not find standing to challenge future applications of the policy.  See Lujan, 504 U.S. at 560-61 (explaining that there must be an injury-in-fact that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical," to maintain standing in a suit).

[12]  In Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971), the Supreme Court held that a plaintiff could recover monetary damages against federal officials who violated the constitutional rights of the plaintiff while acting under the color of federal law.

violations alleged in count three of the complaint.  Am. Compl. ¶ 164; see also Opp'n to Mgmt.

and Cincinnati Mots. at 24-42.  In response, the individual IRS defendants generally argue that

count three should be dismissed because: (1) the Court does not have personal jurisdiction over

several defendants; (2) even if the Court has personal jurisdiction over all defendants, no Bivens

claim can be asserted against the individual IRS defendants; and (3) to the extent any Bivens

claim is allowed, the IRS defendants are entitled to qualified immunity.  See, e.g., Mgmt. Mem.

at 1-2, 6-8; Cincinnati Mem. at 1-2.  As explained below, because precedent does not permit the

Court to create a Bivens remedy for the plaintiff against the individual IRS defendants, the Court

need not address the personal jurisdiction and qualified immunity issues.

     In Kim v. United States, 632 F.3d 713 (D.C. Cir. 2011), the Circuit dealt with aggrieved

taxpayers who alleged IRS wrongdoing, including unconstitutional conduct by individual IRS

employees, and sought Bivens relief as a result of the alleged harm.  Id. at 714-15.  The Circuit

affirmed the district court's dismissal of the "Bivens claims against the [d]efendants in their

official capacities" pursuant to Fed. R. Civ. P. 12(b)(1), noting that it is "well established that

Bivens remedies do not exist against officials sued in their official capacities."  Id. at 715.  The

Circuit also affirmed the district court's dismissal of the "Bivens claims against the [d]efendants

in their individual capacities" pursuant to Fed. R. Civ. P. 12(b)(6) because "no Bivens remedy

was available in light of the comprehensive remedial scheme set forth by the Internal Revenue

Code."  Id. at 717.

     The plaintiff here attempts to distinguish Kim by characterizing it as "materially

different" and suggesting that Kim's holdings are limited to cases involving "Bivens claims

[against IRS employees] under [the] Due Process Clause."  Opp'n to Mgmt. and Cincinnati

Mots. at 40.  But that suggestion relies on a strained reading of Kim.  In affirming the rejection

of the Bivens claims against IRS officials in both their official and individual capacities, the

Circuit's language did not limit the scope of its ruling.  See Kim, 632 F.3d at 715, 717.  And in

any event, the plaintiff has not distinguished—through the cases it cites or otherwise—any

legally cognizable distinction between Due Process Clause claims and First Amendment Claims

such that a Bivens remedy is appropriate in the former context, but not the latter context.[13]

The plaintiff attempts to blunt the force of Kim by complaining that the Circuit in Kim

"omit[ted] an entire[] inquiry into whether Congress ha[d] not inadvertently omitted damages

remedies for certain claimants, and ha[d] not plainly expressed an intention that the courts

preserve Bivens remedies."  Opp'n to Mgmt. and Cincinnati Mots. at 41 (certain internal

alterations and quotations omitted).  Accordingly, the plaintiff urges the Court to engage in this

inquiry.  See id. at 42-44.  The alleged omission by the plaintiff, however, is belied by a closer

reading of the district court opinion as well as the Circuit's opinion.

The district court in Kim undertook the very analysis that the plaintiff asks the Court to

conduct.  In declining to extend a Bivens remedy to the plaintiffs against the IRS employees in

their individual capacities for alleged constitutional violations, the district court recognized that

the "existence of a comprehensive remedial scheme" was a "special factor" that counseled

against its extension.  Kim v. United States, 618 F. Supp. 2d 31, 38 (D.D.C. 2009), aff'd in part,

rev'd in part and remanded, 632 F.3d 713 (D.C. Cir. 2011).  "That is, when 'Congress has put in

place a comprehensive system to administer public rights, has not inadvertently omitted damages

remedies for certain claimants, and has not plainly expressed an intention that the courts preserve

Bivens remedies,' courts 'must withhold their power to fashion damages remedies' pursuant to

Bivens."  Id. (quoting Spagnola v. Mathis, 859 F.2d 223, 228 (D.C. Cir. 1988) (per curiam) (en

---

[13] "The trend in other Circuits also has been to not recognize Bivens actions against IRS agents."  NorCal, 2014 WL 3547369, at *8 (citing Circuit cases, "follow[ing] the majority position," and dismissing Bivens actions).

banc)).  On appeal, the Circuit "agree[d] with the district court's reasoning" that "no <u>Bivens</u> remedy was available in light of the comprehensive remedial scheme set forth by the Internal Revenue Code." <u>Kim</u>, 632 F.3d at 718; <u>see also</u> <u>NorCal</u>, 2014 WL 3547369, at *5-8; <u>Church By Mail, Inc. v. United States</u>, No. 87-cv-0754-LFO, 1988 WL 8271, at *3 (D.D.C. Jan. 22, 1988) (explaining that declaratory relief for applicants seeking tax-exempt status under 26 U.S.C. § 7428 renders <u>Bivens</u> remedy improper for aggrieved applicants).  In light of the Circuit's unequivocal endorsement of the district court's <u>Bivens</u> analysis, the Court cannot take a different approach.

Moreover, a former member of this Court was confronted with a nearly identical case to the one before the Court and refrained from fashioning a <u>Bivens</u> remedy as well.  In <u>Church By Mail</u>, the plaintiff, a non-profit church seeking tax-exempt status, filed suit against the defendants, the IRS and various individual IRS agents, for the denial of its tax-exempt status application.  1988 WL 8271, at *1.  The plaintiff claimed, <u>inter alia</u>, that the defendants violated the Constitution, including the First Amendment, by "favoring traditional churches over more unusual ones," <u>id.</u>, "demonstrat[ing] dislike and intolerance of [the] plaintiff's religion," <u>id.</u> at *2 (internal quotations omitted), and "engag[ing] in invidious discrimination against [the] plaintiff by singling it out for investigation and attack," <u>id.</u>  According to the plaintiff, in denying its tax-exempt application, the defendants "exceeded the bounds of the authority given to [the] defendants under existing law." <u>Id.</u>

In dismissing the plaintiff's claims seeking <u>Bivens</u> damages for the constitutional violations alleged against the defendants, the Court in <u>Church By Mail</u> reasoned that "a court-created remedy" was unnecessary where "Congress has created a specific remedy for challenges to rulings on tax exemption." <u>Id.</u> at *3.  Specifically, the Court recognized "that no <u>Bivens</u>-type

damages remedy against the individual IRS agents should be created by the Court . . . because Congress has created a specific, meaningful declaratory judgment remedy under 26 U.S.C. [§] 7428 for cases . . . in which an application for tax[-]exempt status has been denied." Id. Had it created a Bivens remedy, the Court opined that it could have "'wre[acked] havoc . . . [on] the federal tax system.'" Id. (quoting Baddour, Inc. v. United States, 802 F.2d 801, 807 (5th Cir. 1986)). The Court reasoned that "[i]t would make the collection of taxes chaotic if a taxpayer could bypass the remedies provided by Congress simply by bringing a damage action against [IRS] employees." Id. (internal quotations and alterations omitted). This Court agrees with Judge Oberdorfer's assessment, and therefore dismisses count three of the complaint with prejudice for the failure to state a proper claim for relief under Federal Rule of Civil Procedure 12(b)(6).[14]

## C. Count Four of the Plaintiff's Complaint

In count four of the complaint, the plaintiff seeks relief from the defendants for their alleged violations of 26 U.S.C. § 6103 because "[p]ursuant to the IRS [t]argeting [s]cheme, the IRS [d]efendants knowingly requested information from [the plaintiff] in furtherance of the IRS'[s] discriminatory and unconstitutional" conduct. Am. Compl. ¶ 175. So according to the plaintiff, "the IRS [d]efendants knowingly inspected information provided to the IRS . . . [which was] unnecessary." Id. ¶ 179 (internal quotations and citations omitted). Because the information provided by the plaintiff was unnecessary, the plaintiff claims that the defendants'

---

[14]   The plaintiff asserts that because the IRS pays for the individual defendants' legal representation in a Bivens action, it follows that permitting the plaintiff to proceed on a Bivens claim against the individual defendants is appropriate. See Opp'n to Mgmt. and Cincinnati Mots. at 26. The Court fails to see how this is remotely relevant, let alone a basis to rule contrary to this Circuit's precedent. Moreover, the plaintiff argues that the declaratory relief provided by 26 U.S.C. § 7428 is not an adequate alternative remedy for constitutional injuries. Opp'n to Mgmt. and Cincinnati Mots. at 30-37. But the plaintiff's dissatisfaction with the remedies available to it is not a legally sufficient reason for the Court to create a Bivens remedy. See Spagnola, 859 F.2d at 227 ("[I]t is the comprehensiveness of the statutory scheme involved, not the 'adequacy' of specific remedies extended thereunder, that counsels judicial abstention.").

inspection of that information was not "per se for tax administration purposes."  Id. ¶ 178

(internal quotations omitted).  Consequently, the plaintiff argues that the defendants are liable

under 26 U.S.C. § 7431, which provides damages for violations of 26 U.S.C. § 6103.  Am.

Compl. ¶¶ 170, 207; see also Opp'n to Defs.' Mot. at 28-42.  The defendants contend that the

underlying basis for the plaintiff's fourth count is the "nature of the [IRS's] requests for

information," which is not actionable under 26 U.S.C. § 6103, as this provision only prohibits

"the improper inspection and disclosure" of the information which the plaintiff provided.  Defs.'

Mot. at 10-11.

26 U.S.C. § 6103 protects the confidentiality of taxpayers' tax "[r]eturns and [tax] return

information."  Id. § 6103(a).  Tax "return information" is broadly defined to include:

> [A] taxpayer's identity, the nature, source, or amount of his income, payments,
> receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability,
> tax withheld, deficiencies, overassessments, or tax payments, whether the
> taxpayer's return was, is being, or will be examined or subject to other
> investigation or processing, or any other data, received by, recorded by, prepared
> by, furnished to, or collected by the Secretary with respect to a return or with
> respect to the determination of the existence, or possible existence, of liability (or
> the amount thereof) of any person under this title for any tax, penalty, interest,
> fine, forfeiture, or other imposition, or offense[.]

Id. § 6103(b)(2)(A); see also id. § 6103(b)(2)(B)-(D).  Section 6103 contains numerous

exceptions to the general prohibition against disclosure or inspection of tax returns and tax return

information, including that:

> Returns and return information shall, without written request, be open to
> inspection[15] by or disclosure to officers and employees of the Department of the
> Treasury whose official duties require such inspection or disclosure for tax
> administration purposes.

Id. § 6103(h)(1).  And "[t]he term tax administration"

---

[15] "The terms 'inspected' and 'inspection' mean any examination of a return or return information."  26 U.S.C. §
6103(b)(7).

(A) means—
(i) the administration, management, conduct, direction, and supervision of the execution and application of the internal revenue laws or related statutes (or equivalent laws and statutes of a State) and tax conventions to which the United States is a party, and
(ii) the development and formulation of Federal tax policy relating to existing or proposed internal revenue laws, related statutes, and tax conventions, and
(B) includes assessment, collection, enforcement, litigation, publication, and statistical gathering functions under such laws, statutes, or conventions.

Id. § 6103 (b)(4).  In short, Section 6103 addresses "improper disclosure of tax return information."  Mann v. United States, 204 F.3d 1012, 1020 (10th Cir. 2000); see also Venen v. United States, 38 F.3d 100, 105 (3d Cir. 1994) ("The history of [S]ection 6103 indicates that Congress enacted the provision to regulate a discrete sphere of IRS activity—information handling.").

Section 6103 does not provide a means for the plaintiff to avoid dismissal of count four of its complaint.  As just noted, Section 6103 concerns the disclosure or inspection, i.e., the "handling," of tax return information.  Venen, 38 F.3d at 105.  To the extent the plaintiff takes issue with the defendants' inspection of its tax return information, those allegations are insufficiently pleaded in its amended complaint.  See Iqbal, 556 U.S. at 679 (conclusory allegations "are not entitled to the assumption of truth").  The insufficiency of the plaintiff's allegations is highlighted by the plaintiff's admission that "[t]he number of unauthorized inspections of [the plaintiff]'s return information and the identity of those who made the inspections cannot be completely and accurately ascertained at this time . . . ."[16]  Am. Compl. ¶ 182.

---

[16]  As the Court will explain, any alleged inspections of the plaintiff's tax return information by the defendants cannot support a claim for a violation of 26 U.S.C. § 6103, as the predicate for these allegedly unauthorized inspections is the defendants' requests for information that were allegedly "wholly unnecessary" to its application to obtain tax-exempt status.  Opp'n to Defs.' Mot. at 35.

The plaintiff's real bone of contention is that the defendants allegedly demanded "information [that] was not necessary for determining [the plaintiff]'s [tax-]exempt status," and then inspected it.  Opp'n to Defs.' Mot. at 31-32.  Although the plaintiff is upset about the defendants' inspection of its tax return information, it is actually the defendants' alleged unconstitutional conduct in acquiring that information that forms the basis of count four of the complaint.  But, unfortunately for the plaintiff, Section 6103 is silent as to how tax return information can be acquired.  Even assuming that the defendants improperly acquired the plaintiff's tax return information, that does not compel a finding that such information was improperly inspected.  In the Court's view, there is a clear dichotomy between the means by which tax return information is acquired and the disclosure or inspection of that information thereafter.  The plaintiff, however, attempts to have the Court disregard this dichotomy,[17] which conflicts with cases which have found that the propriety of certain conduct separate and apart from the actual handling of tax return information is irrelevant and cannot be the predicate of a Section 6103 violation.  Cf. Mann, 204 F.3d at 1020 ("Sections 6103 and 7431 address improper disclosure of tax return information and not improper collection activity.  We therefore agree with the district court that the validity of the means by which the return information was disclosed is irrelevant to whether the disclosure of the information violated § 6103.  We further agree with the district court and the majority of courts which have considered the issue that there is nothing in § 6103 which requires that the underlying means of disclosure be valid before [a disclosure exception] applies." (emphasis added)); Wilkerson v. United States, 67 F.3d 112, 117 (5th Cir. 1995) (holding that disclosures of tax return information "were not wrongful"

---

[17]  Again, the plaintiff attempts to amend its complaint through its opposition brief by contending that its "[S]ection 7431 claim is premised on the improper handling of its information."  Opp'n to Defs.' Mot. at 32 n.9.  The plaintiff identifies nothing in its amended complaint that supports this position.  Nor could it, as this is contrary to the allegations in its complaint.  See Am. Compl. ¶¶ 174-80.

notwithstanding "improper levying procedures"); Venen, 38 F.3d at 106 ("Section 6103 and its

attendant damages provision, [S]ection 7431, were meant to regulate only one sphere of

activity—information handling—and were not intended to interfere with collection actions.

Thus, the propriety of the underlying collection action, in this instance the validity of the levy, is

irrelevant to whether disclosure is authorized under [S]ection 6103 and the basis for liability

under [S]ection 7431." (internal citations, quotations, and ellipses omitted)); Huff v. United

States, 10 F.3d 1440, 1447 (9th Cir. 1993) (finding no liability under Section 6103 "despite the

possible procedural lapses involving the actual levy").

    Further supporting the Court's maintenance of the dichotomy between the IRS's

acquisition of tax return information for assessing tax-exempt status and the IRS's inspection of

that information thereafter,[18] is the availability of judicial review and a separate and distinct

remedy for an applicant aggrieved during the tax-exempt application process.  Cf. Wilkerson, 67

F.3d at 116 ("Congress enacted separate and distinct provisions concerning collection activities

and information handling."); Venen, 38 F.3d at 105 ("In a claim such as the present one based on

an improper levy, the concern is not improper information handling but rather improper

collection activity.  Collection activity is a separate sphere of IRS activity governed by a separate

body of law.").  Under 26 U.S.C. § 7428, an applicant requesting tax-exempt status under 26

U.S.C. § 501(c)(3) may seek a declaratory judgment that it indeed qualifies for tax-exempt status

if either the application has been denied by the IRS or the IRS has failed to act on the application

---

[18]  The plaintiff asserts that the defendants have violated 26 U.S.C. § 6103 because the defendants did not "per se" inspect the plaintiff's tax return information for "tax administration purposes."  Opp'n to Defs.' Mot. at 33; see also id. at 37; Am. Compl. ¶¶ 177-78.  At first blush, this argument has appeal.  The plaintiff appears to argue that the request and inspection of information allegedly unnecessary to determine an applicant's tax-exempt status is not the result of "tax administration."  See Opp'n to Defs.' Mot. at 39-42.  However, there does not appear to be a genuine dispute that "tax administration" encompasses the review of return information submitted in conjunction with a tax-exempt application.  Again, the basis for the plaintiff's alleged violation of 26 U.S.C. § 6103 is not the inspection of tax return information; rather, it is the defendants' request for allegedly unnecessary information during the tax-exempt application process.

in 270 days.  26 U.S.C. §§ 7428(a)-(b).  If the application is denied, the applicant may file suit

within ninety days of the mailing of the rejection letter.  Id. § 7428(b)(3).  Alternatively, if the

IRS fails to act on the application within 270 days, the applicant is "deemed to have exhausted its

administrative remedies," provided that it, "in a timely manner, [took] all reasonable steps to

secure . . . [a] determination" of its tax-exempt status.  Id. § 7428(b)(2).  In either case, the

applicant may file suit in the United States Tax Court, the United States Court of Federal Claims,

or the United States District Court for the District of Columbia.  Id. §§ 7428(a), (b)(2).  In light

of the remedies made available under 26 U.S.C. § 7428 for controversies arising out of the tax-

exempt application process,[19] which would encompass plaintiff's allegations against the

defendants, cf. Church By Mail, 1988 WL 8271, at *3 (holding that "plaintiff clearly has an

adequate remedy under 26 U.S.C. [§] 7428" for constitutional violations during the tax-exempt

application process), it must remain separate and distinct from the remedies available under 26

U.S.C. § 7431 for unauthorized inspections of tax return information that occur after the

application process has either stalled or concluded.  Accordingly, count four of the complaint

fails to state a claim for relief and will be dismissed with prejudice pursuant to Fed. R. Civ. P.

12(b)(6).[20]

---

[19]  Other avenues of relief may be better candidates than 26 U.S.C. § 7431.  For example, the plaintiff acknowledges that the defendants' conduct could potentially be governed by 26 U.S.C. § 7605(b), which generally ensures that "[n]o taxpayer shall be subjected to unnecessary examination or investigations . . . ."  Opp'n to Defs.' Mot. at 37 n.14.  And in NorCal, the Court identified 26 U.S.C. § 7433 as potentially providing adequate relief to aggrieved applicants for tax-exempt status, as it "creates a damages remedy for the wrongful collection of federal tax."  2014 WL 3547369, at *6.  The Court declines to weigh in, however, on the merits of any potential argument under these statutory provisions.

[20]  In light of the Court's interpretation of the authority cited in this Memorandum Opinion, the Court must respectfully disagree with that portion of the NorCal opinion, which permitted the plaintiffs to take discovery "to establish with evidence that IRS officials inspected or disclosed the [plaintiffs]' return information for improper purposes," 2014 WL 3547369, at *13, even though the plaintiffs' complaint there apparently muddied the dichotomy identified by the Court in this opinion, and thus did not sufficiently plead allegations concerning a violation of 26 U.S.C. § 6103.  See 2014 WL 3547369, at *13 (citing "PageID 1046" of the plaintiffs' complaint); Second Amended Class Action Complaint ¶ 247, NorCal, No.1:13-cv-341 (S.D. Ohio Jan. 23, 2014), ECF No. 71

(continued . . .)

## IV. CONCLUSION

For the foregoing reasons, the Court grants the defendants' motions to dismiss as to all

five counts of the plaintiff's complaint and denies the plaintiff's motion to stay agency action.[21]

**SO ORDERED** this 23rd day of October, 2014.

REGGIE B. WALTON
United States District Judge

---

(. . . continued)
("Defendants inspected [p]laintiffs' information and shared it amongst themselves even though they knew it was
unnecessary for making a decision on [p]laintiffs' tax-exempt status, and even though they knew it had been sought
based on [p]laintiffs' political viewpoint.  Accordingly, the inspection, review, and disclosure was objectively
unnecessary, and subjectively not undertaken, 'for tax administration purposes' under 26 U.S.C. § [6103(h)].").
Here, the Court will not allow the plaintiff to take discovery where it has not sufficiently pleaded a violation of 26
U.S.C. § 6103.  See Am. Compl. ¶ 182 (asserting the need for discovery only because the "number of unauthorized
inspections" and "the identity of those who made the inspections cannot be completely and accurately ascertained at
this time.").

   Further, because the Order accompanying this opinion closes this case, the plaintiff's motion for a stay of
agency action is moot.

[21] An Order consistent with this Memorandum Opinion will be issued contemporaneously.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TRUE THE VOTE, INC.,** | |
| *Plaintiff*, | |
| *v.* | Civ. No. 13-cv-00734-RBW |
| **INTERNAL REVENUE SERVICE**, *et al*., | |
| *Defendants*. | |

### PLAINTIFF'S NOTICE OF APPEAL

Notice is hereby given this 18th day of December 2014, that the Plaintiff, True the Vote, Inc., appeals to the United States Court of Appeals for the District of Columbia from the Order of this Court entered on October 23, 2014 (Docket No. 102), and the Memorandum Opinion entered on October 23, 2014 (Docket No. 103).

Dated: December 18, 2014

Respectfully submitted,

   /s/   Noel H. Johnson

| | |
|---|---|
| Kaylan L. Phillips (D.C. 1110583) | Michael J. Lockerby (D.C. 502987) |
| Noel H. Johnson (Wisc. 1068004)* | Cleta Mitchell (D.C. 433386) |
| ACTRIGHT LEGAL FOUNDATION | FOLEY & LARDNER, LLP |
| 209 West Main Street | Washington Harbour |
| Plainfield, IN 46168 | 3000 K Street, N.W., Suite 600 |
| (317) 203-5599 (telephone) | Washington, DC 20007 |
| (888) 815-5641 (fax) | (202) 672-5300 (telephone) |
| kphillips@actrightlegal.org | (202) 672-5399 (fax) |
| njohnson@actrightlegal.org | mlockerby@foley.com |
| *Counsel for Plaintiff* | cmitchell@foley.com |
| | *Lead Counsel for Plaintiff* |

William E. Davis (D.C. 280057)
Mathew D. Gutierrez (Fla. 0094014)*
FOLEY & LARDNER, LLP
One Biscayne Tower
2 South Biscayne Boulevard
Suite 1900
Miami, FL 33131
(305) 482-8404 (telephone)
(305) 482-8600 (fax)
wdavis@foley.com
mgutierrez@foley.com
*Counsel for Plaintiff*

John C. Eastman (Cal. 193726)*
Center for Constitutional Jurisprudence
c/o Chapman University School of Law
One University Drive
Orange, CA 92866
(877) 855-3330 x2 (telephone)
(714) 844-4817 (fax)
jeastman@chapman.edu
*Counsel for Plaintiff*

*\*Pro Hac Vice Motions granted*

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 18, 2014, I caused the foregoing to be filed with the

United States District Court for the District of Columbia via the Court's CM/ECF system,

which will serve all registered users.

Dated: December 18, 2014      <u> /s/ Noel H. Johnson </u>
            Noel H. Johnson
            njohnson@actrightlegal.org
            *Counsel for Plaintiff*

## Certificate of Service

I hereby certify that I electronically filed the foregoing Joint Appendix with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system on December 7, 2015. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: December 7, 2015                       /s/  Noel H. Johnson
                                        *Counsel for Appellant*