# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 14, 2016          Decided August 5, 2016

No. 14-5316

TRUE THE VOTE, INC.,
APPELLANT

v.

INTERNAL REVENUE SERVICE, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:13-cv-00734)

———

*John C. Eastman* argued the cause for appellant. With him on the briefs were *Kaylan L. Phillips*, *Noel H. Johnson*, *Cleta Mitchell*, *Michael J. Lockerby*, *William E. Davis*, and *Mathew D. Gutierrez*.

*Judith A. Hagley*, Attorney, U.S. Department of Justice, argued the cause for appellees United States of America and Internal Revenue Service. With her on the brief were *Gilbert S. Rothenberg* and *Teresa E. McLaughlin*, Attorneys.

*Eric R. Nitz* argued the cause for Individual Defendant-Appellees. With him on the briefs were *Jeffrey A. Lamken*, *Brigida Benitez*, and *Catherine Cockerham*.

2

---

No. 15-5013

LINCHPINS OF LIBERTY, ET AL.,
APPELLANTS

v.

UNITED STATES OF AMERICA, ET AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:13-cv-00777)

---

*Carly F. Gammill* argued the cause for appellants.  With her on the briefs were *Jay Alan Sekulow*, *Stuart J. Roth*, *Jordan A. Sekulow*, *Abigail A. Southerland*, *Miles L. Terry*, *Andrew J. Ekonomou*, and *Julian A. Fortuna*.

*Judith A. Hagley*, Attorney, U.S. Department of Justice, argued the cause for appellees United States of America and Internal Revenue Service.  With her on the brief were *Gilbert S. Rothenberg* and *Teresa E. McLaughlin*, Attorneys.

*Brigida Benitez* argued the cause for Individual Defendant-Appellees.  With her on the brief were *Catherine Cockerham*, *Jeffrey A. Lamken*, and *Eric R. Nitz*.

Before: HENDERSON, *Circuit Judge*, and GINSBURG and SENTELLE, *Senior Circuit Judges*.

3

Opinion for the Court filed by *Senior Circuit Judge* SENTELLE.

SENTELLE, *Senior Circuit Judge*: Although these cases are not officially consolidated, they were separately argued before the same panel on the same day and are governed by the same legal principles on decision. We have therefore determined that a single opinion is sufficient for the disposition of both. Although there are differences in factual detail, those differences are immaterial to our ultimate decision on all issues, and therefore, all our statements of law hereinafter are applicable to both.

## I. BACKGROUND

Appellants appeal from judgments of the district court dismissing some of their claims under Rule 12(b)(6) for failure to state a claim for relief, and others under Rule 12(b)(1) for lack of jurisdiction, by reason of mootness. *See True the Vote, Inc. v. IRS*, 71 F. Supp. 3d 219 (D.D.C. 2014); *Linchpins of Liberty v. United States*, 71 F. Supp. 3d 236 (D.D.C. 2014). Each of the above-named appellants together with numerous co-plaintiffs in the *Linchpins of Liberty* litigation, filed applications with the Internal Revenue Service for recognition of tax exemption as charitable or educational organizations pursuant to 26 U.S.C. § 501(c)(3), (4). As to what happened thereafter, we construe the complaints in the light most favorable to the plaintiffs, *see Missel v. DHSS*, 760 F.3d 1, 4 (D.C. Cir. 2014), although there is very little factual dispute between the parties as to the conduct committed by the IRS.

Instead of processing these applications in the normal course of IRS business, as would have been the case with other taxpayers, the IRS selected out these applicants for more rigorous review on the basis of their names, which were in each

4

instance indicative of a conservative or anti-Administration orientation, as we will set out in more detail below, and as was admitted by the Department of Treasury in the 2013 report of the Treasury Inspector General for Tax Administration (TIGTA).

The appellants before us, plaintiffs below, are applicants who were afforded this unequal treatment. They brought the present actions against the IRS and several of its individual employees, seeking money damages by way of relief under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), and equitable relief by way of injunction and declaratory judgment. Additionally, the complaints alleged that the IRS invaded the plaintiffs' statutory rights by violating 26 U.S.C. § 6103, by conducting unauthorized inspection and/or disclosure of tax return information from their applications and the other information improperly obtained from them. The district court held that the *Bivens* action would not lie against the individual defendants or the Service, and granted a Rule 12(b)(6) motion for dismissal as to that relief. *See True the Vote*, 71 F. Supp. 3d at 229-32; *Linchpins of Liberty*, 71 F. Supp. 3d at 242-44. The district court also dismissed the claims for violation of § 6103 under Rule 12(b)(6) for failure to state a claim for relief. *See True the Vote*, 71 F. Supp. 3d at 232-35; *Linchpins of Liberty*, 71 F. Supp. 3d at 247-50.

After the initiation of the suits, the Internal Revenue Service took action to end some unconstitutional acts against at least a portion of the plaintiffs. Based on these actions, the district court dismissed the equitable claims as moot. *See True the Vote*, 71 F. Supp. 3d at 226-29; *Linchpins of Liberty*, 71 F. Supp. 3d at 244-47. *True the Vote* and *Linchpins of Liberty* were decided by the same district court judge on the same day and rely on the same reasoning. Going forward, we will only cite to the

5

*Linchpins of Liberty* decision.

We review the district court's Rule 12(b)(6) dismissals of the *Bivens* actions de novo, taking as true the allegations of the complaint. *See Layman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014). However, our review of the district court's Rule 12(b)(1) dismissals for mootness depends on "[t]he posture in which the motion[s] [were] presented to [the] trial court . . . ." *Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1992). When a district court relies either "on the complaint standing alone" or on "the complaint supplemented by undisputed facts evidenced in the record," our review is de novo. *Id.* "If, however, the trial court rests not only upon undisputed statements, but determines disputed factual issues, we will review its findings as we would any other district court's factual determinations: accepting them unless they are clearly erroneous." *Id.* (citation and internal quotation marks omitted).

Accordingly, we affirm the district court's decisions as to the *Bivens* actions and statutory claims, but hold that the equitable actions are not moot. Even if we accord deference to the district court, the government has not carried its heavy burden of showing mootness under the voluntary cessation doctrine. We therefore vacate and remand for further proceedings with respect to the equitable claims of the plaintiff-appellants.

## II. ANALYSIS

We once again consider the implications of the Internal Revenue Service affording unequal treatment in the processing of applications for tax exempt status by applicants whose names might suggest certain political orientations. *Cf. Z St. v. Koskinen*, 791 F.3d 24, 28 (D.C. Cir. 2015) (concerning allegations that the IRS had an Israel-special policy "delay[ing]

6

the processing of section 501(c)(3) applications from organizations whose views on Israel differ from the administration's"). This time, appellants allege that their applications for tax exempt status were selected out on the basis of an "IRS targeting scheme" that identified for enhanced scrutiny the applications of applicants with names associated with "conservative" causes, such as "Tea Party" and "patriot," and perhaps "liberty." According to the complaint, this enhanced examination involved, "among other things, a multi-tier review process, . . . harassing and unconstitutional questions and requests for information that often required applicants to disclose donor lists, communications with members, and internet passwords and usernames." *Linchpins of Liberty*, Pl.-Appellants' Br. at 4 (citing Second Am. Compl. at 32-56). Perhaps most tellingly, the Service sorted the "targeted" names of organizations to be subjected to the allegedly unconstitutional treatment through the use of a "Be-On-The-Lookout" list referred to as BOLO. Because their applications were subjected to extended delay and were not receiving the same processing as those of other organizations, and as they learned from other sources that the IRS might be employing improper and unconstitutional criteria, several applicants brought the present actions.

Also in May of 2013, the Department of the Treasury received what is referred to by the government as the "TIGTA" Report, for the Treasury Inspector General for Tax Administration. *See* J.A. in *Linchpins of Liberty*, at 87-140. That report, which we will often refer to as the Inspector General's Report, to avoid overburdening our opinion with acronyms, from Michael E. McKenney, Acting Deputy Inspector General for Audit, to the Acting Commissioner for Tax-Exempt and Government Entities Division of the Internal Revenue Service, bore the principal heading "Inappropriate Criteria Were Used to Identify Tax-Exempt Applications for

7

Review."

The Inspector General's Report was produced in response to requests by members of Congress resulting from what had become fairly high profile complaints against the apparently improper failure to normally process exemption applications by applicants like or including appellants. The district court disposed of the action in a judgment supported by a reported opinion, *Linchpins of Liberty v. United States*, 71 F. Supp. 3d 236 (D.D.C. 2014).

### A. The Bivens *Claims*

The court first took up the government's motion to dismiss the *Bivens* actions under Rule 12(b)(6). As to those claims, the district court rightly deemed itself bound by our decision in *Kim v. United States*, 632 F.3d 713 (D.C. Cir. 2011). As we had held in *Kim* that no action would lie against IRS employees in their individual capacities because "no *Bivens* remedy [is] available in light of the comprehensive remedial scheme set forth by the Internal Revenue Code," *Kim*, 632 F.3d at 717, the district court dismissed the present action as required by circuit precedent, *Linchpins of Liberty*, 71 F. Supp. 3d at 244. For this reason, as more fully set out in the district court's opinion, *see id.* at 241-44, we affirm the dismissal of the *Bivens* actions.

### B. The Claims Under 26 U.S.C. § 6103

As the district court viewed the statutory claims, the plaintiffs were attempting to turn their grievances for the discriminatory acquisition of information into a claim that the information was improperly "inspected" by one or more IRS employees who had no need to inspect it because the information was not material to their applications for tax exempt status. *See Linchpins of Liberty*, 71 F. Supp. 3d at 247. There

8

is no controlling appellate decision concerning the application of § 6103 to a comparable situation, perhaps in part because there is no factual history of such discriminatory acquisition of taxpayer information prior to the events giving rise to these cases and the *Z Street* decision, *supra*. However, there is one unpublished district court decision which, while obviously not controlling, is nonetheless instructive.

Both parties rely on the decision of the Southern District of Ohio in *NorCal Tea Party Patriots v. IRS*, No. 1:13-cv-341, 2014 WL 3547369, at *11-14 (S.D. Ohio July 17, 2014). Both parties are correct that the decision contains a careful analysis of the governing law, though they come to opposite conclusions as to its effects. In *NorCal*, the plaintiffs raised similar claims to those we consider today. As in the cases before us, the IRS moved to dismiss the statutory claims under Rule 12(b)(6). The *NorCal* court considered the relevant sections of the IRS Code, 26 U.S.C. §§ 6103, 7431, and noted correctly that "Section [6103] requires that tax 'returns and return information shall be confidential.'" 2014 WL 3547369, at *11.

The statute defines "return information" as including the following:

> a taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest,

9

fine, forfeiture, or other imposition, or offense . . . .

26 U.S.C. § 6103(b)(2)(A).  As the Ohio district court further noted, 26 U.S.C. § 7431 creates a private cause of action for violations of § 6103.  That section provides:

> If any officer or employee of the United States knowingly, or by reason of negligence, inspects or discloses any return or return information with respect to a taxpayer in violation of any provision of section 6103, such taxpayer may bring a civil action for damages against the United States in a district court of the United States.

26 U.S.C. § 7431(a)(1).

However, we further note, as did the Ohio district court, that §§ 6103 and 7431 provide exceptions.  Specifically, § 6103(h)(1) permits "inspection by or disclosure to officers and employees of the Department of the Treasury as official duties require such inspection or disclosure for tax administration purposes."  The term "tax administration" is defined broadly as "the administration, management, conduct, direction, and supervision of the execution and application of the internal revenue laws or related statutes (or equivalent laws and statutes of a State) and tax conventions to which the United States is a party . . . ."  *Id.* § 6103(b)(4).

The *NorCal* court denied the Rule 12(b)(6) motion, but did so noting:

> Plaintiff Groups will have to establish that the IRS officials who inspected or disclosed the return information did so knowing that the information was not necessary for tax administration purposes, regardless of whether the IRS officials who requested the information knew or believed it

10

was necessary for the § 501(c)(4) application.

*NorCal*, 2014 WL 3547369, at *13.

While the question may be a close one, review of the complaints in the district court in this case does not reveal allegations sufficient to support the statutory requirements which were set forth, we believe correctly, by the *NorCal* court. As the district court correctly noted, unlike in *NorCal*, the complaint in this case makes only conclusory allegations and "general averments" regarding the handling of tax return information.  *See Linchpins of Liberty*, 71 F. Supp. 3d at 248 n.18 (observing that "the plaintiffs admit that certain individual defendants were using tax return information 'to conduct official IRS business,'" and paragraph 296 of the complaint "does not allege that any of the defendants improperly inspected or disclosed *the plaintiffs'* tax return information . . ."). Further, "[b]ecause § 7431 represents a waiver of sovereign immunity, it must be 'strictly construed, in terms of its scope, in favor of the sovereign.'" *Snider v. United States*, 468 F.3d 500, 509 (8th Cir. 2006) (quoting *Lane v. Pena*, 518 U.S. 187, 192 (1996)).

Therefore, we affirm the dismissal of the section 6103 counts of the complaints by the district court.

### C.  The Other Equitable Claims

None of the above disposes of the other equitable claims of appellants for violation of their constitutional rights by the viewpoint based targeting of their applications by the IRS.  The district court concluded that those claims were moot, depriving it of jurisdiction, and therefore dismissed the claims pursuant to Rule 12(b)(1).  We disagree with this conclusion and reverse the district court's judgments on those claims.

11

As the district court rightly recognized, *see Linchpins of Liberty*, 71 F. Supp. 3d at 244, the courts of the United States, pursuant to Article III of the Constitution, have no jurisdiction to act unless there is "a case or controversy." *See, e.g.*, *Clarke v. United States*, 915 F.2d 699, 700-01 (D.C. Cir. 1990). The IRS has not disputed that this litigation began with a case or controversy. The government contends, however, and the district court agreed, that the case has become moot and therefore no longer comes within the jurisdiction of Article III courts. As the district court properly noted, "[e]ven where a case once posed 'a live controversy when filed, the [mootness] doctrine requires' the Court 'to refrain from deciding it if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future.'" 71 F. Supp. 3d at 244 (quoting *Clarke*, 915 F.2d at 701) (second alteration the district court's) (additional citations and internal quotation marks omitted).

Here the IRS contended, and the district court agreed, that plaintiffs' claims have become moot because the IRS has stopped using its admittedly improper discriminatory criteria and handling of applications by taxpayers with politically disfavored names. For a fuller understanding of the IRS's claim of mootness based on its putative voluntary cessation, we need to make a rather full examination of the Inspector General's Report.

### *1. The Inspector General's Report*

At the outset, we note that the Inspector General's Report was properly before the district court in its consideration of the motions to dismiss, and is properly before this court in our consideration of the appeal. In both actions, the plaintiffs attached and incorporated the full report with their complaints. The IRS has, obviously, taken no action to disavow or discredit

12

the report of investigation by its parent department.

On May 14, 2013, the Treasury Inspector General for Tax Administration issued the audit report styled "Inappropriate Criteria Were Used to Identify Tax-Exempt Applications for Review," and bearing the reference number: 2013-10-053 (citations to the report will be shown as "TIGTA").

The gist of the Inspector General's Report is clear from its name. The first sentence of the 25-page "Results of Review" states, "The Determinations Unit [of the IRS] developed and used inappropriate criteria to identify applications from organizations with the words Tea Party in their names." TIGTA at 5. Elucidating on that point, the audit determined that "according to the IRS, a Determinations Unit specialist was asked to search for applications with Tea Party, Patriots, or 9/12 in the organization's name as well as other 'political-sounding' names." *Id.* at 6.

Indeed, officials from the IRS function in charge of exempt organizations stated to the Inspector General that

in May 2010, the Determinations Unit began developing a spreadsheet that would become known as the "Be On the Look Out" listing (hereafter referred to as the BOLO listing), which included the emerging issue of Tea Party applications. In June 2010, the Determinations Unit began training its specialists on issues to be aware of, including Tea Party cases. By July 2010, Determinations Unit management stated that it had requested its specialists to be on the lookout for Tea Party applications.

*Id.* (citation omitted).

13

The report goes on to remind the IRS that its function is to help American taxpayers to "understand and meet their tax responsibilities and" to "apply[] the tax law with integrity and fairness to all." *Id.* In recognizing that the IRS's handling of exemption applications from persons of disfavored viewpoints utterly failed that mission, the report states, "the criteria developed by the Determinations Unit gives the appearance that the IRS is not impartial in conducting its mission. The criteria focused narrowly on the names and policy positions of organizations instead of tax-exempt laws and Treasury Regulations." *Id.* at 6-7.

Although the TIGTA reports that some change was made in the criteria in June of 2011, the report goes on to observe that by January 2012, "criteria again focused on the policy positions of organizations instead of tax-exempt laws and Treasury Regulations." *Id.* at 7. In the meantime, the employees using these improper criteria delayed, denied, and generally mishandled the applications of disfavored applicants. "As of December 17, 2012, many organizations had not received an approval or denial letter for more than two years after they submitted their applications. Some cases ha[d] been open during two election cycles (2010 and 2012)." *Id.* at 11.

The audit report is replete with details of discriminatory processing and delay. For example, "[t]he Determinations Unit sent requests for information that we later (in whole or in part) determined to be unnecessary for 98 (58 percent) of 170 organizations that received additional information request letters." *Id.* at 18.

The TIGTA includes specific examples, e.g.:

1.   The names of the donors, contributors, and grantors. If the donor, contributor, or grantor has run or will run for

14

a public office, identify the office.  If not, please
confirm by answering this question "No."

2.   The amounts of each of the donations, contributions,
and grants and the dates you received them.

3.   How did you use these donations, contributions, and
grants?  Provide the details.

*Id.* at 19.

The Inspector General went on to list "seven questions
identified as unnecessary by the [exempt organization]
function."

1   Requests the names of donors.

2   Requests a list of all issues that are important to the
organization and asks that the organization indicate its
position regarding such issues.

3   Requests 1) the roles and activities of the audience and
participants other than members in the activity and 2)
the type of conversations and discussions members and
participants had during the activity.

4   Asks whether the officer, director, *etc.*, has run or will
run for public office.

5   Requests the political affiliation of the officer, director,
speakers, candidates supported, *etc.*, or otherwise refers
to the relationship with identified political
party–related organizations.

15

6    Requests information regarding employment, other
     than for the organization, including hours worked.

7    Requests information regarding activities of another
     organization – not just the relationship of the other
     organization to the applicant.

*Id.* at 20.

### 2. Viewpoint Discrimination

To place in context our discussion of TIGTA's findings,
we recall that under the First Amendment, the government "has
no power to restrict expression because of its message, its ideas,
its subject matter, or its content." *Reed v. Town of Gilbert, Ariz.*,
135 S. Ct. 2218, 2226 (2015) (quoting *Police Dep't of Chicago
v. Mosley*, 408 U.S. 92, 95 (1972)). "Content-based laws—those
that target speech based on its communicative content—are
presumptively unconstitutional and may be justified only if the
government proves that they are narrowly tailored to serve
compelling state interests." *Reed*, 135 S. Ct. at 2226. A "more
blatant" and "egregious form of content discrimination" is
viewpoint discrimination, which occurs when a government
regulation "targets not subject matter, but particular views taken
by speakers on a subject . . . ." *Rosenberger v. Rector &
Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Viewpoint
discrimination is based on "the specific motivating ideology or
the opinion or perspective of the speaker[,]" *id.*, and, therefore,
"plainly offend[s]" the First Amendment, *First Nat'l Bank of
Boston v. Belloti*, 435 U.S. 765, 785-86 (1978).

Just last term, we stated directly that, "in administering
the tax code, the IRS may not discriminate on the basis of
viewpoint . . . ." *Z St.*, 791 F.3d at 30. We went on to say that
"to process exemption applications pursuant to different

16

standards and at different rates depending upon the viewpoint of the applicants" is "a blatant violation of the First Amendment." *Id.* at 32.   The tax code may not "discriminate invidiously . . . in such a way as to aim at the suppression of dangerous ideas." *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 548 (1983) (internal quotation marks and alteration omitted).

### 3. The Mootness Ruling

It being plain to the Inspector General, the district court, and this court that the IRS cannot defend its discriminatory conduct on the merits, the governing issue is now whether the controversy is moot.   The district court held that it was; we conclude that it is not.  The fundamental concept of mootness is quite straightforward.  As applied in the context of injunctive litigation, if there remains no conduct to be enjoined, then normally there is no relief that need be granted, the case or controversy has ceased, and the jurisdiction of the court has expired under Article III.   However, there is a difference between the controversy having gone away, and simply being in a restive stage.   This difference gives rise to the concept of "voluntary cessation."   That concept governs the case in which the defendant actor is not committing the controversial conduct at the moment of the litigation, but "the defendant is 'free to return to [its] old ways'—thereby subjecting the plaintiff to the same harm but, at the same time, avoiding judicial review." *Qassim v. Bush*, 466 F.3d 1073, 1075 (D.C. Cir. 2006) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953)) (additional citations omitted).  For a defendant to successfully establish mootness by reason of its voluntary cessation of the controversial conduct, the defendant must show that "(1) there is no reasonable expectation that the conduct will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Id.* at 1075 (quoting *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449,

17

459 (D.C. Cir. 1998)).    Both the district court and the
government acknowledge that the defendant has the burden of
establishing that these criteria have been met, and that it is a
"heavy burden." 71 F. Supp. 3d at 245;  Appellee United States
Br. in *Linchpins of Liberty*, at 13.

Here, voluntary cessation has never occurred.  The IRS
has admitted to the Inspector General, to the district court, and
to us that applications for exemption by some of appellant-
plaintiffs have never to this day been processed.  The IRS
proudly boasts that "no more than 'two' applications for
exemption remain pending with the IRS."  Appellee United
States Br. in *Linchpins of Liberty*, at 14.  Further, they claim,
"the vast majority of the plaintiffs lack a personal stake in the
outcome of the lawsuit . . . ." *Id.*  We would advise the IRS that
a heavy burden of establishing mootness is not carried by
proving that the case is nearly moot, or is moot as to a "vast
majority" of the parties.  Their heavy burden requires that they
establish cessation, not near cessation.

The IRS offers a rather puzzling explanation for why the
continued failure to afford proper processing to at least some of
the victim applicants should not prevent a finding of cessation.
That explanation is that the organizations whose applications
were still pending "were involved in 'litigation' with the Justice
Department . . . ." *Id.* at 27.  The Service's brief further
illuminates this point with a footnote explaining that "[u]nder
long-standing procedures, administrative action on an
application for exemption is ordinarily suspended if the
applicant files suit in court." *Id.* at 28 n.4.  It is not at all clear
why the IRS proposes that not ceasing becomes cessation if the
victim of the conduct is litigating against it.  The IRS position is
reminiscent of Catch-22 from the novel of the same name.
Under that "catch," World War II airmen were not required to
fly if they were mentally ill.  However, anyone who applied to

18

stop flying was evidencing rationality and therefore was not mentally ill. *See* Joseph Heller, *Catch-22* (1971). "You are entitled to an exemption from flying," the government said, "but you can't get it as long as you are asking for it."

Parallel to Joseph Heller's catch, the IRS is telling the applicants in these cases that "we have been violating your rights and not properly processing your applications. You are entitled to have your applications processed. But if you ask for that processing by way of a lawsuit, then you can't have it." We would advise the IRS: if you haven't ceased to violate the rights of the taxpayers, then there is no cessation. You have not carried your burden, be it heavy or light.

The IRS's only further attempt to justify the lack of cessation as to some of the applicants is to refer to its Catch-22 litigation rule as a "longstanding policy." To this we would advise the IRS: if you haven't ceased discriminatory conduct, the fact that you have been failing to cease it for a long time does not create cessation. You still have not carried your burden.

The IRS further calls our attention to a later follow-up report from the Treasury Inspector General for Tax Administration. The IRS argues, with support in the text of the document, that this report evidences further progress toward alleviation of the past discriminatory actions in the processing of the targeted applications. That second report, dated March 27, 2015, is not a part of the record before us. Indeed, it did not exist until over five months after the issuance of the district court opinion under review. While the IRS may be correct that we could consider this extra-record evidence by granting judicial notice to the official document, that does not in itself make the document ripe for consideration in our review. As noted, it is not part of the record. As further evident from the date of the

19

document and the date of the opinions under review, it was not before the district court.

As we noted above, a dismissal under Rule 12(b)(1), unlike a dismissal under Rule 12(b)(6), is not reviewed de novo in its entirety, but only as to legal conclusions. Where, as here, the jurisdictional question before the court is fact-dependent, the first step of the review is a clear-error review regarding the factual decision of the district court. It is hardly possible for this court to determine whether a clear error occurred based on evidence that the district court did not consider, and that indeed did not exist at the time of the decision. Aside from that rather obvious proposition, it is also true that judicially-noticed evidence, like any other evidence, is subject to a trial court's determination as to its weight, effect, and consistency with other evidence. That the evidence in question is documentary rather than testimonial does not change the standard of review. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985). The 2015 report may be noticeable, *see* Fed. R. Evid. 201(b), but its evidentiary use is not ripe. As we will be remanding this case for further proceedings, the government is free to offer the document in the district court.

Even if we assumed there was voluntary cessation, we would still conclude that the government has not carried its burden to establish mootness because it has not demonstrated that "(1) there is no reasonable expectation that the conduct will recur [or] (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Qassim*, 466 F.3d at 1075 (quoting *Motor & Equip. Mfrs. Ass'n*, 142 F.3d at 459). As to element 2, it is absurd to suggest that the effect of the IRS's unlawful conduct, which delayed the processing of appellant-plaintiffs' applications, has been eradicated when two of the appellant-plaintiffs' applications remain pending. Nor can the government satisfy element 1 in

20

light of the IRS's own language, which condemns it.  As the district court observed, the IRS relied upon its announcement that "[w]e have *suspended* the use of 'be-on-the-lookout,' or BOLO, lists in the application process for tax exempt status," to show "that there is no reasonable expectation that the alleged conduct will recur . . . ."  71 F. Supp. 3d at 245 (emphasis added).

The IRS's response to the Inspector General's Report further caused the Service to announce that it "specifically . . . has *suspended* the use of BOLO lists in the application process for tax-exempt status . . . ."  *Id.* (internal punctuation omitted) (emphasis added).  And most tellingly, the IRS announced that "[e]ffective immediately, the use of watch lists to identify cases or issues requiring heightened awareness is *suspended until further notice* . . . ."  *Id.* (emphasis added).

A violation of right that is "suspended until further notice" has not become the subject of voluntary cessation, with no reasonable expectation of resumption, so as to moot litigation against the violation of rights.  Rather, it has at most advised the victim of the violation – "you're alright for now, but there may be another shoe falling."

To this point, we, like the Inspector General, have focused on the BOLO segment of the targeting scheme.  We note that the complaints alleged extensive discriminatory conduct including "delayed processing . . . harassing, probing, and unconstitutional requests for additional information that . . . required applicants to disclose, among other things, donor lists, direct and indirect communications with members of legislative bodies, Internet passwords and user names, copies of social media and other Internet postings, and even the political and charitable activities of family members."  Linchpins Sec. Am. Compl. at ¶ 2.  While the Inspector General's Report references

21

many of these discriminatory actions, neither it nor anything else presented by the government meets the heavy burden of establishing that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Qassim*, 466 F.3d at 1075 (citation omitted). While a court's inquiry into possible mootness in response to a Rule 12(b)(1) violation has, as we have noted, a factual component, nonetheless the norm is that at the Rule 12 stage, the allegations of a complaint are taken as true, absent some reason for a rejection. In these cases, as the government has not carried its heavy burden of establishing mootness by voluntary cessation, we apply that normal presumption. The allegations of the complaint are quite sufficient to warrant a merits disposition based on adjudication of substantive evidence, not simply a dismissal at the pleadings stage.

Finally, although not addressed by the district court, the void-for-vagueness challenges raised by appellants in *Linchpins of Liberty*, to 26 C.F.R. § 1.501(c)(4)-1 and Revenue Procedure 86-43 are not moot for the same reasons as above—i.e, they continue to affect those plaintiff-organizations with pending applications and are amply supported by allegations in the complaint. *See* Linchpins Sec. Am. Comp. ¶¶ 298-308, 385-88, 399-401.

In short, the district court correctly identified the nature of this controversy and the nature of the government conduct subject to equitable relief. However, the court erred in concluding that the litigation over that conduct had been mooted by the government's putative voluntary cessation of the conduct.

22

### III.  CONCLUSION

For the reasons set forth above, we affirm the district court's dismissal of appellants' *Bivens* actions and statutory claims, but reverse the district court's dismissal of the actions for injunctive and declaratory relief and remand for further proceedings consistent with this opinion.

*So ordered.*